IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

**MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

---

Plaintiffs move the Court to enter a Temporary Restraining Order and a Preliminary Injunction. As grounds for this motion, they state:

**I. INTRODUCTION**

This action is a challenge to the constitutionality of C.R.S. § 18–12–115 (the "Waiting Period Act" or the "Act") enacted by the Colorado General Assembly and signed by Governor Polis on April 28, 2023. The Act is effective October 1, 2023. The Act makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to her until three days after the seller has initiated a background check, even if a clean background check comes back immediately. As such, it is unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment. HB23-

1

1219 is the bill that became the Waiting Period Act. A copy of HB23-1219 is attached as Exhibit A.

## II. FACTS

1.     Plaintiff RMGO is a nonprofit organization. Declaration of Taylor Rhodes, ¶ 3. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. *Id*. RMGO has members who reside in Colorado who desire to exercise their Second Amendment right to purchase a firearm without having their right burdened by arbitrary, unnecessary, burdensome and useless delays. *Id*. RMGO represents the interests of these members. *Id*. Specifically, RMGO represents the interests of those members who are affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. *Id*. It is these members' present intention and desire to lawfully purchase firearms for lawful purposes, including self-defense in their home, and they desire to do so without arbitrary, unnecessary, burdensome and useless delays. Rhodes Dec., ¶ 4. These members are precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by the Waiting Period Act. *Id*. The following three persons (whom, for the sake of their privacy, are identified by initials) have or will suffer the harm described above: B.R., J.H., and S.H. *Id*. RMGO asserts representational standing.

2.     Plaintiff Garica is an adult law-abiding citizen of Colorado. Declaration of Alicia Garcia, ¶ 2. She is affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. *Id*.

On October 1, 2023, Garcia went to Triple J Armory for the purpose of acquiring a new lever action .357/.38 Special Henry rife. Garcia Dec., ¶ 3. She filled out all of the necessary paperwork for her background check. *Id*. She passed the background check and paid the purchase price for her firearm. *Id*. At this point, title to the firearm transferred to her. *Id*. Garcia requested J.D. Murphree (the owner of Triple J Armory) to deliver the firearm to her. *Id*. Mr. Murphree refused to do so. *Id*. Garcia asked why Triple J Armory was holding onto her property and refusing to deliver it to her. *Id*. Mr. Murphree responded that he was required to do so because of the Waiting Period Act. *Id*. Garcia asked if Triple J Armory disputed that title to the firearm had passed to her, and Mr. Murphree assured her that it did not. Garcia Dec., ¶ 4. Garcia asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Act why she could not receive her property and take it with her. *Id*. Mr. Murphree said there was none. *Id*. The Waiting Period Act's requirements were the only reason he would not deliver the property to her. *Id*. Garcia is employed in the firearms industry and as such she purchases firearms frequently. Garcia Dec., ¶ 5. Accordingly, even if she receives delivery of her firearm described above while this action is pending, this matter will not be moot. *Id*. She will purchase another firearm in the near future and when she does so, she will be subjected to the same unconstitutional burden. *Id*.

3. Defendant Jared S. Polis is the Governor of the State of Colorado. This action is brought against him in his official capacity. The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall

3

take care that the laws be faithfully executed." Colo. Const. Art. IV, § 2. Colorado has long recognized the practice of naming the governor, in his official role as the state's chief executive, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008). The Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

4. Defendant is or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

### III. STANDARD FOR OBTAINING RELIEF

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The requirements for issuance of a TRO are essentially the same as those for a preliminary injunction order. *See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

### IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**A.     The Legal Framework of Second Amendment Challenges**

The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*. In *Bruen*, the Court set forth the following standard for resolving Second Amendment challenges: "We reiterate that the standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

**B.     The Plain Text Covers Plaintiffs' Conduct**

Plaintiffs desire to obtain possession of firearms they have purchased for lawful purposes (including defense of their homes). The Waiting Period Act prohibits Plaintiffs from doing so without being subjected to an arbitrary, unnecessary, burdensome and useless delay. The right to "keep" arms necessarily implies the right to possess arms one has acquired. After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. 570, 582 (2008). And "bear" means to "carry" (*id.* at 584),

5

and when a person has been deprived of possession of a firearm they have acquired, they cannot carry it.

