IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

**THE GOVERNOR'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION [DOC. 2]**

      More Coloradans die from firearms than from car crashes or opioid overdoses. Some of those deaths, both by homicide and suicide, are caused by individuals going out and purchasing a gun to immediately use in a moment of passion. To reduce these avoidable deaths, Colorado enacted a three-day waiting period between purchasing and delivery of a commercially sold firearm. A study has found that such waiting periods can reduce firearm homicides and suicides between 7 and 17 percent. In Colorado, this translates to saving over a hundred lives every year.

      Plaintiffs seek to preliminarily enjoin this law. But they cannot meet their burden to justify this extraordinary remedy. The plain text of the Second Amendment covers the possession ("keep") and carrying ("bear") of arms. A waiting period affects neither right. Plaintiffs seek to read an implied right-to-acquire firearms on demand into the Second Amendment, but the Supreme Court has expressly limited the Amendment's scope to its plain text and that text has never been understood to include an immediate right to acquire. The Court has also clarified that

the Second Amendment does not preclude governments from enacting laws in areas they have historically regulated, including commercial sales. And even if Colorado's waiting period law impacted Second Amendment interests, laws aimed at preventing impulsive use of firearms to protect public safety are nothing new in our nation's history and so are consistent with the Amendment. Plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

### A.   HB 23-1219.

On April 28, 2023, the Governor signed House Bill 23-1219 into law. *See* Ex. 1. The Act makes it unlawful for any person who sells a firearm to deliver it for three days or until the required background checks are complete, whichever is later. *See id.* § 2 (codified at Colo. Rev. Stat. § 18-12-115).[1] A seller who violates the waiting period commits a civil infraction that carries a fine but no imprisonment. *See id.* The Act does not regulate purchasers. There are exceptions to the waiting period, including for firearm transfers that do not require a background check. *See id.* This includes, among other things, gifts between immediate family members and certain temporary transfers of firearms. *See* Colo. Rev. Stat. § 18-12-112(6). The Act took effect on October 1, 2023. Ex. 1, § 3.

In enacting the law, the Colorado General Assembly found that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." *Id.* § 1(2)(a). The General

---

[1] Plaintiffs erroneously state that under the Act, "a firearms seller may not deliver an arm to a buyer until three days after the buyer has *passed* a background check." Doc. 2 at 13 (emphasis added). The three-day period is triggered when the seller initiates the background check. § 18-12-115(1)(a)(I).

2

Assembly recognized that Colorado has recently seen peaks in its firearm-related homicides and that Colorado ranks seventh nationally in terms of suicide by firearm. *Id.* § 1(1)(c), (d). The Act cites a study finding that mandatory waiting periods have led to a 7 – 11% reduction in firearm-related suicides and a 17% reduction in firearm homicides. *Id.* § 1(1)(f); *see also* Ex. 2 (Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 46 Proc. of the Nat'l Acad. of Sci. 114 (2017)).

By passing HB 23-1219, Colorado joined 11 other states that require waiting periods for commercial firearms sales. Colorado's three-day waiting period is the shortest of any state that has a waiting period. Florida, Illinois, and Vermont also have three-day waiting periods. *See* Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); Vt. Stat. Ann. tit. 13, § 4019a. Several states have longer waiting periods. *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles); Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns).

   **B.**   **Procedural background.**

Plaintiffs Alicia Garcia and Rocky Mountain Gun Owners filed a separate, prior lawsuit on the day the Act was signed. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-1076-PAB-NRN. They moved for a preliminary injunction on June 7, 2023. Chief Judge Brimmer denied their motion for preliminary injunction on August 7. *See id.*, 2023 WL 5017257 (D. Colo. Aug. 7, 2023). The Court concluded that neither plaintiff had shown they possessed "standing to move

to enjoin HB 23-1219 before it is enforced" because they had neither a present injury nor a credible threat of future enforcement since the law only proscribes the conduct of sellers, not purchasers. *Id.* at *5. Plaintiffs voluntarily dismissed their complaint a few days later.

