**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

I have been asked to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods.

This declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

I have been retained by the Office of the Attorney General of the State of Colorado to render expert opinions in this case. I am being compensated at a rate of $750 per hour for testimony and $500 per hour for all other services.

## BACKGROUND AND QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an Adjunct Professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached to this Declaration.

I have been studying, teaching, and writing about gun policy for over thirty years.  My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995.  It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and international media on gun-related matters.  For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

I have provided written testimony as an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts' restrictions on assault weapons.  I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012). I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one:  *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super.

Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.).

I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the

U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational

Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## SUMMARY OF OPINIONS

### I. INTRODUCTION

This Declaration examines two types of historical weapons regulations that are similar to

the modern regulatory technique of waiting periods: laws relating to weapons and intoxication,

and licensing laws. After discussing waiting periods, the similarities of each type will be

examined in turn.

### II. GUN PURCHASE WAITING PERIODS

Gun purchase waiting periods as they are understood and implemented today did not

exist early in the country's history. Yet no special wisdom is required to discern why. Three

important differences between early America and the modern era explain why.

First, in the modern era, gun and ammunition purchases can be made easily and rapidly

from tens of thousands of licensed gun dealers,[1] private sales, gun shows, and through internet

sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us"

outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes

did not exist in the U.S. until the end of the nineteenth century, when mass production

techniques, improved technology and materials, and escalating marketing campaigns all made

guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the

1880s gunmaking had completed the transition from craft to industry."[2] The rise of handgun mail

---

[1] As of 2021, there were over 52,900 dealer licensees and over 7,000 licensed pawnbrokers. http://www.atf.gov/about/foia/ffl-list.html; "Gun Dealers," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/#footnote_1_5597.

[2] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.

4

order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[3] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.[4]

Second, no organized system of gun background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993 (although the waiting period was phased out in 1998 and replaced with an instant background check system).[5] As of today ten states plus D.C. have waiting period laws ranging in length from three to 14 days.[6] By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound two reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[7]

Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More

---

[3] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)

[4] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.

[5] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.

[6] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/. Minnesota enacted a law that provides for a 30 day waiting period for the purchase of handguns and assault weapon purchases from dealers, to take effect as of August 1, 2023.

[7] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114

specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[8]

Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the logical absence of modern waiting periods earlier in American history, are there similar, analogous historical gun laws? The answer is found below.

## III.  GUNS AND INTOXICATION

An interesting, instructive, and analogous historical parallel to waiting periods is gun laws pertaining to alcohol use and intoxication. These measures mimicked waiting periods because, for the most part, they prevented gun acquisition or use only for the period of time of actual intoxication (leaving aside those individuals for which chronic intoxication was a more-or-less permanent condition). When a person became sober, the intoxication barrier disappeared. Because intoxication is by its nature temporary, it interrupts gun access only temporarily, as is the case with waiting periods. Moreover, old intoxication laws avoided or thwarted "heat of the moment" gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment. These purposes also mimic the purpose of modern waiting periods.

---

[8] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), including "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink-driving countermeasures, modifying the drinking context, and treatment and early intervention."[9] Interestingly, nearly all of these types of measures date back hundreds of years,[10] despite changing social attitudes about alcohol and drinking.

In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[11] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[12] Reliance

---

[9] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.

[10] "History and Culture of Alcohol and Drinking: 17th Century," in Scott C. Martin, *The SAGE Encyclopedia of Alcohol* (Thousand Oaks, CA: SAGE Publications, Inc. 2015), 669-72.

[11] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/

[12] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131

on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a problem to be "condemned and punished."[13] During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, that encouraged "responsible oversight"[14] by tavern owners.

The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[15] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[16] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, only to be repealed by the Twenty-first Amendment in 1933.

Remarkably, despite the greater indulgence of drinking alcohol to excess in the colonial and early Federal periods, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations. From the 1600s through

---

[13] Aaron and Musto, "Temperance and Prohibition in America," 132.
[14] Aaron and Musto, "Temperance and Prohibition in America," 133.
[15] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[16] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states regulated the commercial sale or distribution of alcohol when firearms were also present; at least 2 states barred gun sales to those who were intoxicated; at least 6 states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred guns to Native Americans if intoxicated (see Exhibit B and C).

To parse the data chronologically, in the 1600s, at least 3 states (which at the time were colonies) enacted 7 such laws; in the 1700s at least 7 states enacted 9 laws; in the 1800s at least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws (note that some states enacted laws across more than one century; see Exhibits B and C). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[17] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred when "drinking" was involved. In a 1655 Virginia law, more general alcohol-fueled revelry was subject

---

[17] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.

to fines for any who would "shoot any guns at drinking," though the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[18]

In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[19] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[20] In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[21]

Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[22] In 1865, Kansas enacted a law to punish any found to carry a deadly weapon while "under the influence of intoxicating drink."[23] Nevada enacted measures in 1881 and 1885 that

---

[18] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.
[19] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.
[20] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.
[21] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debauncheries.
[22] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.
[23] The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory

punished any who discharged firearms in various public spaces while "under the influence of liquor."[24] An 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."[25] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon[26] (minors and those intoxicated were more than occasionally treated together within these laws[27]). In 1907 Arizona found it necessary to enact a law making it "unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[28]

The state of Missouri must have felt its population to have been greatly abused by the intersection of guns and alcohol: in 1879 and again in 1883, the state enacted a law to fine or imprison any who carried concealed or brandished "any kind of fire arms" or other listed

---

of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

[24] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places, § 1.

