# EXHIBIT 1

1
2
3
4
5                      UNITED STATES DISTRICT COURT
6                   SOUTHERN DISTRICT OF CALIFORNIA
7

8   JAMES MILLER, et al.,                    Case No.:  19-cv-01537 BEN (JLB)
9                              Plaintiffs,
                                             **DECISION**
10  v.
11  ROB BONTA, in his official capacity as
    Attorney General of the State of
12  California, et al.,
13                             Defendants.
14

## I.  INTRODUCTION

Like the Bowie Knife which was commonly carried by citizens and soldiers in the 1800s, "assault weapons" are dangerous, but useful.  But unlike the Bowie Knife, the United States Supreme Court has said, "[t]here is a long tradition of widespread lawful gun ownership by private individuals in this country."[1]

Americans have an individual right to keep and bear firearms.[2]  The Second Amendment to the United States Constitution "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[3]  Whether citizens ever fire or need

---

[1] *Staples v. United States*, 511 U.S. 600, 610 (1994).
[2] *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008).
[3] *Id.* at 606 (quoting 2 Tucker's Blackstone 143) ("This may be considered as the true palladium of liberty …. The right to self defence is the first law of nature:  in most

to fire their weapons, is not important.  This guarantee is fully binding on the States and limits their ability to devise solutions to social problems.[4]  And the guarantee protects "the possession of weapons that are 'in common use,'"[5] or arms that are "typically possessed by law-abiding citizens for lawful purposes."[6] These are the decisions this Court is bound to apply.  "It's our duty as judges to interpret the Constitution based on the text and original understanding of the relevant provision—not on public policy considerations, or worse, fear of public opprobrium or criticism from the political branches."[7]

This case is about California laws that, in contrast to these constitutional principles, make it a crime to acquire and possess many common modern semiautomatic firearms.[8]  Modern semiautomatic rifles like the AR-15 platform rifle are widely owned

_____

governments it has been the study of rulers to confine the right within the narrowest limits possible.").

[4] *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 785 (2010) (emphasis in original).

[5] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

[6] *Caetano v. Massachusetts*, 577 U.S. 411, 416 (Alito and Thomas concurring) (quoting *Heller,* 554 U.S. at 625, in turn quoting *United States v. Miller,* 307 U.S. 174, 179 (1939)) ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.").

[7] *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (Ho, J., concurring) (citations omitted).

[8] California Penal Code § 30600 imposes a felony criminal penalty for anyone who manufactures, distributes, imports, keeps for sale, offers for sale, or lends an "assault weapon." The prescribed prison sentences for violations of these malum prohibitum crimes are four, six, or eight years.  One who merely possesses an "assault weapon" in California is guilty of a misdemeanor under California Penal Code § 30605(a) or a felony pursuant to California Penal Code § 1170(h)(1).  If one possesses only one or two properly registered pre-ban "assault weapons," the crime is a misdemeanor for the first offense.  Cal. Pen. Code § 30605(b).  A prosecutor may in lieu of criminal prosecution for mere possession of an "assault weapon," institute a civil action for an injunction, fine, and destruction of the firearm as a nuisance.  Cal. Pen. Code §30800.

by law-abiding citizens across the nation.  Other than their looks (the State calls them "features" or "accessories") these prohibited rifles are virtually the same as other lawfully possessed rifles.  They have the same minimum overall length, they use the same triggers, they have the same barrels, and they can fire the same ammunition, from the same magazines, at the same rate of fire, and at the same velocities, as other rifles.  What is it, then, that animates the State's criminalization of possessing certain rifles as "assault weapons"?  It is that similar rifles have been used in some mass shootings and that by virtue of this law, the legislature hoped to keep these modern weapons out of the hands of mass shooters.  The California legislature, at a time in the past when the lower courts did not recognize an individual's right to keep firearms and in a state that has no constitutional analogue to the Second Amendment, balanced that interest above and against its law-abiding citizens who wanted these firearms for self-defense.[9]

That was then.  Today, the Supreme Court has very clearly ended modern interest balancing when it comes to the Second Amendment.  The Second Amendment, the Court said, "is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense."[10]  It is "this balance—struck by the traditions of the American people—that

_____

[9] In the year 1989, the California Legislature was not concerned with maintaining room for a citizen's constitutional right to have a common firearm of one's choosing to defend hearth and home.  In making its policy choice, the California Legislature neither mentioned a modern rifle as a means of self-defense, nor did the core Second Amendment right appear to have been any part of its consideration.  The formal legislative findings say nothing about self-defense.  See § 30505(a).  The balance was simply about criminal use, on the one hand, versus sporting or recreational activities, on the other hand.  When the features-based definition (California Penal Code § 30515(a)) was added for the year 2000, a citizen challenging the law in a federal court was still (incorrectly) regarded as lacking basic Article III standing.  Judicial recognition of an individual right to keep and bear arms to be respected by the states would come later with the *Heller* decision in 2008 and the *McDonald* decision in 2010.

[10] *Bruen*, 142 S. Ct. at 2131 (simplified).

3

demands our unqualified deference."[11]  The American tradition is rich and deep in protecting a citizen's enduring right to keep and bear common arms like rifles, shotguns, and pistols.  However, among the American tradition of firearm ownership, there is nothing like California's prohibition on rifles, shotguns, and handguns based on their looks or attributes.  Here, the "assault weapon" prohibition has no historical pedigree and it is extreme.  Even today, neither Congress nor most states impose such prohibitions on modern semiautomatic arms.  In contrast, laws that punish criminal acts committed with any gun, like the crime of assault with a deadly weapon, remain perfectly constitutional.  Those criminal laws are not at issue here.

The State says criminals already have and favor using guns described as "assault weapons."  Rather than being outgunned, many citizens want these same firearms as a defense against criminal attacks.  Americans today own 24.4 million modern rifles (*i.e.*, AR-15 platform and AK-47 platform rifles), according to the State's expert.[12]  Of the AR-15 rifle owners surveyed, 61% said one reason they acquired their gun is for home defense.[13]  Consequently, while criminals already have these modern semiautomatics, the State prohibits its citizens from buying and possessing the same guns for self-defense.  At the same time these firearms are commonly possessed by law-abiding gun owners elsewhere across the country.  Guns for self-defense are needed a lot because crime happens a lot.  A recent large-scale survey estimates that guns are needed defensively approximately 1,670,000 times a year.[14]  Another report, originally commissioned and

---

[11] *Id.*

[12] *See* Suppl. Decl. of Louis Klarevas, Dkt. 137-5 ("Suppl. Klarevas Decl."), at ¶ 15 and n.12 (the 24.4 million estimate may include some AR-15s in possession of law enforcement).

[13] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7, 33 and figure 15 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022), https://ssrn.com/abstract=4109494 [https://perma.cc/83XT-75YG].

[14] *Id.* at 35.

long cited by the Centers for Disease Control and Prevention estimated that there are between 500,000 and 3,000,000 defensive gun uses in the United States each year.[15] That is a lot of situations where Jane Doe needs a firearm to defend herself and her family.  Trial testimony from hoodlums is not needed to prove that a homeowner brandishing an AR-15 can be a strong deterrent to criminal attackers.  But when brandishing does not stop an attack, Jane needs an effective defense.  That is where an AR-15 style semiautomatic rifle can come to the rescue.  And although this Court focuses its analysis on rifles, California's ban also includes such common weapons as semiautomatic shotguns with removable magazines and semiautomatic handguns with threaded barrels.

People have heard about the Robb Elementary School shooting in Uvalde, Texas.  They have heard about Sandy Hook, Parkland, the Pulse nightclub, and other tragic mass shootings.  But they do not hear of the AR-15 used in Florida by a pregnant wife and mother to defend her family from two armed, hooded, and masked home intruders.  As soon as the armed intruders entered the back door of her home they pistol-whipped her husband -- fracturing his eye socket and sinus cavity.  Then they grabbed the 11-year old daughter.  The pregnant wife and mother was able to retrieve the family AR-15 from a bedroom and fire, killing one of the attackers while the other fled.[16]  It does not require

---

[15] *See* Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013), https://doi.org/10.17226/18319 [https://perma.cc/K3N4-FEXQ].  The CDC's "fast facts" page referred to page 45 of the same report estimating 60,000 to 2,500,000 defensive gun uses in America.  *See* Internet Archive Wayback Machine, CDC Firearm Violence Prevention, captured July 26, 2021, https://web.archive.org/web/20210726233739/https://www.cdc.gov/violenceprevention/firearms/fastfact.html.  The Court notes that the CDC has changed its reporting to delete reference to this study and the Court will not comment on how or why that happened as the CDC website does not reflect why it was deleted.

[16] Decl. of Emanuel Kapelsohn in Supp. of Mot. for Prelim. Inj., Dkt. 22-12 ("Kapelsohn Decl."), Exhibit 1 at 26.

much imagination to think what would have happened next if the woman had lived in California and could not possess such a firearm.

People do not remember the disabled 61 year-old man living alone on a 20-acre property in Florida with dense woods and a long dirt driveway.  After the homeowner had gone to bed, three men armed with a shotgun, pistol, and BB gun invaded.  One wore a "Jason" hockey mask.  The disabled victim said he was awakened by a loud noise and grabbed the AR-15 laying near his bed.  He saw the masked man and a second man coming toward him inside his home.  Gunfire was exchanged.  By the time police arrived, one attacker had run away, one lay wounded outside, and one was dead on the dining room floor.  Police found the disabled man in his bedroom alive, but bleeding from a gunshot wound to the stomach.  The AR-15 lay across his legs.[17]  Without his modern rifle, the victim would have become an evidence tag and a forgotten statistic.

People do not hear about the AR-15 used by a young man in Oklahoma to defend himself from three masked and armed home invaders clothed in black.  The three intruders broke through a rear glass door.  Though outnumbered, the homeowner put up a successful defense with his AR-15.[18]  People do not hear about the AR-15 that was needed when seven armed and masked men burst through a front door at 4:00 a.m. firing a gun.  Outnumbered seven to one, it took the resident 30 rounds from his AR-15 to stop the attackers.[19]

California's "assault weapon" ban takes away from its residents the choice of using an AR-15 type rifle for self-defense.  Is it because modern rifles are used so frequently for crime?  No.  The United States Department of Justice reports that in the year 2021, in the entire country 447 people were killed with rifles (of all types).  From this one can say

---

[17] Austin L. Miller, *Deadly Invasion*, Ocala StarBanner (July 11, 2019), https://www.ocala.com/story/news/local/2019/07/11/summerfield-homeowner-injured-kills-2-intruders-with-ar-15/4663503007/ [https://perma.cc/EE6W-DN9H].

[18] Kapelsohn Decl., Exhibit 7 at 43.

[19] Kapelsohn Decl., Exhibit 2 at 29.

1    that, based on a national population of 320 million people in the United States, rifles of

2    any kind (including AR-15s) were used in homicides only 0.0000014% of the time.  Put

3    differently, if 447 rifles were used to commit 447 homicides and every rifle-related

4    homicide involved an AR-15, it would mean that of the approximately 24,400,000 AR-

5    15s in the national stock, less than .00001832% were used in homicides.  It begs the

6    question: what were the other AR-15 type rifles used for?  The only logical answer is that

7    24,399,553 (or 99.999985%) of AR-15s were used for lawful purposes.

8           In California, while modern semiautomatics are not rare, they are rarely the

9    problem.  For example, in 2022, only three "assault weapons" were used in violent

10   California crimes, according to the Attorney General's annual report, "Firearms Used in

11   the Commission of Crimes."[20]  For the preceding year, the report announced that only

12   two assault weapons were used in violent crimes, while the 2020 report identified zero

13   "assault weapons" used.[21, 22]  Other government homicide statistics do not track "assault

14   rifles," but they do show that killing by knife attack is far more common than homicide

---

[20] *See* Off. of the Att'y Gen. Rob Bonta, *Firearms Used in the Commission of Crimes* (2022), https://oag.ca.gov/publications#crime [https://perma.cc/UX88-4LZZ].

[21] The report collects data from the State's ten regional crime laboratories which serve 46 of the State's 58 counties.  The report observes that "*there has been very little change overall in the number of assault weapons examined in the last 20 years; as a category, their numbers have been nominal relative to the total number of firearms examined*." (Emphasis added.)  The report also notes that an "absence of data from the local laboratories that serve population-dense regions means this report may not reflect gun use trends in urban areas or across California as a whole."  Apparently, the Attorney General does not have that data.  The State did not provide its *Firearms Used* report for the record in this case, but it may be considered as a relevant legislative fact.  *See e.g., Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (describing difference between legislative facts and adjudicative facts when applying *Bruen*).

[22] A cross check with the Gun Violence Archive reveals some errors in over-counting but generally confirms the Attorney General's reports that assault weapons are rarely used in crime.  *Gun Violence Archive 2023*, Gun Violence Archive https://www.gunviolencearchive.org/ (last visited June 5, 2023).

7

by any kind of rifle. In California, with a population close to 39 million people, murder by knife occurs seven times more often than murder by rifle.[23] Of course, this is a type of means-end scrutiny that *Bruen* has made irrelevant for judging the constitutionality of a firearm ban because the People of the United States have already made the decision long ago to protect a citizen's choice to possess and use any common firearm for self-defense.[24]

This Court understands the unquestionable tragedy caused by lawless individuals using modern semi-automatic guns or any gun to injure or kill innocent men, women, or children. Their lives are important. But are their lives any more important than Jane Doe's or the lives of her family? We hear constantly about mass shootings for days and weeks and on anniversaries. But how often do we celebrate the saving of the life of Jane Doe because she was able to use a semi-automatic weapon to defend herself and her family from attackers? Are the lives of Jane, John, and Junior Doe worth any less than others? Are they less important?

The State of California posits that its "assault weapon" ban, the law challenged here, promotes an important public interest of disarming some mass shooters even though it makes criminals of law-abiding residents who insist on acquiring these firearms for self-defense. Nevertheless, more than that is required to uphold a ban. The discussion that follows will sound repetitive to astute readers of this Court's decision in *Duncan v. Bonta*, 17cv1017 BEN (JLB). Many of the same arguments and historic laws are relied on by the State in both cases.

---

[23] In 2021, 39 people were killed with some type of rifle—not necessarily an assault rifle or modern rifle, while California saw 303 people murdered with a knife, according to California Department of Justice crime statistics.

[24] *Baird v. Bonta*, 2023 WL 5763345, *5 (9th Cir. Sept. 7, 2023) ("In *Bruen*, the Supreme Court expressly rejected the use of such 'means-end scrutiny in the Second Amendment context' and described the two-step approach as 'one step too many.'").

8

1    *Bruen* makes clear that, "[t]o justify its regulation, the government may not simply
2    posit that the regulation promotes an important interest."[25] After all, "the very
3    enumeration of the right takes out of the hands of government—even the Third Branch of
4    Government—the power to decide on a case-by-case basis whether the right is really
5    worth insisting upon."[26] Still focused on balancing interests, the State objects that
6    "assault weapons" are unusually dangerous.  As this Court has previously agreed, all
7    firearms are dangerous.  The Second Amendment is unconcerned with Nerf guns and
8    foam baseball bats.  The Supreme Court carefully uses the phrase "dangerous and
9    unusual arms," while the State, throughout its briefing, refers to "dangerous [or] unusual
10   arms."  That the State would advocate such a position is disheartening.  Justice Alito took
11   pains to point out that this is a conjunctive test.  "As the *per curiam* opinion recognizes,
12   this is a conjunctive test: A weapon may not be banned unless it is both dangerous and
13   unusual . . . . If *Heller* tells us anything, it is that firearms cannot be categorically
14   prohibited just because they are dangerous."[27]  In *Heller*, the Supreme Court said the
15   firearms that are protected are firearms "that are not dangerous and unusual and typically
16   possessed by law abiding citizens for lawful purposes like self-defense."  This Court
17   assumes that the Supreme Court does not use language frivolously…that it says what it
18   means and it means what it says.  The "dangerous *and* unusual" test is the test that this
19   Court will apply.  If there is a different test, the Circuit or the Supreme Court will tell us,
20   but for now, this Court applies the plain meaning of the language used in *Heller*.[28]  As the

---

[25] *Bruen*, 142 S. Ct. at 2126.
[26] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).
[27] *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring).
[28] *Teter*, 76 F.4th at 949-50 ("*Heller* itself stated that the relevance of a weapon's
dangerous and unusual character lies in the 'historical tradition of prohibiting the carrying
of dangerous and unusual weapons.'  It did not say that dangerous and unusual weapons
are not arms.") (citation omitted); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir.
2012) ("The Court also concluded that the historical tradition of prohibiting the carrying

1   Supreme Court says, "[d]espite their potential for harm, guns generally can be owned in

2   perfect innocence."[29]

3        In any event, the arms the State bans as "assault weapons" are no more dangerous

4   than other arms the State does not ban.  The banned arms are just modern versions of

5   rifles, shotguns, and pistols.  For example, a Springfield 1911 pistol *with* a threaded

6   barrel is an "assault weapon," according to California law.  The same 1911 pistol

7   (standard issue for the United States military for decades) without a threaded barrel, is

8   fine.  An AR-15 with normal parts is banned, but the same AR-15 with an awkward shark

9   fin grip, an unmovable stock, and a barrel compensator in place of a flash hider, shooting

10   the same ammunition, is fine.

