IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:23-cv-02563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF CLAYTON CRAMER

---

I, Clayton Cramer, pursuant to 28 U.S.C. § 1746 do depose and state as follows:

I have been asked to render an opinion on the history of firearms waiting periods, their effectiveness, and to address the Declarations of Robert Spitzer and Randolph Roth.

This Declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

### BACKGROUND AND QUALIFICATIONS

1.    I am currently an adjunct professor of history at College of Western Idaho after having previously taught at Boise State University. I have published numerous works regarding the Second Amendment as it was understood at the time of our nation's founding, including *For The Defense Of Themselves And The State: The Original Intent and Judicial Interpretation of the Right To Keep And Bear Arms*, and *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, along with numerous Journal articles.

1

2.      My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); Miller v. Bonta (S.D.Cal. 2023); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert, granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

3.      In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018).  My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

4.      I am being compensated for services performed in the above-entitled case at an hourly rate of $250 for expert declarations.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## SUMMARY OF OPINIONS

### I.      Introduction

5.      Spitzer fails to appreciate that guns were readily available for purchase in the colonial and early Republic periods.  He makes much of the number of gun dealers in the U.S. with no awareness that our population is 85x larger than it was in 1790.  Of course, we have a lot of gun dealers and gun manufacturers.  Spitzer presents no evidence that their per capita number

---

[1] *McDonald v. Chicago,* 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

is larger than in 1790. The evidence from probate records, advertising and city directories is clear that guns were commonly available for purchase in the Founding Era.

6.     Spitzer makes much of Randolph Roth's data on homicide rates with no apparent awareness that Roth's data is not comparable to murder rates, making comparisons to today meaningless.

7.     Spitzer parrots Roth's claims about black powder firearms not being kept loaded because Spritzer is unfamiliar with the first-hand accounts and statutes of the period.

8.     Spitzer engages in end-means reasoning specifically rejected by *Bruen*.

9.     Spitzer misrepresents many laws that he claims prohibited being armed while drunk which do nothing of the sort. These misrepresentations are so calculated in their deception that he should be disqualified as an expert witness.

10.    Spitzer's putative armed while drunk laws are not even slightly analogous to the challenged law. They are very nearly perfect examples of what Bruen calls the "green hat" example of how *not* to argue.

11.    We are in agreement as to "… the absence of firearm purchase waiting periods early in American history…."

## II.    "Guns-R-Us"

12.    Spitzer's declaration makes claims as to why Colorado's three-day waiting period is better suited to what he calls "Guns-R-Us" retail purchases because as he directly admits on p. 4:

> Gun purchase waiting periods as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get.

13.    "Gun R Us" in some form must have existed in the more settled parts of colonial America given the high ownership of firearms as measured by probate records:

Guns are found in 50- 73% of the male estates in each of the eight databases and in 6-38% of the female estates in each of the first four databases.

Gun ownership is particularly high compared to other common items. For example, in 813 itemized male inventories from the 1774 Jones national database, guns are listed in 54% of estates, compared to only 30% of estates listing any cash, 14% listing swords or edged weapons, 25% listing Bibles, 62% listing any book, and 79% listing any clothes.[2]

14.    The number of gun sellers in the modern era reflects the much larger population of the United States.  The U.S. population in 1790 was 3,929,214;[3] on January 1, 2023, the Census Bureau estimated 334,233,854 residents.[4]  That is 85x more people.  Spitzer points to a total of 59,900 "dealer licenses" and "pawnbrokers" today licensed to sell guns.  The equivalent per capita for 1790 would be 704 dealers in firearms.

15.    How many gun retailers were there?  While I have gathered data on gunsmiths and gun makers through 1840, neither I nor to my knowledge anyone else has attempted to count those who retailed guns in the pre-1791 era.  There are enough ads surviving to suggest that it

---

[2] James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43:5 WILLIAM AND MARY L.R. 1777, 1778 (2002).

[3] U.S. Census Bureau, *1790 Fast Facts,* https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html, last accessed October 18, 2023.

[4] Derick Moore, U.S. Census Bureau, U.*S. Population Estimated at 334,233,854 on Jan. 1, 2023*, https://www.census.gov/library/stories/2022/12/happy-new-year-2023.html, last accessed October 18, 2023.

was not rare.  At least one ad offering guns for sale appears among the surviving 1720 issues of the *Boston Gazette*.  It offered goods salvaged from a wreck off the South Carolina coast, including, "Six blunderbusses… Ten muskets… Two pistols."[5]  Firearms of various sorts, some described as "fit for Guinea" (suitable for sale in West Africa, suggesting that the firearm was in very poor condition), and others described only as "Musketts" appear in three ads.[6]  Another series of issues of the *Boston Gazette*, dated November 17, 1741, through September 13, 1742, is awash in gun ads.  John Gerrish's November 17, 1741, ad is fairly typical.  Gerrish offered a variety of consumer goods, including cloth, flour, stockings, furniture, and "Fire Arms" and "Pistols" for sale.  Variations of this ad, with slightly different collections of goods, sometimes specifying "neat Fire Arms" but not pistols, and sometimes "Guns, Pistols, &c." appear in a total of sixteen ads over the next ten months.[7]  (Many issues in this series were damaged or missing, making a complete count for this period impossible.)  In six issues, there are two different vendors offering guns for sale, one of whom advertises himself as a gunsmith.[8]

16.     An online search of the *Pennsylvania Gazette* from 1728 through 1800 found far more ads for guns than there was time to catalog.  A fairly typical ad was that of a merchant named Peter Turner who, in 1741, was liquidating his inventory before returning to London.  Included among his very broad collection of consumer goods were "Rifle barrel Guns,… with several sorts of fowling Pieces…."[9]  A Robert Towers offered as part of his selection, "rifle

---

[5] *Boston Gazette*, May 30, 1720.

[6] *Boston Gazette,* March 1, 1730; Id., March 9, 1730; Id., August 14, 1730.

[7] *PETER TURNER intending for London,* Boston Gazette, November 17, 1741; December 1, 1741; Id.,December 8, 1741; Id.,December 15, 1741; Id., January 19, 1742; Id., February 2, 1742; Id., [unreadable date], 1742; Id., March [unreadable], 1742; Id., May 11, 1742; Id., May 18, 1742; Id., May 25, 1742; Id.,  July 13, 1742; Id., August 10, 1742; Id., August 24, 1742; Id., August 31, 1742; [September 13?], 1742.

[8] *Boston Gazette*, May 11, 1742; Id., May 18, 1742; Id., May 25, 1742; Id., July 13, 1742; Id., August 24, 1742; Id., August 31, 1742.

[9] *Pennsylvania Gazette,* July 30, 1741.

double barrel and smooth bore guns, pistols, flints, bullet and shot molds…."[10]  A Robert Lettis Hooper offered "superfine Rifle Powder by the Quarter Cask or Pound… a Parcel of Spanish Muskets, neatly fitted with iron Rods, and small Bayonets, the Locks are large and well made, and the whole Piece very handy and convenient for common Use."[11]  Samuel Carruthers offered "a neat Assortment of birding and fowling Pieces, and a valuable Rifle Gun…."[12]  Francis & Relfe offered "rifle gun barrels and locks, gunpowder…."[13]  There are many other similar ads, as well as a large number of ads offering muskets, pistols, and gunpowder for sale, as well as parts for making guns.[14]

17.     Searching other colonial newspapers for ads offering firearms for sale produced a number of matches.  "A List of sundry Goods to be sold by Henning & Shute at their Store… Indian trading guns and cutlasses, pistols…"[15]  "In the Susannah, Capt. Gregory, and to be sold by Steel and Hume, at the Corner House… Trading Guns, Pistols…"[16]  "JUST IMPORTED in

---

[10] *Imported from Liverpool,* PENNSYLVANIA GAZETTE, September 6, 1764. 1.

[11] *To be SOLD by ROBERT LETTIS HOOPER*, PENNSYLVANIA GAZETTE, September 22, 1763, 1.

[12] *JUST landed, a select Parcel of SAWS,* PENNSYLVANIA GAZETTE, July 8, 1762, 1.

[13] PENNSYLVANIA GAZETTE, March 5, 1761, Id., *Just imported in the last Ships from London*, June 4, 1761, 1.

[14] *JUST imported from London*, PENNSYLVANIA GAZETTE, November 1, 1744, 4; Id., September 26, 1745; Id., October 3, 1745; Id., October 17, 1745; Id., February 11, 1746; Id., July 17, 1746; Id., July 30, 1747; Id., March 29, 1748; Id., May 5, 1748; Id., May 12, 1748; Id., September 15, 1748; Id., October 25, 1750; Id., November 27, 1755; Id., January 18, 1759; Id., August 2, 1759; Id., November 19, 1761; Id., February 11, 1762; Id., August 19, 1762; Id., April 14, 1763; Id., May 19, 1763; Id., February 16, 1764; Id., April 12, 1764; Id., April 19, 1764; Id., May 14, 1772; Id., May 28, 1772; Id., August 26, 1772; Id., February 17, 1773; Id., November 28, 1778; Id., December 24, 1783.

[15] *A List of sundry Goods to be sold by Henning & Shute at their Store…,* SOUTH CAROLINA GAZETTE, Nov. 8, 1735, 2.

[16] *Just Imported,* SOUTH CAROLINA GAZETTE, Dec. 22, 1739, 3.

the John & Mary, … Guns & Pistols , Gun-powder, Bullets…"[17]  "IMPORTED in the Brigt. Dorothy… two pair of very near [neat?] pistols…"[18]

18.     Some are ads for much larger quantities.  "Whereas there were 300 Muskets and Bayonets brought over from Great Britain in the Alaborough Man of War. This is to give Notice the same are to be sold by Mr. Commissary Dart, at his House, at the Rate of 12 £. Currency each Musket and Bayonet. They are fine Arms, have double Bridle Locks, and Walnut Tree Stocks."[19]

19.     Sometimes these ads include cannon for sale: "ON Monday next will be sold by publick vendue… 12 fine carriage guns, 12 swivels [a type of small cannon mounted on a swivelling stand or fork], a parcel fine blunderbusses, muskets, pistols, cutlasses, best gunpowder…"[20]  "The remaining store goods belonging to the late Captain William Grant, deceased, consisting of the following articles (in order to close the sales)… a large parcel of muskets and bayonets…"[21]  "On Monday next, the fourth of April, will be sold at vendue… muskets … 10 carriage guns, and 6 swivel guns."[22]  "N.B. Said Howel has for sale a parcel of guns, carrying four pound shot, suitable *hand granades*, muskets, pistols…"[23] [emphasis added]

20.     A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749.  A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as

---

[17] *JUST IMPORTED in the John & Mary*, SOUTH CAROLINA GAZETTE, Nov. 29. 1735, 4.
[18] *IMPORTED in the Brigt. Dorothy*, SOUTH CAROLINA GAZETTE, Oct. 25, 1735, 3.
[19] *Whereas There Were 300 Muskets And Bayonets*…, SOUTH CAROLINA GAZETTE, Jun. 1, 1745, 2.
[20] *ON Monday next will be sold by publick vendue*, PENNSYLVANIA GAZETTE, Sep. 15, 1748, 3.
[21] *The remaining store goods belonging to the late Captain William Grant*, PENNSYLVANIA GAZETTE, Nov. 3, 1757, 3.
[22] *On Monday next, the fourth of April, will be sold at vendue,* PENNSYLVANIA GAZETTE, MAR. 29, 1748, 3.
[23] *Just imported in the Myrtilla*, PENNSYLVANIA GAZETTE, May 25, 1758, 4.

they said, got the six Pair at some other Place."[24]   In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[25] as did Henry Deabarear (under several slight spelling variations), who sold "pistols for holsters and the pocket…."[26] Philadelphia merchants advertised pistols and muskets for sale repeatedly from 1744 onward.[27]

21.    In 1748 New York City, Edward Annely advertised his services as a gunsmith and dealer in imported guns.  He also advertised guns made to order: "He likewise makes guns and pistols as any gentleman shall like…."[28]   John Cookson, a Boston gun maker, advertised his wares in the April 13, 1756, BOSTON GAZETTE.[29]

22.    Into the early Republic, the evidence of common retailing of guns continues. Anthony Desverneys, Jr., of South Carolina in 1785 advertised that he "continues to make and repair all sorts of guns, Pistols and generally everything that belongs to the Gunsmith's Business."  A 1791 Philadelphia newspaper advertised a merchant as a "Pistol Maker."  A similar 1798 advertisement in the PENNSYLVANIA PACKET advertised: "Gun and Pistol Manufactory… Where Merchants, Captains of vessels, and others may be supplied with all sorts of small arms, on the lowest terms and shortest notice."  Aaron Hart, advertised in 1812 Pittsburgh his ability to furnish: "Rifles, Fowling pieces, and Pistols, equal in goodness and workmanship to any made in

---

[24] PENNSYLVANIA GAZETTE, August 31, 1749, 2.