The State has previously argued for the proposition that the Second Amendment's plain text does not extend to the acquisition of firearms. This is not correct for two reasons. First, the Waiting Period Act does not prevent anyone from "acquiring" an arm. It prevents them from obtaining possession of their firearm that they have already acquired. For example, as described above, the seller did not dispute that title to Garia's firearm had passed to her. He was just unable to deliver it to her because of the prohibitions of the Act. Secondly, even if the Act prohibited acquisition of an arm (as opposed to possessing an arm that has already been acquired), the text would nevertheless apply. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to keep and bear arms obviously implies the right to acquire them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."), *quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).

The State has also argued that Plaintiffs' Second Amendment rights have not been infringed because the law does not apply to *all* arms transfers. The point of the State's argument seems to be that unless it completely obliterates a person's Second Amendment rights, it has not even infringed on those rights. This is not correct. *Bruen* did not require a law to completely obliterate the Second Amendment right to

6

implicate the text. Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *Bruen*, 142 S Ct. at 2134. Thus, even though New York did not completely bar the practice but instead subjected it to a discretionary licensing regime, the text was nevertheless implicated. In this case, the Waiting Period Act does not apply to all avenues for the acquisition of firearms, only the most important one – purchase from a commercial gun seller. This burden on Plaintiffs' right to keep and bear arms certainly implicates the text of the Second Amendment. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another).

In summary, the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing bearable arms. Accordingly, "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen's* step one. The Waiting Period Act is presumptively unconstitutional.

### C. The Act is Not Consistent with the Nation's History and Tradition of Firearms Regulation

The State may attempt to rebut the presumption of unconstitutionality by demonstrating that the Act is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden. *See* David B. Kopel, Complete Colorado, *Kopel: Colorado bill forcing delay of firearms acquisition on shaky constitutional ground* (available at https://bit.ly/43bEKvD, last visited October 1, 2023). Professor Kopel (whose work was cited favorably in *Bruen*) performed exhaustive historical research, which led him to conclude that there is no

7

historical tradition supporting firearm purchase waiting periods. Specifically, Professor Kopel found that there were no waiting periods to acquire firearms or other arms anywhere in the United States before 1900. *Id.*, § B. The first waiting period law was enacted in California in 1923, a one-day wait for handgun sales. *Id.*, *citing* §§ 10–11, 1923 Cal. Stat. at 701. A minority of other states enacted handgun waiting period laws in the 1920s and 1930s. *Id.* Under *Bruen*, laws from the 1920s are far too late to offer any insight on the original public meaning of the Second Amendment. *Bruen,* 142 S. Ct. 2154, n. 28 ("As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. In *Heller*, D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the social problem D.C. identified, i.e. handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of the Founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

The State has identified impulsive gun violence as the problem it seeks to address. *See* Sec. 1(2)(a) of HB23-1219. But the problem of impulsive gun violence dates from the invention of guns, and the Founders themselves could have adopted

8

regulations to confront this problem. Thus, the Waiting Period Act addresses a general societal problem that has persisted since long before the 18th century. The fact that there is a complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the Waiting Period Act is "inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

The State has nevertheless argued that even though there were no waiting period laws in the Founding era, the Act is analogous to historical regulations relating to intoxicated persons. *Bruen* points to two metrics that are important in determining whether a historical regulation is analogous to a challenged regulation. Those are the "how and why of the regulations." *Id.*, 142 S. Ct. at 2133. The State's reliance on regulations of intoxicated person manifestly fails the "why" metric. Regulations of intoxicated persons are justified because those persons are obviously a danger to themselves and to others. That is the "why" justifying the regulations. But the Waiting Period Act temporarily deprives everyone of their arms without any inquiry, much resolution, of the question of whether a particular person poses a threat to anyone. Indeed, every person to whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks. Thus, regulations of intoxicated persons are of no relevance in this case.