On October 1, the day the law went into effect, Plaintiffs refiled their suit and simultaneously moved for a temporary restraining order and preliminary injunction. *See* Doc. Nos. 1 & 2. The Court denied their request for an ex parte temporary restraining order and set the matter for a preliminary injunction hearing. Doc. No. 11.[2]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" granted only where a plaintiff establishes a "clear and unequivocal" right to relief. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). To meet its burden, a plaintiff must establish (1) a substantial likelihood of success on the merits, (2) irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Free the Nipple-Ft. Collins v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019). The last two factors merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

---

[2] The Governor, sued here in his official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

"Typically, a preliminary injunction serves the limited purpose of preserving the status quo ante in order to prevent irreparable harm until a court can make a final decision on the merits." *Lopez v. Griswold*, No. 22-cv-00247-JLK, 2022 WL 715122, at *3 (D. Colo. Mar. 10, 2022) (footnote omitted). To that end, "injunctions that disrupt the status quo are disfavored and must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Beltronics USA*, 562 F.3d at 1070-71 (quotations omitted). Here, because Plaintiffs seek to enjoin a law that currently applies throughout Colorado, they seek a disfavored injunction that would disrupt the status quo. Accordingly, Plaintiffs "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

**ARGUMENT**

**I.     Plaintiffs cannot show a likelihood of success on the merits under *Bruen*'s two-step approach.**

   **A.     The framework from *Heller, McDonald*, and *Bruen*.**

In 2008, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But "[o]f course, the right [is] not unlimited." *Id.* "[I]ndividual self-defense is 'the central component' of the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court acknowledged that it should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

5

commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.

Last year, the Court established a two-step framework to resolve Second Amendment challenges in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). At the first step, the Court considers whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. If it does, the Second Amendment "presumptively protects that conduct." *Id.* The burden then falls on the government at the second step to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Three justices concurred specifically in *Bruen* to emphasize the continuing validity of the presumptively lawful category of regulatory measures, including "laws imposing conditions and qualifications on the commercial sale of arms." *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27); *see also id.* at 2157 (Alito, J., concurring) (*Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (citation omitted). The Tenth Circuit recently affirmed that *Bruen* did not implicitly overturn the presumptively lawful category and that presumptively lawful regulations are valid without analyzing the historical tradition of firearm regulation. *Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (affirming law barring felons from possessing firearms).

**B.    The Second Amendment's plain text does not cover Colorado's waiting period law.**

Plaintiffs are unlikely to succeed on the merits because their claim fails at *Bruen* step one, for two independent reasons. First, because the law regulates only sales of firearms, it is a

6

commercial regulation of firearms, a category of regulation that a majority of the Supreme Court and the Tenth Circuit have recognized is presumptively lawful. Second, Plaintiffs' claims concern their ability to acquire guns without delay, which falls outside the scope of the Second Amendment's plain text.

1. **The Act is "presumptively lawful" because it regulates "the commercial sale of arms."**

Plaintiffs' challenge fails at *Bruen*'s first step because, as a regulation on commercial firearm sales, the Act is a "presumptively lawful" firearm regulation. *Heller*, 554 U.S. at 627 n. 26. "*Bruen*, *McDonald*, and *Heller* preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms.'" *United States v. Marique*, --- F. Supp. 3d ---, 2022 WL 17822443, at *2 (D. Md. 2022) (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)). This "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession." *Id.* (quoting *United States v. Price*, No. 2:22-cr-00097, 2022 WL 6968457, at *2 (S.D. W. Va., Oct. 12, 2022)); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("the natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted").

The Act does not regulate Plaintiff Garcia's conduct or any other firearm owner's conduct. *See Rocky Mountain Gun Owners*, 2023 WL 5017257, at *4 ("Ms. Garcia does not intend to sell a firearm. Plaintiffs make no claim that Ms. Garcia could be prosecuted under" the Act) (citation omitted). Instead, the Act makes it a civil infraction for a firearms *seller* to deliver a firearm before the end of the waiting period. Colo. Rev. Stat. § 18-12-115(1). But it does not regulate the possession of a firearms owner. In a pre-*Bruen* challenge to California's ten-day

7

waiting period, one Ninth Circuit judge found that this issue was dispositive: "As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (Thomas, C.J., concurring). Chief Judge Thomas noted that "[o]n its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun." *Id.* at 830.[3] The same is true here.