[25] 1883 Wis. Sess. Laws 290.

[26] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[27] E.g. William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[28] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.

weapons "when intoxicated or under the influence of intoxicating drinks."[29] Not content with these two state laws, at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits B and C).

A Maryland state law from 1884 pertaining to Baltimore said that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[30] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[31] An 1899 South Carolina law said that "any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[32] A 1909 Idaho law criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[33]

While the focus of these laws was those who had weapons while drinking or drunk, another type of law appeared early: that restricting the sale or distribution of alcohol in the proximity of those with firearms. A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart"

---

[29] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[30] John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[31] General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[32] 1899 S.C. Acts 97, An Act to Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1.

[33] 1909 Id. Sess. Laws 6, § 1.

on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[34] In 1746 New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[35] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[36] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[37] Pennsylvania enacted the same type of measure in 1780.[38] Such measures extended into the nineteenth century.[39]

---

[34] Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.

[35] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.

[36] An Act for Establishing a Militia in this Government (Delaware, 1756).

[37] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

[38] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[39] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity. Aside from these laws, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[40] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[41] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[42] during the Revolutionary War, but like any good commander he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[43] Despite the efforts to control quantity, drunkenness was a serious and chronic problem among the militias throughout the existence of the old militia system.[44]

A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating

---

[40] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[41] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[42] Burns, *The Spirits of America*, 16.

[43] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces.

[44] Spitzer, *The Politics of Gun Control*, 40-41, 46-49; "The Militia System," *The Advocate of Peace (1837-1845)* 6(November/December 1845): 133-35, https://www.jstor.org/stable/pdf/27888661.pdf?refreqid=excelsior%3Aca7db5c5969e023981868 e0b56120741&ab_segments=&origin=&initiator=&acceptTC=1

liquors or to any intemperate person."[45] St. Paul, Minnesota enacted a similar measure in 1858.[46] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[47]

As this account demonstrates, laws enacted to keep those who were intoxicated from weapons possession or use because of the universal understanding that the intoxicated would be much more likely to act rashly, impulsively, and with diminished judgment—i.e., in the heat of the moment. These purposes are analogous to the purpose of modern waiting periods.

## III.  HISTORICAL WEAPONS LICENSING LAWS

Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[48] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its

---

[45] George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.
[46] The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.
[47] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).
[48] Henry C. Black, *Black's Law Dictionary,* 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application or permission to do something is submitted (such as a hunting license) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods. In addition, licensing by its nature thwarts any ability to acquire or use firearms on demand.

State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits D and E); 17 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question.

With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[49] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals

---

[49] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67.

or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[50] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below.  All of these types of laws are detailed in Exhibits D and E.

## A.      Licensing of Weapons Carrying or Possession

In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[51] St. Louis enacted its own municipal version of this law in 1892.[52] A similar measure was enacted for Kansas City,

---

[50] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

[51] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[52] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

Missouri, in 1880.[53] Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[54]  As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[55]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[56]

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[57]

Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission

---

[53] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[54] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[55] https://www.thefreedictionary.com/fowling+piece.

[56] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[57] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

of the Captain of Police."[58] Evanston, Illinois's concealed carry licensing law of 1893 granted

licensing issuance authority to the city mayor.[59]

New York City criminalized the carrying of "a pistol of any description concealed on his

person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his
> protection, may apply to the officer in command at the station-house of the precinct
> where he resided, and such officer, if satisfied that the applicant is a proper and law
> abiding person, shall give said person a recommendation to the superintendent of police,
> or the inspector in command at the central office in the absence of the superintendent,
> who shall issue a permit to the said person allowing him to carry a pistol of any
> description.[60]

This provision also allowed for non-residents who had occasional business in the city to

apply for permits as well. An 1884 New York state law barred the carrying or possession of

named weapons, including fighting knives and types of clubs, from those under eighteen, unless

they possessed a license to do so. Licenses could only be granted for up to one year and were

subject to revocation "at the pleasure of the mayor."[61] A year later, the law was extended to all

---

[58] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[59] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[60] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

[61] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

cities in the state and included "any pistol or other firearms of any kind."[62] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[63]

Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[64] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[65]

An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[66] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[67] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a

---

[62] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[63] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[64] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[65] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[66] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[67] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[68] The California cities of Stockton (1891)[69] and Fresno (1896)[70] did the same.