11        Falling back on an old, recycled justification, the State says that its ban should

12   stand because a person can have as many *other* rifles, shotguns, and pistols as one wants.

13   The problem is that the alternatives-remain argument has no limiting principle and would

14   justify incremental firearm bans until there is only a single-shot derringer remaining for

15   lawful self-defense.  *Heller* demolished that argument.  The same argument – that a

16   handgun ban might be justified because government-approved alternatives are available –

17   was rejected in *Heller* and it is rejected here.  *Heller* said quite clearly that it is no

18   constitutional answer for government to say that it is permissible to ban some guns so

19   long as other guns are allowed.[30] This is not the way American Constitutional rights

---

of 'dangerous and unusual weapons' limits the right to keep and carry arms.") (citation
omitted); *United States v. Kittson*, 2023 WL 5015812 *5 (D. Ore. Aug. 7, 2023)
("Because *Heller* was undisturbed by *Bruen*, and *Henry* reached its holding by relying on
*Heller*, *Henry* is binding precedent on this Court.") (citation omitted).

[29] *Staples*, 511 U.S. at 611.

[30] *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible
to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long
guns) is allowed."); *cf. Renna v. Bonta*, No. 20-cv-02190-DMS-DEB, 2023 WL 2846937
at *7, n.8 (S.D. Cal. Apr. 3, 2023) (disagreeing with similar argument that the state may
ban state-of-the-art pistols because older pistols are permitted).

work.  It is not permissible for a state to ban some books simply because there are other books to read, or to close synagogues because churches and mosques are open.  In their normal configurations, the so-called "assault weapons" banned in California are modern firearms commonly-owned by law-abiding citizens for lawful purposes across the nation.[31]  Under *Heller*, *McDonald*, *Caetano*, and *Bruen*, they may not be banned.

Like a cut diamond, the uniquely American right to keep and bear arms is multi-faceted.  The unalienable right to have firearms for self-defense existed before the Bill of Rights and today remains the central protection of the Second Amendment.  It is a right that was recognized in English common law and in the American colonies.  There is a corollary right, perhaps important in the future and unquestioned at the time of the founding, to have firearms useful to bring to militia service.  *United States v. Miller* held that sawed-off shotguns were not protected because there was no evidence that they were useful for military purposes.[32]  The obvious corollary was that weapons that could be useful for military purposes would be protected by the Second Amendment.  It would be a mistake to think *Heller* and *Miller* are inconsistent.

The State argues, and some courts have reasoned, that modern semiautomatic rifles are "most useful in military service" and therefore, can be banned.[33]  The Supreme Court said no such thing.  *Caetano* addresses this question and says, "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'"[34]  *Heller* was

---

[31] That AR-15s are commonly owned and number in the millions across the nation and are rarely used to commit crimes, is detailed in depth in this Court's prior decision.  *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1020–21 (S.D. Cal. 2021); *see also* Suppl. Klarevas Decl. at ¶ 15 and n.13.

[32] 307 U.S. 174, 178 (1939).

[33] *See, e.g.*, *Hanson v. D.C.*, No. CV 22-2256-RC, 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023) ("*Heller* established that weapons that are 'most useful in military service' are excluded from Second Amendment protection."); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 987 (C.D. Cal. 2019) (same).

[34] *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624-25).

explaining *Miller*.  In *Miller*, the Supreme Court applied a reasonable-relationship-to-militia-use test to a short-barreled shotgun, asking whether the shotgun would have a reasonable relationship to the preservation or efficiency of a well-regulated militia.  Finding none, it decided the Second Amendment did not guarantee the right to keep that particular firearm.  *Miller*'s realm of Second Amendment protection encircled a firearm if it was reasonably related to militia use.  This "reasonably-related" construct received a nod again in *Lewis v. U.S.*, where the Supreme Court approved *Miller* again, saying, "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'"[35] There was no undermining of *Miller* in *Heller* or *Bruen*.   Rather, *Heller* endorsed *Miller* and understood that *Miller* constructed an outer fence line.  "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.  That accords with the historical understanding of the scope of the right."[36] And *Bruen* "quoted, explained, re-affirmed, and then applied" *Miller*.[37] *Heller* acknowledged the already expansive zone of protection for weapons that could be used by the militia and focused instead on the core use of firearms for self-defense.

In other words, *Heller* made the logical connection between weapons commonly possessed by law-abiding citizens for lawful purposes that would also be useful for military purposes, *i.e.*, in the militia.  Since *Miller*, the Supreme Court has described a large circle of firearms protected by the Second Amendment which includes commonly owned firearms useful for the core right of self-defense and other lawful purposes like hunting, sporting, and target shooting.  Unless the Supreme Court clearly says otherwise,

---

[35] 445 U.S 55, 65, n.8 (1980).
[36] *Heller*, 554 U.S. at 625.
[37] *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *7 (W.D.N.C. Mar. 2, 2023).

commonly owned weapons that may be useful for war and are reasonably related to militia use are also fully protected, so long as they are not useful solely for military purposes.  Modern semiautomatic rifles, shotguns, and pistols are such reasonably-related arms.  In *Staples*, the Supreme Court identified some types of weapons that do lay beyond the fence of absolute constitutional protection -- and they are not modern semiautomatic rifles, normal shotguns, or threaded barrel pistols.[38]

## II.  *BRUEN* AND THE ASSAULT WEAPONS CONTROL ACT

Plaintiffs challenge a net of interlocking statutes known as the Assault Weapons Control Act which impose strict criminal restrictions on common firearms that fall under California's complex definition of an "assault weapon."[39]  The firearms deemed "assault weapons" are fairly ordinary, popular, modern semi-automatic firearms.

### A. "Assault Weapons" Defined

Under California Penal Code § 30515(a), a semi-automatic rifle is labeled an "assault weapon" if it is one of three principal types.  The first type is a centerfire[40] rifle that does not have a fixed magazine and has one of the following prohibiting features: a pistol grip that protrudes conspicuously beneath the action of the rifle, a thumbhole stock,

---

[38] *Staples*, 511 U.S. at 611–12 ("[C]ertain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces" are subject to regulation notwithstanding the Second Amendment.); *see also United States v. Freed*, 401 U.S. 601, 616 (1971) ("[T]he firearms covered by the [National Firearms] Act are major weapons such as machineguns and sawed-off shotguns; deceptive weapons such as flashlight guns and fountain pen guns; and major destructive devices such as bombs, grenades, mines, rockets, and large caliber weapons including mortars, antitank guns, and bazookas.").
[39] *See* California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming those "assault weapons" a public nuisance), 30915 (regulating those "assault weapons" obtained by bequest or inheritance), 30945 (restricting use of registered "assault weapons"), and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8).
[40] "Centerfire" refers to the most commonly used type of ammunition cartridge, as opposed to the much smaller rimfire cartridge.

a folding or telescoping stock, a grenade or flare launcher, a flash suppressor, or a forward pistol grip. The second type is a centerfire rifle that has a fixed magazine able to hold more than 10 rounds. The third type is a centerfire rifle that has an overall length of less than thirty inches. Cal. Penal Code § 30515(a)(1)–(3). The statute also deems a semiautomatic pistol an "assault weapon" if it has a threaded barrel (or some other features not detailed here). Cal. Penal Code § 30515(a)(4)–(5). A semiautomatic shotgun is deemed an "assault weapon" if it has a telescoping stock and a pistol grip or a revolving cylinder or a removable magazine. Cal. Penal Code § 30515(a)(6)–(8). Antique firearms and certain pistols designed expressly for Olympic events are exempted.

Under California's law one commits a crime by simply possessing one of these firearms called "assault weapons." Likewise, one commits a felony by lending, giving, exposing for sale, offering for sale, keeping for sale, importing into the state, transporting, distributing, manufacturing, or causing to be manufactured one of these firearms. Since possessing one of these prohibited firearms is protected by the Constitution, it should go without saying that criminalizing selling, lending, and manufacturing also impinges on a citizen's constitutional right to acquire these firearms for self-defense. "This acquisition right is protected as an 'ancillary right' necessary to the realization of the core right to possess a firearm for self-defense."[41] After all, testimony supports what is generally observed: people want to buy AR-15s for home and self-defense,[42] so much so that modern semi-automatic rifles like the AR-15 are as

---

[41] *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021) (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*en banc*) ("[T]he core Second Amendment right 'wouldn't mean much' without ability to acquire arms.")).

[42] During the evidentiary hearing on October 22, 2020, a gun store owner testified that he sells a lot of AR-15 type firearms for home and self-defense explaining, "it's been my observation, working in my shop every single day, or most days, that my customers don't feel a handgun is adequate. They see cities being burned, on fire, and people being attacked, you know, sucker-punched in groups where it's, you know, 10, 12 people

ubiquitous as Ford F-series pickup trucks (which are the most popular vehicles in America).

## B. Remand for *Bruen* Review

This case was remanded from the United States Court of Appeals for the Ninth Circuit specifically to consider the challenged laws under the recent decision in *Bruen*. This Court reaffirms all of its relevant findings of fact and conclusions of law from its prior decision.[43] Under *Bruen*, the government must affirmatively prove that its firearm regulation is part of a constitutional historical tradition. It is the same text, history, and tradition standard the Court used in *Heller* and *McDonald*. What is different is that the old means-end, interest balancing, tiers-of-scrutiny, test is no longer viable. The State now has a second chance to defend its "assault weapon" prohibitions and must do so applying the *Bruen* test.

*Bruen* says,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.* Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[44]

*Bruen* continues,

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical

---

against a single person. I've heard many customers tell me they don't feel comfortable with a handgun, they want something with more fire power." Hr'g Tr., Day 3, Dkt. No. 59, at 20:21–21:5

[43] *Miller v. Bonta,* 542 F. Supp. 3d 1009 (S.D. Cal. 2021).

[44] 142 S. Ct. at 2129–30 (emphasis added).

understanding.[45]

And *Bruen* confirms, once again, that the Second Amendment applies to modern arms. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense,"[46] such as modern semiautomatic rifles, shotguns, and pistols.

### 1.   Already Determined: No Historical Pedigree

This Court has previously determined that the State's ban on modern semi-automatics has no historical pedigree. Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or threaded barrels. In fact, prior to California's 1989 ban, so-called "assault weapons" were lawfully manufactured, acquired, and possessed throughout the United States. Before the *Bruen* decision, the State had unpersuasively argued that its laws are analogous to a handful of state machinegun firing-capacity regulations from the 1920s and 1930s and one District of Columbia law from 1932—a law that the Supreme Court ignored while dismantling the District of Columbia's handgun ban in *Heller*. While that argument remains unpersuasive today, *Bruen* invites a look farther back into the Nation's history.

### 2.   The State Asked for Time for Discovery

The State has been given generous time and leeway to satisfy its new burden. Additional time to study history is not needed. The State's experts have been studying historic firearm regulations for more than twenty years.[47] This Court has reviewed all of

---

[45] *Id.* at 2131.

[46] *Id.* at 2132.

[47] The State's expert, professor Robert Spitzer, has studied gun policy for 30 years. *See* Decl. of Robert Spitzer, Dkt 137-8 ("Spitzer Decl."), at ¶ 5. The State's expert, professor Saul Cornell, said that he has been studying gun regulations for 20 years, and that was in

the declarations of the State's experts and historians as well as many of their cited sources, and finds no support for the State's ban.

### 3.  <u>Some Text, History, and Tradition Analysis is Already Done</u>

Some of the work of analyzing text, history, and tradition, has already been done by the Supreme Court.  To begin, "the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'"[48]  Further, "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[49]  The term "bear" naturally encompasses public carry.[50]  The Court explained that the terms "keep" and "bear" mean that the Second Amendment's text protects individuals' rights to "'keep' firearms in their home, at the ready for self-defense," and to carry arms on one's person in and outside the home in case of confrontation.[51]

As to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*,

---

2017.  *See* Saul Cornell, Five Types of Gun Laws the Founding Fathers Loved, Salon (Oct. 22, 2017, 7:29 a.m.), https://www.salon.com/2017/10/22/five-types-of-gun-laws-the-founding-fathers-loved_partner/ [https://perma.cc/73SL-VAKV].  Ten years ago, Mark Anthony Frasetto compiled a list of over 1,000 historical gun laws spanning the years 1607 to 1934 and is available on the Social Science Research Network. [https://perma.cc/Q2L8-SW6U].  His law collection was not unknown.  It was described in detail in 2017 by professor Spitzer in his article *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017), and included in professor Cornell's Compendium of Works cited in his Declaration, Dkt. 154-3, at 1707–33.
[48] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).
[49] *Id.* (quoting *Heller*, 554 U.S. at 584).
[50] *Id.* at 2134–35 (noting that while the need for armed self-defense is most acute in the home, the need for self-defense exists beyond the home).
[51] *Id.*

1  *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that "the Second Amendment

2  protects the possession and use of weapons that are 'in common use at the time.'"[52]

3        Plaintiffs want to possess and carry firearms deemed "assault weapons" by

4  California Penal Code § 30515.  Plaintiffs are law-abiding citizens who want to possess

5  (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-owned for

6  lawful purposes.  The conduct is covered by the plain text of the Second Amendment.

7  Therefore, Plaintiffs have met their burden of showing that the prohibited firearms fall

8  within the text of the Second Amendment.

9        *Bruen* next instructs courts to assess whether the initial conclusion is confirmed by

10  the historical understanding of the Second Amendment.  For conducting a historical

11  inquiry, *Bruen* identifies a number of guidelines.  First, "when a challenged regulation

12  addresses a general societal problem that has persisted since the 18th century, the lack of

13  a distinctly similar historical regulation addressing that problem is relevant evidence that

14  the challenged regulation is inconsistent with the Second Amendment."[53]  Second, "if

15  earlier generations addressed the societal problem, but did so through materially different

16  means, that also could be evidence that a modern regulation is unconstitutional."[54]  Third,

17  "if some jurisdictions actually attempted to enact analogous regulations during this

18  timeframe, but those proposals were rejected on constitutional grounds, that rejection

19  surely would provide some probative evidence of unconstitutionality."[55]  Fourth, "cases

20  implicating unprecedented societal concerns or dramatic technological changes may

21  require a more nuanced approach."[56]  Fifth, "[w]hen confronting such present-day

22  firearm regulations, this historical inquiry that courts must conduct will often involve

---

[52] *Id.* at 2128 (citations omitted).
[53] *Id.* at 2131.
[54] *Id.*
[55] *Id.*
[56] *Id.* at 2132.

reasoning by analogy."[57] "Determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[58] *Bruen* notes,

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risks endorsing outliers that our ancestors would never have accepted." On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.[59]

In surveying American history, the task is to stay within *Bruen*'s guardrails. The road ahead leads back to 1791.

### C.  1791 to 1868

*Bruen* teaches that the most significant historical evidence comes from 1791, and secondarily 1868. For the Second Amendment (and other protections in the Bill of Rights), "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[60] The Second Amendment was adopted in 1791. "[W]e

---

[57] *Id.*

[58] *Id.*

[59] *Id.* at 2133.

[60] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct. 2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings. The line . . . has to accord with history and faithfully reflect the understanding of the Founding Fathers.") (cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era.").

have generally assumed that the scope of the [Second Amendment] protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[61]  Consequently, whatever evolving standards of gun regulation the state legislature thought was good policy in the year 1989 when the Assault Weapon Control Act was passed, or the year 2000 when it was amended, or today, is not the test for constitutional scrutiny.

Courts are to "afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."[62]  British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule.  Sources post-enactment are not particularly helpful.[63]  "[T]o the extent later history contradicts what the text says, the text controls . . . . Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."[64]  Late nineteenth century evidence is not particularly instructive, "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"[65]

---

[61] *Bruen*, 142 S. Ct. at 2137.
[62] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding.  And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.").
[63] *Bruen*, 142 S. Ct. at 2136 ("Similarly, we must also guard against giving postenactment history more weight than it can rightly bear.").
[64] *Id.* at 2137 (citations omitted) (cleaned up).
[65] *Id.* (quoting *Heller*, 554 U.S. at 614).  There is little reason to rely on laws from the later part of the 1800s or the 1900s rather than ones put into effect at the time of the founding in view of *Bruen*'s central question about the meaning of the Second

*Bruen* and *Heller* have already considered some of the historical firearm statutes. Consequently, we know that colonial laws restricting handguns that were dangerous and unusual in the 1690s do not justify modern laws restricting handguns. The Court explains that even if handguns were considered "dangerous and unusual" in the 1690s, it would not matter because handguns are common today. As *Bruen* puts it,

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.[66]

On this ground alone, that part of the "assault weapon" ban on semiautomatic pistols with threaded barrels is suspect. They are handguns and they are in common use for self-defense today.