[25] WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, September 4, 1772; Id., September 14, 1773, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (1992).

[26] PENNSYLVANIA GAZETTE, Aug. 11, 1770, August 16, 1770, 1; Id., September 15, 1773, 1.

[27] PENNSYLVANIA GAZETTE, Jun. 26, 1746, 2; Id., Mar. 29, 1748, 3; Id., Sep. 15, 1748, 3; Id., September 15, 1748, 3; Id., Oct. 6, 1748, 3; Id., Nov. 11, 1756, 3; Id., November 27, 1755; Id., May 20, 1756, 3; Id., May 25, 1758, 4; Id., Mar. 27, 1782, 1; Id., Nov. 10, 1784, 3.

[28] THE NEW YORK GAZETTE REVIVED IN THE WEEKLY POST-BOY, August 1, 1748, quoted in Henry J. Kauffman, EARLY AMERICAN GUNSMITHS 4 (1952).

[29] BOSTON GAZETTE, April 13, 1756, quoted in Kauffman, EARLY AMERICAN GUNSMITHS 20 (1952).

the state."  Isaac King advertised in the January 8, 1818, SOMERSET [Pennsylvania] WHIG that: "He has and expects to have on hand, for sale, GUNS of all descriptions, Pistols…."[30]

23.    A November 9, 1807, letter from the Superintendent of the Springfield Armory to Secretary of War Henry Dearborn shows that pistols were being made in America for non-governmental purposes.  Prescott responds to Dearborn's request for pistols: "I believe Pistols… can be made here as advantageously as in any other part of the country and I think I may venture to say better…."[31]  If not being made at the government's own armory for the military, then who was the intended market?

24.    There are many surviving pistols of the early Republic, apparently *not* made under government contract, or for military purposes, including dueling pistols.  Lindsay shows a number of these survivors from the first few decades of the nineteenth century, unmistakably American-made, by makers such as Silas Allen, Asa Waters, and Simeon North.  While some have English-made gunlocks, the Asa Waters pistol is signed by Waters on the lockplate, suggesting that Waters made the lock, along with the rest of the pistol.[32]

25.    Robert McCormick advertised for "Lock forgers, lock filers" among other "Gun-Smiths wanted" in the *Pennsylvania Herald and York General Advertiser* of May 25, 1798. Daniel Sweitzer advertised for mechanics to work at his "Gun Lock Manufactory" in a

---

[30] Michael Bellesiles, ARMING AMERICA 378 (2000); SOUTH CAROLINA GAZETTE & PUBLIC ADVERTISER, October 13, 1785 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 23; FEDERAL GAZETTE, September 21, 1791 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 14; PENNSYLVANIA PACKET (CLAYPOOLE'S AMERICAN DAILY ADVERTISER), April 26, 1798, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 66; PITTSBURGH GAZETTE, December 18, 1812 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 45; SOMERSET [Pennsylvania] WHIG, January 8, 1818 quoted in Whisker, THE GUNSMITH'S TRADE, 155.
[31] James E. Hicks, 1 NOTES ON UNITED STATES ORDNANCE 28 (1940).
[32] Merrill Lindsay, THE NEW ENGLAND GUN: THE FIRST TWO HUNDRED YEARS 85-91 (1975).

Lancaster, Pennsylvania newspaper on August 23, 1808.  One pistol with a Sweitzer gunlock survives.[33]

26.     James Haslett made muskets for Virginia but also imported pistols in Baltimore as early as 1806.  He advertised in the November 12, 1806, FEDERAL GAZETTE & BALTIMORE DAILY ADVERTISER that he offered dueling pistols for sale, some made by him, and others that were imported from London.  His pistols were apparently of very high quality, and his customers included the governors of both Maryland and Virginia.  Halbach & Sons sold imported pistols, and a number of pistols have survived from the period 1824-1833 with gunlocks stamped "McKim and Brother Baltimore."  As was common at the time, some gunlocks imported from Britain were stamped with the American importer's name.  These gunlocks were made into pistols for the civilian market after arrival in America.[34]

27.     Francis D. Poyas advertised his services as a gunsmith in 1825 Charleston, South Carolina—but Poyas apparently made pistols as well.  The Charleston Museum has a pair of percussion lock pistols stamped with Poyas' name on the frame.  It seems likely that they are his manufacture; they are not government contract pistols.[35]

28.     Debts owed to the estate of James Ross, a Steubenville, Ohio gunsmith who died in 1816, showed that along with debts for repairs of guns, and apparently for purchases of guns, there was also $45 owed by a customer named John Miller for a "pair of pistols."  S. E. Dyke's THOUGHTS ON THE AMERICAN FLINTLOCK PISTOL shows ninety-one flintlock pistols

---

[33] Kauffman, EARLY AMERICAN IRONWARE, 115; S. E. Dyke, THOUGHTS ON THE AMERICAN FLINTLOCK *Pistol*, (York, Penn.: George Shumway, 1974), 58; Whisker, THE GUNSMITH'S TRADE, 18, 31.
[34] Daniel D. Hartzler, ARMS MAKERS OF MARYLAND 61 (1977).  See *Ibid.,*65-68, for photographs of a number of surviving Haslett pistols.
[35] Kauffman, EARLY AMERICAN GUNSMITHS, 76.

unquestionably of American manufacture before 1840; they do not appear to be government contract pistols.[36]

29.     J. Bolton and J. McNaught advertised in 1816 Richmond that their services included "All kinds of GUNS and PISTOLS made, altered and repaired in a perfect manner…." The inventory of James McNaught's estate in 1826 showed a "pair of dueling pistols… 6 pair small dirk pistols… 2 pair best round stock pistols with flints… 2 pair percussion pistols, plain secret triggers… 3 pair rifle barrel pistols… 5 pair secret trigger pistols…."[37]  It seems a good assumption that these were unsold inventory; the descriptions of the pistols do not sound like they were intended for military use.

30.     Jacob S. Baker advertised in WHITELY'S PHILADELPHIA ANNUAL ADVERTISER of 1820: "All orders for Rifles, Pistols, Fowling Pieces and Muskets will be punctually attended to…."  A Cleveland, Ohio gunsmith in 1823 advertised: "Rifles, Fowling pieces, and Pistols will be furnished on short notice."  While the ad is ambiguous as to whether Andrews made all of these items, or simply sold and repaired them, it is clear that he sold pistols, and considered that there was enough demand to bother listing them for sale.[38]

31.     Francis Areis advertised in 1831: "Manufacturers and Repairer of all kinds of Fire Arms; Pistols, Guns, Swords, Gunlocks."[39]  This can be read as either manufacturing or repair of pistols; either way, it appears that there was either enough demand for pistols, or enough pistols in need of repair, that Areis considered this ad worth running.  Henry A. Cargill, a Nashville merchant, advertised pistols for sale for almost two months on the front page of the NASHVILLE

---

[36] Whisker, THE GUNSMITH'S TRADE, 200; S. E. Dyke, THOUGHTS ON THE AMERICAN FLINTLOCK PISTOL 13-60 (1974).
[37] RICHMOND COMMERCIAL COMPILER, September 21, 1816,  quoted in Whisker, THE GUNSMITH'S TRADE, 163, 203-204.; Id., October 4, 1816, Id.,, 163, 203-204.
[38]  WHITELEY'S PHILADELPHIA ANNUAL ADVERTISER B2 (1820); CLEVELAND HERALD, May 8, 1823, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 4.
[39] Kauffman, EARLY AMERICAN GUNSMITHS, 5.

DAILY REPUBLICAN BANNER. A few months later, A. W. Spies advertised in every issue of the NEW YORK MORNING HERALD for several weeks: "Hardware, Cutlery, Guns and Pistols… 500 Guns, 300 Rifles, 2,000 pair Pistols/Gun and sporting implements of every kind/Gun materials for Gunsmiths…."[40]

32.    In the same paper, on many of the same days, S. M. Pike was advertising, "Particular Notice to Sportsmen—A choice assortment of fine double and single barrel guns, rifles and pistols…."[41] A B. Ferguson of Huntsville, Alabama, advertised in May of 1837 that he was a "Gun and Locksmith," offering repairs as well as, "I also have on hand some Guns and Pistols for sale, and also a variety of gun and pistol locks…."[42]

33.    In Louisville, Kentucky, Fletcher & Reeves advertised in an 1837 business directory, "Dealers in Watches, Jewellery [sic], Silver Ware, Military Goods, Pistols, Surveyor's Compasses, Piano Fortes, Music, &c."  In St. Louis that same year, Meade & Adriance described themselves as "Importers and wholesale dealers in… *Guns, Pistols*, Cutlery, Military and Fancy Goods, generally….."[43]  [emphasis in original]

34.    Bishop's description of 1791 Pittsburgh reports that of 130 families, there were 37 engaged in some form of manufacturing, of which two were gunsmiths.[44]  About 1.5 percent of the families in what was still a frontier community were therefore making their living as gunsmiths, apparently making guns.  Cuming lists two gunsmiths in 1807 Pittsburgh.[45]  Fearon includes a table of "Manufactories in and near the city of Pittsburgh, in the State of

---

[40] *Guns, Pistols, Bowie Knives*, Nashville DAILY REPUBLICAN BANNER, October 2, 1837, through November 25, 1837, 1; NEW YORK [City] MORNING HERALD, January 1838, 1, 3-6, 9-17.

[41] NEW YORK [City] MORNING HERALD, January 1, 3, 4, 5, 6, 9, 10, 11, 12, 13, 15, 16, 17;

[42] *Gun and Locksmith*, [Huntsville, Alabama] FREE DEMOCRAT, May 23, 1837, 1.

[43] W.G. Lyford, THE WESTERN ADDRESS DIRECTORY 385, 418 (1837).

[44] *Id.,* 1:568.

[45] Fortescue Cuming, SKETCHES OF A TOUR TO THE WESTERN COUNTRY 222 (1810).

Pennsylvania, in the year 1817" listing 14 men employed as "Gun-smiths, and bridlebit-makers" with a yearly value of $13,800.[46]

35.     The most complete early Republic statement of firearms manufacturing comes from the 1810 manufacturing census.  Inconsistencies in the data clearly demonstrate that this survey was haphazard and incomplete.  As an example, Massachusetts manufactured 19,095 guns classified as "other"—but listed no gun manufactories, and no gunsmiths.  Only nine of the seventeen states are listed as having made any guns at all, and there is no firearms manufacturing listed in any of the five territories, or the District of Columbia.  Only Maryland, South Carolina, and the territories of Orleans and Louisiana reported any gunsmiths.  In spite of the 1807 and 1817 data from Fearon and Cuming for Pittsburgh showing a growing community of gunsmiths there, there are *no* gunsmiths listed in Pennsylvania.  New York, at the time one of the great manufacturing states of the Union, showed no gun manufacturing or gunsmithing at all.  Even with these clearly incomplete records, however, there were 117 "Gun manufactories" in the U.S., 37 gunsmiths (a severe undercount, based on Fearon and Cuming's reports for 1807 and 1817 for Pittsburgh alone), and 42,853 firearms manufactured.[47]

36.     It is always hazardous to make comparisons between such different times as 1810 and the present.  Firearms manufactured in 1810 were far less precise than modern weapons, and they had shorter useful lifetimes as well.  During this period, "it was assumed that a musket would have a life of 12 years in the regular service or 10 years if in use by State militia."[48]

---

[46] Henry Bradshaw Fearon, SKETCHES OF AMERICA: A NARRATIVE OF A JOURNEY OF FIVE THOUSAND MILES THROUGH THE EASTERN AND WESTERN STATES. 203 (3rd ed. 1819).

[47] Albert Gallatin, A STATEMENT OF THE ARTS AND MANUFACTURES OF THE UNITED STATES OF AMERICA 11 (1814). Secretary of the Treasury Tench Coxe's admission that the manufacturing census was very incomplete can be found in Margo J. Anderson, THE AMERICAN CENSUS: A SOCIAL HISTORY 19 (1988).

[48] Berkeley R. Lewis, SMALL ARMS AND AMMUNITION IN THE UNITED STATES SERVICE, 1776-1865 47 (1956).

Nonetheless, it is intriguing to compare 1810 production rates per capita with modern production rates.

37.     The *minimum* 1810 U.S. production rate was 592 guns per 100,000 people.  By comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people.[49]  To add to the impressiveness of this per capita gun manufacturing rate, the United States in 1969 had an army that approached 1% of the total population, and was actively at war in Vietnam where guns were being used up and lost; by comparison, in the 1820s, the United States Army "fluctuated between 5,500 and 5,700 until the end of the 1820s"[50] out of a population of 13,000,000[51]—or 0.04%.  In spite of a far larger military, with an active war consuming small arms, when small arms had much longer lifetimes, the United States manufactured *no* more than 4.5 times as many small arms per capita in 1969 as it did in 1810. The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels.