In *United States v. Connelly*, 2023 WL 2806324 (W.D. Tex. 2023), the plaintiffs challenged a statute that prohibited users of intoxicants from possessing firearms (even when they were not actually intoxicated). The court held the law

9

violated the plaintiffs' Second Amendment rights. In doing so, the court rejected many of the proposed analogues advanced the State. The court held the laws were not analogous because the historical laws prevented individuals from using firearms while actively intoxicated, while the challenged statute prevented users of intoxicants from possessing firearms altogether. *Id.*, *7. The court held that prohibiting someone who has used drugs in the last year from keeping arms for self-defense is not analogous to preventing people from shooting their guns while intoxicated. *Id. A fortiori*, a law that prevents law-abiding citizens who are not even suspected of having done nothing wrong from possessing the arms they have acquired is not analogous to a law that bans people from shooting guns while intoxicated.

     The State has argued that the intoxicated person laws are analogous to the Waiting Period Act because the statute prevents impulsive firearms violence by "someone not thinking clearly." If the Act were limited to firearm purchasers for whom there was some reason to believe they might not be thinking clearly, the State might have a point. But it is not. Instead, with respect to the overwhelming number of law-abiding citizens affected by the Act, there will be no reason to think they are impaired at all. Thus, a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone, including a teetotaler who has never had a drink in her life. The laws identified by the State banned selling arms to obviously intoxicated persons. If the Waiting Period Act imposed a waiting period on sales to obviously intoxicated persons, it would be analogous to

those historical laws. It does not, and for that reason it is not analogous to the historical laws identified by the state.

### D. Interest Balancing is Not Appropriate in the Second Amendment Context

The State has previously pointed to the fact that, in the Colorado legislature's opinion, waiting periods for firearm purchases promote the important governmental interest of public safety. In other words, the Colorado legislature believes the means it has chosen (an arbitrary waiting period for the acquisition of firearms by law-abiding citizens) promotes an important end (public safety). This means-end argument is irrelevant to the resolution of Plaintiffs' Second Amendment challenge. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022) (repeatedly and emphatically rejecting means-end analysis in the Second Amendment context).

### E. The Act Is Not a Regulation of Commercial Sales

The State has argued that the Waiting Period Act is a "presumptively lawful" regulation of commercial sales under *Heller*. This is not correct. First, as this Court has recently held, the State has misunderstood *Heller*. "[T]he Court disagrees with the Governor's reading of *Heller* as exempting certain types of regulations at the first step of the *Bruen* test. *Bruen* does not suggest that a different test applies to certain categories of laws or regulations." *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *13 (D. Colo. Aug. 7, 2023). "Rather, *Bruen* is clear that the government must justify the constitutionality of *any law* regulating conduct covered by the plain text of the Second Amendment." *Id*. (emphasis added). Second, as in

11

*RMGO*, the State will not be able to show that the Act falls into the category of commercial regulations described by *Heller* in the first place. "Regulations of the commercial sale of arms have been described as 'condition[s] or qualification[s]' that 'affect[ ] only those who regularly sell firearms.' RMGO, at \*14, (*quoting United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). The Waiting Period Act does not impose obligations on sellers as a regulation of commercial activity. Rather, the General Assembly specifically stated that the Act is directed at purchasers, and Act imposes duties on sellers not as a means of regulating their commercial activity but as a means of regulating *purchasers*. In the legislative findings section of HB23-1219, the General Assembly declared that the purpose of the Act was to "[delay] immediate access to firearms by establishing a waiting period for receipt of firearms [which] can help prevent impulsive acts of firearm violence, including homicides and suicides."[1] The legislature was not concerned about firearms violence by firearm sellers.[2] The purpose of the Act is to deprive a purchaser of possession of her property during the three-day waiting period.

### F.  *Silvester* Has Been Abrogated by *Bruen*

The State has cited *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), for the proposition that waiting periods are constitutional under the Second Amendment, even though it admitted that *Silvester's* central holding was implicitly abrogated by *Bruen*. *Silvester* assumed that the waiting period implicated the text of the Second Amendment. *Id.*, 826 F.3d at 826-27. But it nevertheless upheld the law under

---

[1] See the HB-1219, 2. A copy is attached as Exhibit A.
[2] After all, it required sellers to maintain possession of the arms during the waiting period.

intermediate scrutiny because it believed the California legislature's policy objectives were reasonable. *Id.* at 829. The Court never attempted to ground its decision in the Nation's historical tradition of firearms regulation. This is exactly the sort of analysis that *Bruen* repeatedly and emphatically rejected.