Further establishing that the Act regulates commercial sales, and does not infringe on Plaintiffs' rights, it exempts non-commercial transactions from the waiting period. The law applies only to those who "sell[] a firearm." Colo. Rev. Stat. § 18-12-115(1)(a). It does not apply to anyone who doesn't sell a firearm. It also expressly exempts a "firearm transfer for which a background check is not required pursuant to state or federal law," *id.* (§ 18-12-115(2)(c)), which includes:

- A bona fide gift between immediate family members (§ 18-12-112(6)(b));
- An intestate transfer or transfer through a will (§ 18-12-112(6)(c));
- A temporary transfer in the transferee's home if needed for self-protection (§ 18-12-112(6)(d));
- A temporary transfer while hunting (§ 18-12-112(6)(e)(III));
- A temporary transfer of up to 72 hours (§ 18-12-112(6)(h)).

---

[3] The Ninth Circuit panel upheld California's waiting period law under the intermediate scrutiny standard courts applied before *Bruen*, after "assum[ing], without deciding, that the regulation . . . is not the type of regulation that must be considered presumptively valid." *Id.* at 826-27.

Plaintiffs argue that it is not a commercial regulation because "the Act is directed at purchasers," Doc. 2 at 12, but this is wrong for two reasons. First, this is an incorrect reading of the Act. By its plain text, the Act only regulates sellers. Colo. Rev. Stat. § 18-12-115(1)(a). Second, even under Plaintiffs' reading of the law, the Act is a commercial regulation because it regulates *purchasers*. Not all acquirers of guns—and certainly not all owners of guns—acquire their firearms through a purchase. Only those who do are affected by the Act. The Act thus does not implicate an individual's right to keep and bear arms and is instead a presumptively lawful "condition[] and qualification[] on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

Finally, Plaintiffs argue that *Bruen* abrogated the "presumptively lawful" category of firearms regulations. *See* Doc. 2 at 11-12. Not so. As the Tenth Circuit recently recognized, "six of the nine Justices pointed out that *Bruen* was not casting any doubt" on the presumptively lawful category. *Vincent*, 80 F.4th at 1201.[4] The Tenth Circuit in *Vincent* thus upheld the federal ban on felons' possession of firearms based on its prior precedent and the continued validity of *Heller*'s presumptively lawful category, without requiring the government to make any showing of historical analogues. *See id.* at 1202. And just as felon-in-possession bans remain presumptively lawful, so, too, does regulation of commercial activity like HB 23-1219.

---

[4] The Tenth Circuit's opinion in *Vincent* reaffirming the presumptively lawful category postdates the district court order Plaintiffs cited that calls that category into question. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-1077-PAB, 2023 WL 5017253, at *13 (D. Colo. Aug. 7, 2023).

> **2. Colorado's waiting period law does not implicate the plain text of the Second Amendment because it does not affect Plaintiffs' rights to "keep and bear Arms."**

HB 23-1219 is a regulation on the commercial sales of firearms that does not implicate the plain text of the Second Amendment. Plaintiffs have not cited any court that has held the Second Amendment's right "to keep and bear Arms" covers a plaintiff's desire for on-demand firearm acquisition. Nor has the Supreme Court so held. *Heller* held the Second Amendment was understood to guarantee a right "to keep and bear Arms" unconnected with militia service based on the historical understanding of those terms. 554 U.S. at 581. *Bruen* held the Second Amendment prohibits laws requiring gun owners to demonstrate a special need to obtain a license to carry a firearm in public. 142 S. Ct. at 2135. Notably, *Bruen* clarified that "shall-issue" licensing regimes, including those that require background checks and firearm safety courses that inevitably cause some delay, were constitutional absent some evidence the statute was being put to "abusive ends" to "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. HB 23-1219's waiting period is now part of Colorado's "shall-issue" regime enacted to legitimately reduce deaths caused by heat-of-the-moment firearm purchases. *See* Ex. 1, § 1(2)(a).

Nor have Plaintiffs separately established that the Second Amendment's text protects a right to on-demand gun acquisition. The Act does not plausibly infringe on Plaintiffs' right to "bear Arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 142 S. Ct. at 2134–35 (holding the word "'bear' naturally encompasses public carry"). The Act plainly doesn't affect this right.