A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[71] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[72]

Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of

---

[68] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[69] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[70] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[71] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.

[72] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[73]

A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[74] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[75] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[76]

In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[77] Licensing was extended to long guns—

---

[73] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[74] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[75] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[76] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[77] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

machine guns and automatic rifles—in New Jersey in 1927[78] and 1934.[79] (A number of the 32 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[80] It extended licensing to a variety of guns in 1927.[81] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[82] It extended the permitting process in 1926.[83] Georgia enacted a detailed handgun permitting system in 1910.[84] Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[85] Indiana,[86]

---

[78] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[79] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[80] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[81] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[82] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[83] 1926 Va. Acts. 285-87, CHAP. 158.

[84] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[85] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[86] 1925 Ind. Acts 495, 495-98.

Michigan,[87] New Hampshire,[88] North Carolina,[89] North Dakota,[90] Ohio,[91] Oregon,[92] Pennsylvania,[93] Rhode Island,[94] and South Carolina.[95]

The existence and functioning of old licensing laws makes clear that the government had every right to take whatever time it felt was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing   provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand.

## B.    Permits for Firearms Discharge or Use of Explosives

As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms and discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without

---

[87] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[88] 1923 N.H. Laws 138.

[89] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[90] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[91] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[92] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[93] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[94] 1927 (January Session) R.I. Pub. Laws 256.

[95] 1934 S.C. Acts 1288.

license."[96] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[97] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[98] A 1750 law did the same for the District of Southwark,[99] as did a colony-wide law also in 1750.[100] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[101]

Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[102] New Hampshire enacted a discharge permit

---

[96] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[97] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[98] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[99] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[100] 1750 Pa. Laws 208.

[101] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[102] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a

system for Portsmouth in 1823.[103] New York State enacted a law in 1824 that allowed the

Schenectady mayor or other city officials to grant permission for discharge of any gun or various

fireworks.[104] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that

"the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[105]

New London, Connecticut singled out "some public day of review" in an 1835 law as a

permissible reason for issuing a discharge permit,[106] and New Haven enacted a similar law in

1845.[107] The same was enacted for Quincy, Illinois in 1841,[108] Jeffersonville, Indiana in 1855,[109]

and Richmond, Virginia in 1859.[110] Another 20 states enacted such laws from the end of the

Civil War up to the end of the 1800s (not including states that enacted laws both before and after

the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas,

---

Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[103] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[104] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[105] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[106] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[107] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[108] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[109] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[110] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits D and E).

### C.      Commercial Licensing

As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans for guns, knives, tomahawks, or other items, unless they first obtained a license from the governor.[111] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[112] An 1854 law for San Francisco, California licensed commercial shooting galleries.[113] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements. This historical evidence is consistent with the notion that the government can regulate the commercial activity of selling weapons.

### D.  Licensing Restrictions on Gunpowder

Gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the

---

[111] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[112] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[113] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

seventeenth century through the start of the twentieth century.[114] One element of this regulation was gunpowder licensing; at least 21 states enacted such licensing from the 1700s through the early 1900s.

### E.    Weapons Sellers Recording Purchases

Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

In 1885, Illinois enacted this registration requirement for weapons dealers:

All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[115]

---

[114] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), Available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.
[115] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[116]

A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[117] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.  Regulations being placed on the sellers of weapons are a historic normality.

## F.    Licensing Pertaining to Named Groups

The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also traded arms with Natives throughout this entire period, as they sought profitability, access to highly

---

[116] 1911 Colo. Sess. Laws 408, Section 3.
[117] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[118]

As for licensing related to enslaved persons and free persons of color (listed separately in Exhibit D), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons. The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## IV.  CONCLUSION

Gun purchase waiting periods are an artifact of the modern era, with roots in American history and tradition. While the idea of waiting periods as a public policy tool was, unnecessary and beyond the reach of the immature and undeveloped American nation-state, American society

---

[118] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

instead adapted to the realities of firearms purchasing at that time. As Jacob Charles has argued, the fact that our ancestors were silent on some question or issue should not bestow "historical silence" with "explanatory power" over current policymaking.[119] There is no reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option. Far from it, especially considering the inherently modest nature of waiting periods. Intoxication laws and licensing laws both utilized the passage of time, whether to ward off intoxicated individuals or to conduct a licensing process, to improve the likelihood that those who ought not to have ready access to firearms do not obtain that access.

When our ancestors in the colonial, post-colonial, and developmental periods of the seventeenth, eighteen, and nineteenth centuries encountered social, behavioral, and other problems with respect to firearms, they responded with public policy techniques appropriate to their time, place, and circumstances. The examples pertaining to alcohol consumption and weapons licensing are two such examples that are analogous to modern waiting period laws.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of October, 2023.

Robert Spitzer

---

[119] Jacob D. Charles, "The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History" (January 23, 2023). *Duke Law Journal*, Vol. 73 (forthcoming), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545).