_____

Amendment as understood by the people who adopted it. *See Worth v. Harrington*, No. 21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.")); *but see Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[66] *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627, 629).

### D. **The State's List of Relevant Laws**

To aid in the task of looking for a national historical tradition of firearm regulation, the State was directed to create a list of relevant laws regulating arms dating from the time of the Second Amendment (1791) to twenty years after the Fourteenth Amendment (1868 + 20). This was not an acknowledgement that 20 years after the Fourteenth Amendment is a relevant period. Twenty years after the Fourteenth Amendment is an admittedly arbitrary limit and probably includes laws too late to shed much light.

The State went far beyond. The State produced a list of 316 laws covering 550 years—from 1383 to 1933.[67] Many of the entries are not relevant because they came much earlier or later than the most significant time period of 1791–1868. The first fourteen laws pre-date the Second Amendment.[68] At the other end, the last 225 laws post-date the adoption of the Fourteenth Amendment. Also, two-thirds of the State's list (199 laws) are restrictions on *use*—not on possession. Here, the "assault weapon" laws prohibit possession, manufacturing, giving, lending, offering for sale, etc, instead of regulating the *use* or *manner* of carrying guns. The laws challenged here impose no additional taxes on prohibited firearms, yet, the State's historical list also includes 22 tax

---

[67] *See* Defs.' Survey of Relevant Statutes, Dkt. 163-1 and 163-2 (citations to these entries herein are indicated by brackets [--]).

[68] The State includes in its list a conceal carry statute in East New Jersey from 1686 which treated pocket pistols as "unusual" weapons. [6]. *Bruen* bulldozed that citation. The East New Jersey statute was too old and too different. *Bruen* found little there to commend a present-day ban on carrying pistols. The statute prohibited only the concealed carrying of pocket pistols; it did not prohibit possession or public carrying. *Bruen*, 142 S. Ct. at 2143. The statute did not apply to all pistols, much less all firearms. Moreover, even if pocket pistols were uncommon in 1686 in East New Jersey, they were commonly used by the time of the founding. *Id.* at 2144 and n.13. The statute did not survive the merger of East and West New Jersey in 1702. Consequently, the Court made short work of the history summing it up, "[a]t most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment." *Id.* at 2144.

laws.  Incredibly, the State asks this Court to treat as analogues 38 laws on the State's list which applied only to particular disfavored people groups, such as slaves, Blacks, or Mulattos.  Those laws are not relevant to the "assault weapon" ban challenged in this case.  Even if they were, this Court would give such discriminatory laws little or no weight.

## III.  IN AMERICA PEOPLE WERE GENERALLY FREE TO CARRY FIREARMS PUBLICLY AND PEACEABLY FROM 1791 to 1868

### A. <u>Traditions</u>

The history and tradition of the United States of America is a tradition of widespread gun ownership and expertise.  *Bruen* says, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[69] Thomas Jefferson pointed out that our soldiers were good shots because they had practiced with guns since they were children.  Jefferson wrote,

> I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, until November 1777, since which there has been no event of any consequence ... I think that upon the whole it has been about one half the number lost by them.  In some instances more, but in others less. *This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy.*[70]

Then, having firearms was commonplace.  Carrying firearms was accepted.  Proficiency

---

[69] 142 S. Ct. at 2146.

[70] Letter from Thomas Jefferson, to Giovanni Fabbroni, *Founders Online*, National Archives (June 8, 1778), https://founders.archives.gov/documents/Jefferson/01-02-02-0066 [https://perma.cc/8VTV-K9HB]; [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–98] (emphasis added).

with firearms was encouraged.  Readiness with firearms was required.  Then, as now, terrorizing with a firearm or carrying a firearm with the intent to assault another was punishable.  But, "[n]one of the[] historical limitations on the right to bear arms . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[71]

The national tradition of gun ownership and expertise continues to the present day.  In 1903, Congress established the Civilian Marksmanship Program (or "CMP") with the Department of the Army running the program.[72]  Through the CMP, surplus Army firearms are sold to civilians and marksmanship training and competitions are held.  In 1996, Congress privatized the program by creating a federally chartered, non-profit corporation.[73]  Even today, the CMP sells surplus *actual* weapons of war to citizens, including the .45 caliber M1911 pistol and the .30 caliber M1 Garand rifle and the M1 Carbine.  The M1 Carbine came standard with 15 and 20-round detachable magazines.  According to the Government Accountability Office, since 1996, the Army has transferred 700,000 surplus military rifles to the CMP for sale to citizens.[74]  The M1 Carbine, which the federal government has sold to citizens over the years, could easily be deemed an "assault weapon" under California's definition.  It is certainly the case for the World War II M1A1 Carbine paratrooper version with its folding stock and 15-round detachable magazine and flash suppressor.  The M1 Carbine, a centerfire, semi-automatic, large caliber rifle, has been used by the military of many nations, as has the Ruger Mini-14.  The AR-15, on the other hand, is not used by any military as a standard

---

[71] *Bruen*, 142 S. Ct. at 2150.

[72] The CMP was then known as the National Board for the Promotion of Rifle Practice.

[73] *See* 36 U.S.C. §§ 40701, *et seq*.

[74] *See* U.S. Gov't Accountability Off., *Civilian Marksmanship Program: Information on the Sale of Surplus Army Firearms—Fast Facts* (Feb. 14, 2019), https://www.gao.gov/products/gao-19-287.

issue piece.[75]

In the United States, with its long tradition of gun ownership, there are no historical laws prohibiting simple possession of any type of firearm until long after the 1868 adoption of the Fourteenth Amendment.  That is too late.  "[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[76]  From this alone, a student of *Heller*, *McDonald*, and *Bruen* can see the writing on the wall for California's "assault weapon" ban.

Notwithstanding having significant time to do so, the State has identified no national tradition of firearm regulation so broad in its coverage or so far reaching in its effect as its extreme "assault weapon" statutes.  So, what are the traditions of firearm regulation evidenced by the State's law list?

Historical regulations are considered chronologically, "mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification."[77]  The Court has reviewed every law cited in the State's list.  It has sometimes searched for the actual text of a cited law rather than the parties' summary in order to understand any legal nuance.  It has reviewed the laws with a view to understanding the tradition of all the states rather than in an isolated frontier state.  Frontier states often had different social and security concerns than did the interior of the new nation.  The Court sought to understand how states responded to new technological developments in revolvers, repeaters, and high-capacity, fast-shooting, lever-action rifles.

The State's experts opine that gun laws were plentiful and widespread and firearm regulation was the norm.  But, if the test were to look at gun laws with that level of

---

[75] Testimony of U.S. Army General Allen Youngman (Ret.), Hr'g Tr., Oct. 30, 2020, Dkt. 58.

[76] *Bruen*, 142 S. Ct. at 2137 (citation omitted) (emphasis in original).

[77] *Rahimi*, 61 F.4th at 456.

1  generality, no gun law would ever fail scrutiny and *Heller*, *McDonald* and *Bruen* could

2  not have been decided as they were.  Furthermore, as will be shown, it is an exaggeration.

3  The State also says regulations on dangerous or unusual *weapons* existed throughout

4  American history.  By "weapons," the State means bladed or melee weapons – not

5  firearms.  Relevantly similar regulations are *firearm* prohibitions—not bladed or melee

6  weapon regulations.  And neither "dangerous or unusual" nor "unusually dangerous" is

7  the test, although the State cannot point to an outright prohibition on even unusual or

8  unusually dangerous *firearms* until Alabama's 1868 prohibition on the dangerous and

9  unusual rifle-walking cane.  [87]

10       Because the State cannot find a historic regulation of *firearms*, it turns to the

11  historic regulations of *weapons*, whether bladed weapons, melee weapons, blunt

12  weapons, or lead-filled weapons.  Yet, the Supreme Court does not look to knife laws

13  when reviewing a restriction about guns.  *Bruen* teaches that a state's burden is to identify

14  a historical tradition of *firearm* regulation, not a tradition of knife regulation.

15  Underscoring the importance of its words, three different times *Bruen* repeats the specific

16  phrase "firearm regulation," as in the following instances: (1) "Rather, the government

17  must demonstrate that the regulation is consistent with this Nation's historical tradition of

18  *firearm regulation*;[78] (2) "The government must then justify its regulation by

19  demonstrating that it is consistent with the Nation's historical tradition of *firearm*

20  *regulation*;"[79] and (3) "[T]he burden falls on respondents to show that New York's

21  proper-cause requirement is consistent with this Nation's historical tradition of *firearm*

22  *regulation*."[80]  In contrast, the *Bruen* majority opinion did not mention bowie knives at

23  all.  The Supreme Court was not interested in traditions of knife regulation or melee

24

25

26  [78] *Bruen*, 142 S. Ct. at 2126 (emphasis added).

27  [79] *Id.* at 2130 (emphasis added).

28  [80] *Id.* at 2135 (emphasis added).

1   regulation.  Even in the dissent, bowie knife laws were hardly mentioned.  Consequently,

2   when the State asserts, "weapons restrictions proliferated," it misses the mark by

3   referring to non-firearm weapon restrictions or concealed carrying restrictions.[81]

4   During the most important period of history, there were relatively few gun

5   restrictions.  This conclusion can be drawn from inspecting the State's comprehensive

6   historic law list and it is confirmed by at least one historian.  "Between 1607 and 1815 ...

7   the colonial and state governments of what would become the first fourteen states

8   neglected to exercise any police power over the ownership of guns by members of the

9   body politic . . . . These limits on colonial and early state regulation of arms ownership

10   outlined a significant zone of immunity around the private arms of the individual

11   citizen."[82]  More importantly, it is a conclusion confirmed by the Supreme Court.  *Bruen*

12   says, "[a]part from a few late 19th-century outlier jurisdictions, American governments

13   simply have not broadly prohibited the public carry of commonly used firearms for

14   personal defense."[83]

15   There were regional differences, to be sure.[84]  As the nation aged, the southern

16   states tended to prohibit concealed carrying while the northern states remained free from

17   almost any restrictions on guns.[85]  In short, California weakly argues that because some

---

[81] Def's Br. in Resp., Dkt. 142, at 20.

[82] Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007); *see also*, Don B. Kates, Jr., *Restricting Handguns* 12 (North River Press ed., 1979), found in Compendium Works Cited in Decl. of Randolph Roth, Dkt. 153-26, at 0349 ("By 1850, every Western state barred the carrying of concealed weapons.  In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century.  Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.").

[83] *Bruen*, 142 S. Ct. at 2156.

[84] "[T]here were profound regional differences in early America."  Decl. of Saul Cornell, Dkt. 137-3 ("Cornell Decl.") at ¶ 26, n.46.

[85] It is true that there were laws criminalizing the *use* of guns for criminal acts such as carrying with intent to assault another or displaying a gun in a threatening manner.  These

states have regulated in some ways the use of some weapons, that translates into the State being able to regulate any weapon in any way. This is a non sequitur and particularly in this case—a bridge too far.

## 1. No Prohibitions on Possessing Guns

It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind.[86] Based on a close review of the State's law list and the Court's own analysis, there are no Founding-era categorical bans on firearms in this nation's history.[87] Though it is the State's burden, even after having been offered a clear opportunity to do so, the State has not identified any law, anywhere, at any time, between 1791 and 1868 that prohibited simple possession of a gun.[88]

With 315 other entries in the State's law list, there must be many other laws in the relevant time period of American history to demonstrate a tradition of firearm regulation

---

were crimes of violence, not crimes of possession. California has similar laws today, such as California Penal Code § 245(a)(2) & (3) (assault with a deadly weapon - firearm) and § 417(a)(2) (exhibition of a firearm in a rude, angry, or threatening manner). These assault and exhibition laws are not being challenged in this case.

[86] According to one scholar, the first prohibition on simple ownership of a gun came in 1911. Churchill, *supra*, at 139, n.61 ("The first law restraining gun ownership by citizens mentioned in the secondary literature is New York's 1911 Sullivan Law, which prohibited the ownership of concealable arms without a police permit."); *see also* David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900* 50 J. of Legis., Apr. 25, 2023, at 45–46 (2024), https://ssrn.com/abstract=4393197 ("Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787 . . . . There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.").

[87] Pls.' Resp. Br. Re: Defs.' Hist. Surveys, Dkt. 166, at 6.

[88] (Unless the person was an African-American or a slave or a mulatto).

analogous to the "assault weapon" ban.  What else is there?

## 2.  No Gun Laws In The Northern States For 50 Years

From the adoption of the Second Amendment through the next 50 years, there were no firearm restrictions in any states north of the Mason-Dixon Line.[89]  Imagine that. One could live in any of the northern states without restrictions of almost any kind.[90]  A

---

[89] The Mason-Dixon Line established the boundary line between Pennsylvania and Maryland.  Beyond its importance as a literal boundary between states, "the Mason-Dixon Line has become known as the boundary between the North and the South.  When Mason and Dixon surveyed the land in the late 18th century, the border was never about slavery, yet it took on that association on March 1, 1790, when the Pennsylvania Assembly passed legislation ending slavery in the state.  They made the Mason-Dixon Line as the boundary between slave territory and free land, since slavery was still allowed in Maryland.  The border between Pennsylvania and Maryland became tied to the North and South divide, especially after the Missouri Compromise was passed in 1820, which prohibited slavery north of the Mason-Dixon Line.  To the many slaves who used whatever means necessary to reach free land, the Mason-Dixon Line became important to their freedom.  For the slaves located in Maryland, they only needed to get to the state line to secure their freedom, although many continued traveling north in an attempt to get as far away from their former masters as possible."  Kathryn DeVan, *Our Most Famous Border: The Mason-Dixon Line*, Pa. St. Univ. (fall 2008), https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/our-most-famous-border-mason-dixon-line.

[90] The State lists one New Jersey statute from 1799 as a law purportedly prohibiting the carrying of a pistol with the intent to assault (*see* Dkt. 139-3, [19]), but this appears to be a sentencing enhancement statute applicable only if one was apprehended for burglary. *See* Duke Center for Firearms Law collection of firearm statutes.  "[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.  And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or

gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island, Vermont, Maine, Ohio, Illinois, Michigan, or Indiana.  One might never be subject to a later surety statute in Massachusetts (1836) [29] and Maine (1841) [46].[91]  In fact, if anything, regulations were not about what kind of firearm one was *not* allowed to keep, but about the kind of firearm one was *required* to buy and have ready for militia duties.

The same was largely true south of the Mason-Dixon Line (disregarding laws concerning slaves and Indians, neither of which were considered citizens).  Like the northern states, from the time of the adoption of the Second Amendment to the time of the adoption of the Fourteenth Amendment, there were no state gun laws in Delaware, North Carolina, South Carolina, Mississippi, Florida, West Virginia, and Texas, according to the State's law list.  A citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions.  This understanding is not based on expert opinion, but a methodical reading and assessment of the laws set out in the government's survey.  The parties' own experts express some disagreements but are unpersuasive.

In the Northern States there was no tradition of criminalizing the simple act of keeping or carrying any firearm.  There were hardly any firearm laws at all.  In the District of Columbia, governed by Congress, there were no firearm laws for the first

---

out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person." Duke Ctr. For Firearms L., *Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources*, https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-474-image-501-1821-available-at-the-making-of-modern-law-primary-sources/.

[91] That the two states would share similar laws makes sense since Maine was part of the Commonwealth of Massachusetts prior to its statehood in 1820.

eighty years until a concealed carry prohibition was enacted in 1871. [97]. Maine enacted its first law, a gunpowder storage regulation to prevent fires, in 1821. [27]. Massachusetts enacted its first state firearm law in 1836 as a surety law [29] with Maine following suit in 1841. [46]. *Bruen* already notes that under the surety laws everyone started out with robust carrying rights and *Bruen* saw little evidence that the laws were enforced.

Illinois was admitted to the Union in 1818. In 1845, Illinois enacted its first firearm statute criminalizing carrying a gun *with the intent to assault another person*. [49]. Indiana became a state in 1816. In 1855, its first law was passed, according to the State's law list. [62]. Indiana criminalized shooting a gun at a train or throwing stones or sticks at a train. The law did not concern keeping any gun whatsoever, or carrying a gun anywhere, in any manner whatsoever.[92] Ohio became a state in 1808. Ohio had no state laws respecting firearms until 1859, according to the State's law list. [70]. Not until almost 70 years after the adoption of the Second Amendment did Ohioans have a gun law. The first gun law was one that prohibited carrying a pistol, bowie knife, dirk, or other dangerous weapon *concealed*. California enacted its first gun regulation in 1853. That law criminalized the act of having "upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." [57].