38.     Whisker gives the details of several small gun makers based on the 1820 U.S. Census of Industry.  Because the 1810 United States Census of Manufactures included only firms grossing more than $500 a year, or employing more than one person, reliance on it gives a false impression of the number of gunsmiths making guns in America, tending to underreport the one

---

[49] James D. Wright, Peter H. Rossi, and Kathleen Daly, UNDER THE GUN: WEAPONS, CRIME, AND VIOLENCE IN AMERICA 30 (1983), provides production and importation figures from which this data was calculated.

[50] Gregory J. W. Urwin, THE UNITED STATES INFANTRY: AN ILLUSTRATED HISTORY, 1775-1918 49 (1988).

[51] William G. Ouseley, REMARKS ON THE STATISTICS AND POLITICAL INSTITUTIONS OF THE UNITED STATES, WITH SOME OBSERVATIONS ON THE ECCLESIASTICAL SYSTEM OF AMERICA, HER SOURCES OF REVENUE, &c, 32 (1832).  That the U.S. Army was still only 6000 men in the 1830s is confirmed in Lorenzo de Zavala, Wallace Woolsey trans., JOURNEY TO THE UNITED STATES OF NORTH AMERICA 23 (1980).

man gunmaker.  We know of at least one illiterate Virginia gunsmith, Joseph Shelton, who made guns for at least three decades starting in 1820, but who appeared only in the 1820 Census of Industry.[52]  It seems inevitable that many other small gun makers are also missing from the censuses, but this in no way indicates that they were not making guns.  Considering that new guns often sold for as little as $10, a gun maker who made a few dozen guns a year without any employees would simply not show up in the Census of Manufactures—even if every gun maker that was supposed to be counted actually was.

39.     Whisker also claims that

> Cottage industry gunsmiths supplied the militia needs of most states well through the War of 1812.  Many Civil War militia regiments were armed with sniper and common weapons made by individual gunsmiths in their small shops….  Despite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870.[53]

40.     The Henry gun making business has left us a pile of documents establishing that they were a substantial gun manufacturer in the early Republic with many pages of items such as a November 10, 1819 ledger shows $23,359.75 in assets, and a balanced amount in cash and notes held by two banks, J. Joseph Henry, and in cash.  There is a July 8, 1813 order from the State of Maryland for 1000 muskets at $12.25 each, to be delivered in six weeks, "and will continue to take one thousand stand of muskets every six weeks till the order shall become terminated of which three weeks notice shall be given."[54]  There are many pages of such

---

[52] Felicia Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY, 7, n. ** (1948); Whisker, *The Gunsmith's Trade*, 47-48.
[53] Whisker, THE GUNSMITH'S TRADE, 67.
[54] THE HENRY PAPERS AT THE HAGLEY MUSEUM, series 2, box 8, Folder 6 Accounts 1814-19; Ibid., Folder 8 John Joseph Henry III Business Accounts 1813-31.

documents demonstrating that the Henry's firm was very busy filling orders for thousands of guns during this period.[55]

41.     These were firms large enough that they were required to report their activities in the manufacturing censuses, yet still small enough to leave few traces in other official documents.  Samuel Baum of Columbia County, Pennsylvania, reported that in the year ending June 30, 1820, he employed two workers, had a $550 capital investment, and made guns valued at $1200.   John Bayles of Georgia employed three journeymen gunsmiths during that same period.  Joseph Shelton of Lewis County, Virginia, employed two men, and made guns valued at $520.  He also made gun repairs that he valued at $150. [56]

42.     There are many other similar examples that Whisker reports of small operations that made a small number of guns—and it would appear that there were many such gun makers in America in 1820.[57]  Otho Sheets of Frankford, Virginia, employed three men and had made 90 firearms in the year previous to the census date, "each valued at $18."[58]  Whisker describes how Lancaster and Berks Counties, Pennsylvania, specialized in the manufacturing of gun barrels from the time of the Revolutionary War onward, with these barrels found on guns "made in Ohio, Kentucky, New York, Indiana, Illinois, and elsewhere."  Daniel Cryscher was one of these specialists in the making of gun barrels.  Some surviving records show that he made barrels to order for gunsmiths in other counties, and one transaction in 1830 involves an order for fifteen gun barrels, with Cryscher offering ten more if wanted.[59]

---

[55] Ibid., Series 1, Box 5, Production Records (1838).
[56] Whisker, THE GUNSMITH'S TRADE, 47-51.
[57] Whisker, THE GUNSMITH'S TRADE, 47-51.
[58] Ibid., 207.
[59] Ibid., 225-230.

43.     Gun manufacturing was a well-established craft and even industry before the Revolution and remained a substantial craft and industry after the Revolution.  To claim otherwise requires destroying vast numbers of documents from the period.

44.     This is a scattered collection of ads offering pistols or muskets for sale.  In 1773, Jacob Allen, "Gun-smith" had a shop in Maiden Lane, New York City—and the only mention of his business is that another merchant's ad described his location as "between the House of Mr. Jacob Allen's, Gun-smith and Mr. John Taylor Brass-Founder."[60]  It is entirely possible that in small towns, retailers of firearms would not need to advertise; "everyone knows everyone's business in a small town" is an apt discussion of gossip but it also identifies that everyone in a town of 1000 would know who made and sold guns.  The tenth largest town in America in 1790 was Marblehead with a population of 5,661.[61]

45.     The argument could be made that many of these ads are by importers, not necessarily retailers, but if so, it implies a network of retailers buying from those importers. Were there 704 gun retailers (which would include gun manufacturers and importers who sold directly to the public) in 1791?  It is hard to use this fragmentary advertising as persuasive proof, but it does suggest that Spitzer's characterization that there were no "Guns-R-Us" equivalents in the "1600s, 1700s, or most of the 1800s" is a supposition that requires evidence.

46.     One might argue that many of these merchants sold guns as only part of their stock.  The same is true today.  If I wanted to buy a scary black rifle, there are three business within four miles of my home that stock them: Midstar Arms (a gun store); Ace Hardware; and BiMart (which sells groceries, hardware, farm supplies, electronics, and more other categories than I can immediately remember).

---

[60] THE NEW YORK JOURNAL OR GENERAL ADVERTISER, February 25 1773, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 2.
[61] U.S. Census Bureau, *1790 Fast Facts,* op cit.

47.     Examining Colt Manufacturing correspondence shows that wholesalers (or Allies as Colt labeled them) were already buying pistols in considerable quantities by 1873:

> [Proposed contract] [w]ould meet the unanimous consent of the allies & in the long run be more advantageous to the Colt Pat. Fire Arms Co- The quantity should be 150 to 175 per month at the outside assorted viz.  22 cal [125]. 32 cal [30] 38 cal [5] 41 cal [15] with privilege of taking more of the larger or less of the smallest if demand required it.[62]

48.     A letter of January 24, 1874 from Colt to the Allies shows that the quantities of revolvers under discussion, and hardnosed pricing from Colt, does not suggest a problem selling Colt revolvers:

> [F]or we have between 4 & 5 thousand Pistols on hand and in the works.  The price named to the Allies (5.25 less 8%) is the lowest price we shall quote for them.   We have 1486 New Pocket BL [breech loading] Rim Fire and 408 do [ditto] do [ditto] pistols that we will sell to the Allies at 5.00 Each net 60 days. [63]

49.     A June 29, 1874, letter from the Allies to Colt:

> Please accept this order from each of the subscribers for two hundred OM [Old Model] 7 Shot Revolvers at $2.99 each, weekly for one year."[64]   Three Allies signed the letter, so this was an order for 31,200 revolvers a year.  On August 22, 1874 Colt confirmed an order from the Allies for "Ten Thousand (10000) new model 7 shot Pistols to be delivered within Twelve months from Sept 1st/74 at the net price of Five Dollars and Thirty five cents (%.35) each.  The first delivery of 1000 Pistols to be made in November 1874.[65]

50.     A December 30, 1874 letter to Colt ordered "Five thousand (5000) of the new 30 cal Revolvers."[66]  A December 29, 1874 letter asks, "How many new Pk't [Pocket] 4 ½ to 6 ½ [inch barrel length] Rev[olvers] have you all told including finished pistols & those that can be produced from parts on hand, if not over 2,000 we might be induced to take them with ½ to 2/3

---

[62] *Ibid., Colt Allies to Colt Patent Fire Arms Co.,* June 26, 1873, p. 15 of COLT PATENT FIREARMS CO. COLT COLLECTION, RG103, business file, box 11A, correspondence, Allies letter book, 1873-1880, from Hugh Harbison to Allies, October 30, 1877, p. 174 of letter book, Connecticut State Library.

[63] *Id.,* Hugh Harbison to [illegible], January 24, 1874, p. 22 of letter book.

[64] *Ibid.,* [Allies] to Colt Fire-Arms, June 29, 1874, p. 25 of letterbook.

[65] *Ibid.,* Colt Fire-Arms to [illegible], August 22, 1874, p. 31 of letterbook.

[66] *Ibid.,* Hugh Harbison to Colt Patent Fire Arms, December 30, 1874, p. 39 of letterbook.

altered to metallic ctgs [cartridges] (at a price) & the balance at less the cost of altering."  The use of "induced" suggests a willingness to buy if Colt gives them a bargain.

51.     The following sentence demonstrates that demand for handguns was not limited to Colt's products:

> We are of the opinion that it will be necessary for you to reduce the price of your new 38 & 41 [caliber] Rev[olvers] for they move very slow since the reduction of Allen and other manufacturers of 38 & 41 [caliber] Revolvers, being 40 to 50/ [cents?] higher in price.[67]

52.      Colt's response:

> The stock of new Pocket that we have on hand and the works cannot exceed 2000 Pistols of these about 1500 are finished.  The remainder are in the works, of those on hand their [*sic*] are about an equal quantity of 4 ½, 5 ½ and 6 ½ inch [barrel length].  By altering them into Breech Loaders we could make them all 4 ½ inch [barrel length] if desired.  We will let the 'Allies,' have them as they are (C&B[cap and ball]) at 4.00 ea. Net or we will alter them into Breech Loaders at 5.50 ea. Net.[68]

53.     The Allies agreed on January 5, 1875, to buy the new "Pkt [Pocket] Revolvers on hand & in your works & which will not exceed Two thousand (2000) Revolvers."[69]

## A.     Gun Availability and Gun Laws

54.     Spitzer on pp. 4-5 claims: "The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.  When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s."  His claim for this causal relationship, which took at least thirty years to happen, is his own article.  One would hope that for such a fundamental claim, Spitzer could provide some evidence more persuasive than, "Trust me."

---

[67] *Ibid.,* [Allies] to Colt Patent Fire Arms, December 29, 1874, p. 42 of letterbook.
[68] *Ibid.,* Hugh Harbison to [Allies], December 31, 1874, p. 43 of letter book.
[69] *Ibid.,* [Allies] to Colt Patent Fire Arms, January 5, 1875, p. 44 of letter book.

55.     Furthermore, historians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved.  (Add sodium metal to water: causality is certain and predictable.   Societies are a bit more complex.)   What else happened in America between 1870 and 1900?  Immigration: "The third wave, between 1880 and 1914, brought over 20 million European immigrants to the United States, an average of 650,000 a year at a time when the United States had 75 million residents."[70]  Urbanization:

> Between 1880 and 1900, cities in the United States grew at a dramatic rate. Owing most of their population growth to the expansion of industry, U.S. cities grew by about 15 million people in the two decades before 1900. Many of those who helped account for the population growth of cities were immigrants arriving from around the world. A steady stream of people from rural America also migrated to the cities during this period. Between 1880 and 1890, almost 40 percent of the townships in the United States lost population because of migration.[71]

56.     The battle for labor unions:

> One result of mechanization and factory production was the growing attractiveness of labor organization. To be sure, craft guilds had been around a long time. Now, however, there were increasing reasons for workers to join labor unions. Such labor unions were not notably successful in organizing large numbers of workers in the late 19th century. Still, unions were able to organize a variety of strikes and other work stoppages that served to publicize their grievances about working conditions and wages.[72]

57.     I could go on at length examining other plausible factors explaining these laws. Spitzer's single-factor explanation would earn him a poor grade in a freshman history class, or a criminology class, or a biology class.

---

[70] *Trends in Migration to the U.S.,* https://www.prb.org/resources/trends-in-migration-to-the-u-s/, last accessed October 19, 2023.

[71] *City Life in the Late 19th Century*, Library of Congress, https://www.loc.gov/classroom-materials/united-states-history-primary-source-timeline/rise-of-industrial-america-1876-1900/city-life-in-late-19th-century/, last accessed October 19, 2023.

[72] *Work in the Late 19th Century,* Library of Congress, https://www.loc.gov/classroom-materials/united-states-history-primary-source-timeline/rise-of-industrial-america-1876-1900/work-in-late-19th-century/, last accessed October 19, 2023.

B.      **The Purpose of Waiting Periods**

58.     At p. 5: "Second, no organized system of gun background checking could feasibly exist until the modern era."  Yet, background checks were instituted as early as 1923 in California.[73]

59.     Spitzer at p. 5 explains the purpose of waiting periods: "By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound [*sic*] two reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons."