### G. The Act Applies *only* to Law-Abiding Citizens

The Second Amendment "elevates above all other interests" the right of law-abiding citizens to use arms for self-defense. *Bruen*, 142 S. Ct. at 2131. Because of this, the Act is particularly suspect because, by definition, it burdens the rights of *only* law-abiding citizens. The law states that a firearms seller may not deliver an arm to a buyer until three days after the buyer has passed a background check. C.R.S. § 18-12-115(1)(a). In other words, the waiting period applies only after the buyer has already proved they are a law-abiding citizen. Thus, the Act imposes a particular burden on Second Amendment rights.

### H. Practical Impediments to Firearm Delivery Are Not the Same as Legal Impediments

The State has previously cited *Silvester's* observation that in colonial days practical transportation issues sometimes imposed delays on the delivery of firearms. The point of this observation is unclear. As *Silvester* itself noted, these delays were not caused by government regulations. 843 F.3d at 827. Thus, such practical delays were not analogous to HB23-1219.

### I. Conclusion

In summary, Plaintiffs have met their burden under *Bruen's* "plain text" step. The plain text of the Second Amendment covers their conduct (i.e., acquiring arms

13

for lawful purposes). The Waiting Period Act burdens Plaintiff's rights under the plain text and is therefore presumptively unconstitutional. The State cannot carry its burden under *Bruen's* "history and tradition" step, because there is no 18th-century (or even 19th-century) history or tradition of forcing people who are not even suspected of any wrongdoing to wait to exercise their right to possess arms they have acquired. Accordingly, the State will not be able to rebut the presumption of unconstitutionality, and Plaintiffs will prevail on the merits.

## V. THE REMAINING FACTORS FAVOR ENTRY OF INJUNCTIVE RELIEF

### A.   Plaintiffs Have Suffered Irreparable Harm

Plaintiffs have established that they will prevail on the merits of their constitutional claim. Violation of constitutional rights per se constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). Recently, the Ninth Circuit applied the *Elrod* principle in the Second Amendment context. *Baird v. Bonta,* 2023 WL 5763345, at *3 (9th Cir. Sept. 7, 2023). In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id.*, at *9. Moreover, such a likelihood, "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id*. *See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context); and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no

14

further showing of irreparable injury."); *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

### B. The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief

Finally, the balance of harms and public interest factors[3] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

---

[3] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

15

Defendants may argue the Waiting Period Act furthers an important governmental interest. But even if the Act did further an important policy goal, that fact would be irrelevant under *Bruen*. Indeed, the government's argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. 2126. *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation. Moreover, "[w]hile the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

**IV.   A Bond is not Necessary**

Courts in the Tenth Circuit have wide discretion under Rule 65(c) in determining whether to require security and may, therefore, impose no bond requirement. *New Mexico Cattle Growers' Ass'n v. United States Forest Serv.*, 2023

16

WL 2185698, at *3 (D.N.M. Feb. 22, 2023) (internal citations and quotation marks omitted). A bond is unnecessary in a case that seeks to enforce a constitutional right against the government. *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *20 (D. Colo. Aug. 7, 2023). Therefore, Plaintiffs respectfully request that no bond requirement be imposed.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court to enter a temporary restraining order and an order preliminary enjoining enforcement of the Waiting Period Act.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

## CERTIFICATE OF NOTICE TO THE OFFICE OF THE ATTORNEY GENERAL

On October 1, 2023, undersigned counsel emailed a copy of the Complaint and this motion to the following members of the Attorney General's Second Amendment team:

Leeann Morrill, First Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
Emily B. Buckley, Senior Assistant Attorney General
Michael Kotlarczyk, Senior Assistant Attorney General
Peter G. Baumann, Senior Assistant Attorney General
Matthew J. Worthington, Assistant Attorney General
Daniel R. Magalotti, Assistant Attorney General Fellow

at the following email addresses:

17

leeann.morrill@coag.gov
grant.sullivan@coag.gov;
emily.buckley@coag.gov
mike.kotlarczyk@coag.gov;
peter.baumann@coag.gov
matt.worthington@coag.gov
daniel.magalotti@coag.gov

/s/ Barry K. Arrington
_____
Barry K. Arrington

18