Plaintiffs primarily argue that the Act infringes their right to "keep Arms." *See* Doc. 2 at 5-6. But that right is focused on possession: historically, "'[k]eep arms' was simply a common

way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from keeping handguns in their homes, the Act does not make possession of any firearm illegal. No Coloradans will be deprived of their firearms by the Act. It places no limits or regulations on the firearms that are kept by an individual. Instead, it merely delays delivery of firearms to reduce firearm-related suicides and crimes of passion.

Plaintiffs have not met their burden to show the words "to keep and bear arms" were originally understood to guarantee a right to on demand firearm acquisition, for three reasons. *See Heller*, at 576–77 (courts give words their "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation."); *see also id.* at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). First, Plaintiffs have presented no historical analysis or evidence demonstrating that the words "to keep and bear arms" were publicly understood to guarantee a right to on-demand gun purchases. Having failed to establish that the Amendment was originally so understood, Plaintiffs would instead turn *Bruen* on its head by requiring the State to show a historical restriction on the right at *Bruen*'s second step before they have even shown the right ever existed.

Second, there was no understanding at the time of the founding or Reconstruction that the Second Amendment guaranteed a right to immediately acquire commercially sold firearms. As Professor Robert Spitzer notes:

> No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. . . . When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.

Ex. 3 at 4-5; *accord Silvester*, 843 F.3d at 827 ("There is . . . nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time."). In other words, "[t]hough delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring).

Additionally, many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. *See* Ex. 3 at 16-17 (at least 29 states had licensing requirements for weapons ownership; at least 26 states had licensing requirements for firearms discharging). And "licensing by its nature thwarts any ability to acquire or use firearms on demand." *Id.* at 16. So even if the Second Amendment protects some right to acquire firearms, it has never protected a right to acquire firearms without delay. Plaintiffs argue that because the waiting period applies after a firearms purchase is made, it interferes with their possession of firearms. Doc. 2 at 5-6. But because the right to keep arms has never included the right to immediately acquire possession of new firearms, Plaintiffs have failed to show that the Act infringes on any right historically understood to be covered by the Second Amendment

Third, Plaintiffs fail to meet their burden to demonstrate their conduct is covered by the "plain text" of the Act. Instead, they assert that "[t]he right to 'keep' arms necessarily *implies* the right to possess arms one has acquired." Doc. 2 at 5. (emphasis added).  However, a right to possess something (to "keep" it) is not the same as the right to acquire it, let alone the right to acquire it without delay. *See, e.g.*, *United States v. 12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 123 (1973) (right to possess obscene materials did not extend to right to import those same

12

materials, even when sought only for personal possession). A delay in exercising a right is therefore not an unconstitutional infringement of that right. To the contrary, "[t]he Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade." *Silvester*, 843 F.3d at 832 (Thomas, C.J., concurring).

Moreover, Plaintiffs' implied-rights argument is contrary to *Bruen* and *Heller*. The Court was clear: courts must determine whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added). Plaintiffs' focus on implied rights necessarily disregards the actual text of the Second Amendment and its scope as revealed by historical understandings. Nowhere in the Court's Second Amendment jurisprudence has it sanctioned such a disregard for the Amendment's plain text or the creation of implied rights. *See, e.g.*, *Bruen*, 142 S. Ct. at 2127 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language.") (quoting *Heller*, 554 U.S. at 576-77). Accordingly, Plaintiffs' argument that the Second Amendment "implicitly includes the right to acquire" firearms "is quite-clearly not a 'plain text' analysis, required under *Bruen*." *See Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022). Here, by labeling the so-called "right to acquire" firearms an "implie[d] right," Plaintiffs concede that the right is not found in the plain text of the Second Amendment. This dooms their claim under *Bruen*.

      **C.**    **Even if the Act implicated Plaintiffs' Second Amendment interests, it is consistent with the Nation's historical tradition of firearm regulation and so is constitutional.**

Because "the plain text of the Second Amendment does not cover" the waiting period on sellers imposed by the Act, "the government need not provide historical evidence that the regulation is consistent with the Nation's history of firearms regulation." *Tilotta*, 2022 WL 3924282, at *6. If, however, the Court proceeds to the second step of *Bruen*, Plaintiffs are not substantially likely to succeed on their challenge because Colorado's waiting period law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

To meet its burden at this stage, the government does not need to identify a historic law that is a "dead ringer." *Id*. at 2133. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Instead, the Governor must demonstrate only that the Act has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