In short, the history and tradition of the northern states was to leave firearm ownership and use completely unregulated. From the time of the adoption of the Second Amendment to the time of the adoption of the Fourteenth Amendment, there were no

---

[92] The State's law list erroneously describes the 1855 Indiana law as one prohibiting the carrying of a pistol with the intent to injure another. This appears to be a scrivener's error. Although the State does not include it in its law list, Indiana may have enacted an earlier statute prohibiting carrying a pistol concealed, with an exception made for travelers. "In *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons." *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 933 (9th Cir. 2016).

1   state gun laws in Pennsylvania, New York, Connecticut, Rhode Island, Vermont, New

2   Hampshire, Michigan, Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri, or the

3   District of Columbia.  In Massachusetts and Maine there were only surety statutes.  In

4   New Jersey there was a sentencing enhancement.  In this half of the nation, keeping and

5   bearing firearms was done freely without government interference.

### 3.  No Gun Laws In The Southern States For 50 Years

6   

7   South of the Mason-Dixon Line, where slavery was practiced, there were many

8   laws restricting firearms for slaves, African-Americans, and Indians.  Setting aside that

9   obviously unconstitutional tradition, among the southern states firearm ownership was

10   largely unregulated for at least the first 50 years after 1791.  Like the northern states,

11   from 1791 to 1868 there were no state gun laws in Delaware, North Carolina, South

12   Carolina, Mississippi, Florida, West Virginia, or Texas, according to the State's law list.

13   The few laws in other southern states that did exist concerned: (1) carrying a pistol

14   *with the intent to assault another*; and (2) carrying a pistol in a *concealed* manner.

15   Twelve years after the adoption of the Second Amendment, Tennessee enacted the first

16   firearm regulation in the southern states in 1801 in the form of a surety law.  [20].  The

17   Tennessee law was discussed in *Bruen*, as mentioned earlier.  A decade later in 1811,

18   Maryland passed the second firearm regulation in the south. [23].  The Maryland law was

19   a sentencing enhancement for carrying a pistol *with the intent to assault another*.

20   In 1813, Louisiana passed the first law prohibiting the carrying of a *concealed* gun.

21   [24].[93]  *Bruen* noticed that a Louisiana court found the prohibition on concealed carrying

22   constitutional only because it permitted openly carrying a firearm.[94]  Kentucky passed a

23   prohibition on carrying a *concealed* pistol that year, although it is omitted from the

_____

25
26   [93] Louisiana reenacted similar, if not the same, statutes two more times, in 1842 and again
     in 1855.  [63].

27   [94] 142 S. Ct. at 2146 and n.19 (quoting *State v. Chandler*, 5 La. 489, 490 (1850)
     ("Louisiana concealed-carry prohibition 'interfered with no man's right to carry arms (to
28   use its words) "in full open view," which places men upon an equality'")).

State's law list.  Perhaps it is omitted because Ketuncky's concealed carry law was struck down as unconstitutional a short time later.  The only other firearm regulation in the south during this time was Georgia's 1816 law prohibiting the carrying of a pistol *with intent to assault* another person.  [25].

Around 50 years after the Second Amendment, four southern states passed their first firearms regulations taking the form of *concealed* carry prohibitions.  In 1837, Arkansas prohibited carrying a pistol concealed unless on a journey.  [32].  In 1837, Georgia added its own prohibition on carrying a pistol concealed.  [33].  The constitutionality of the Georgia law was upheld because open carry was unregulated.[95]  In 1838, Virginia prohibited carrying a pistol concealed.  [40].  In 1839, Alabama prohibited carrying a firearm concealed [41], adding exceptions for self-defense and for travelers, two years later.  [45].[96]

Three more recent regulations were enacted in the south in the years leading up to the adoption of the Fourteenth Amendment.  In 1856, Tennessee passed its first prohibition in the form of selling or lending a pistol to a minor, except for hunting.  [65].  In 1868 Florida enacted a prohibition on carrying secretly "arms of any kind whatever" and the outright carrying of a pistol or other arm or weapon.  [90].  The 1868 Florida law was not tested in a published court decision.[97]

---

[95] *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").
[96] *Lockett v. State*, 47 Ala. 42, 45–46 (1872) ("Nor is it required that he should have any necessity for the use of his pistols.  It is enough if he was traveling on a journey, long or short.").
[97] However, an 1867 court decision considered an earlier law where only *concealed* carrying was prohibited.  *See Sutton v. State*, 12 Fla. 135, 136 (1867) ("The statute under which this indictment was found provides, 'that hereafter it shall not be lawful for any

The first restriction on a *dangerous and unusual* firearm did not occur until 1868, the year the Fourteenth Amendment was adopted.  In that year, Alabama prohibited carrying a rifle walking cane or a shotgun walking cane.  [87].  A rifle walking cane was a single shot rifle disguised to appear as a walking cane with a variety of handles.  When fired, one bullet would exit through the bottom of the cane.  It was patented in 1858 and manufactured by the E. Remington & Sons company until approximately 1888, with less than 2,000 produced.[98]  Remington was the only major gun maker to produce a rifle cane gun.  California currently has a law prohibiting possession of a "cane gun."  *See* Cal. Penal Code § 24410.

In short, the history and tradition of the southern states was to leave firearm ownership and use mostly unregulated.  At least for the first half of the century, in this half of the nation, keeping and bearing firearms was done freely, with a handful of states enacting prohibitions on carrying pistols in public in a concealed manner, and Maryland and Georgia making it a crime to carry a firearm with the intent to assault another person.

### 4. Territories

The State includes in its law list a number of regulations from nineteenth century United States territories.  *Bruen* has already considered such laws and decided that they are not particularly helpful for several reasons.  "First, the bare existence of these

---

person in this State to carry arms of any kind secretly on or about their person, &c.: Provided, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes' . . . . The statute was not intended to infringe upon the rights of any citizen to bear arms for the 'common defense.'  It merely directs how they shall be carried, and prevents individuals from carrying concealed weapons of a dangerous and deadly character, on or about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary.").

[98] *See* Remington Soc'y of Am., *Remington Cane Guns*, https://www.remingtonsociety.org/remington-cane-guns/ [https://perma.cc/A74W-EHPT] (last visited May 26, 2023).

localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition . . . ."[99]  "These territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'"[100]  "Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality. . . . we fail to see how they inform 'the origins and continuing significance of the Amendment.'"[101]  "Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived . . . . Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation."[102]  One commentator disagrees and argues that territorial regulations should enjoy more Second Amendment significance because they were adopted with consideration for the Bill of Rights.[103]  Even so, they suggest an absence of gun bans during the most important historical period.  Though territorial regulations are not instructive, fail to inform the continuing significance of the Second Amendment, and deserve little weight, the State has listed some.

None of the territorial regulations from 1791 to 1868 prohibited a firearm.  There were no prohibitions on owning firearms of any type.  There were no prohibitions on keeping a firearm of any type for self-defense, whether in the home or in public.  The first territorial regulation came approximately 47 years after the Second Amendment (in 1839) and addressed the carrying of a firearm in a *concealed* manner in the Florida

---

[99] *Bruen*, 142 S. Ct. at 2154.
[100] *Id.* (quoting *Heller*, 554 U.S. at 614).
[101] *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 592).
[102] *Id*. (citations omitted).
[103] *See* Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. Univ. L. Rev. (2023), https://ssrn.com/abstract=4372185.

19-cv-01537 BEN (JLB)

Territory.  [42].  In other words, throughout the first 40 years of the nation's history, the only territorial restriction on firearms, anywhere, was in the Florida territory taken from Spain in 1819.

In 1853, the New Mexico Territory also adopted a *concealed* carrying law.  [58]. In 1854, the Washington Territory addressed *exhibiting* a pistol in a rude, angry, or threatening manner, reenacting a similar law in 1859.  [60, 71].  The Nebraska Territory made it a crime to carry a pistol *with the intent to assault* another person in 1858.  [68] The Colorado Territory (in 1862 and again in 1867) and the Montana Territory (in 1864) restricted the *concealed* carrying of a pistol in a city, town, or village.  [75, 79, 84]. These territorial laws do not evidence a history or tradition of prohibiting firearms of any type.  They do evidence some later restrictions on the manner of carrying firearms in some public places.

### 5.   The State Tries Four Longshots

With nothing else to go on, the State tries to identify a tradition of firearm regulation based on four laws that the State claims banned possession of "dangerous weapons."[104]  Because a law criminalizing mere possession of a firearm in one's home kept for self-defense, like California's Assault Weapon Control Act, is *so extreme*, it would be very important if the State could at least point to a historical tradition of banning the simple possession of any kind of firearm.  Unfortunately, the State is unable to find such a tradition.  The four laws it offers up either did not ban firearms or they did not ban possession.  Moreover, the four longshot laws came too late in time to establish a new tradition and cannot be used to confirm a non-existent earlier tradition.

The biggest miss is that three of the four laws the State cites for a tradition of firearm regulation did not ban possession of a *firearm*.  Law [81] was an 1866 New York statute banning a slungshot, billy, sandclub, dirk, dagger, sword cane, air-gun, or metal

---

[104] Defs.' Br. in Resp., Dkt. 170, at 8 (citing [81, 150, 170, 171]).

knuckles.  Law [150] was an 1881 iteration of the same New York law about slungshots, billys, etc.  Law [171] was a third iteration of the New York law.  These three statutes spanning twenty years from New York did not infringe on one's right to possess a firearm.

The second miss is that the fourth law [170], an 1885 law from the Montana Territory, does not go as far as the State imagines.  One problem is that, coming 94 years after the adoption of the Second Amendment and 20 years after the Fourteenth Amendment, the Montana regulation appears too late to be indicative.  While it could be indicative of a tradition *if* it were consistent with earlier laws of the same caliber, there were no such earlier laws.  Another problem is that it was a territorial law to which *Bruen* says should be given little weight.  The biggest problem is that the Montana regulation did not ban possession.  The State's law list summary contains a scrivener's error that becomes apparent when reading the actual text of the law.  The law's formal title ("Threateningly drawing deadly weapons prohibited") gives it away.  The 1885 Montana territorial ordinance [170] punished drawing or exhibiting a gun in a rude, angry, or threatening manner.[105]  It did not criminalize simply possessing or keeping a gun.  In fact, unlike the "assault weapon" ban, this territorial law even provides an exception

_____

[105] The Montana Territory's 1885 amendment to § 62 provided:  "Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, *who shall, in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner*, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory, shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court…" *See Laws, Resolution and Memorials of the Territory of Montana* 74–75 (1885), reproduced at the HathiTrust Digital Library, https://hdl.handle.net/2027/uc1.a0005193305?urlappend=%3Bseq=93%3Bownerid=1351 0798903325764-113 (emphasis added).

permitting one to possess and exhibit a gun in self-defense.

To sum up, the three New York laws had nothing to do with firearms and the Montana territorial law did not prohibit mere possession.[106]  As some scholars have observed, "[d]uring Reconstruction, no government in the United States attempted to prohibit the possession of any particular type of firearm."[107]

## B. **Historical Twins**

*Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[108]  The same can be said about California's "assault weapon" ban.  To paraphrase the Supreme Court, none of these historical limitations on the right to bear arms approach California's complete ban on "assault weapons."  None of the early nation's laws operated to prevent law-abiding citizens with ordinary self-defense needs from possessing rifles, shotguns, or pistols.

So, what analogue for the "assault weapon" ban does the State rest its case upon?  There are no founding era dead ringers or historical twins.  A historical twin is not unimaginable.  It could have been the case that the early states prohibited ownership of rifles and muskets with bayonet attachments or firearms capable of multiple shots without reloading.  One could imagine the states prohibiting private possession of canons or Gatling guns.  There were no such restrictions.

---

[106]  The State also mentions an Alabama tax on bowie knives that "effectively banned" most people from owning the knife.  Defs.' Br. in Resp., Dkt. 170, at 8.  Of course, a bowie knife is not a gun and the AWCA goes well beyond "effectively banning most people" from possessing a modern semiautomatic rifle, to actually banning and making criminals of people possessing a modern semiautomatic rifled deemed an "assault weapon" (with statutory exceptions).  A tax on bowie knives is not a close analogue.
[107] Kopel & Greenlee, *This History of Bans*, *supra*, at 60.
[108] 142 S. Ct. at 2150.

## IV.  ANALOGUES

Although the State does not identify a historical twin of its "assault weapon" ban, it may not have to.  After all, it can be argued that "assault weapons" represent a dramatic change in technology and the State is attempting to address a modern societal concern of mass shootings.[109]  Where that is the case, *Bruen* calls for a more nuanced approach.  On one hand, a modern rifle like the AR-15 clearly represents a dramatic technological advancement when compared to a musket.  On the other hand, the lever-action repeating Henry and Winchester rifles that were popular at the time of the Fourteenth Amendment were also dramatic technological advancements in firearms.  These popular lever-action rifles had large tubular magazines and could be fired multiple times in succession very accurately and quickly.  Yet, there are no state prohibitions on the possession or manufacture of these lever-action rifles in the State's law list.  In the same way, a semiautomatic pistol with a threaded barrel (*i.e*, an "assault weapon") is is not much of a technological advancement over an 1868 navy revolver with a smooth barrel.  And is a semiautomatic shotgun with a pistol grip and adjustable stock (*i.e*, an "assault weapon") really a dramatic technological advancement over common multi-shot shotguns from the 1800s?

Large capacity, rapid-firing rifles appeared in large numbers in 1860 with the fast shooting Henry lever-action rifle equipped with a 30-round tubular magazine.  By 1866, Winchester began mass marketing its amazing Model 1866 (a rifle capable of firing 15 rounds in half as many seconds).[110] And long before these popular lever-action repeaters was the Girandoni air rifle, developed in 1779, with a 22-round capacity famously carried on the Lewis and Clark expedition.[111]  The Henry and Winchester lever-action large-

---

[109] Defs.' Resp., Dkt. 167, at 13–14.

[110] *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020); Decl. of Michael Vorenberg, Dkt. 137-9 ("Vorenberg Decl."), at ¶ 17.

[111] *Duncan*, 970 F.3d at 1147.

capacity repeating multi-shot rifles were not novelties; they were common among civilians by the end of the Civil War and in the years thereafter. "[O]ver 170,000" Winchester 66's "were sold domestically."[112]  The successors that replaced the Model 1866, the deadly Model 1873 holding 15 rounds and Model 1892, sold more than 1,700,000 in the ensuing decades.[113]  In fact, so common were the lever-action Winchester rifles that anyone could order one from the Sears Roebuck & Co. catalog and have it delivered to their door in 1898.[114]

During the Civil War, Union soldiers used 8,500 Henry repeating rifles and at the end of the war kept 7,500 for their personal use.[115]  Unfortunately, the Army did not fully embrace the Henry/Winchester rifles, leading to its ignominious defeat at the Battle of Little Big Horn in 1876.  Plains Indians, using Winchester repeating rifles, wiped out George Custer's army equipped with only Springfield single-shot rifles.[116]  One author explains that the smaller caliber and the rapid fire, which was unattractive to military authorities, made it popular among hunters and frontiersmen.[117]

These technologically advanced rifles were also used to great advantage for self-defense.  In 1865, two Civil War veterans who kept their Henry repeating rifles were mining borax in the Blackfoot Indian country of the Rocky Mountains when 40 warriors

---

[112] *Id.* at 1148

[113] Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (14,000 Henry rifles were sold between 1860 and 1866).

[114] *See* 1898 Sears, Roebuck & Co., *Our Line of Winchester Repeating And S. S. Rifles*, Catalogue No. 107, at 372–73, viewed at Internet Archive https://bit.ly/3VeUhHo, cited by State expert Brennan Rivas, Decl. of Brennan Rivas, Dkt. 137-6 ("Rivas Decl."), at n.2.

[115] Vorenberg Decl. at ¶ 24.

[116] *Id.* at ¶ 58.

[117] Harold F. Williamson, *Winchester: The Gun That Won the West* 41 (Washington D.C.; Combat Force Press, 1952), found in Compendium of Works Cited in Decl. of Vorenberg, Dkt. 150-8, at 458.

attacked.  The attackers made a fatal mistake of assuming the miners had only single shot rifles.  The two miners were able to keep firing at the attackers, eventually wiping them out and discouraging all future attacks.[118]  It is a perfect example of civilians outnumbered by attackers successfully using high-capacity rifles for self-defense.  Another example comes from the 1863 story of James E. Wilson.  Wilson was attacked in his home with his family by seven armed men firing shots.  Grabbing his Henry repeating rifle, Wilson defended himself by killing the seven home invaders with eight shots.[119]  With the popularity of these deadly, high-capacity, lever action rifles, it is telling that there are no state laws banning possession or manufacturing of these firearms in the State's law list.

## A.   The State's Best Historic Analogue: Guns Set As Traps

The State argues the best analogue to the "assault weapon" ban are *trap gun laws*.[120]  With the benefit of academic historians who have studied historic gun laws for more than 20 years, the State was asked to identify its best analogous historical regulation.  The State identified its best analogue: a 1771 statute from the colony of New Jersey restricting the use of *guns set as traps*.  It is an odd choice.