60.     The first part of this claimed value is redundant to the existing national background check system:

> When a person tries to buy a firearm, the seller, known as a Federal Firearms Licensee (FFL), contacts NICS electronically or by phone. The prospective buyer fills out the ATF form, and the FFL relays that information to the NICS. The NICS staff performs a background check on the buyer. That background check verifies the buyer does not have a criminal record or isn't otherwise ineligible to purchase or own a firearm. Since launching in 1998, more than 300 million checks have been done, leading to more than 1.5 million denials.[74]

61.     The second benefit that Spitzer attributes to waiting period laws was specifically rejected by Bruen:

> In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

> Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its

---

[73] 1923 Cal. Stats. Ch. 339 § 9 (requiring mailing of Dealer Record of Sale to law enforcement); § 10 ("In no event shall any such firearm be delivered to the purchaser upon the day of the application for the purchase thereof…").

[74] FBI, *Firearms Checks (NICS)*, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics, last accessed October 19, 2023.

regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

62.     At pp. 5-6 Spitzer throws out a storm of claims, each of which requires substantial refutation:

> Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.

### a) Roth's Homicide Rates

63.     Sprinter does not understand Roth's homicide rates, which makes Spitzer's comparison of Roth's statistics to current murder rates invalid.  Roth's homicide rates are not *murder* rates. First, Roth repeatedly indicates that he is looking at *homicides* by "unrelated adults."[75]  Many murders today are of minors or by relatives.  About 6% of murder victims in 2019 were under 18.[76]  It seems likely that murder of minors (which at that time would have included all under 21 years) would have been similarly common.  "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[77]

---

[75] Randolph Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).

[76] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).

[77] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).

64.     Damaging comparability in the other direction, Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[78]  About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable.

65.     Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[79]

### b)  Black Powder Firearms Not Kept Loaded

66.     Spitzer repeats Roth's persuasive and logical argument that firearms were not kept loaded except when ready to be used.   Unfortunately, the people who lived then disagree. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to keep their firearms unloaded:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[80]

67.     And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling

---

[78] Randolph Roth, AMERICAN HOMICIDE xii (2009).

[79] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).

[80] John Winthrop, James Kendall Hosmer, ed., 1 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 83 (1908).

piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within an inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[81]

68.     Children were not safe from these rarely loaded firearms:

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[82] [emphasis added]

69.     And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one,) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[83]

70.     These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in colonial-era books that I have not read?

71.     Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1782, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

---

[81] Id. 2:55.
[82] Id., 2:317.
[83]  Id., 2:72.

72.     The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town… [84]

73.     You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one ever did this?

### c) Single Shot Firearms

74.     Spitzer on p 6 makes the claim that nearly all firearms were single shot weapons. From the late 18th century, gun makers made repeating handguns called pepper-boxes.[85]  It was also the case that a person expecting trouble (or seeking to cause it) would carry a *brace of*

---

[84] Acts and Laws of the Commonwealth of Massachusetts, ch. 46 at 119-120 (1782).

[85] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [sic], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

*pistols* (meaning a pair)[86] and use them in succession.[87]  Thomas Jefferson bought at least two braces of pistols while in London.[88]

### d)  End-Means Reasoning

75.     The same public safety argument Spitzer advances for waiting periods would also work for ignoring the protections of freedom speech and freedom of the press (questioning government policy on vaccines *might* lead to massive refusal which *might* lead to a larger public health problem; obscene publications *might* encourage objectification of women which *might* increase rape and domestic violence), freedom of religious worship (which would allow religions, *some* of whose adherents have a poor record of confusing runways with office buildings), freedom from arbitrary searches (which *might* allow violent criminals to continue their depredations on innocent parties).  If "public safety" is the "Open Sesame" to the Bill of Rights, few civil liberties could survive a windstorm of tendentious "research."

### C.     Armed While Intoxicated as an Analog to Waiting Periods

76.     Spitzer starting at p. 6, recognizing that waiting periods have no historical basis, yet still attempts to analogize laws prohibiting being armed while drunk to waiting periods.

> That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), including "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink driving countermeasures, modifying the drinking context, and treatment and early intervention." Interestingly, nearly all of these types of measures date back hundreds of years, despite changing social attitudes about alcohol and drinking.

---

[86] *Brace*, 1 A NEW ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES (1888).

[87] ACCOUNT OF THE BEHAVIOUR, CONFESSIONS, AND DYING WORDS, OF THE MALEFACTORS, WHO WERE EXECUTED AT KENNINGTON-COMMON ON THURSDAY THE 21ST OF THIS INSTANT AUGUST 16 (1735).

[88] M. Andrew Holowchak and Brian W. Dotts, ed., ELUSIVE THOMAS JEFFERSON: ESSAYS ON THE MAN BEHIND THE MYTHS 168 (2017) describes Jefferson's purchase of two pairs of flintlock pistols while in London, negotiating a treaty).

77.     Americans drank alcohol in large quantities until the 1830s:

A brief survey of American alcohol consumption from the colonial period to the present will help us put the early nineteenth century in proper perspective. As Chart 1.1 shows, during the colonial period, the annual per capita consumption of hard liquor, mostly rum, reached 3.7 gallons.[89]

78.     Rorabaugh's Chart 1.2 shows that annual consumption of alcohol in all alcoholic beverages per capita in the colonial and Revolutionary era was at least twice the rate of consumption in 1970.[90]

79.     From a historical standpoint, Colonial and early Republic practice shows that drinking while armed was widespread, even if unwise. "We met people coming from a militia muster, drunk, and staggering along the lanes and paths; these on happy souls have had their camp- meeting, and shout forth the praises of the god of strong drink: glory be to God, we have our camp-meetings too of longer continuance, and more and louder shouting of glory, and honour, and praises to the God of the armies of the earth."[91]

There is no space for a detailed examination of the charges against the courage of the Virginians of the seventeenth century and of the poor quality of the militia. There were only a few occasions when the militia was called out prior to the French and Indian War, but the service was in each case as satisfactory as a militia is apt to be. Had Mr. Wertenbaker been a reader of Dryden he would have remembered that the poet said that the chief object of militia-muster in England in his day, was to get drunk.[92]

80.     Describing an 1840 muster: "The ringing of a steamboat bell at the head of the column filled up the ranks, and the Racine Militia gallantly trained til noon, when they adjourned

---

[89] W.J. Rorabaugh, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 7-9 (1979).
[90] Id.
[91] Francis Asbury, 3 THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF THE METHODIST EPISCOPAL... 121 (1821).
[92] Philip Alexander Bruce and William Glover Stanard, 18 VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY 347 (1910).

to the Fulton House for dinner, where they all got so drunk they couldn't muster at all in the evening."[93]

81.     "MILITIA MUSTER DAYS. On the second Saturday of October each year there was a general muster at each county seat, when the various companies drilled in battalion or regimental formation; and each separate company met on its local muster grounds quarterly, and on the fourth of July the commanding officers met at the court house to drill . The Big Musters called most of the people together, and there was much fun and many rough games to beguile the time. Cider and ginger cakes were sold, and many men got drunk."[94]

82.     It is unclear to what years to which this refers, but other parts of the chapter reference the antebellum period.

83.     William Cullen Bryant's memoirs:

At that time there was in each township at least one company of militia, which was required to hold several meetings in the course of the year, and at these the minister was always present. The military parade, with the drums and fifes and other musical instruments, was a powerful attraction for the boys, who came from all parts of the neighborhood to the place at which the militia mustered. But on these occasions there was one respect in which the minister's presence proved but a slight restraint upon excess…. *It was, to be sure, esteemed a shame to get drunk; but, as long as they stopped short of this, people, almost without exception, drank grog and punch freely with out much fear of a reproach from any quarter. Drunkenness, however, in that demure population, was not obstreperous, and the man who was overtaken by it was generally glad to slink out of sight.* …

The afternoon was far spent, and I was going home with other boys, when we overtook a young man who had taken too much of the election toddy, and, in endeavoring to go quietly home, had got but a little way from the green, when he fell in a miry place, and was surrounded by three or four persons, who assisted in getting him on his legs again. The poor fellow seemed in great distress, and his new nankeen pantaloons, daubed with the mire of the road, and his dang ling limbs, gave him a most wretched appearance. *It was, I think, the first time I had ever seen a drunken man. As I approached to pass him by, some of the older boys*

---

[93] *Old Settlers' Society (RACINE, County of, Wisconsin),* OFFICIAL RECORD OF THE OLD SETTLERS SOCIETY OF RACINE COUNTY, WISCONSIN 43 (1871).

[94] John Preston Arthur, WESTERN NORTH CAROLINA: A HISTORY (1730-1913) 284 (1914).

*said to "Do not go too near him, for if you smell a drunken man it will make you drunk."[95]* [emphases added]

84.     The year is not clear, but it is in a chapter titled "Mr. Bryant's Early Life" and Bryant was born in 1797.

85.     "At that time, it was less thought of, since it was the universal custom, in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service."[96]   The date is unclear but certainly before publication date of 1832!

> "At that period, in the region where the conversation occurred, *the officers were in the habit of distributing large quantities of rum to the soldiers*. The soldiers, on their part, were in the habit of wasting much powder to honor the officers who treated them so liberally. The Colonel readily acceded to most of the opinions of the Minister, but said he did not see how such a reform could be effected. In speaking of treating the soldiers with ardent spirits, and honoring officers by the discharge of muskets near their heads or their feet, he said he had thought his life in about as much danger on a muster day, as it would be in a field of battle; especially so after the soldiers had become inflamed by rum."[97] [emphasis added]

86.     Spitzer attempts to support his claim that laws restricting firearm use in conjunction with alcohol are among the very earliest weapons regulations by citing various laws, some of which are carefully quoted out of context to misrepresent them. For example, on p. 10: "In 1636 Rhode Island enacted a measure to punish any who would engage in 'shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than necessity requireth.'"   The footnote is curious: "1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636."   Is 1636 the publication date for a volume that includes laws through 1748?   Spitzer seems to have copied this scrambled

---

[95] William Cullen Bryant, 1 LIFE AND WORKS OF WILLIAM CULLEN BRYANT 16-17 (1883).
[96] 3 NEW-ENGLAND MAGAZINE 111 (1832).
[97] Philo Pacificus [Noah Worcester], FRIEND OF PEACE 379 (1827).

citation from the Duke Repository of Gun Laws,[98] which at least had the full text, not Spitzer's misrepresented edit. It took a while, but I found the misquoted 1679 statute:

> And bee it further enacted by the authority aforesaid, That any person or persons shall presume to sport, game or play at any manner of game or games, *or shooting on the first day of the weeke* as aforesaid, or shall sit tippling and drinking in any tavern, ale-house, ordinary or victualling house on the first day of the weeke, more than necessity requireth;[99] [emphasis added]

87.    This was a Sabbath-keeping law that prohibited sport of all variety as well as drinking on Sundays.  It did not prohibit being armed while drunk or even drinking.  If Spitzer looked up this statute, he has falsely represented it.  If he did not look up a law that he cited, he is not being honest.  Either way he is no "expert."

88.    At p. 10, Spitzer continues misrepresenting colonial laws: "In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would 'be drunk within their vessels by day or night' and 'shoot off any gun after the daylight is past, or on the sabbath day.'"  The actual statute:

> Sect. 4. Be it also enacted by the authority of this court,  that no masters of ships, or seamen, having their vessels riding  within any of our harbours in this jurisdiction, shall presume to drink healths, or suffer any healths to be drunk within their vessels by day or night, *or* to shoot off any gun after the daylight is past, or on the sabbath day, on penalty for every health twenty shillings, and for every gun so shot twenty shillings.[100] [emphasis added]

---

[98] https://firearmslaw.duke.edu/laws/1636-1748-r-i-pub-laws-31-at-a-general-assembly-held-for-rhode-island-colony-at-newport-6th-of-may-1679/, last accessed October 20, 2023.

[99] 3 RECORDS OF THE COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 31 (1858). https://books.google.com/books?id=ehxPAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20sport%2C%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&pg=PA31#v=onepage&q=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20sport,%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&f=false, last accessed October 21, 2023.

[100] Colonial Laws of Massachusetts 140 (1890), https://babel.hathitrust.org/cgi/pt?id=nnc1.0063787636&seq=9&q1=that+no+masters+of+ships,+or+seamen,+having+their+vessels+riding, last accessed October 21, 2023.