The United States has a long history of firearms regulation targeted at "prevent[ing] impulsive acts of firearm violence," the focus of Colorado's waiting period law. Ex. 1, § 1(2)(a). Specifically, States have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence. As far back as 1655, Virginia made it an offense to "shoot any guns at drinking." Ex. 6 (1655 Va. Acts 401, Acts of Mar. 10, 1655, Act XII). Much of the firearms regulation of the Revolutionary era focused on militias, and states frequently imposed limitations on the availability of alcohol near armed militiamen to avoid impulsive violence by armed men. *See, e.g.*, *id.* (An Act for Establishing a

14

Militia in this Government (Del., 1756) (barring officers from holding company meetings within "half a mile of any Inn or Tavern")); *id.* (An Act for Regulating the Militia of the Province of Maryland (Md. Gen. Assembly, L.H.J. Liber No. 48, May 22, 1756) (barring the sale of liquor near militia training grounds)).

In the 19th century, some laws barred the sales of firearms to intoxicated persons. *See id.* (1878 Gen. Laws Miss. 175 ("[I]t shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any [concealable] weapon . . . , or any pistol cartridge.")). Other jurisdictions went even farther and banned not just the sale but the carrying of firearms while intoxicated, directly implicating the right to "bear arms." *See, e.g.*, *id.* (2 Gen. Stats. of Kan. 353 (1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found within the limits of this state carrying on his person a pistol, bowie knife, dirk, or other deadly weapon, shall be subject to arrest[.]")); *id.*, (1883 Mo. Laws 76 (making it a criminal offense "[i]f any person . . . shall carry concealed any kind of [firearm] upon or about his person when intoxicated or under the influence of intoxicating drinks")). Notably, the Kansas law was passed in 1868, the same year the Fourteenth Amendment was ratified. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring). "The temporal connection between this prohibition on armed intoxication and the Fourteenth Amendment's ratification is strong evidence that the Second Amendment, particularly as incorporated against the states, was not originally understood to preclude states from criminalizing armed intoxication." *Id.*

In considering these historic analogues, the Court should look at "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at

15

2133. The "why" for these laws targeting arms and intoxication are aimed at the same evil sought to be avoided by waiting period laws—"that the intoxicated would be much more likely to act rashly, impulsively and with diminished judgment—i.e., in the heat of the moment. These purposes mimic the purpose of modern waiting period laws." Ex. 3 at 15. As the Act states, "establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence." Ex. 1, § 1(2)(a). And the "how" of these laws are either the same as waiting period laws—targeting sales of such arms—or are even more directly targeted at the bearing of arms by making any such carrying while intoxicated a crime. Thus, while the laws around arms and intoxication are not historical twins for waiting periods, they were animated by the same rationale and are analogous.

Waiting period laws themselves have been around for 100 years. *See, e.g.*, Ex. 9 (1923 Cal. Laws 695, 696, ch. 339 §§ 2, 10; 1923 Conn. Laws 3707, ch. 252, § 7; 1923 N.D. Laws 379, ch. 266 § 10). But this does not mean that guns were available on demand to Americans in the 1790s and later. Instead, different "societal concerns" and "dramatic technical changes" made the primary justification for waiting periods—to avoid crimes of passion—largely unnecessary around the time of the nation's founding. *Bruen*, 142 S. Ct. at 2132. This is for two reasons.

First, as noted above, firearms were not universally available on demand in the 1790s due to the lack of stores and licensing requirements. The lack of waiting period laws before the early 20th century does not show that Americans could buy and take possession of a gun whenever they wanted. Rather, it shows that such laws were unnecessary because a waiting period inherent in the acquisition of firearms already existed for many Americans. *See supra* at I.B.2.