First, what the State does not admit or seem to recognize is that "trap guns" are not guns at all.  They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other atypical triggering mechanisms without an operator.  Second, there was no history and tradition of trap gun restrictions in the important years between 1791and 1868.  Predating the Second Amendment by twenty years, the Declaration of Independence, and New Jersey statehood,[121] the 1771 trap gun law cannot be said to reflect a national understanding of

---

[118] *Id.* at 459–60.
[119] *Id.* at 456.
[120] Defs' Brief in Response, Dkt 168, at 3-5; Defs' Brief in Response, Dkt 167, at 23.
[121] New Jersey was one of the few states that did not have in its state constitution a provision like the Second Amendment.  (Six states do not have provisions protecting a

the Second Amendment right.  More importantly, ninety-five years passed before a second restriction on setting a gun as a trap appeared -- and that law applied only to the Utah Territory (1865).  [80].  Remember that *Bruen* discounted territorial laws.  In the years following the adoption of the Second Amendment, the first state law on setting a gun as a trap came in 1873 (Minnesota).  [109].  Two more states followed in 1875 (Michigan) and 1884 (Vermont).[122]  In other words, trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states, until 1873.  California waited to enact its own trap gun law until 1957.[123]  If this is what a national tradition of trap gun regulation looks like, it is a strange look, indeed.[124]

Third, and perhaps most important, trap gun laws did not prohibit possession or use of particular guns.  Trap gun laws restricted only the particular manner of using any gun.[125]  Trap gun laws did not prohibit the simple possession of the gun even when set as

---

right to arms in their state constitutions:  California, New Jersey, New York, Maryland, Minnesota, and Iowa.)  *See* David B. Kopel and Clayton E. Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev 1113, 1145, n.51 (2010).

[122] Defs.' Br. in Resp., Dkt. 168, at n.6.  The State's expert (Spitzer) also notes a Wisconsin law from 1872, and laws from South Carolina (1855), Rhode Island (1890), and North Dakota (1891) that are about proscribing the use of a trap gun or set gun solely as a disfavored hunting technique.

[123] *See* Cal. Fish & Game Code § 2007.

[124] Some argue that a complete absence of historical laws does not necessarily mean that states lacked constitutional authority to enact such laws.  If that were the case, however, one would expect to find other indicia of that silent authority.  For example one might find a court opinion observing that it is well known throughout the country that trap guns are criminal implements.  Defendants have offered no such interstitial evidence and it is the government that bears the burden.  Instead, there are relevant period court decisions that fill the silence with a different explanation: trap guns were lawful to use for defense of persons and property.

[125] *People v. Ceballos*, 12 Cal. 3d 470, 477 (1974) (*en banc*) ("Where the actor is present, there is always the possibility he will realize that deadly force is not necessary, but deadly mechanical devices are without mercy or discretion.") (citation omitted).

42

a trap with a string.

The State says the New Jersey law imposed a burden "comparable" to § 30515 by prohibiting certain configurations of firearms, including inside the home.[126] Not according to the terms of the statute. The 1771 Act concerns, *inter alia*, using oversized hunting traps and trespassing while hunting with guns and dogs. No prohibition is made of setting a trap gun within a home.[127] A predecessor law from 1751 focused almost entirely on setting traps and spring guns *on the properties of others*.[128] Most importantly, the colonial lawmakers of New Jersey deemed it important to clarify that in all events, it remained lawful to carry a gun. Section 2 of the Act says, "*nothing herein contained shall be construed to extend to prevent any person carrying a gun upon the king's highway in this colony*."[129]

Grasping at straws, the State also argues that trap guns were designed to injure or kill individuals. The text of the 1771 law, on the other hand, suggests that trap guns were designed to kill deer. The State argues that trap gun laws sought to avoid harm to the

---

[126] Defs.' Br. in Resp., Dkt. 168, at 4.

[127] Compare, the section the State relies on (§ 10), to § 7 which prohibits unusually large deer traps. Section 7 specifically penalizes possession or keeping unusually large traps "in their house." So, New Jersey knew how to prohibit a trap within one's house. That language was not used for setting guns as traps. Further, it can be argued that these hunting regulations did not apply at all in one's own lands. *See* § 12.

[128] *Koons v. Platkin*, No. 22-7364-RMB-AMD, 2023 U.S. Dist. LEXIS 85235, at *201 (D.N.J. May 16, 2023) (the law was designed to discourage poaching).

[129] (Emphasis added.) The notion that hunting laws regulating firearms were not intended to apply beyond the hunting context, is not novel. The California Supreme Court in 1898 recognized the distinction, explaining, "[t]he legislature did not mean to make it a misdemeanor to use a No. 8 gun in any possible or conceivable way, or for any possible purpose. Taking the whole context of the act, it is apparent that the intention was to prohibit the use of guns of large caliber for the purpose of killing game or other animals." *Ex parte Peterson*, 119 Cal. 578, 578 (1898).

public.  Instead, it is the trespasser, that the law sought to protect.[130]

Lastly, the State asserts that its best analogue, trap gun laws, are also designed to prevent unintended injury to innocent bystanders.  In reality, the "problem" addressed by a trap gun law is that the gun hits precisely what it is aimed at, not that it injures human bystanders.  Some trap gun laws had no connection to protecting the public from gun shots.  For example, an 1855 South Carolina law protected deer, turkeys, and ducks while an 1892 Rhode Island law protected quail and partridge.  North Dakota's 1891 law concerned only particular wildlife like South Dakota's law in 1909.

To sum up, by the year 1900, there were 45 states in the Union.  From before the adoption of the Second Amendment, for the next 100 years, only New Jersey had a law prohibiting setting a gun, any gun, as a trap, and that law concerned the manner of hunting deer.  Court decisions between 1791 and 1868 recognized that in other states it was entirely lawful to use guns set as traps (or spring guns, as they were sometimes called) to defend one's property.[131]  And in every case, it was the manner and setting of a

---

[130] *State v. Green*, 118 S.C. 279, 110 S.E. 145, 148 (1921) (quoting *Simpson v. State*, 59 Ala. 1 (1877) ("In the one case, if the trespasser came not with an unlawful intent--if his trespass was merely technical--if it was a child, a madman, or an idiot, carelessly, thoughtlessly entering and wandering on the premises, the owner would withhold all violence.  Or, he could exercise a discretion, and graduate his violence to the character of the trespass.  The mechanical agency, is sensitive only to the touch; it is without mercy, or discretion; its violence falls on whatever comes in contact with it.")).

[131] *See, e.g.*, *Gray v. Combs*, 7 J. J. Marsh 478 (Ky. 1832) (one who sets traps or spring guns to protect valuable property by means of which another is killed while attempting to enter the premises is guilty of no crime); *Loomis v. Terry*, 1837 WL 2808 (N.Y. Sup. Ct. 1837) ("It is not like setting spring guns with public notice of the fact; for even that has been held warrantable as being necessary (*Ilott v. Wilkes*, 3 Barn. & Ald. 304).")); *State v. Moore*, 31 Conn. 479, 479–80 (Conn. 1863) ("Breaking and entering a shop in the night season with intent to steal, is by our law burglary, and the placing of spring guns in such a shop for its defense, would be justified if a burglar should be killed by them."); *Maenner v. Carroll*, 46 Md. 193, 208 (Md. Ct. App. 1877) ("While it is decided that traps, spring-guns, and other dangerous instruments, may be lawfully placed on private

firearm that was proscribed; possession of a firearm by itself, whether a string or rope or some other thing was attached to the firearm, was never prohibited.

## B. The State's Other Analogues

### a. Gunpowder Storage Laws

For another possible analogue, the State identifies historic gunpowder storage laws. These were *fire* safety regulations—nothing more.[132] "Boston in 1782 enacted a unique ordinance, expressly for fire protection."[133] "The ordinance did not prohibit *carrying* loaded firearms within the City of Boston—only leaving them unattended in a building—and . . . this law was for the protection of those fighting fires."[134] In fact, one

---

grounds, for the purpose of deterring trespassers or catching strange animals doing damage . . . ."); *see also Simpson*, 59 Ala. at 18 (citing *Moore*, 31 Conn. at 479) ("The setting a spring-gun on his premises, by the owner, is culpable only because of the intent with which it is done. Unless the public safety is thereby endangered, it is not indictable. If dangerous to the public, it is indictable as a nuisance."); *United States v. Gilliam*, 25 F. Cas. 1319, 1320 and n.2 (D.C. Crim. Ct. 1882) ("The setting of a spring-gun as a protection for property, though not in itself unlawful and indictable, is certainly undeserving of encouragement. . . .") (citing English common law and the court of King's Bench, *Ilott v. Wilkes*, 3 Barn. & Ald. 304 ('A trespasser, having knowledge that there are spring-guns in a wood, although he may be ignorant of the particular spots where they are placed, cannot maintain an action for an injury received in consequence of his accidental treading on the latent wire connecting with the gun, and thereby letting it off.')).

[132] *See* Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2; s*ee also Renna*, 20-cv-02190-DMS-DEB, 2023 WL 2846937, *12–13 (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating "Boston's firearm-and-gunpowder storage law is historically distinct from the challenged firearm regulation in light of *Heller*" and dismissing argument that Massachusetts gunpowder storage law is analogous for Second Amendment purposes to California's unsafe gun roster).

[133] David B. Kopel and Joseph G. S. Greenlee, *The Sensitive Places Doctrine*, 13 Charleston L. Rev. 205, 240 (2018); Defs.' Compendium of Works, Dkt. 158-2, at 151.

[134] Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 705 (2008) (emphasis in original).

scholar mused, "Strictly speaking, the law did not forbid bringing an unloaded gun into a building, and then loading it when inside.  So, occupants of homes or businesses remained free to keep loaded guns."[135] In contrast, the State's expert witness, professor Cornell, opined that the gunpowder storage law prohibited Bostonians from storing a loaded weapon in one's home within the town.  However, the statutory text does not support his view.

In 1783, gunpowder presented a fire danger and a fire could quickly get out of control.[136] In neighboring New York City, there had been two great fires the previous decade.  In 1776, New York City experienced "the most destructive fire in colonial North America," which burned much of Manhattan to the ground.[137]  Shortly thereafter, a second fire swept through the city in 1778.[138] The point of the Boston gunpowder storage statute and others like it was, as it proclaimed, to protect communities from fire and

_____

[135] *Id.*

[136] Gunpowder remained a fire threat for years.  For example, in 1841, the *New York Herald* published: "Another dreadful calamity – Terrible Explosion at Syracuse – Thirty Lives Lost, Fifty Wounded.  We have to chronicle another awful calamity by which upwards of thirty persons have been killed and fifty seriously wounded.  We learned that last Friday night a fire broke out at Syracuse in a carpenter's shop near the Oswego Canal.  It spread with great rapidity and the building was soon enveloped in flames.  Crowds of citizens flocked to the scene, and soon after a great number had collected, a barrel of gunpowder which had been placed in the shop, exploded, and sent death and destruction all around.  As near as could be ascertained, upwards of thirty persons were killed outright, and no less than fifty wounded, some very seriously, and perhaps fatally.  From ten to fifteen were so mangled and cut to pieces that it was impossible to recognize them."  OnonDaga Hist. Ass'n, *Gunpowder Explosion on Oswego Canal Kills 25, Injures 60* (Aug. 23, 1841), https://www.cnyhistory.org/2016/08/gunpowder-explosion/ [https://perma.cc/XCU8-34E6].

[137] New York City Fire Museum, *The Great New York Fire of 1776* (Mar. 21, 2023), https://www.nycfiremuseum.org/greatfire1776 [https://perma.cc/A3BW-TQRP].

[138] Richard Howe, *Notes on the Great Fires of 1776 and 1778* (2014), The Gotham Center for New York City History, https://www.gothamcenter.org/blog/notes-on-the-great-fires-of-1776-and-1778 [https://perma.cc/WJ4V-3QKP].

explosion during a time when towns had many wood buildings, fire departments were ill-equipped, and gunpowder was susceptible to accidental ignition.[139] These types of fire safety laws are analogous to laws requiring gasoline to be stored in state-approved gas cans and fire sprinklers and fire escapes for city buildings.

If the State's proposed analogy is that an AR-15 is dangerous like gunpowder was dangerous, the analogy is inapt. While gunpowder storage was regulated, acquisition and possession of gunpowder was not prohibited. The same cannot be said for an AR-15 today. Even the State's expert professor Cornell notes that, "[e]arly Americans were permitted to *own* more gunpowder than they could physically *possess*."[140] The 1784 New York City gunpowder storage law was passed in response to its devastating fires. Yet it did not prohibit possession of gunpowder. Keeping up to 28 pounds of gunpowder was still lawful.[141] And professor Cornell notes, "[t]wenty to thirty pounds of gunpowder is certainly not an inconsiderable amount."[142] The State's gunpowder-storage law analogue is newly urged here, but it is not new. The State's proposed analogue has been rejected before. *Heller* said,

> . . . gunpowder-storage laws . . . did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an

---

[139] Saul Cornell & Nathan DeNiro, *A Well Regulated Right*, 73 Fordham L. Rev. 487, 512 (2004) (citing Mass. laws enacted in 1780 and 1801).

[140] *Id.* at 511 (emphasis in original).

[141] 1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28 (". . . and the said quantity of twenty-eight pounds weight, which shall be lawfull for any person to have and keep at any place within this city, shall be seperated into four stone jugs or tin canisters . . . .").

[142] Cornell & DeNiro, *supra*, at n.173.

absolute ban on handguns.[143]

*Bruen* looked at whether historical regulations were enforced.  For example, it looked at surety laws, saw little evidence "that authorities ever enforced [historical] surety laws," and as a result discounted them as analogues.[144]  Here, the State offers no evidence that the Boston gunpowder storage law was enforced.  This Court's own search of *Thacher's Reports*, a collection of reports of criminal cases tried in the City of Boston Municipal Court from 1823–1843 reveals no such prosecutions.[145] The lack of enforcement evidence further undercuts using Boston's gunpowder regulation as an analogue to today's "assault weapon" regulations.

The remaining handful of historic gunpowder storage laws are like Boston's and New York's.  They affected only city dwellers in places like Hartford, Connecticut, Chicago Illinois, and St. Paul, Minnesota, amongst a mostly agrarian society.  They did not prohibit the possessing of weapons.  They did not prohibit keeping loaded firearms within the home.  These few laws across the years do not evidence a national tradition of firearm restrictions.  The gunpowder storage laws were rejected in *Heller* as a basis to ban handguns and the gunpowder storage fire regulations are not reasonably analogous to the State's ban of modern rifles like the AR-15.[146]

Remarkably, the early Boston gunpowder storage law implies that a variety of very dangerous arms were, in fact, lawful to keep at home.  The law begins with the following

---

[143] *Id*. at 631–32.

[144] 142 S. Ct. at 2149.

[145] *Thacher's Reports* may be found at https://www.mass.gov/info-details/historical-massachusetts-cases#1800-1899-.

[146] *Cf. Boland v. Bonta*, No. SA CV 22-01421-CJC-ADSx, 2023 WL 2588565, at *8 (C.D. Cal. Mar. 20, 2023) ("The main goal of the gunpowder storage laws was to prevent fire."); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901 (N.D. Cal. 2022) ("[T]he regulations themselves were often specific to gunpowder and not easily translatable to firearm regulations.").

48

language: "That all cannon, swivels, mortars, howitzers, cohorns,[147] firearms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling house . . . charged with, or having in them any gun-powder, shall be liable to be seized . . . ."  The inference can be drawn that, in the years between the signing of the Declaration of Independence and the adoption of the Second Amendment, some Bostonians owned and kept at home cannons, howitzers, grenades, and bombs, all of which may have been more lethal than is an AR-15 today.[148]  At least one historian agrees.[149]

### b.  Dirks, Daggers, and Bowie Knives

The State argues that a historical tradition of restricting the concealed carrying of pistols, dirks, daggers, and bowie knives is an analogue for its present day "assault weapon" ban.[150]  Of course, some might find it ironic that the State now wants to compare "assault weapons" like the AR-15 to dirks, daggers, and knives.  Undoubtedly, dirks, daggers, and bowie knives are dangerous—even Swiss Army Knives.  Many have forgotten, or worse yet intentionally ignored, that the most horrible, single, mass killing in America's history was facilitated by terrorists with Swiss Army Knives and other

---

[147] A cohorn is a small bronze mortar used for throwing light shells.  Merriam-Webster, *cohorn*, https://www.merriam-webster.com/dictionary/cohorn (last visited May 26, 2023).

[148] Elsewhere, owning and using a cannon was lawful in Ohio as late as 1877 as long as it was not fired too close to a roadway.  1877 Ohio Laws 278, Offenses Against Public Policy, § 60: Whoever, except in case of invasion by a foreign enemy, or to suppress insurrection or a mob, or for the purpose of raising the body of a person drowned, or for the purpose of blasting or removing rock, fires any cannon, or explodes at any time more than four ounces of gunpowder, upon any public street or highway, or nearer than ten rods to the same, shall be fined not more than fifty nor less than five dollars.