89.     As the full statute demonstrates, this law banned *drinking* not being drunk.  A *separate* offense was shooting "after the daylight is past, or on the sabbath day…"  The term "gun" in this period often means cannon, not small arms.  As an example with a similar law, Georgia in 1759 made it unlawful to fire "any great gun or shall [*sic*] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."  The "shall arm" appears to be a typo for "small arm"; the marginal description is "person firing any great Guns or small arms…"[101]  A similar statute limiting such firing can be found in Pennsylvania, and again it seems limited to cannon: "And that no master or commander of any merchant ship or vessel shall fire, or suffer to be fired, on board his vessel, any ordnance or other gun after eight o'clock in the evening, nor before daylight in the morning…."[102]

90.     Spitzer has again misrepresented a statute as prohibiting shooting while drunk that says nothing about being drunk and prohibits firing guns (likely cannon) as a separate offense not tied to drunkenness.

91.     At p. 10: 'In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.'  As usual Spitzer gets the citation wrong.  He cites this as "1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries."  As both the marginal note and the last paragraph clearly state, this was a 1751 law.

92.     More importantly, Spitzer misrepresents the law:

---

[101] Chandler, 18 THE STATE RECORDS OF THE COLONY OF GEORGIA 294-5 (1759).
[102] Mitchell and Flanders, 2 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 420 (1896).

To the end the provisions already made by our laws, for preventing accidents which may happen by fire in the city of Philadelphia, and several other boroughs and towns, within this province, may be made more generally useful, and to prevent, as much as in us lies, the growing sins of idleness, drunkenness, and other debaucheries, too frequent among us, Be it enacted, that if any person or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled, not hitherto restricted nor provided for by our laws, shall set on fire their chimnies to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or *shall fire any gun or other fire-arm*, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the governor's special license for the same, every such person, or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

IV. *If any person or persons whatsoever, shall give or sell any rum, wine, or other strong liquors, at the time of any vendue,* to any person or persons attending the same, he, she, or they, so selling or giving any liquors, shall forfeit and pay for the first offence, the sum of four pounds, and for the second and every other offence, the sum of five pounds.

V. Every of the fines and forfeitures accruing or becoming due, for offences against this act, shall be paid, one half to the overseers of the poor, for the use I poor of the township within which such offence may be committed, and the other half to the use of him or them, who shall inform or sue for the same, before any justice of the peace of this province, who is hereby empowered and authorized to hear and determine the same, and to convict the offender or offenders, either on his own view, or by the legal testimony of one or more witnesses ; saving to every such offender or offenders the right of appeal in like manner as is provided in and by an act, entit"ed, " An act for the more easy and speedy recovery of small "ebts" -which fines and forfeitures shall be recovered by distress and sale of the off'nder's goods, or for want of such distress, if the offender refuses to pay, he, she, or they shall be committed to prison for every such fine, where the same is twenty shillings, the space of eight days, without bail or mainprize, and so in proportion for any of the greater fines.

VI. Provided, that every such conviction be made within one month after such offence or offences committed. Pas<sup>se</sup>d 9th February, 1751.-1 Sm. L. p. 208.[103] [emphases added]

---

[103] GENERAL LAWS OF PENNSYLVANIA FROM THE YEAR 1700, TO APRIL 1849 Ch. 44 at 86 (2nd ed. 1849),

93.     Shooting firearms in towns was prohibited.  This law also prohibited selling "any rum, wine, or other strong liquors…."  There was no prohibition on being armed while drunk and no prohibition on being drunk.  Spitzer either has not read his source or or is knowingly making false statement.

94.     A third possibility, no more supportive of Spitzer's claim to be an "expert," is that part of the first paragraph, with the same erroneous date, appears in the Duke Firearms Law Repository of Gun Laws,[104] where at least, there is no claim that it banned being armed while drunk.  This explanation would show that Spitzer is too lazy to look up the primary source that he cites.

95.     At p. 10: "For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825."  The citation is immediately suspect: "1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292."  I was unable to find this private act; in light of his either incompetent or willful misrepresentation of his first three statutes, I am skeptical that he has accurately described it.

96.     At p. 10: "In 1865, Kansas enacted a law to punish any found to carry a deadly weapon while 'under the influence of intoxicating drink.'"  He cites this as "The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the

https://books.google.com/books?id=TxhRAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22already%20made%20by%20our%20laws%2C%20for%20preventing%20accidents%20which%20may%20happen%20by%20fire%20in%20the%20city%20of%20Philadelphia%22&pg=PP7#v=onepage&q=%22already%20made%20by%20our%20laws,%20for%20preventing%20accidents%20which%20may%20happen%20by%20fire%20in%20the%20city%20of%20Philadelphia%22&f=false, last accessed October 21, 2023.

[104] https://firearmslaw.duke.edu/laws/1750-pa-laws-208-an-act-for-the-more-effectual-preventing-accidents-which-may-happen-by-fire-and-for-suppressing-idleness-drunkenness-and-other-debaucheries/, last accessed October 20, 2023.

United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources."  Again, his citation is identical to the Duke Firearms Law Repository of Gun Laws.[105]  Both have the title wrong, using the phrase "United State of Kansas": "United" is not in the actual title.

97.    Examining the actual primary source shows that Spitzer has misrepresented the statute, relying on the Duke Firearms Law Repository of Gun Laws which has the wrong text. The actual law is:

> SECTION 1. That any person who shall, directly or indirectly, sell, barter or give away any spirituous, vinous, fermented or other intoxicating liquors within the unorganized counties and territories of the state of Kansas, shall, on conviction thereof, be fined a sum of not less than one hundred [ nor] or more than one thousand dollars, or by confinement in the county jail for a term not less than four nor more than twelve months, or by both such fine and imprisonment.
>
> SEC. 2. That justices of the peace of the organized counties to which the unorganized counties or territory of this state, as set forth in section one, are attached, shall have jurisdiction of, and power to summon, try and determine cases arising under this act; and for that purpose shall have power to impannel [sic] a jury of six householders of the vicinage, who, if they find the defendant guilty, shall assess the fine to be paid by him, or the imprisonment to which he shall be subject, subject only to the provisions of this previous section.
>
> SEC. 3. That for all fines and costs assessed against any person or persons, for any violation of this act, the real estate and personal property, of every kind, without exemption, shall be liable for the payment thereof; and such fines and costs shall be a lien upon such real estate and property until paid.
>
> SEC. 4. That upon the trial for this offense, it shall not be necessary to aver the kind or the character of the liquor alleged to have been sold, bartered or given away; but it shall be sufficient if said indictment allege the liquor so sold, bartered or given away, was intoxicating. to what sum.
>
> SEC. 5. Any person who shall make complaint or give information that shall lead to conviction under this act, shall be entitled to a sum not less than fifty nor morethan two hundred dollars, to be paid out of any fines which may be collected

---

[105] https://firearmslaw.duke.edu/laws/the-general-statutes-of-the-state-of-kansas-to-which-the-constitutions-of-the-united-state-of-kansas-together-with-the-organic-act-of-the-territory-of-kansas-the-treaty-ceding-the-territory-of-loui/, last accessed October 20, 2023.

under the provisions of this act. SEC. 6. This act to take effect and be in force from and after its publication in the Leavenworth Evening Bulletin.[106]

98.     There is not a word about firearms or shooting in this prohibition statute; Spitzer has clearly not even *tried* to look up the primary source or he would have at least used the actual title.

99.     Spitzer on pp. 11-12 lists several post-1868 laws which are irrelevant under the Bruen standard.

100.     At the bottom of p. 12, Spitzer returns to colonial laws:

101.     A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.

102.     The footnote provides no identifiable printed source: "Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, M$^{ay}$ 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages."  I was able to find the statute and as Spitzer admits, it prohibits sale of alcohol in proximity to militia trainings.  It does not prohibit being armed while drunk or even while drinking.[107]  Spitzer then lists similar prohibitions on sale of alcohol at militia musters in New Jersey, Delaware, Maryland, and Pennsylvania.  Spitzer characterizes all of them as bans on being armed while drinking or drunk, not as bans on sale.  Also on p. 14: "These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity."

---

[106] GENERAL STATUTES OF THE STATE OF KANSAS TO WHICH THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF KANSAS, TOGETHER WITH THE ORGANIC ACT OF THE TERRITORY OF KANSAS, THE TREATY CEDING THE TERRITORY OF LOUISIANA TO THE UNITED STATES, AND THE ACT ADMITTING KANSAS INTO THE UNION, ARE PREFIXED 386-387 (1868).
[107] 5 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211 (1854).

103.    Spitzer claims on p. 13: "Such measures extended into the nineteenth century." "Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852)…."  I was unable to find this statute but case law confirmed this as a general ban on sales of alcohol "in any tent, shanty, hut, or place of any kind for selling refreshments, on or near the ground of any cattle show, agricultural exhibition, military muster, or other public occasion…"[108]   Again, it was not a ban on being armed and drunk and was not specific to militia.

104.    "An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853)…" The actual text of §10:

> SEC. 10. All cases arising under this act, whether by action , complaint or indictment , which shall come before the Court of Common Pleas , or Supreme Court, shall take precedence of all other business, except those criminal cases, in which the parties are actually confined in jail, awaiting trial.[109]

105.    §14 uses nearly identical language to the Vermont 1852 statute:

> It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any intoxicating liquors are kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and ifsuch officer shall find upon the premises any intoxicating liquors, he shall seize them and apprehend the keeper or keepers of such place…

---

[108] Fenner v. State, 3 Vt. 108 (1855).

[109] An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), https://books.google.com/books?id=AWUoAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22All%20cases%20arising%20under%20this%20act%2C%20whether%20by%20action%20%2C%20complaint%20or%20indictment%20%22&pg=PP5#v=onepage&q=%22All%20cases%20arising%20under%20this%20act,%20whether%20by%20action%20,%20complaint%20or%20indictment%20%22&f=false, last accessed October 20, 2023.

106.    Again, like the other statutes Spitzer cites, these are bans on sale of alcohol near militia musters *and other public events*, not bans on being armed while drunk and not specific to militia activities.

107.    Spitzer continues citing irrelevant statutes on p. 14 with laws regulating alcohol consumption while on active military duty and an 1851 Chicago ordinance that regulated storage of gunpowder and prohibited issuing permits to "any retailer of intoxicating liquors or to any intemperate person."  Again, this was not a regulation on being armed while drunk.

108.    Spitzer's entire argument analogizing waiting periods to laws banning being armed while drunk suffers serious failings: First, many of the laws he cites he has misrepresented as bans on being armed while drinking or drunk.  Second, many are bans on sale of alcohol near public events, including militia musters, not bans on being armed while drunk.  Third, a law that regulated storage of gunpowder was not specific to drunks but retailers of alcohol and those considered "intemperate."

109.    Most important of all is Spitzer's claim on p. 15:

As this account demonstrates, laws enacted to keep those who were intoxicated from weapons possession or use because of the universal understanding that the intoxicated would be much more likely to act rashly, impulsively, and with diminished judgment—i.e., in the heat of the moment. These purposes are analogous to the purpose of modern waiting periods.

110.    Here Spitzer demonstrates Bruen's claim about false analogies: "For instance, a green truck and a green hat are relevantly similar if one's metric is 'things that are green.' …. They are not relevantly similar if the applicable metric is 'things you can wear.'"

111.    What evidence is there that purchasing a firearm is done "rashly, impulsively, and with diminished judgment…"?  I know that I have never done so.  *Some* gun purchasers may do so, or they might simply be buying a gun calmly, after considerable thinking, having compared

the features and benefits of several different guns. Someone who is in fear of an angry, threatening intimate partner may not have the luxury of buying a gun today who may need to use it this afternoon in self-defense.

112.   Spitzer starting on p. 15 argues that "historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not." This is not even a "green hat" mistake. As mentioned previously, there is *already* a federal background check for firearms transfers. Colorado's waiting period is the greater of three days or "the bureau after it has completed any background check required by state or federal law."[110] The three-day minimum is not analogous to a licensing law's background check.

113.   Spitzer on p. 16 asserts: "In addition, licensing by its nature thwarts any ability to acquire or use firearms on demand." Just like a waiting period does; is a criminal or terrorist o thwarted by waiting three days?

114.   On p. 17: "At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks." Odd. That used be the gun rights argument: gun regulatory measures have their roots in racism and nativism. Now, what used to be a sign of systemic racism is an argument for a law.

115.   For five paragraphs on pp. 16-17, Spitzer makes claims without citations. This is unsurprising. He has made many of these claims in other expert declarations with citations that did not survive fact checking. But I am paid by the hour.

---

[110] Colorado, HB 23-1219, § 2.

116.    "At least 26 states enacted laws to regulate firearms discharging through licensing…. At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s.  At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons….  Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas…"  Colorado's waiting period law does not regulate firearms discharge, hunting, shooting ranges, gunpowder, recording or keeping information about buyers of weapons, nor pertain only to populated areas.  Spitzer is in deep "green hat" territory.

117.    Starting at p. 18, Spitzer lists weapons carrying or possession licensing laws. Every single law is post-1868 and thus irrelevant.

118.    Starting at p. 25: "Permits for Firearms Discharge or Use of Explosives."  The law in dispute does not regulate discharge or explosives.

119.    On p. 28: "Commercial Licensing."  The law in dispute does not add any commercial licensing requirements.

120.    Starting on p. 28: "Licensing Restrictions on Gunpowder."  The law in dispute does not license possession or sale of gunpowder.