Second, there was less need for a cooling off period at the time of the nation's founding because firearms were not—unlike today—the weapon of choice for homicide. Overall homicide rates were low, and only 10-15% of homicides were committed with a firearm. Ex. 10 (Dec. of R. Roth) ¶ 15. That's not surprising because the common firearms at the time were poorly suited for a crime of passion. They were generally muzzle-loading, required a great deal of labor to load, often misfired, and could only shoot one shot without reloading. *Id.* ¶ 16. Homicide was much more frequently committed "with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." *Id.* ¶ 17. Plaintiffs' assertion—without any evidence—that "the problem of impulsive gun violence dates from the invention of guns" and was a "general societal problem that has persisted since long before the 18th century," Doc. 2 at 8-9, is thus contradicted by Professor Roth's declaration. *Id.*

In short, the "impulsive acts of firearm violence" the Act seeks to prevent were not a societal problem at the founding. Ex. 1, § 1(2)(a). Today, by contrast, firearms are among the five leading causes of death for people between the ages of 1 and 44. *Id.* § 1(1)(a). To the extent that firearms were used in impulsive violent crimes, the practical limitations on the availability of firearms for purchase and the ability of America's rural population to immediately access those firearms made the risk that someone would run out and purchase a gun in a fit of anger minimal. Considered together, these factors make it unsurprising that waiting period laws did not exist. Rather, "unprecedented societal concerns" and "dramatic technological changes" prompted States to adopt waiting period laws beginning 100 years ago. *Bruen*, 142 S. Ct. at 2132.

### II.  Plaintiffs will not suffer irreparable harm without an injunction.

Plaintiffs' motion also fails because they cannot show irreparable harm in the absence of an injunction. "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Plaintiffs must show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. (quotations omitted).

Plaintiffs assert that "[v]iolation of constitutional rights per se constitutes irreparable injury." Doc. 2 at 14. But Plaintiffs bear the burden to make it "clear [] that [constitutional] interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). They cannot do so, for two reasons. First, for all the reasons given above, the Act does not burden Plaintiffs' right to "keep and bear arms." *See Free the Nipple*, 916 F.3d at 806 (in constitutional claims, the irreparable injury and likelihood-of-success factors largely collapse). That right has never been understood to confer an immediate right to acquire arms. Second, as the Court previously noted, Ms. Garcia has only stated an intent to purchase another firearm in the "near future," so the timing (or existence) of any potential future harm is uncertain and may not be affected by a preliminary injunction at all. *See* Doc. 11.

### III.  The public interest favors public safety over Plaintiffs' desire for guns on demand.

Finally, the public interest favors denying the preliminary injunction. For one, Colorado's elected officials are in a better position than Plaintiffs or the Court to determine the public interest. *See, e.g.*, *Fish*, 840 F.3d at 755 ("our democratically elected representatives are in a better position than this Court to determine the public interest").

More fundamentally, there is an overwhelming public interest in preventing gun deaths. Colorado's elected officials, relying on social science data and reflecting the will of their constituents, passed the Act to address this scourge. Colorado is experiencing increasing rates of firearm homicides and high levels of firearm suicides. Ex. 1 § 1(1). More people die in Colorado from firearms than from car crashes or opioid overdoses. *Id.* One study has found that mandatory waiting periods have led to a 7-11% reduction in firearm suicides and a 17% reduction in firearm homicides. *Id.*; *see also* Ex. 2. A comparable effect in Colorado would save more than a hundred lives annually. Plaintiffs would ignore this data and the will of Colorado's voters, based on a preliminary record without discovery. The interest of the public is adamantly to the contrary.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated: October 17, 2023  PHILIP J. WEISER
Attorney General

*/s/ Michael T. Kotlarczyk*
*Grant T. Sullivan*, Assistant Solicitor General
*Michael T. Kotlarczyk*, Senior Assistant Attorney General
*Matthew J. Worthington*, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6349; -6187; -6124
Email: grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov; matt.worthington@coag.gov

*Attorneys for Defendant Jared Polis*
*Counsel of Record

**EXHIBIT LIST**

Ex. 1: HB 23-1219
Ex. 2: Handgun Waiting Periods Reduce Gun Deaths
Ex. 3: Spitzer Declaration
Ex. 4: Exhibit A to Spitzer Declaration – Spitzer CV
Ex. 5: Exhibit B to Spitzer Declaration – Table of Intoxication/Weapons Laws
Ex. 6: Exhibit C to Spitzer Declaration – Text of Intoxication/Weapons Laws
Ex. 7: Exhibit D to Spitzer Declaration – Table of Weapons Licensing Laws
Ex. 8: Exhibit E to Spitzer Declaration – Text of License and Licensing Laws
Ex. 9: Historical Waiting Period Laws
Ex. 10: Roth Declaration
Ex. 11: Exhibit A to Roth Declaration – Roth CV