[149] Cramer & Olson, *Pistols, Crime, and Public*, *supra*, at 706 ("The law also clearly considered the possession of firearms, cannon, and grenades to be unremarkable, and the carrying of loaded firearms a sufficiently common practice as to need no separate regulation – and no prohibition while walking the streets of Boston.").

[150] Defs.' Suppl. Br. in Resp., Dkt. 137, at 67–68.

1    short-bladed instruments.[151]

2         But dirks, daggers, and bowie knives were not guns.  (Pistols are addressed

3    separately below.)  They were bladed instruments; they were not firearms.  Knife laws

4    may not be completely irrelevant, but they are pretty close.  The Supreme Court does not

5    look to knife laws for a gun ban.  This is not to say that bowie knives are not "arms"

6    imbued with Second Amendment protection.[152]  Historical knife laws would be relevant

7    in evaluating a modern prohibition on knives.[153]  It is simply to say that historical *firearm*

8    regulations will obviously be more likely to be analogous to modern firearm restrictions.

9         Even if knife regulations were relevant, they would not help the State much.  There

10   were laws restricting bowie knives in some states in the 1800's, but not the vast majority

11   of states.  There is little evidence of actual prosecutions for simply possessing a bowie

12   knife, much less a judicial opinion on constitutionality.  One court observed that the

13   Tennessee bowie knife law was generally disregarded.[154]  The argument that a cluster of

14   laws prohibiting the carrying of dangerous knives could justify a gun ban, lost its wind in

15   *McDonald*.  The argument did not win the day.  If the regulation of knives was not a

16

17   _____

18   [151] Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* 530

19   and n.145 ("Atta had a stopover in Zurich, where he bought two Swiss Army knives. . . .
     He may have intended to use the knives during the attacks."); *id.* at 476 and n.57

20   ("Knives with blades under 4 inches, such as Swiss Army Knives, scout knives, pocket

21   utility knives, etc., may have been allowed to enter the sterile area."), https://www.9-
     11commission.gov/report/911Report.pdf [https://perma.cc/W235-EBKV].

22   [152] *See, e.g.*, David B. Kopel, Clayton E. Cramer and Joseph E. Olson, *Knives and the*

23   *Second Amendment*, 47 U. Mich. J. L. Reform 167, 168 (2013); Defs.' Compendium of
     Works, Dkt. 158-2, at 65, 67 ("This Article analyzes Second Amendment protection for

24   the most common 'arm' in the United States – the knife.").

25   [153] *See, e.g., Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (finding butterfly knife ban
     violates the Second Amendment).

26   [154] *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that

27   these sections of this act, so severe in their penalties, *are so generally disregarded* in our
     cities and towns.") (describing state law prohibiting the concealed carrying of bowie

28   knives) (emphasis added).

sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks, daggers, and bowie knives useful analogues for prohibiting modern rifles.

## C. **Prohibitions on Carrying Concealed Pistols**

Some antebellum laws prohibited carrying concealed pistols. If there is a history and tradition of government regulation related to guns, this is it. Among the thirty-seven states and the District of Columbia in 1868, about a dozen states had laws that prohibited carrying concealed pistols. Importantly, the concealed carry laws did not prohibit either keeping pistols for all lawful purposes or carrying all guns openly. None of the concealed carry laws included long guns in their restrictions.

Kentucky passed the first concealed carry law in 1813. The Kentucky law imposed a fine on any person who wore a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon. It was an inauspicious start for outlawing the carrying of a gun in a concealed manner. The law was struck down as unconstitutional nine years later.[155] Before *Bliss* was decided, Louisiana passed the second such law, also in 1813. [24]. That law was also tested in court. Louisiana's law was upheld specifically because it did not impinge on the right to carry a gun openly. The Louisiana Supreme Court explained the difference:

> The act of the 25th of March, 1813, makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full open view." This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and

---

[155] *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) (declaring unconstitutional state law banning the carrying of concealed weapons finding "in principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.").

assassinations committed upon unsuspecting persons. It
interfered with no man's right to carry arms (to use its words)
"in full open view," which places men upon an equality. This
is the right guaranteed by the Constitution of the United States,
and which is calculated to incite men to a manly and noble
defence of themselves, if necessary, and of their country,
without any tendency to secret advantages and unmanly
assassinations.[156]

According to the State, Indiana passed the third concealed carry law in 1820 and again in 1831. The 1831 law was also tested in court and upheld—but with no explanation in a one sentence decision.[157] The fourth state was Arkansas, which prohibited (in 1837) a person from carrying concealed a pistol or large knife, unless on a journey. [32]. The Arkansas law was the first *not* tested in court. The fifth state to pass a concealed carry law was Georgia, also in 1837. [33]. The Georgia law was tested in *Nunn v. State* and resulted in a decision recognizing the continuing constitutional right to carry firearms openly.[158] In 1838, Virginia passed the next concealed carry law which prohibited "habitually or generally" carrying a concealed pistol, dirk, bowie knife, or any other kind of weapon. [40]. The Virginia law escaped judicial review. In 1839, Alabama passed a similar law. [41]. It was tested in court and upheld.[159] Nevertheless, in 1841, Alabama amended its statute to include an exception for self-defense and for travelers. [45]. No

---

[156] *State v. Chandler*, 5 La. Ann. 489, 489–90 (La. 1850).
[157] *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833). Even then, travelers continued to enjoy a right to carry concealed guns. *Id.* ("It was held in this case, that the statute of 1831, prohibiting all persons, except travellers, from wearing or carrying concealed weapons, is not unconstitutional.").
[158] 1 Ga. 243 (1846) ("So far as the [challenged state] act . . . seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").
[159] *State v. Reid*, 1 Ala. 612 (1840).

other southern states enacted concealed carry laws prior to the Fourteenth Amendment.

In the northern and western states, only two such laws were passed between 1791 and the Fourteenth Amendment. The first concealed carry prohibition appeared in Ohio in 1859. [70]. California enacted the second concealed carry prohibition in 1863. [78]. The California statute prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or other dangerous weapon. After realizing it only hurt law-abiding citizens, the statute was repealed in 1870.[160] The District of Columbia, governed directly by Congress, waited 80 years after the Second Amendment to restrict concealed carrying. [97]. Three territories also adopted concealed carry restrictions during the period.

In all, about one-fourth of the states and three territories had laws that prohibited the carrying of a pistol in a concealed manner. The statutes were often tested in court, suggesting that any broad carrying restriction ran close to the constitutional line. Today's "assault weapon" ban prohibits carrying firearms openly or concealed, and even more restrictively prohibits simple possession. The history and tradition of concealed carry prohibitions are not nuanced analogues for California's "assault weapon" ban. At best, it is a historical twin for California's present laws restricting the concealed carrying of firearms. *See* Cal. Penal Code §§ 25400–25700, 26150–26225.

The concealed carry laws identified by the State did not outlaw openly carrying pistols or rifles. The concealed carry laws did not outlaw the home possession of pistols or rifles. In fact, the laws did not ban keeping and carrying rifles of any type and did not ban carrying long guns concealed or openly. Today, California law prohibits the carrying of all rifles openly (*see* Cal. Penal Code § 17030, with exceptions for hunting or training, Cal. Penal Code § 25640) and altogether prohibits the simple possession, anywhere, of guns that fit the "assault weapon" definition. Were today's statute analogous, open carrying of guns would be lawful everywhere. Antebellum society was comfortable with

---

[160] Roth Decl. at ¶ 32 and n.82.

seeing people openly armed with guns and uncomfortable with the knowledge that some carried guns concealed.  Today, at least in metropolitan California, the opposite is true, giving the notion of the constitutional open carrying of firearms an air of unreality.[161]

### D. Surety Statutes

The State includes in its collection an 1801 surety statute from Tennessee.  [20].  Early surety statutes are evidence that carrying a gun was normal.  But, historic surety statutes could not justify the District of Columbia's modern handgun ban.  State courts recognized that even the common law did not punish the carrying of deadly weapons *per se*.  "All told," notes *Bruen*, "under surety laws . . . everyone started out with robust carrying rights."[162]  Historic surety statutes are not analogous to the State's ban on acquiring and possessing "assault weapons."

### E.  Machinegun Laws

The State also cites twentieth century machinegun restrictions.  These laws do not evidence a long enough historical tradition of prohibiting particular firearms.  These few and ephemeral regulations mostly came and went with little fanfare during the twentieth century, as discussed in the Court's original decision.  The argument that machinegun laws of the twentieth century are analogues to the "assault weapon" ban fares no better today.

_____

[161] Eugene Volokh, *Symposium: The Second Amendment and the Right to Bear Arms After D.C. v. Heller: Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1521 (2009) ("To be sure, any discussion of open carry rights has a certain air of unreality.  In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the police.  Most people are aware that many neighbors own guns, and even that many people are licensed to carry concealed guns and many others carry them illegally, but this abstract knowledge doesn't cause much worry.  But when a gun is visible, it occupies people's attention in a way that statistical realities do not.").

[162] *Bruen*, 142 S. Ct. at 2149.  The Supreme Court was skeptical that surety laws were actually enforced.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## F.  Racist Laws

Among the State's list of firearm laws are a number of statutes based on a person's race, color, or slave status.  The State agrees that these old reprehensible laws are morally repugnant and would obviously be unconstitutional today.[163]  Though the State suggests that these despicable legislative efforts might somehow be relevant to determining the traditions that define the scope of the Second Amendment, that makes little sense.  One reason is that these laws treated our citizens as non-citizens that were not entitled to fully enjoy constitutional rights.  In other words, the legislators who passed these embarrassments were not concerned with the Second Amendment rights of citizens.  Here, they are disregarded.

## V.  EXPERT WITNESSES

### A. Historians Opine

When a historian overgeneralizes about past laws, it is not helpful.[164] For example, the State's expert, professor Spitzer, opines that, "[c]urrent restrictions on assault weapons and detachable ammunition magazines are historically grounded.  They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries."[165]  Unfortunately, when one digs a little deeper, it turns out that his first example comes from twentieth-century machinegun laws.  *Bruen* puts very little weight on machinegun laws so far removed from the nation's beginnings.

Professor Spitzer also says that, "[b]y the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other

---

[163] Defs.' Resp., Dkt. 167, at n.17.

[164] *See* Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1521 (2003) ("At trial, however, the pressures of the adversary system routinely push historians toward interpretations of the past that are compressed and categorical.").

[165] Spitzer Decl. at ¶ 2.

weapons carrying."[166]  Once again, late-in-time laws at the end of the nineteenth century provide less guidance on how the Second Amendment was understood at the time it was adopted in 1791.  During the more important years from 1791 to 1868, only 25% of the states had enacted concealed carrying restrictions on pistols.

Wandering out of his field of history into the area of law, professor Spitzer incompletely comments on a Tennessee court decision.  He quotes from *Aymette v. State*,[167] but omits the court's admonition that "[t]he right to keep and bear arms for the common defence is a great political right."[168]   Historians and political scientists are to be forgiven if they misapprehend the full meaning of an old court decision, as they are not trained in law.  However, it is for courts to decide whether knife laws, or laws restricting blunt weapons, are proper analogues to current gun laws (they are not).

Another expert witness for the State, Michael Vorenberg, is a history professor. He also makes a sweeping observation that is not very helpful.  He opines that,

> [t]here were high-capacity firearms during Reconstruction, and all of them . . . were regarded in all the states at the time as weapons suitable only for law enforcement officers, not for ordinary citizens.  With very few exceptions . . . high-capacity firearms during the era were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense.[169]

From where does he get this notion?  Curiously, he concedes that his evidence does not take the form of state statutes or reasoned court decisions.  He concedes that, "[n]o statutes or court opinions can be found during the period that banned civilian possession of artillery pieces, hundreds of which existed unused after the Civil War."  Nevertheless,

---

[166] *Id.* at ¶ 30 (citing Spitzer, *supra*, *Gun Law History in the United States*, at 63–67).
[167] 21 Tenn. 154, 159 (1840).  *Aymette* concerned a prohibition on carrying a concealed bowie knife.
[168] *Id.*; Spitzer Decl. at ¶ 38.
[169] Vorenberg Decl. at ¶ 7.

1  the absence of laws or court cases does not bother the professor.   He continues, "but of

2  course the absence of such express prohibitions cannot be read as evidence that civilians

3  were allowed to possess such pieces.  Rather, policy and practice dictated that only the

4  United States army and its allied military units could possess such weapons."[170] But in

5  one source referred to by professor Vorenberg, two lone borax miners effectively used

6  their Henry repeating rifles to repel an Indian surprise attack.[171] Professor Vorenberg's

7  claims are unusual.  In essence, he says although there were no laws on high-capacity

8  firearms and artillery pieces, they were still "restricted," as evidenced by the conspicuous

9  absence of government support for civilian use.  It is one way to interpret history.

10     *Bruen* suggests a more traditional way of looking for a history and tradition of

11  governmental arms regulation based on laws actually enacted by state legislatures.  If one

12  looks for laws regulating high-capacity firearms, the first one appears in history only in

13  the State of Florida in 1893 and it was constitutionally defective from the start.[172]  The

14  statute was reviewed by the Florida Supreme Court in 1941.[173]  In his concurring opinion,

---

17  [170] *Id.* at ¶ 8.

18  [171] *See* Williamson, *Winchester: The Gun That Won the West* 41 (Washington D.C.;
    Combat Force Press, 1952), found in Compendium of Works Cited in Decl. of
19  Vorenberg, Dkt. 150-8, at 458.

20  [172] *See* 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147,
    §1 ("That in each and every county of this State, it shall be unlawful to carry or own a
21  Winchester or other repeating rifle or without first taking out a license from the County
    Commissioner of the respective counties, before such persons shall be at liberty to carry
22  around with him on his person and in his manual possession such Winchester rifle or
    other repeating rifle.").  Duke Ctr. For Firearms L., *1893 Fla. Laws 71-72, An Act to*
23  *Regulate the Carrying of Firearms, chap. 4147, §§ 1-4,*
    https://firearmslaw.duke.edu/laws/1893-fla-laws-71-72-an-act-to-regulate-the-carrying-
24  of-firearms-chap-4147-%c2%a7%c2%a7-1-4/; *see also* Gen. Stats of Fla. (1906) Title VI,
25  Chap I § 496 ("No merchant, storekeeper, or dealer shall keep for sale or sell pistols,
    Springfield rifles, other *repeating rifles*, bowie knives or dirk knives, without first paying
26  a license tax of ten dollars.") (emphasis added).

27  [173] *See Watson v. Stone*, 148 Fla. 516 (Fla. 1941) (*en banc*).

28

one Justice said that he was familiar with the racist history of the law.  Justice Buford recalled,

> The statute was never intended to be applied to the white population and in practice has never been so applied.  We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute.  It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.[174]

There appears to be no other law in the nation's history that prohibited high-capacity repeating rifles such as the Winchester lever-action repeater rifles or the Gatling gun.  And at least one court around the time of the Fourteenth Amendment specifically protected repeating firearms.  "[W]e would hold, that the *rifle of all descriptions*, the shot gun, the musket, and *repeater*, are such arms; and that under the Constitution the right to keep such arms, cannot be infringed or forbidden by the Legislature."[175]  To his credit, professor Vorenberg did see that Governor Scott of South Carolina had said in 1870, "the Winchester rifle is the best law that you can have."[176]

The State's expert, professor Cornell, has been studying and writing about historic gun laws for decades.  His opinions tend to reach out beyond historical facts and over-interpret judicial decisions.  One example is his sweeping opinion that at the time of the Fourteenth Amendment Americans were apprehensive about "the proliferation of

---

[174] *Id.* at 524 (Buford, J., concurring).
[175] *Andrews v. State*, 50 Tenn. 165, 179–80 (1871) (emphasis added).
[176] Vorenberg Decl. at ¶ 78.

especially dangerous weapons and the societal harms they caused."  In support he cites *McDonald*.[177]  *McDonald* says no such thing.

Another example is his overly-elevated view of state police power.  He opines, "[t]he power to regulate firearms and gunpowder was therefore at the very core of the police power . . . ."[178]  He discusses three cases that mention gunpowder but say little about actual firearms.[179]  The first case, *Brown*, was about the constitutional grant of interstate commerce regulatory power to the federal government.  *Brown* does not mention firearms.  The second case, *Alger*, was about a municipal ordinance regulating the construction of buildings over the waters of Boston Harbor.  In passing, it describes the police power as one would expect, giving as an example the storing of gunpowder near houses and highways.  *Alger* describes typical police powers for pedestrian matters.[180]  But *Alger* does not mention regulating firearms at all (except in the positive sense that Boston Harbor was formerly a defense against Dutch attack used "to play guns upon").[181]  The third case, *Thorpe*, was about the state police power to require a railroad to construct cattle guards because railroads were dangerous businesses and fences were reasonable provisions for the protection of domestic animals.  Like *Brown* and *Alger*, *Thorpe* does not mention firearms.