121.    Starting on p. 29: "Weapons Sellers Recording Purchases."  The law in dispute adds no recording requirements.

122.    Starting on p. 30: "Licensing Pertaining to Named Groups."  The law in dispute does not discriminate based on race or enslaved status.

### III.   Randolph Roth Rebuttal

### A.   American Exceptionalism

123.   In ¶11, Roth informs us:

For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.

124.   What does Roth mean by homicide?  His book, AMERICAN HOMICIDE (2009) does not examine *murder* rates.   Roth repeatedly indicates that he is looking at *homicides* by "unrelated adults." [111]   "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family." [112] About 6% of murder victims in 2019 were under 18. [113]   Roth's historical homicide data is thus non-comparable to current murder rates.

125.   His homicide numbers include "assaults that were legally justified or not meant to cause death." [114]   Roth's definition of homicides thus includes both justifiable and excusable homicides.   Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")

---

[111] Randolph Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).

[112] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).

[113] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).

[114] Randolph Roth, AMERICAN HOMICIDE xii (2009).

126.    The FBI's crime reporting system is based on original police reports.    If homicides are later determined by police, prosecutor, judge or jury to not be a criminal offense, this change is not reflected in the initial reporting.  About 6% of civilian *firearms* homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. [115]

127.    If Roth means homicides in the broad definition of intentional killing of another person, then he is including deaths that while regrettable to the deceased and likely his family are really a social positive not a negative.

128.    In 2019, the U.S. had a reported murder rate of 5.0/100,000.[116]  Because 73.7% of U.S. murders are committed with firearms,[117] this suggests that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but later determined not to be, murder) is really 3.72/100,000.  Other nations may have similar overreporting of lawful firearms homicides by firearms, but it seems likely that the widespread availability of firearms and the well-recognized lawful use of firearms in self-defense may make the U.S. an outlier in this area as well.

129.    Roth does not define "Western world."  Does he mean just European nations? Does he mean nations with overwhelmingly white populations? Does he mean historically Christian nations?    Does he include Russia?  Russia's 2019 murder rate was 7.69.  Other European nations that had murder rates comparable to the U.S. after adjusting for overreporting

---

[115] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).
[116] FBI, Crime in the United States 2019, Table 16https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-16, last accessed October 22, 2023.
[117] FBI, Crime in the United States 2019, Table 7, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-7.xls, last accessed October 22, 2023.

based on initial reports: Ukraine: 4.12; Latvia, 3.39; Lithuania, 3.30; Moldova, 3.89; Montenegro, 3.65.[118]

130.    The overall U.S. murder rate after adjustment of 3.72/100,000 is an average for the entire country.  In the same way that, "The average American has one testicle and one ovary," is correct, that average fails to take into account the enormous variation from state to state.

131.    To avoid making assumptions about how consistent that 6% overcount of firearms murders is from state to state, I will use only the FBI's overcounted murder rates hereafter.  The 52 entities that appear in CRIME IN THE UNITED STATES 2019 include the 50 states, the District of Columbia, and Puerto Rico.  These range from 1.5/100,000 for Maine to 23.5 for D.C.



132.    The five states at the low end, with murder rates of 2.0/100,000 or less, in the mainstream of European nations are Maine (1.5), Vermont (1.8), Iowa (1.9), South Dakota (1.9), and Idaho (2.0); an average of 1.83/100,000 summing population and raw murder counts across

[118] United Nations Office on Drugs and Crime, *Victims of Intentional Homicide*, Region: Europe, Sex: Total; Year: 2019; Rate Per 100,000 population; https://dataunodc.un.org/dp-intentional-homicide-victims, last accessed October 22, 2023.

all five states).  Everytown for Gun Safety in 2023 ranked Maine and Vermont as Missing Key Laws; Iowa as Weak Systems; South Dakota and Idaho as National Failures.[119]

133.    An attentive person might wonder how states with such defective laws end up as safe as many European nations while Everytown's five National Leaders such as California (4.3), New York (2.9), Hawaii (3.4), New Jersey (2.9), and Connecticut (2.9) (averaging 3.66/100,000 summing population and raw murder counts across all five states) have murder rates collectively 100% higher than states such as my own of Idaho where a license is not required to purchase or carry openly or concealed, no waiting periods, and no state licensing of machine guns or suppressors.  I will not pretend that states with failing grades from Everytown are all at the bottom of the murder rates list, but if a lack of gun regulation is the reason for high U.S. murder rates, it is odd to see this astonishing lack of correlation.

134.    Roth does distinguish the slave South's high murder rates from the rest of antebellum America.  This has not changed.  Slavery is gone, but the average of the rates for the states that still held slaves in 1861 (Louisiana, Mississippi, South Carolina, Maryland, Arkansas, Tennessee, Alabama, Oklahoma, Georgia, North Carolina, Florida, Virginia, Texas, Kentucky, and Delaware) is 6.16/100,000, 23% higher than the national average.  Perhaps there is some other explanation for America's high murder rate besides gun laws?

135.    Prof. Roth recognizes that there are other factors in play in ¶11, but in ¶12 insists that advancements in firearms technology explains America's homicide problem.  Starting at ¶14, Roth points to low murder rates in the colonial era: "By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England."  As previously

---

[119] Everytown for Gun Safety, *Everytown Gun Law Rankings 2023*, https://everytownresearch.org/rankings/, last accessed October 22, 2023.

discussed, Roth measures homicides among unrelated adults, which undercounts murders by leaving out domestic murders and murders of minors.  This presents an artificially rosy view of murder in this period.

136.     There have been dramatic improvements in weapons: rate of fire, rifling of pistol and rifle barrels, high capacity magazines, and more powerful ammunition; in addition, today's murder rates include minors and victims related to their murderers.  The five lowest murder rates in 2019 America are only slightly higher than colonial New England and much lower than Pennsylvania and Tidewater Virginia.  Roth has an explanation in desperate need of a problem to explain.

### B.     Colonial Firearms Technology

137.     In ¶16: "Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading."

### a)  Firearm Accuracy

138.     Most murders in America today are at close range; with rare exceptions, shooting someone with a handgun beyond about 25 yards with a handgun is the sign of a remarkable handgun and a remarkably skilled shooter.

139.     The high accuracy of Revolutionary-era firearms is easily established.  The very bookish James Madison wrote a letter on June 19, 1775 to William Bradford in Philadelphia:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers.  You would be astonished at the perfection this art is brought to.  The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards.  I

am far from being among the best & should not often miss it on a fair trial at that distance.[120]

140.  Frederick County, Maryland raised two companies of riflemen to join the army forming outside of Boston.  An eyewitness account of Captain Michael Cresap's rifle company of "upwards of 130 men" described a demonstration:

to show the gentlemen of the town their dexterity at shooting.  A clapboard, with a mark the size of a dollar, was put up; they began to fire off-hand, and the bystanders were surprised, so few shots being made that were not close to or in the paper.

When they had shot for a time in this way, some lay on their backs, some of their breast or side, others ran twenty or thirty steps, and, firing, appeared to be equally certain of the mark.  With this performance the company was more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took up the board, and, holding it as was held before, the second brother shot as the former had done.

By this exercise I was more astonished than pleased.  But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree, while another drove the center?[121]

141.  Other accounts of Cresap's company also report on their marksmanship:

[W]e mention a fact which can be fully attested by several of the reputable persons who were eye-witnesses of it. Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre; and while one of them supported this board perpendicularly between his knees, the other, at the distance of upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh!

Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side.

The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that

---

[120] James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 THE PAPERS OF JAMES MADISON 153 (1962).
[121] John Thomas Scharf, 1 HISTORY OF WESTERN MARYLAND 130 (1882).

there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail. In short, to prove the confidence they possessed in their dexterity at these kind of arms, some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who saw the other experiments declined to be witnesses of this.[122]

142.    Thatcher's military journal of August 1775, apparently referred to this same group of frontier riflemen:

They are remarkably stout and hardy men; many of them exceeding six feet in height.  They are dressed in white frocks or rifle shirts, and round hats.  These men are remarkable for the accuracy of their aim, striking a mark with great certainty at two hundred yards' distance.  At a review, a company of them, while on a quick advance, fired their balls into objects of seven inches diameter at the distance of two hundred and fifty yards.  They are now stationed on our lines, and their shot have frequently proved fatal to British officers and soldiers,… even at more than double the distance of common musket-shot.[123]

143.    John Harrower recounted a no less astonishing account of how a rifle company commander in Virginia sought to identify the best marksmen out of an overflow crowd of volunteers.  The colonel's solution was a shooting contest:

Col. Washington… made a demand of 500 Riflemen from the frontiers.  But those that insisted on going far exceeded the number wanted when in order to avoid giving offence, the commanding officer chose his company by the following method, viz. He took a board of a foot square and with chalk drew the shape of a moderate nose in the center and nailed it up to a tree at 150 yards distance and those who came nighest the mark with a single ball was to go.  But by the first 40 or 50 that fired the nose was all blown out of the board, and by the time his company was [filled] up, the board shared the same fate.[124]

144.    British Army Major George Hanger, who held in contempt the accuracy of the common soldier's musket, had a different opinion about America's riflemen.  He described being on horseback with Lieutenant Colonel Banastre Tarleton, preparing an attack on the Americans.

---

[122] *From* THE VIRGINIA GAZETTE *(1775)* quoted in Albert Bushnell Hart and Mabel Hill, CAMPS AND FIRESIDES OF THE REVOLUTION 230 (1902).
[123] 2 PENNSYLVANIA ARCHIVES 6 (1906).
[124] John Harrower. *Diary of John Harrower, 1773-1776*, 6 AMERICAN HISTORICAL REVIEW 100 (Oct. 1900).

A rifleman 400 yards away fired at Hanger and Tarleton, who were less than two feet apart. The shot killed the horse of the orderly standing between and just behind Hanger and Tarleton.

145.    Hanger became a prisoner of war at the Battle of Saratoga. The riflemen told Hanger that, "an expert rifleman…can hit the head of a man at 200 yards. I am certain that provided an American rifleman was to get a perfect aim at 300 yards at me standing still, he most undoubtedly would hit me, unless it was a very windy day…."[125]

### b) Multishot Firearms

146.    From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[126] The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism. On YouTube you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[127]

147.    38. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges

---

[125] *Types of Guns That Our Forefathers Used in Colonial Days*, OUTING (Apr., 1918).

[126] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [sic], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/itempage?Sku=308-654, last accessed October 23, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

[127] *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[128]   Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[129]

### c)   Black Powder Arms Kept Unloaded

148.    In ¶16: "And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire. The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage. That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use."

149.    As discussed above in the Spitzer rebuttal, the people who lived then disagree. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to keep their firearms unloaded:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[130]

150.    And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under

---

[128] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.

[129] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.

[130] John Winthrop, James Kendall Hosmer, ed., 1 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 83 (1908).

his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[131]

151.    Children were not safe from these rarely loaded firearms:

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[132] [emphasis added]

152.    And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one,) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[133]

153.    These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in colonial-era books that I have not read or were not recorded?

154.    Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1782, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

155.    The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

---

[131] Id. 2:55.
[132] Id., 2:317.
[133] Id., 2:72.

Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town… [134]

156.    You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one ever did this?

### C.    Why Homicide Rates Rose

157.    Roth in ¶20 asserts that: "But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over. In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century. By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  At least Roth admits that murder rates fell at a time when firearms technology advanced. Percussion caps start to appear in American newspaper ads in the 1820s.[135]  Percussion caps made it possible fire guns under damp conditions such as rainstorm.  They also speeded up reloading.

158.    Starting at ¶24, Roth launches into a discussion of concealed weapon regulation. How this applies to the challenged waiting period laws mystifies me; this new law does nothing to change concealed weapon regulation.  At ¶25, Roth puts his foot into it good with: "The new

---

[134] Acts and Laws of the Commonwealth of Massachusetts, ch. 46 at 119-120 (1782).

[135] *Ammunition Store*, [Newport, R.I.] Rhode-Island Republican, May 22, 1828, 3; *Haskell & Sawyer,* Lancaster Gazette, Oct. 28, 1828, 3.

types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents."

159.    The name "dirk" alone should be a hint that Roth is in over his head.  The CATALOGUE OF THE NATIONAL MUSEUM OF ANTIQUITIES OF SCOTLAND, WITH ILLUSTRATIONS (1892) lists "Highland Dirks, with carved handles of interlaced work… 16 ½ in. long" that would be immediately recognized as the father of the Arkansas Toothpick, the Bowie Knife's equally feared brother.[136]

160.    In ¶¶26-27, Roth chases a bunny trail that I recognize from declarations he has made in cases where his claims were actually relevant to laws concerning the carrying of arms. For a challenge to this waiting period law, it is irrelevant.