---

[177] Cornell Decl. at ¶ 43 (citing *McDonald*, 561 U.S. at 767–68).

[178] Cornell Decl. at ¶ 37.

[179] *See id.* at ¶¶ 37–39 and n.79 (citing *Brown v. Maryland*, 25 U.S. 419, 442-43 (1827); *Commonwealth v. Alger*, 61 Mass. 53 (1851); *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855)).

[180] "Such are the laws to prohibit the use of warehouses for the storage of gunpowder near habitations or highways; to restrain the height to which wooden buildings may be erected in populous neighborhoods, and require them to be covered with slate or other incombustible material; to prohibit buildings from being used for hospitals for contagious diseases, or for the carrying on of noxious or offensive trades; to prohibit the raising of a dam, and causing stagnant water to spread over meadows, near inhabited villages, thereby raising noxious exhalations, injurious to health and dangerous to life."

[181] 61 Mass. at 73.

Professor Cornell follows up with a quote about state police power from *Thurlow v. Massachusetts*.[182]  He mis-describes the quote as from the majority opinion of the Supreme Court, rather than from Justice McClean's dissent, but it makes no difference. *Thurlow* is a case about the intersection of state police power to license the sale of alcohol and the federal government's power to regulate interstate commerce.  Other than to note in passing that a state can regulate its militia, neither the majority opinion nor the dissent in *Thurlow* mentions firearms.  Professor Cornell finishes his discussion of the antebellum era as he begins.  He extols a court case from Alabama because it upheld a conviction for concealed carry while he discounts a case from Kentucky striking down a concealed carry law, labeling it an outlier.[183]

The Alabama criminal case of *State v. Reid* is an odd duck in that the defendant convicted of carrying a concealed pistol was the county sheriff.[184]  Yet, professor Cornell praises *Reid* as an excellent illustration of the way state police power was used to regulate gun rights.[185]  Nevertheless, *Reid* construed the police power as permitting the legislature to regulate only *the manner* of bearing arms.  Decided 50 years after the Second Amendment, the Alabama court was aware of the limiting force of constitutional rights. *Reid* explained, "[w]e do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion.  A statute which, under the pretense of regulating, amounts to a destruction of

---

[182] 46 U.S. 504, 592 (1847); Cornell Decl. at ¶ 41 and n.84.

[183] Cornell Decl. at ¶ 42 and n.87.

[184] *Reid*, 1 Ala. at 621 ("[T]he defendant needed no arms for his protection, his official authority furnished him an ample shield.").

[185] Cornell Decl. at ¶ 42 ("One of the most important early American gun-related cases . . . . [A] classic example of antebellum police power jurisprudence.").  There is, however, a bit of irony in the admiration of *Reid,* because the court decided that a county sheriff, the embodiment of the state's police power, did not have the authority to carry a pistol concealed even for his self-protection.

the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."[186]  In his rendition of *Reid*, professor Cornell implies the opposite was true.

On the other hand, the Kentucky case discounted by professor Cornell, *Bliss v. Commonwealth*, struck down a similar concealed carry law.  *Bliss* said, "it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution."[187]

Among the handful of antebellum cases recorded, but not mentioned by professor Cornell, is *State v. Huntly*.[188]  *Huntly* upheld a conviction for making public threats of violence with a firearm because the threats were attacks on the public order.  This is an uncontroversial example of state police power.  The state may punish crimes carried out with a gun.  But prohibiting the carrying of a gun, by itself, is not within the police power of the state.  *Huntly* reminds its readers, "it is to be remembered that the carrying of a gun *per se* constitutes no offence.  For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun.  It is the wicked purpose--and the mischievous result--which essentially constitutes the crime."[189] The United States Supreme Court makes special mention of *Huntly* in *Bruen*.[190] Reading *Huntly* and other cases, the United States Supreme Court concludes, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[191]

So, when professor Cornell opines that the very core of the police power was the

---

[186] *Reid*, 1 Ala. at 616–17.
[187] *Bliss*, 12 Ky. at 91–92.
[188] 25 N.C. 418 (1843)
[189] *Id*. at 422–23.
[190] *Bruen*, 142 S. Ct. at 2145 ("Perhaps more telling was the North Carolina Supreme Court's decision in *State v. Huntly*, 25 N. C. 418 (1843).").
[191] *Id*. at 2146.

power to regulate firearms and gunpowder, his opinion is only half right. Gunpowder was regulated because of its fire danger—not its danger for use in a firearm. Possession of firearms, on the other hand, was not regulated at all. The antebellum court decisions upon which professor Cornell rests, do not say what he contends they say. Perhaps he is to be forgiven because he is a historian rather than a member of the bar, but his opinions are not persuasive and are entitled to no weight.

Dr. Randolph Roth is a historian. He opines that in the eighteenth century laws restricting the use or ownership of firearms by colonists of European ancestry were rare.[192] The State's list of laws bears this out. He reports that "household ownership of firearms was widespread" but firearm use in homicides was rare.[193]

Dr. Brennan Rivas is a historian. Professor Rivas opines in overly-broad terms like other historians. For example, he opines about a flurry of "public carry" regulations without reference to the State's list of laws and without explaining how laws in the late 1800s are relevant to the original understanding of the Second Amendment in 1791.[194] His opinions are not persuasive. Professor Rivas opines that the experiences with pocket pistols and revolvers in three states (Arkansas, Tennessee, and Texas), in contrast to the other 35 states at the time of the Fourteenth Amendment, amount to a historical precedent for California's "assault weapon" ban.[195] While these three exceptional situations may suggest a precedent, they do not demonstrate a historical tradition, or confirm a pre-existing tradition, or represent a broad understanding of the Second Amendment. He reports that Tennessee prohibited the carrying of pistols in an 1871 law.[196] The law does

---

[192] Roth Decl. at ¶ 9.
[193] *Id.* at ¶ 13.
[194] Rivas Decl. at ¶ 12.
[195] *Id.* at ¶ 25.
[196] *Id.* at ¶ 16 and n.12 (1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1).

19-cv-01537 BEN (JLB)

not appear in the State's law list.  The law comes later in time than the adoption of the Second and Fourteenth Amendments.  The law was upheld by the Tennessee Supreme Court, but on the basis of the state's unique constitutional provision.[197]  He cites as another example an Arkansas law enacted in 1881.[198]  Once again, this law comes 90 years after the adoption of the Second Amendment, 13 years after the adoption of the Fourteenth Amendment, and cannot be said to be consistent with a history and tradition of pistol carrying prohibitions because there was no such tradition prior to 1868.[199]  Moreover, Arkansas court decisions took an odd turn in 1882.  A few years earlier, in *Wilson v. State*, the Arkansas court reasonably held the view that, "to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms."[200]

As one might expect, *Wilson* reminded legislators that the solution to gun violence in 1878 was the enforcement of criminal laws rather than prohibiting the carrying of guns.  Unfortunately, Arkansas lawmakers may have missed that message.  And four years later, the court must have forgotten its own tutelage.  In 1882, in *Haile v. State* the court upheld a conviction for carrying a large revolver (known as a Colt's army pistol)

---

[197] *State v. Wilburn*, 66 Tenn. 57, 58–59 (1872) ("By sec. 26 of the Declaration of Rights, art. 1 of the Constitution of 1870, 'the citizens of this State have a right to keep and bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime.'").

[198] Rivas Decl. at ¶ 16 and n.13 (1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1–2) (excepting pistols that are used by the Army or Navy).

[199] *Cf. Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) ("But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little).").

[200] 33 Ark. 557, 560 (1878).

uncovered around the waist when it should have been held in the hand.[201]  Admitting only a cramped understanding of the Second Amendment, *Haile* saw the right as limited to carrying a handgun: (1) on one's own premises; or (2) elsewhere only inconveniently carried in an open hand.[202]  According to some scholars, "*Haile* marked an abrupt shift in Arkansas jurisprudence, and was contrary to the three cases decided just a few years before.  In essence, the court had now agreed with the legislature that the right to bear arms was a bad idea."[203]  Professor Rivas may be correct when says that the 1881 Arkansas law received no notable challenge.  What is notable is that the Arkansas court seems to have veered far off the constitutional course.  All in all, Professor Rivas' opinions are entitled to little weight.

### B.  Non-Historian Expert Witnesses

The State offers declarations from a number of other expert witnesses to address subjects other than historical analogues.  In general, these are subjects that this Court has already addressed in its earlier opinion and is beyond the Court of Appeals remand order.  Nevertheless, some of these opinions are mentioned here.

Dr. Louis Klarevas reports that there are now an estimated 24.4 million rifles like the AR-15 rifles and AK-47 rifles in circulation in the United States.[204]  He estimates 7.9 million individuals own a modern sporting rifle.[205]  He also reports that his search of

---

[201] 38 Ark. 564, 566 (1882).

[202] *Haile* said, "[t]he Legislature, by the [1881] law in question, has sought to steer between such a condition of things, and an infringement of constitutional rights, by conceding the right to keep such arms, and to bear or use them at will, upon one's own premises, and restricting the right to wear them elsewhere in public, unless they be carried uncovered in the hand.  It must be confessed that this is a very inconvenient mode of carrying them habitually, but the habitual carrying does not seem essential to 'common defense.'"  *Id.*

[203] Kopel & Cramer, *State Court Standards of Review*, *supra*, at 1145.

[204] Suppl. Klarevas Decl. at ¶ 15.

[205] *Id.*

newspaper archives found no mass shootings of ten or more deaths until 1949.[206]  In looking, he excluded from the search incidents of large-scale, intergroup gun violence such as mob violence and rioting.  Certainly, such events have occurred in the nation's history, such as the Philadelphia nativist riots in the spring and summer of 1844.[207]

Ryan Busse is a Giffords senior advisor and former firearm industry executive for a manufacturer and seller that specializes in pistols and revolvers, but not AR-15 platform rifles.  The few rifles sold by his former firm are traditional-style bolt action models.  Busse opines that a firearm does not need any of the devices, accessories, or configurations listed in the "assault weapon" ban to operate as a gun as intended or to use a gun effectively for self-defense.[208]  It is not at all clear what expertise Busse has to support his opinion.  He does not describe any professional experience using AR-15 platform rifles for sport or self-defense.  In any event, this type of opinion is not relevant to the question of whether the State may ban a firearm that is commonly owned by law-abiding citizens for lawful purposes and does not fit the prerequisites for Federal Rule of Evidence 702.

Another expert witness for the State, economist Lucy Allen, has supplemented her earlier testimony.[209] Today, she opines on the frequency of rifles reported in defensive gun uses.  The State asserts that Allen's statistics prove "assault weapons" are not being commonly fired for self-defense.[210] To support this notion, Allen looks at a very small

---

[206] Suppl. Klarevas Decl. at ¶ 11.

[207] *See* Zachary M. Schrag, *The Fires of Philadelphia*, Pegasus (2021) (the State offered Professor Schrag as an expert historian to buttress its request for more time for discovery); *see also* Roth Decl. at ¶ 8 (from the colonial era to the early twentieth century, mass murders "were carried out by large groups of individuals acting in concert, rather than by individuals or small groups").

[208] Decl. of Ryan Busse, Dkt. 137-2, at ¶¶ 22–24.

[209] Suppl. Decl. of Lucy P. Allen, Dkt. 137-1 ("Suppl. Allen Decl.").

[210] Defs.' Suppl. Br. in Resp., Dkt. 137, at 40–41.

database of defensive gun uses collected from news broadcasts or publications, where 54% of the time the gun type is *unknown.* From this, she implies that using a rifle to defend oneself is incredibly rare. Her charts misleadingly suggest that rifles are used in just 2–4% of defensive gun uses and actually occurred only 51 times across three and one-half years.[211] Other evidence suggests that guns are needed and used defensively thousands of times each year, and that rifles are used far more frequently than Allen's statistics suggest.

How does Allen arrive at her opinion? She looks at a database maintained by the Heritage Foundation. The database explicitly states that it is not intended to be comprehensive. It attempts to highlight some successful defensive gun uses that are reported by news organs.[212] Allen counts 2,714 total defensive gun uses in the database between January 2019 and October 2022.[213] Her results cannot be tested because she does not identify the specific incidents or how she scored the gun-type variables attributed to each incident. Consequently, there is no way to check her analysis or her math. Her study cannot be reproduced. Unfortunately, this means her opinion lacks classic indicia of reliability. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[214]

Validity is another concern. Of the 2,714 total incidents studied, less than half (1,241) of the events indicated a known firearm. Trying to perform a study about the frequency of a particular type of gun used in self-defense, where more than 50% of the

---

[211] Suppl. Allen Decl. at ¶ 10.
[212] *Id.* at ¶ 9.
[213] *Id.* at ¶ 10.
[214] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.), 211 Reference Guide on Statistics, 2011 WL 7724256, 10 and n.37 ("*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.).

time the gun type is unknown, is of questionable validity.  Doing just that, she opines that a rifle was used only 4% of the time when gun type is known.[215]  Next, she factors in the 1,471 "unknowns" and lowers her result to 2%.

But this calculation, incredibly, requires one to assume that none of the unknown incidents involved a rifle.  She factors in a zero for rifles every time there is an unknown firearm type.  What if one instead assumed that all of the unknown incidents involved a rifle—then it could be said that rifles had been used over 50% of the time.  Of course, neither the 0% nor the 100% assumption is useful.

Along the way, Allen fails to mention that the Heritage Foundation webpage she linked to notes that guns are probably used in self-defense between 500,000 and 3,000,000 times a year.  Nor does Allen mention any of the incidents where AR-15s were used that are linked on the Heritage Foundation defensive gun use visualization web page.  For example, Allen skips over mentioning the disabled 61-year-old, though attacked and shot in his home, saved by his AR-15.[216]  Nor does Allen cite the Georgia man with an AR-15 who shot at three attackers after they approached his home at 4 a.m. with their faces covered and firing shots.[217]  Allen also could have found the report of the pregnant wife and mother who used an AR-15 to defend against multiple armed attackers.[218] These are just three incidents from three months of reports that appear on the

---

[215] *Id.* at ¶ 11.

[216] Lucas Drill, *Guns Saved These Americans From Assault and Robbery in July*, The Daily Signal (Aug. 7, 2019), https://www.dailysignal.com/2019/08/07/guns-saved-these-americans-from-assault-and-robbery-in-july/ [https://perma.cc/EE6W-DN9H].

[217] Mairead Mcardle, *Georgia Homeowner Uses 'Semi-Automatic' Rifle to Repel Three Armed Home Invaders*, Nat'l Rev. (Sept. 18, 2019, 8:52 a.m.), https://www.nationalreview.com/news/georgia-homeowner-uses-semi-automatic-rifle-to-repel-three-armed-home-invaders/ [https://perma.cc/UY7F-5Y2G].

[218] Amy Swearer, *These Law-Abiding People Used Guns to Defend Themselves in October*, The Daily Signal (Nov. 20, 2019), https://www.dailysignal.com/2019/11/20/these-law-abiding-people-used-guns-to-defend-

67

Heritage Foundation webpage that should have been counted in Allen's chart.  Allen's study is suspect for larger reasons.  The whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports.  There are no police reports or eyewitness declarations collected for Allen's study.  A limited collection of news articles lacks the usual indicia of accuracy and reliability of admissible evidence.

Without hard facts, one is left to drawing inferences.  With between 500,000 and 3,000,000 defensive gun uses each year, it is not hard to visualize a great many more than 51 incidents involving an AR-15 rifle being used defensively.  In what its author describes as the largest survey of its kind, a 2021 survey of 54,000 United States residents identified 16,708 gun owners who described their personal self-defense uses of firearms.  Compared to Allen's chart, the survey paints a vastly different picture. William English estimates from his survey results that guns are used defensively approximately 1,670,000 times each year.[219]  Disturbingly, English found 51.2% of defensive gun uses involve more than one assailant.[220]  In contrast to Allen's estimate, English estimates that rifles are used defensively approximately 13% of the time.[221] English also estimates about 24,600,000 individuals have owned AR-15 styled rifles.[222] The evidence, once again, suggests that modern rifles are commonly owned and useful for self-defense.

Using the English survey results, defensive gun uses happen *1,670,000 times per year* (which falls comfortably within the CDC's report estimate of 500,000 to 3,000,000

---

themselves-in-october/ (hyperlinking to https://www.baynews9.com/fl/tampa/news/2019/11/01/victim-of-violent-home-invasion-speaks--credits-wife-with-saving-his-life  [https://perma.cc/AD8Y-EJW6]).

[219] *See* English, *supra*, at n. 13.

[220] *Id.* at 10.

[221] *Id.* at 10–11.

[222] *Id.* at 35.

times per year).  If rifles, some of which would be AR-15 platform rifles, are being used defensively 13% of those 1,670,000 times, that would imply that rifles are used defensively *217,100 times each year*, rather than Allen's number of 51.  In all, Allen's statistics and opinion are unreliable and misleading.