161.    Starting at ¶28, Roth claims that "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession."  This statement is false.  No state banned concealed firearms, or even placed restrictions on possession.  Concealed *carry* was heavily regulated, when not completely banned.

162.    Roth lists two sources for this claim.  "Kates, Toward a History of Handgun Prohibition'" and "Jordan, Frontier Law and Order, 17-22."  Texas attempted to discourage handgun sales by imposing a 50% tax on "gross receipts from sales of all firearms" by dealers in pistols.[137]  Kates lists several state laws such as that of Texas intended to disarm black people my making handguns expensive and a 1902 South Carolina law "banning all sales except to sheriffs

---

[136] THE CATALOGUE OF THE NATIONAL MUSEUM OF ANTIQUITIES OF SCOTLAND, WITH ILLUSTRATIONS 304 (1892).
[137] REVISED CIVIL STATUTES OF THE STATE OF TEXAS ADOPTED AT THE REGULAR SESSION OF THE THIRTY-SECOND LEGISLATURE Art. 7380 (1911).

and their special deputies – i.e., company goons and the KKK."[138]  (What a persuasive argument for gun regulation.)  Kates make no claim that "every state … placed severe restrictions on their possession."  If such laws were widespread, I am amazed at how little case law they have left behind.

163.    In the footnote Roth observes: "

These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

44. What makes this claim in the footnote misleading is that the Vermont Supreme Court overturned a Rutland ordinance that banned concealed carry, while upholding the state law which required that the carrier did so "with the intent or avowed purpose of injuring a fellow man."  Without that criminal intent, the Court ruled, the Vermont Constitution's right to keep and bear arms provision took precedence over a city ordinance.[139]

164.    Roth in ¶29-33 argues that the rise in murder rates was because: "As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust."   All of these provide at least plausible multi-factorial explanations for rising murder rates.   In ¶33, discussing "Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver": "Smith and Wesson had created a near-perfect murder weapon. It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."   They had also created a near-perfect weapon of self-

---

[138] Don Kates, "Toward a History of Handgun Prohibition," 15 in Don Kates, RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT (
    [139] State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)

defense.  That also describes the sidearm carried by every police officer and millions of law-abiding Americans, then and now.  Roth has just admitted his biases.

165.    Because Roth's inclusion of lawful killing in the general category of homicides, his rising rates might be in part because victims were increasingly able to respond to criminal attack with a handgun.  How much?  Roth opines but does not appear to have considered that possibility.

166.    In ¶34, Roth describes how even with all this advancing firearms technology:

> By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.

167.    Yet even though Southern states had become increasingly restrictive through high tax rates on pistol sales, or outright bans such as in South Carolina:

> Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.

168.    Technology does not explain rising rates in the South but falling rates elsewhere. As Roth observes, and then seemingly forgets, social factors are a much more important factor in homicide rates.  Curiously, having claimed in ¶28, that "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession," in ¶34, "And that is why every state in the Union restricted the right to carrying certain concealable weapons."  Laws restricting concealed carry start in 1813, and spread after the Civil War. Somehow, falling homicide rates outside the South lead to bans on concealed carry.

169.    All in all, this entire section on firearms regulation leads to the question, "What does this have to do with waiting periods?"  None of these laws imposed waiting periods.  The

first waiting period law that I have found is the 1923 California law prohibiting transfer of a handgun on the same day that the dealer sent the Dealer Record of Sale record to the local law enforcement agency.[140]

## IV.   Do Waiting Periods Work?

170.   Bruen specifically rejected balancing of interests because it allowed courts to say, "It makes us safer," as an excuse to ignore the constitutional guarantee.  The following material comes a study I wrote some years back.[141]

### A.   Previous Studies

171.   Criminologists who have performed the most sophisticated statistical analyses of the effects of waiting periods on crime rates have found that waiting periods have no statistically significant effect on murder rates, aggravated assault rates, robbery rates, rape rates, suicide rates, or fatal gun accident rates, but they do have a statistically significant impact on gun prevalence rates (what percentage of the population owns a gun).[142]  Another study examining several laws intended to promote safe storage of firearms included waiting period laws and length of waiting period, and found no statistically significant effect on rates of violent crime, murder, rape, robbery, aggravated assault, property crimes, burglary, larceny, or auto theft.[143] One recent summary of such research found "there is not a single study published in any

---

[140] Statutes of California Ch. 339 § 9 at 699 (1923).

[141] Clayton E. Cramer, *Fifty Years of Waiting For a handgun in California: Did it Work?*, Cramer, Clayton E., Fifty Years of Waiting for a Handgun in California: Did it Work? (April 28, 2015).                                    Available                                    at SSRN: https://ssrn.com/abstract=2600148 or http://dx.doi.org/10.2139/ssrn.2600148,                last accessed October 23, 2023.

[142] Gary Kleck and E. Britt Patterson, THE IMPACT OF GUN CONTROL AND GUN OWNERSHIP LEVELS ON VIOLENCE RATES, 9:3  J. QUANT. CRIM., (1993), 249-287, Table 3.

[143] John R. Lott and John E. Whiteley, SAFE-STORAGE GUN LAWS: ACCIDENTAL DEATHS, SUICIDES, AND CRIME, 44 J. LAW & ECON. 659-89 (OCT. 2001), Table 3,

academic journal which concludes waiting periods are effective."[144] If gun ownership in itself was a public safety matter, this might be an argument in favor of waiting periods, but gun ownership is not a public safety concern, but a fundamental right under the Constitution.[145]

**B.    Analysis**

172.    Unfortunately, we don't have the option of comparing equivalent populations, one with waiting periods, and one without, for the simple reason that the factors that determine murder rates are not perfectly understood.  The best we can hope for is to examine the year to year changes in murder rates before and after a waiting period is created or extended.

173.    In much the same way that the populations of adjoining states are not exactly comparable, the demographics of a state change from year to year.  But while the population characteristics of two adjoining states may be dramatically different in subtle and unobvious ways, the demographics *within* a state change very slowly from year to year, as people age, change their behavior, or move in or out of the state.  As a consequence, while looking at a state's crime rates through time is still a technique with limitations, it is nowhere near as prone to problems of non-comparability as comparing different states.

174.    What result should we expect a waiting period to have?  There are two purposes usually given for firearms waiting periods: time for a background check on the purchaser; and a "cooling off" period, while passions abate.  As instant background checks become feasible, and the waiting period is no longer needed for that purpose, the argument for a handgun waiting

---

[144] David B. Kopel, GUNS: WHO SHOULD HAVE THEM 73-74 (1995),.  Kopel quotes even notably pro-gun control academics such as Philip Cook as admitting the ineffectiveness of waiting period laws for reducing murder  because "most felons and other ineligibles… find ways of circumventing the [state] screening system entirely…" at 74.

[145] D.C. v. Heller, 128 S.Ct.2783, 2798 ("By the time of the founding, the right to have arms had become fundamental for English subjects.")

period relies on the claim that waiting periods save lives because of the "cooling off" of passions. What evidence does California's experience provide to judge the accuracy of such a statement?

175.    California is very nearly a perfect example of a laboratory for waiting period laws.  California is sufficiently large, and its urban populations are so remote from its borders with adjoining states, that a waiting period is enforced not only by federal law, but also by the limits of geography.  In addition to the Gun Control Act of 1968, which prohibited interstate purchases of handguns,[146] most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states.  Even assuming that a seller could be found *immediately* over the border in Nevada, Oregon, or Arizona, willing to break federal law, the travel time *alone* imposes a waiting period of hours to days.  In addition, California's handgun waiting period applies to private party sales, and has applied since at least 1953.[147]

176.    California has had a waiting period for handgun sales by dealers since at least 1923.  The California Legislature increased the handgun waiting period from one to three days in 1955, to five days in 1965, and to the 15 days in 1975,[148] then reduced it to 10 days effective April 1, 1997.[149]  A 10 day waiting period for non-handgun transfers was imposed starting in 1996.[150]  Figure 1, "California Handgun Waiting Periods & Murder Rates" plots the murder rate per 100,000 Californians during the period 1952 through 2012.[151]  (The use of a murder *rate*,

---

[146] 18 USC § 922.

[147] People v. Bickston, 91 Cal.App.3d Supp. 29, 154 Cal.Rptr. 409 (1979).

[148] Cal. Penal Code Ann. § 12071 (1991).

[149] SB 671 (1995).

[150] Cal. Penal Code Ann. § 12071 (1991).

[151] California murder rates for 1952-1989 in this article come from California Dept. of Justice, CRIMES REPORTED, 1952-1989, NUMBER AND RATE PER 100,000 POPULATION.  California murder rates for 1990 are from California Dept. of Justice, CALIFORNIA CRIMINAL JUSTICE PROFILE 1990, 5.  U.S. murder rates were derived from population and raw murder figures in FBI, UNIFORM CRIME REPORTS FOR THE UNITED STATES, 1952-1990.

which counts murders relative to the size of the population, eliminates changes in the number of murders caused by changes in the number of people living in California.)



177.    What the graph suggests is further demonstrated by examining the Spearman's rank coefficient between waiting period in days and California's murder rate.  The correlation between handgun waiting period and murder rate is 0.84: meaning that there was a strong positive correlation between handgun waiting period and murder rates.  The longer the waiting period in days, the higher the murder rate.  The correlation between long gun waiting period and murder rate is -0.19: the longer the waiting period for long guns, the lower the murder rate; although this is not a terribly strong negative correlation; and might simply be a coincidence of California adopting a long gun waiting period at a time when U.S. murder rates began a long decline.

178.    The handgun waiting period increase from one to three days in 1955, and from three to five days in 1965, had no apparent effect on rising murder rates.  Indeed, the California murder rate went from a bit above 2/100,000 people in 1952, to over 10/100,000 by 1975.  What

conclusions can we reach from the data?  Positive correlation (that two events happen together with high frequency) does *not* prove causality (that one event causes the other event).  It is also true that zero correlation between two events does not *disprove* causality — but if a positive correlation (especially a very *strong* positive correlation such as we have here) between two events can be shown, it should certainly make us skeptical that increasing A will cause B to decline.

179.    Examining characteristics of murders in the U.S. suggests that relatively few murders are likely to be affected by handgun waiting periods.  In 2013, 29.9% of murders involved non-firearms; which must therefore be outside the realm of any firearm waiting period law.  Nationally, 1.2% of murders are categorized as brawls due "to influence of" alcohol or narcotics.[152]  Since it seems most unlikely that a person who is intoxicated will be able to buy a handgun from a licensed dealer, these murders would seem unlikely to be discouraged by a waiting period.  Also, 5.9% of 2013 murders are characterized by the FBI as "gangland killings" or "juvenile gang killings"; it seems unlikely that gang members are likely to "cool off" while waiting to buy a gun; and it is most unlikely that a juvenile was obtaining any gun to commit murder in California from a licensed dealer.[153]  While some relatively rare circumstances of murder might well fit into the "crimes of passion" category such as "Romantic triangle" (0.5%) it seems most unlikely that "Child killed by babysitter" (0.24%) are in that category.

180.    Time of day is also a factor in why waiting periods seem questionable.  As the following graph of murder victim injury hour from Chicago shows:

---

[152] Id., Table 13.
[153] *Id.* Table 11.



FIGURE 8: MURDER VICTIMS BY HOUR OF INJURY, 2011

154

181.    Murder victims are heavily concentrated in the late evening and early morning perods, when legitimate retail gun stores in the Chicago area are not typically open; but it seems likely that "non-traditional" firearms merchants who are unlikely to follow any waiting period or background check law are successfully filling market demand. The crimes of passion that waiting periods are supposed to prevent must involve either people who remain very angry for very long periods, or are not dependent on lawful purchase of a handgun.

182.    The evidence that waiting periods either do, or even can, reduce murder rates is unpersuasive.

I Declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th Day of October, 2023

Clayton Cramer

---

[154] Chicago Police Department, CHICAGO MURDER ANALYSIS, Figure 8, https://home.chicagopolice.org/wp-content/uploads/2014/12/2011-Murder-Report.pdf, last accessed October 23, 2023.