John J. Donohue is a professor of law.  His supplemental declaration is not particularly helpful.  For example, professor Donohue describes a 2018 medical study published on the JAMA Network Open about 511 gunshot victims in Boston.  He opines that the study "applies directly to bans on assault weapons and high-capacity magazines."[223]   Yet, the study noted that *only one* of the 511 victims studied was shot with a rifle caliber round (7.62 x 39 mm.).[224]  Why the study applies directly to bans on "assault weapons," as professor Donohue opines, is not at all obvious.  Handgun wounds were the main point of study.

Professor Donohue also opines that the dangers of weapons like the AR-15 will outpace any legitimate crime-reducing benefit the firearms provide, citing the 2017 Sutherland Springs Baptist Church shooting.[225]  He picked an ironic example.  A neighbor, Stephen Willeford, stopped the mass shooter in that tragedy with four shots from his own AR-15.[226]

---

[223] Suppl. Decl. of John J. Donohue, Dkt. 137-4 ("Suppl. Donohue Decl."), at ¶ 19.

[224] *See* Anthony A. Braga and Philip J. Cook, *The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults*, JAMA Network Open (2018), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536 ("Most interpersonal gun violence involves handguns, and Boston is no exception.  Only 1 gun homicide was committed with a rifle caliber (7.62 × 39 mm fired from an AK-47 assault rifle).")  [https://perma.cc/LPL5-N3BH].

[225] Suppl. Donohue Decl. at ¶ 23.

[226] *The Hero of the Sutherland Springs Shooting Is Still Reckoning With What Happened That Day*, Texas Monthly (Nov. 2018), https://www.texasmonthly.com/true-crime/stephen-willeford-sutherland-springs-mass-murder/ [https://perma.cc/HMP6-TAZ9].

Professor Donohue previously commented on the lawful-to-own Ruger Mini-14 rifle which is similar to the banned rifles. He offered that the Mini-14's current legality is because the firearm restrictions are to be increased "incrementally." He concludes with abject conjecture imagining the January 6, 2021 Capitol rally would have turned out like the 1970 Kent State University shootings, *but for* the District of Columbia's prohibition on "assault weapons."[227]  Professor Donohue's opinions are entitled to no weight.

## VI.  OTHER NEW ARGUMENTS

The State asserts over 120 discreet arguments in its main 77-page brief.[228]  Approximately 80 arguments are focused on history while 40 address other topics.  The State makes further arguments in its later 20-page brief (Dkt. 157), 25-page brief (Dkt. 167), six-page brief (Dkt. 168), and ten-page brief (Dkt. 170).  For the sake of brevity, not all arguments are addressed herein, but all have been considered.

### A.  **"Commonly Owned"**

A new twist on an old argument is that standard AR-15-type rifles are not commonly owned by law-abiding persons for lawful purposes.  An expert witness for the State suggests that although such rifles number more than 24.4 million among Americans, a smaller number of people (7.9 million) might own most of them.  Seven million nine hundred thousand persons is still a large number of citizens choosing to own AR-15 type firearms.  When the Supreme Court vacated Caetano's conviction for mere possession of a stun gun, 200,000 owners of stun guns was all it took.

The burden of proof is on the government, as this Court pointed out in its earlier decision.  "The constitutional imperative is on the government to not infringe.  The correct starting orientation is that no arm may be prohibited.  If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not, that it is not commonly possessed, or not commonly

---

[227] Suppl. Donohue Decl. at ¶ 27.
[228] Defs.' Suppl. Br. in Resp., Dkt. 137.

possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness.  If the state cannot so prove, the challenged prohibition must be struck down.  The presumption in favor of rightfully possessing a citizen's arm was made during the adoption of the Second Amendment."[229]  Guns that fall under the California definition of an "assault weapon" are presumptively covered by the text of the Second Amendment.

### B. **"Used for Self-Defense"**

The State offers a word game for another new argument.  The State suggests that standard AR-15-type rifles might be commonly owned, but are not *used* for self-defense.  The State says that there is no evidence that firearms equipped with the prohibited accessories or semiautomatic centerfire rifles of less than 30 inches in length are "commonly used" for self-defense.[230]  Once again, the burden is on the government to prove that remarkable claim.  It does not take a Nobel laureate to figure out that if Americans own 400 million guns and 400 million gun crimes are not being committed, that Americans are using their guns for something other than crime.  If Americans own 24.4 million AR-15s and 24.4 million gun crimes are not being committed with AR-15s, Americans must be using them for lawful purposes.[231]  Some people actively use AR-15s for hunting or sport or target practice.  Probably the vast majority of Americans that own guns keep them and use them for self-defense the same way that a driver puts on a seat belt in the case of a collision.  Though collisions rarely happen, the seat belt is used for

---

[229] *Miller*, 542 F. Suppl. 3d at 1029.

[230] *See* Defs.' Suppl. Br. in Resp. Dkt. 137, at 19, 27; Defs.' Resp., Dkt. 167, at 5–8.

[231] The State argues that prevalence alone is insufficient to establish common use, citing a concurring opinion in *Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021) (*en banc)*, *vacated*, *Duncan v. Bonta*, No. 21-1194 (2022).  *See* Defs.' Br. in Resp., Dkt 167, at 8.  A concurring opinion in a decision vacated and remanded by the Supreme Court is not the most persuasive authority.  Even so, the very large number of AR-15s owned by citizens who are not using them to commit crimes is sufficient evidence of common use for lawful purposes to be covered by the text of the Second Amendment.

1   protection and to be ready for the unexpected collision.  A reserve canopy is being used

2   on a parachute jump, although it is not deployed, in case the main parachute fails.  A cell

3   phone in one's pocket is being used when waiting for a telephone call or when one might

4   need to make a call.  An AR-15 under one's bed at night is being used for self-defense

5   even when the night is quiet.  A person may happily live a lifetime without having to fire

6   their gun in self-defense.  But that is not to say that such a person does not *use* their gun

7   for self-defense when he or she keeps it under the bed with a hope and a prayer that it

8   never has to be fired.

9          Here is an illustrative example.  In Uniontown, Pennsylvania, an 81-year old man

10   and his elderly sister were at home when an intruder broke in.  In the middle of the

11   ensuing struggle, the victim fired one shot from his gun.  The victim said he had never

12   before fired the gun and that it had been sitting on his nightstand for thirty years.[232]  Had

13   his gun been an AR-15 he kept under his bed, the State would say that he did not "use"

14   his AR-15 for self-defense during those preceding thirty years.  And this Court would

15   disagree.  This Court would say that the elderly man "used" his AR-15 for self-defense

16   every night for the thirty years he kept it ready under his bed, including the night of the

17   burglary.  In exactly the same way, the disabled man in Florida who was shot, but shot

18   back with his AR-15, "used" his rifle on the night of his attack and on all of the other

19   nights when his gun sat ready in case of attack.[233] But the State seems to say that citizens

20   have no right to keep an AR-15 for self-defense unless they often use it to shoot

21   attackers.  That is incorrect.  "There is no reason to think that semi-automatic rifles are

22   not effective for self-defense in the home, which *Heller* explained is a core purpose of the

---

[232] *81-year-old fatally shoots home invasion suspect, says gun had never been used in 30 years*, WXPI-TV 11 News (Nov. 4, 2016),  https://www.wpxi.com/news/81-year-old-fatally-shoots-home-invasion-suspect-says-gun-had-never-been-used-in-30-years/464100332/

[233] *See* n. 17, supra.

Second Amendment right."[234]  If the test was concerned with the actual firing of a weapon, the *Heller* court would have looked at statistical averages about how often handguns were fired for self-defense.  The statistic was never mentioned.

### C.  Regulating the Use of Certain Accessories

The State downplays the "assault weapon" ban by saying that it does not prohibit anyone from keeping and bearing an arm because it "merely regulates the use of certain accessories that can be attached to a semiautomatic rifle."[235]  The State says that the accessories are not "arms."  The State says that "the prohibited accessories are not integral to the functioning of any firearm; and semiautomatic centerfire rifles that are at least 30 inches in length are plainly operable."  But the "assault weapon" laws do not ban one's possession of individual accessories or parts.  They ban one's possession of whole rifles, entire shotguns, and working pistols.  The State also says that the accessories are combat-oriented features which turn a modern rifle into a weapon of war and therefore is not protected by the Constitution.  That "weapon of war" nostrum has been previously rejected by this Court and need not be re-visited here.

The "assault weapon" ban does not ban possession or manufacture or sales of a pistol grip, or a flash suppressor, or an adjustable stock, or a threaded pistol barrel.  If the law made a pistol grip, unattached to a gun, a crime to possess, the State's argument would have some symmetry.  But to say a semi-automatic rifle with a pistol grip and adjustable stock and a flash suppressor is not a "bearable arm" is to ignore the forest for the trees.  It is the modern semiautomatic gun with these parts installed that the laws criminalize.  Yet, it is the rifle with these parts integrated that is a bearable arm covered by the text of the Second Amendment.

---

[234] *Heller v. District of Columbia*, 670 F.3d 1244, 1290 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).
[235] *See, e.g.*, Defs.' Suppl. Br. in Resp., Dkt. 137, at 2, 19, 23–25; Defs.' Resp., Dkt. 167, at 8–9.

## D. <u>Weapons Most Like the M-16</u>

The State makes a passing argument that weapons with the configurations prohibited by the "assault weapon" ban "are military weapons that are practically indistinguishable from assault rifles 'like' the M-16 and thus 'may be banned' consistent with *Heller*."[236]  *Staples* explained the relevant difference, *i.e.*, the M-16 is a fully automatic machinegun.[237]  Undercutting its own argument, the State says machineguns may be banned, while at the same time the State acknowledges in its own briefing that machineguns are not banned under federal law.  In fact, there are 700,000 machineguns lawfully registered in the nation.[238]  So many lawfully owned machineguns suggests the State's approach of banning semiautomatic AR-15's is infringing.  This Court will not engage in the specious argument about whether AR-15s can fire almost as fast as a machinegun.  Nor will it venture a discussion of effective versus theoretical firing capability.  No one with any knowledge of firearms would accept such an argument.

## E. <u>Firearms in the Regulated Configurations Are Not Commonly Owned?</u>

Like Baghdad Bob during the first Gulf War in 1991, the State clings to a wish. The State wants to believe that the firearms prohibited by the "assault weapon" ban are not commonly owned or are not commonly owned for self-defense.[239]  The argument remains unconvincing.  Normal AR-15s are still massively popular.  *See, e.g.*, *The Gun That Divides A Nation*, Washington Post (Mar. 27, 2023) ("Today, the AR-15 is the best-selling rifle in the United States, industry figures indicate.  About 1 in 20 United States adults—or roughly 16 million people—own at least one AR-15, according to polling data

---

[236] Defs.' Suppl. Br. in Resp., Dkt. 137, at 3 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017)).
[237] 511 U.S. at 603.
[238] Defs.' Suppl. Br. in Resp., Dkt. 137, at n.33.
[239] Defs.' Suppl. Br. in Resp., Dkt. 137, at 29–31.

from The Washington Post and Ipsos.").[240]

### F.  Regulated Configurations Are Not Suitable or Needed for Self-Defense?

The State argues that the prohibited firearms, designed and configured as they are, are somehow not suitable for self-defense.[241]  It has already been determined in the initial decision that the prohibited firearm configurations are well suited for self-defense and they are well-suited for militia use.  The Court of Appeals remand order says nothing about re-visiting those types of fact findings.  Even so, if a firearm is not unusual, it is protected.  Government simply does not have the authority to dictate a list of firearms or configurations that it finds "suitable" for citizen self-defense, hunting, target practice, militia use, or some other lawful use.

### G. State Police Powers Override the Second Amendment?

The State claims that the Second Amendment is not to be read literally.  Instead, it claims that the "history of the Second Amendment demonstrates that governments enjoyed robust police powers to regulate weapons—including who may possess them, where they may be possessed, and what weapons may be possessed and used."[242]  But as was shown above, that is inaccurate.

Governments did, and do, enjoy a police power to criminalize *the use of a firearm to commit another crime* such as assault.  And the police power could be said to include restricting carrying a firearm *concealed* as long as it does not also restrict openly carrying.  However, governments did not possess the power to regulate who among law-abiding citizens could possess firearms.  And governments did not possess the police power to regulate which firearms could be possessed and used.  The only state law in the first 100 years purporting to prohibit the mere possession of any firearm was the 1868

---

[240] Todd C. Frankel et al.*, The gun that divides a nation*, The Wash. Post (Mar. 27, 2023 at 6:13 a.m.), https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-gun-culture-politics/.

[241] Defs.' Suppl. Br. in Resp., Dkt. 137, at 32–39.

[242] *Id.* at 42–43.

Alabama law prohibiting possession of the dangerous and unusual rifle walking cane. [87].  So, it is patently incorrect to say that governments enjoyed a robust police power to decide what firearms could be prohibited.

## VII.   FINAL CONSIDERATIONS

It is still true that, "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."[243]

The question remains, in an age where weapons run the gamut from fighter jets to tanks and anti-aircraft missiles down to AR-15s to handguns to pocketknives, which weapons are protected by the Second Amendment and which are not?  As one judge understood, "this case and others like it demonstrate, we cannot rely on insular federal judges to weigh which weapons are appropriate for self-defense—they honestly don't have a clue, and their intuitions about firearms are not good.  And we can't rely on governments to decide—that's who the Second Amendment was intended to protect against.  But as *Heller* discusses, we can look to what weapons law-abiding citizens have chosen to defend themselves—that is, what weapons are currently 'in common use . . . for lawful purposes.'"[244]  It is the common firearms, in this case semiautomatic rifles, shotguns, and pistols, chosen for whatever the lawful reason, that are protected by the Second Amendment.

---

[243] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).
[244] *Duncan*, 19 F.4th at 1171 (VanDyke, J., dissenting).

## VIII.  CONCLUSION

The State's attempt to ban these popular firearms creates the extreme policy that a handful of criminals can dictate the conduct and infringe on the freedom of law-abiding citizens.  As *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of permissible state action.  California's answer to the criminal misuse of a few is to disarm its many good residents.  That knee-jerk reaction is constitutionally untenable, just as it was 250 years ago.[245] The Second Amendment stands as a shield from government imposition of that policy.

There is only one policy enshrined in the Bill of Rights.  Guns and ammunition in the hands of criminals, tyrants and terrorists are dangerous; guns in the hands of law-abiding responsible citizens are necessary.  To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes.  In early America and today, the Second Amendment right of self-preservation permits a citizen to "'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent that injury.'"[246] Unfortunately, governments tend to restrict the right of armed self-defense.  Punishing every good citizen because bad ones misuse a gun offends the Constitution.  A state supreme court in 1878 said it succinctly: "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a

---

[245] Cesare Beccaria, *On Crimes and Punishments* (1766), chap. 40, recorded by Thomas Jefferson: laws "which forbid to wear arms, disarming those only who are not disposed to commit the crime which the laws mean to prevent . . . makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder, as it requires less courage to attack unarmed than armed persons." *Jefferson's Legal Commonplace Book* 521 (Princeton Univ. Press ed., 2019).
[246] *Heller*, 554 U.S. at 594.

constitutional privilege."[247]  "Today . . . many Americans have good reason to fear that they will be victimized if they are unable to protect themselves.  And today, no less than in 1791, the Second Amendment guarantees their right to do so."[248]

Plaintiffs in this case challenge California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming certain "assault weapons" a public nuisance), 30915 (regulating "assault weapons" obtained by bequest or inheritance), and 30945 (restricting use of registered "assault weapons").  It is declared that these statutes unconstitutionally infringe the Second Amendment rights of American citizens.  These statutes and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in §§ 30515(a)(1) through (8) are hereby enjoined.

**IT IS HEREBY ORDERED that:**

Judgment is entered for Plaintiffs.  The Attorney General respectfully requests a stay of any judgment in Plaintiffs' favor for a sufficient period to seek a stay from the Court of Appeals.  That request is granted.  Therefore, the enforcement of the injunction is hereby stayed for ten (10) days.

The following permanent injunction will be entered:

1.  Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing California Penal Code §§ 30515(a)(1) through (8) (defining an "assault weapon" by prohibited features), 30800 (deeming those "assault weapons" a public nuisance), 30915 (regulating those "assault weapons"

---

[247] *Wilson v. State*, 33 Ark. 557, 560 (1878).
[248] *Bruen*, 142 S. Ct. at 2161 (Alito, J., concurring).

78

obtained by bequest or inheritance), 30945 (restricting use of registered "assault weapons"), and the penalty provisions §§ 30600, 30605 and 30800 as applied to "assault weapons" defined in Code §§ 30515(a)(1) through (8).

2. Defendant Rob Bonta shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.

**3.** This injunction is stayed for ten (10) days from the date of this Order.

**IT IS SO ORDERED.**

Dated: October 19, 2023

**HON. ROGER T. BENITEZ,**
Senior United States District Judge