## **Table of Authorities**

Cases

Fenner v. State, 3 Vt. 108 (1855). ................................................................. 36

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ......................................... 2

People v. Bickston, 91 Cal.App.3d Supp. 29, 154 Cal.Rptr. 409 (1979). ...................................... 56

State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)........................................................... 52

Statutes

18 USC § 922................................................................................................... 56

1923 Cal. Stats. Ch. 339...................................................................................... 21

3 Records of the Colony of Rhode Island, and Providence Plantations, in New England 31
(1858). ............................................................................................... 30

5 Records of the Governor and Company of the Massachusetts Bay in New England 211 (1854).
.............................................................................................................. 35

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), .... 36

Cal. Penal Code Ann. § 12071 (1991). ....................................................................... 56

Candler, 18 The State Records of the Colony of Georgia, 294-5 (1759)...................................... 31

Colonial Laws of Massachusetts 140 (1890) ............................................................... 30

Colorado, HB 23-1219......................................................................................... 38

General Laws of Pennsylvania From the Year 1700, to April 1849 Ch. 44 at 86 (2nd ed. 1849),. 32

Mitchell and Flanders, 2 Statutes at Large of Pennsylvania from 1682 to 1801 420 (1896). ...... 31

Revised Civil Statutes of the State of Texas Adopted at the Regular Session of the Thirty-Second
Legislature Art. 7380 (1911). ........................................................................... 51

SB 671 (1995). ............................................................................................... 56

Other Authorities

. Andrew Holowchak and Brian W. Dotts, ed., Elusive Thomas Jefferson: Essays on the Man Behind the Myths 168 (2017) .................................................. 26

2 Pennsylvania Archives 6 (1906). ............................................................. 46

3 New-England Magazine 111 (1832). ........................................................ 29

A List of sundry Goods to be sold by Henning & Shute at their Store…, South Carolina Gazette, Nov. 8, 1735,....................................................................... 6

Account of the Behaviour, Confessions, and Dying Words, of the Malefactors, Who Were Executed at Kennington-Common on Thursday the 21st of This Instant August 16 (1735).... 26

Albert Bushnell Hart and Mabel Hill, Camps and Firesides of the Revolution 230 (1902)......... 46

Albert Gallatin, A Statement of the Arts and Manufactures of the United States of America 11 (1814 ................................................................................................. 13

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's,...................................................... 25, 47

Antique Pepperbox Pistol 1850's Washington Arms Co,.......................................... 47

Berkeley R. Lewis, Small Arms and Ammunition in the United States Service, 1776-1865 47 (1956)............................................................................................... 13

Boston Gazette, April 13, 1756................................................................... 8

Boston Gazette, March 1, 1730.................................................................... 5

Boston Gazette, May 11, 1742.................................................................... 5

Boston Gazette, May 30, 1720.................................................................... 5

Brace, 1 A New English Dictionary on Historical Principles (1888). .......................... 26

California Dept. of Justice, California Criminal Justice Profile 1990, .......................... 56

California Dept. of Justice, Crimes Reported, 1952-1989, Number and Rate per 100,000 Population ....................................................................................................... 56

Chicago Police Department, CHICAGO MURDER ANALYSIS, Figure 8, ......................................... 59

City Life in the Late 19th Century, Library of Congress,........................................................... 20

Clayton E. Cramer, Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use, 27 U. Fla. J.L. & Pub. Pol'y 505 (2016). ........................................... 23, 41

Cleveland Herald, May 8, 1823 ....................................................................................................11

Colt Allies to Colt Patent Fire Arms Co., June 26, 1873, p. 15 of Colt Patent Firearms Co. Colt Collection, RG103, business file, box 11A, correspondence, Allies letter book, 1873-1880, from Hugh Harbison to Allies, October 30, 1877, p. 174 of letter book, Connecticut State Library............................................................................................................................ 18

Daniel D. Hartzler, Arms Makers of Maryland 61 (1977 ............................................................ 10

Derick Moore, U.S. Census Bureau, U.S. Population Estimated at 334,233,854 on Jan. 1, 2023, 4

English Transitional Pepperbox Revolver, Forgotten Weapons,.................................................... 48

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019) ................ 22, 40

FBI, Firearms Checks (NICS),.................................................................................................... 21

FBI, Uniform Crime Reports for the United States, 1952-1990.................................................... 56

Federal Gazette, September 21, 1791 ........................................................................................... 9

Felicia Deyrup, Arms Makers of the Connecticut Valley, 7, n. ** (1948) .................................... 15

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates ....................................................................................................................................... 25, 47

Fortescue Cuming, Sketches of a Tour to the Western Country 222 (1810)................................ 12

Francis Asbury, 3 The Journal Of The Rev. Francis Asbury, Bishop Of The Methodist Episcopal... 121 (1821). ........................................................................................ 27

General Statutes of the State of Kansas To Which The Constitutions of the United States and the State of Kansas, Together With the Organic Act of the Territory Of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union, are Prefixed 386-387 (1868). ................................................................................ 35

Gregory J. W. Urwin, The United States Infantry: An Illustrated History, 1775-1918 49 (1988). 14

Gun and Locksmith, [Huntsville, Alabama] Free Democrat, May 23, 1837, 1 .......................... 12

Guns, Pistols, Bowie Knives, Nashville Daily Republican Banner, October 2, 1837 ................. 12

Henry Bradshaw Fearon, Sketches of America: A Narrative of a Journey of Five Thousand Miles Through the Eastern and Western States. 203 (3rd ed. 1819). ..................................................... 13

Henry J. Kauffman, Early American Gunsmiths 4 (1952). ............................................................ 8

Imported from Liverpool, Pennsylvania Gazette, September 6, 1764. 1 ....................................... 6

IMPORTED in the Brigt. Dorothy, South Carolina Gazette, Oct. 25, 1735, 3 .............................. 7

James D. Wright, Peter H. Rossi, and Kathleen Daly, Under the Gun: Weapons, Crime, and Violence in America 30 (1983) ................................................................................................. 14

James E. Hicks, 1 Notes on United States Ordnance 28 (1940). ................................................... 9

James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 The Papers of James Madison 153 (1962) ................................................................................................................. 45

James Whisker, The Gunsmith's Trade 159-160 (1992). ............................................................... 8

John Harrower. Diary of John Harrower, 1773-1776, 6 American Historical Review 100 (Oct. 1900). .................................................................................................................................... 46

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special Report 1 (Jul. 1994) .......................................................................................... 22, 40

John Preston Arthur, Western North Carolina: A History (1730-1913) 284 (1914) .................... 28

John Thomas Scharf, 1 *History of Western Maryland* 130 (1882). .............................................. 45

John Winthrop, James Kendall Hosmer, ed., 1 Winthrop's Journal: "History of New England" 1630-1649 83 (1908)....................................................................................................... 23, 48

JUST imported from London, Pennsylvania Gazette, November 1, 1744, 4 ................................. 6

JUST IMPORTED in the John & Mary, South Carolina Gazette, Nov. 29. 1735, 4. .................... 7

Just imported in the Myrtilla, Pennsylvania Gazette, May 25, 1758, 4.......................................... 7

Just Imported, South Carolina Gazette, Dec. 22, 1739, 3............................................................... 6

JUST landed, a select Parcel of SAWS, Pennsylvania Gazette, July 8, 1762, 1............................ 6

Kauffman, Early American Gunsmiths, 14...................................................................................... 9

Kauffman, Early American Gunsmiths, 2....................................................................................... 17

Kauffman, Early American Gunsmiths, 23...................................................................................... 9

Kauffman, Early American Gunsmiths, 4.......................................................................................11

Kauffman, Early American Gunsmiths, 45...................................................................................... 9

Kauffman, Early American Gunsmiths, 5.......................................................................................11

Kauffman, Early American Gunsmiths, 66...................................................................................... 9

Kauffman, Early American Gunsmiths, 76..................................................................................... 10

Lorenzo de Zavala, Wallace Woolsey trans., Journey to the United States of North America 23 (1980)............................................................................................................................... 14

Margo J. Anderson, The American Census: A Social History 19 (1988)..................................... 13

Merrill Lindsay, The New England Gun: The First Two Hundred Years 85-91 (1975). ............... 9

Michael Bellesiles, Arming America 378 (2000) ........................................................... 9

New York [City] Morning Herald, January 1 ............................................................. 12

New York [City] Morning Herald, January 183 ........................................................ 12

Old Settlers' Society (RACINE, County of, Wisconsin), Official Record of the Old Settlers
    Society of Racine County, Wisconsin 43 (1871). .................................................... 28

ON Monday next will be sold by publick vendue, Pennsylvania Gazette, Sep. 15, 1748, 3.......... 7

On Monday next, the fourth of April, will be sold at vendue, Pennsylvania Gazette, Mar. 29,
    1748, 3........................................................................................................ 7

Pennsylvania Gazette, Aug. 11, 1770 ........................................................................ 8

Pennsylvania Gazette, August 31, 1749, 2................................................................... 8

Pennsylvania Gazette, July 30, 1741. ........................................................................ 5

Pennsylvania Gazette, Jun. 26, 1746 ......................................................................... 8

Pennsylvania Gazette, March 5, 1761 ....................................................................... 6

Pennsylvania Packet (Claypoole's American Daily Advertiser), April 26, 1798 .......................... 9

Philip Alexander Bruce and William Glover Stanard, 18 Virginia Magazine of History and
    Biography 347 (1910). ..................................................................................... 27

Philo Pacificus [Noah Worcester], Friend Of Peace 379 (1827). ................................................ 29

Pittsburgh Gazette, December 18, 1812 ..................................................................... 9

Randolph Roth, American Homicide 61, Figure 2.3 at p. 95 (2009)..................................... 22, 40

Randolph Roth, American Homicide xii (2009) .................................................................. 23, 40

Richmond Commercial Compiler, September 21, 1816 ...........................................................11

S. E. Dyke, Thoughts on the American Flintlock Pistol 13-60 (1974). ........................................11

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1................................................................................................................. 48

Somerset [Pennsylvania] Whig, January 8, 1818 ......................................................... 9

South Carolina Gazette & Public Advertiser, October 13, 1785 .................................... 9

The Catalogue of the National Museum of Antiquities of Scotland, With Illustrations 304 (1892). ........................................................................................................................ 51

The Henry Papers at the Hagley Museum, series 2, box 8, Folder 6 Accounts 1814-19; Ibid., Folder 8 John Joseph Henry III Business Accounts 1813-31 .................................... 15

The New York Gazette Revived in the Weekly Post-Boy, August 1, 1748.................................... 8

The New York Journal or General Advertiser, February 25 1773 ................................. 17

The remaining store goods belonging to the late Captain William Grant, Pennsylvania Gazette, Nov. 3, 1757, 3.................................................................................................... 7

To be SOLD by ROBERT LETTIS HOOPER, Pennsylvania Gazette, September 22, 1763, 1..... 6

Trends in Migration to the U.S., .................................................................................. 20

Types of Guns That Our Forefathers Used in Colonial Days, outing (Apr., 1918). .................... 47

U.S. Census Bureau, 1790 Fast Facts, ..................................................................... 4, 17

W.G. Lyford, The Western Address Directory 385, 418 (1837). ................................. 12

W.J. Rorabaugh, The Alcoholic Republic: An American Tradition 7-9 (1979). ........................... 27

Whereas There Were 300 Muskets And Bayonets…, South Carolina Gazette, Jun. 1, 1745, 2..... 7

Whisker, The Gunsmith's Trade, 155 ........................................................................... 9

Whisker, The Gunsmith's Trade, 200 ...........................................................................11

Whisker, *The Gunsmith's Trade*, 47-48........................................................................ 15

Whisker, The Gunsmith's Trade, 47-51 ........................................................................ 16

Whisker, The Gunsmith's Trade, 67. ........................................................................... 15

Whiteley's Philadelphia Annual Advertiser b2 (1820) ...................................................11

William Cullen Bryant, 1 Life and Works of William Cullen Bryant 16-17 (1883)..................... 29

William G. Ouseley, Remarks on the Statistics and Political Institutions of the United States,
with Some Observations on the Ecclesiastical System of America, Her Sources of Revenue,
&c, 32 (1832). ..................................................................................................... 14

Wochtenlichter Pennsylvanische Staatsbote, September 4, 1772 ................................................... 8

Work in the Late 19th Century, Library of Congress.................................................................... 20

Exhibit A
Clayton E. Cramer

24408 Tombstone Ridge Ct.
Middleton, ID 83644
(208) 761-5916
clayton@claytoncramer.com
http://www.claytoncramer.com

EDUCATION:

|  |  |
|---|---|
|  | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

AWARDS:

|  |  |
|---|---|
| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize<br>First Place, Undergraduate Division |

TEACHING EXPERIENCE:

| | |
|---|---|
| Fall, 2020 - present | **Adjunct Faculty**: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| | |
| Fall, 2014 – Spring, 2020 | Recovering from stroke. |
| | |
| Fall, 2009 – Summer, 2010 | **Adjunct Faculty**: ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | **Adjunct Faculty:** Boise State University, teaching **U.S. Constitutional History** |

BOOKS:

Lock, Stock, and Barrel: The Origins of American Gun Culture
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

SELECTED PUBLICATIONS:

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:issue 1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the

Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002.  "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller*                                                          (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

Baird v. Bonta (E.D.Cal. 2023)

Boland v. Bonta (S.D.Cal. 2023)

National Association for Gun Rights v. Lopez (D.Haw. 2023)

Wolford v. Lopez (D.Haw. 2023)

National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023)

Association of New Jersey Rifle & Pistol Clubs v. Platkin (D.N.J. 2023)

Rupp v. Bonta (C.D.Cal. 2023)

U.S. v. Ayala M.D.Fla. 2023)

U.S. v. Martin (E.D.Cal. 2023)

U.S. v. Kazmende (N.D.Ga. 2023)

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.