THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-2563-JLK

ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

        Plaintiffs,

        vs.

JARED S. POLIS,

        Defendant.

------------------------------------------------------------------

REPORTER'S TRANSCRIPT

Preliminary Injunction Hearing, Vol. 1

------------------------------------------------------------------

        Proceedings before the HONORABLE JOHN L. KANE, Judge, United States District Court for the District of Colorado, commencing on the 26th day of October, 2023, in Courtroom A802, United States Courthouse, Denver, Colorado.


APPEARANCES

For the Plaintiffs:
BRIAN A. ABBAS and D. SEAN NATION, Mountain States Legal Foundation, 2596 South Lewis Way, Lakewood, CO 80227


For the Defendant:
MICHAEL T. KOTLARCZYK, GRANT T. SULLIVAN, and MATTHEW J. WORTHINGTON, Colorado Attorney General's Office, 1300 Broadway, Denver, CO 80203




Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358


Proceedings reported by mechanical stenography; transcription produced via computer.

2

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

I N D E X

Opening Statement By Mr. Abbas . . . . . . . . . . . . . . .7

Opening Statement By Mr. Kotlarczyk . . . . . . . . . . . 11

PLAINTIFFS' WITNESSES                                    PAGE

ALICIA GARCIA
     Direct Examination By Mr. Nation . . . . . . . . . . 15
     Cross Examination By Mr. Kotlarczyk . . . . . . . . 23

TAYLOR RHODES
     Direct Examination By Mr. Abbas  . . . . . . . . . . 28
     Cross Examination By Mr. Kotlarczyk . . . . . . . . 34
     Redirect Examination By Mr. Abbas . . . . . . . . . 36

CLAYTON CRAMER
     Direct Examination By Mr. Nation . . . . . . . . . . 38
     Cross Examination By Mr. Sullivan . . . . . . . . . 61
     Redirect Examination By Mr. Nation . . . . . . . . . 95

DEFENDANT'S WITNESSES                                    PAGE

RANDOLPH ROTH
     Direct Examination By Mr. Sullivan . . . . . . . . .110
     Cross Examination By Mr. Abbas . . . . . . . . . . .136

EXHIBITS:

| | Identified | Received |
|---|---|---|
| 1 | 17 | 17 |
| 2 | 22 | 22 |
| 3 | 22 | 22 |
| 4 | 88 | 95 |
| 12 | 30 | 30 |
| 26 | 77 | 95 |
| 34 | 93 | 94 |
| 35 | 93 | 94 |

Reporter's Certificate . . . . . . . . . . . . . . . . . .194

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

P R O C E E D I N G S

(Proceedings commenced at 9:41 a.m.)

THE COURT:  This is case 23-cv-2563.  I have the names of attorneys here in front of me on a chart that has been prepared by my courtroom deputy, and if I mispronounce a name, I certainly don't intend to, and I would ask anyone other than Mr. Sullivan and Mr. Rhodes to tell me how you want me to pronounce your name before you start.  That will help.

The plaintiff Rocky Mountain Gun Owners is a nonprofit organization that seeks to defend the right of law abiding individuals to keep and bear arms.  And the plaintiff Alicia Garcia is a firearm owner and frequent purchaser.  Their claims are asserted against the Governor of the State of Colorado, Jared Polis.  The motion for preliminary injunction was filed on October 1, 2023.  Defendant's response was filed on October 17, 2023.  And plaintiffs' reply in support of the motion was filed on October 20, 2023.  Along with his response, Governor Polis included the lengthy declarations of two experts, Randolph Roth and Robert Spitzer, with an article of which Christopher, and I hope this is correct, Poliquin, is an author.

Professors Roth and Poliquin are on the Governor's witness list for the hearing.  On October 20, 2023, the Governor filed a motion requesting that both these witnesses be permitted to testify by remote means, and I granted that motion.

On October 24, 2023, plaintiffs filed a 67-page

Kevin P. Carlin, RMR, CRR

4

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

declaration of Clayton Cramer, who is on the witness list for the hearing. That same day, plaintiffs also filed a notice of supplemental authority providing the opinion in *Miller versus Bonta*, a case from the Southern District of California. This is a proceeding in equity, and I will talk about that for just a moment. In their reply brief, plaintiffs argued that the Court should exclude as relevant evidence -- as irrelevant evidence related to the, quote, need, effectiveness, or positive results of the waiting period at issue.

But an injunction, especially a preliminary injunction, is equitable in nature. I am mindful of the language in both *District of Columbia versus Heller* and *New York State Rifle and Pistol Association versus Bruen*. Still, I quote from the Supreme Court case of *Hecht versus Bowles* at 321 U.S. at pages 329 and 30, and as follows: The essence of an equity jurisdiction has been the power of the chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

In constitutional adjudication, as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. And that's a quote, the last one from

5

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

*Lemon versus Kurtzman* at 411 U.S. 192 at page 200.

Moreover, this is a bench proceeding without a jury, and I can discern that which is legally permissible from that which is not.  Accordingly, I will consider the testimony presented and the exhibits received, and I will reserve for my findings the relevance of the evidence submitted and the competence of the witnesses to testify as to specific matters.

Now, we have a problem that -- I want to begin with counsel's note of this.  As a preliminary injunction, this matter received as much preference on my docket as possible, but I do not have an excessive amount of time, because some matters that are -- that I have to attend to could not be continued. So, we will go today from now until 11:55, and recess to 1:30. We will adjourn at 5 o'clock this evening or before if we're completed.

But given the scope of the numbers of witnesses and the documents I've already read, I have serious doubts that we can finish this matter today, and I cannot do it tomorrow.  So, if we are not completed, we will reconvene on Monday, October 30, beginning at 9:30 a.m., and continue on that time.  And if we don't finish on Monday, we will go into Tuesday if necessary.

Okay.  The plaintiffs have filed a motion.  Mr. Abbas, are you ready to proceed?

MR. ABBAS:  Yes, Judge.

THE COURT:  Thank you.  And defense ready to proceed?

Kevin P. Carlin, RMR, CRR

6

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

MR. KOTLARCZYK:  Yes, Your Honor.  Thank you.

THE COURT:  Go ahead, please.

MR. ABBAS:  And Your Honor permits openings?

THE COURT:  If you care to make one.  I'm familiar with what you filed, and I think I made it clear, but I'm not going to have any *Daubert* kind of considerations.  I will consider the weight of the experts, but I'm going to let your experts testify.  This is an emergency hearing.  We don't have time for else.  And they can testify remotely or here as you wish.

MR. ABBAS:  Just really quick, Judge, essentially, what we have here is we have the --

THE COURT:  Wait a minute.  I should have said this, and I apologize for not advising you in advance.  I'm hearing impaired, and I'm wearing hearing aids, and they're connected with the court PA system.  And it's not out of any obsession with formality, but just necessity that I ask you to use the lectern.

The other thing I want to point out to you is that we have a screen here on the bench, and you have one as well, but the court reporter is using what's called realtime.  And I may be looking at the screen, because the court reporter has much better hearing than I do.  And I may, in order to make sure that I hear everything, will be looking at the screen.  Given our season record so far, you can be assured that I'm not looking at

Kevin P. Carlin, RMR, CRR

7

23-cv-2563-JLK     Preliminary Injunction Hearing    10-26-2023

a Bronco game.  So, go ahead, please.

MR. ABBAS:  Thank you, Judge.  So, what we're going to have here today is plaintiffs Garcia and Rocky Mountain Gun Owners testify as to how they've been affected by this law.  As Your Honor points out, Your Honor does have some discretion in this matter.  However, as to the what it takes to get a preliminary injunction, the plaintiffs have to prove that we're likely to succeed on the merits, that the plaintiffs suffer harm, and that the balance of the equities and hardships are in the plaintiffs' favor, and that the injunction is in the public interest.

And in this case, since the defendant is the Government, both the balance of the equities and the hardships in the plaintiffs' favor, and injunction is in the public interest is merged.  And in this case, since this is a constitutional case, and we are proving that the Government is restricting the plaintiffs' Second amendment rights, as we've submitted to Your Honor in our filings, it's -- a violation of constitutional rights trumps essentially -- violating constitutional rights is against the public interest.

And so the biggest issue here in this case is going to be whether or not the plaintiffs are likely to succeed on the merits.  The plaintiffs are going to show that we are ordinary, law-abiding citizens who are plainly within the meaning of the Second amendment.  The plaintiffs wish to acquire firearms

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

without having to wait three days even after passing a background check to prove that they are lawful purchasers, conduct that is plainly covered by the text of the Second amendment as covered in *Heller*, and thus it falls on the Government to prove that the law is sufficiently analogous to a historical restriction on the Second amendment between the Bill of Rights, the passage of the Bill of Rights, and the adoption of the 14th amendment between 1791 and 1868.

Instead, the Government in their filing suggests a number of arguments that do nothing of the sort.  The Government suggests a balancing test which goes directly repudiated by *Bruen*, and even the analogs that they do present are irrelevant or outside the timeframe allowed by *Bruen*.  The nearest analog they can produce is to restrictions on intoxicated persons carrying a firearm while -- intoxicated persons are already prevented from possessing firearms, and so that is the analogous case to any kind of laws that were on the books between 1791 and 1868.

And, moreover, a law here in Colorado presuming that every Colorado citizen is under the influence, is a danger to themselves or others, is repugnant to the principles enshrined in the Second amendment, as well as the principles of the Fourth, Fifth, Sixth, and Tenth amendments.

In *Bruen*, the Supreme Court says the constitutional right to keep and bear arms and the public for self-defense is

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

not a second-class right.  It's subject to -- is not a second-class right that is subject to an entirely different body of rules than other Bill of Rights guarantees.  So, in other cases such as *Rodriguez v. U.S.*, 575 U.S. 357, cops were not allowed to prolong a traffic stop longer than is necessary to write a ticket without further suspicion of wrongdoing, because to do so would be unconstitutional, and is not covered.

        And here in this case, we have plaintiffs that are law-abiding citizens that pass a background check to show that they're law-abiding citizens, that go through the hassle of purchasing a firearm in a legal manner, that are prevented from obtaining their firearms for a period of three days.  And when it comes to restrictions allowed on the Second amendment that are analogous to history, the Court in *Bruen* points to historical evidence and lays out for the lower courts.

        Throughout modern Anglo American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could carry arms.  But apart from a handful of late 19th-century jurisdictions, the historical record compiled by the respondents does not demonstrate a tradition of broadly prohibiting public carry of commonly used firearms for self-defense.

        And here, we're talking about restrictions on every

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

firearm that's being purchased by lawful individuals.  And we've also pointed out that our plaintiffs here will suffer irreparable harm and will continue to suffer irreparable harm as long as they are subject to the laws in this case.

And I'd like to point out footnote 28 in *Bruen*, which the Supreme Court says we will not address any of the 20th century historical evidence brought to bear by respondents or their amici.  As with their late 19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight in the meaning of the Second amendment when it contradicts earlier evidence.

And also *Bruen*, footnote three, rather than begin with its view of the governing legal framework, the dissent chronicles in painstaking detail evidence of crimes committed by individuals with firearms -- I will omit the citation.  The dissent invokes all of these statistics presumably to justify granting states greater leeway in restricting firearm ownership and use.  But as many members of the Court have already explained, the right to keep and bear arms is not only a -- is not only a constitutional right that has controversial safety implications.

And because of everything that's in *Bruen*, quite frankly, all of the experts that are here today are going to -- are irrelevant to the legal analysis that is actually required under *Bruen*.  The Supreme Court laid out the test how to apply

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

it and what historical restrictions there were at the time.  But what we see here is not a reasonable restriction with a valid historical analog.

We do not presume that every driver on the road is under the influence and allow police to detain them for three days for a simple speeding ticket.  We do not presume that public speakers will start a riot and so must undergo a three-day waiting period before giving a speech.  We do not presume that defendants are guilty until they are innocent.  And the same applies for the Second amendment, Judge.  Thank you.

THE COURT:  Thank you.  Please.

MR. KOTLARCZYK:  Thank you, Your Honor.  May it please the Court, Michael Kotlarczyk on behalf of the Governor.  I will reserve the balance of my legal argument for closings after the evidence is in, but I'd like to respond to a couple -- a couple things said in plaintiffs' opening, and to discuss a little bit of what evidence will and will not be presented today at this hearing.

And let me start with what the Court is not going to hear today.  The Court is not going to hear any evidence establishing that the generally understood meaning of the Second amendment at the time it was enacted conferred a right to immediately obtain firearms.  To the contrary, our evidence will show that the public did not have that understanding, that in colonial and early republic America, individuals did not have a

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

broad-ranging ability to obtain the firearms immediately, as the Ninth Circuit has previously found.

The Court also won't hear any evidence that Colorado's waiting period law regulates anything other than commercial sales.  To the contrary, the evidence will show that is all it regulates, and under *Heller*, *McDonald*, and *Bruen*, conditions and qualifications on the commercial sale of arms continue to be a presumptively lawful category.

The majority of the evidence that the Court will hear today concerns the historical evidence that Courts should consider at the second step of the *Bruen* analysis.  Which is -- which asks whether there is a historic analog to current law. But the Court is going to hear very little evidence today about *Bruen* step one, which is whether the plain language of the Second amendment applies to the plaintiffs' conduct.  And as I will address in greater detail at closing, and as is already addressed in our briefs, the plaintiffs' claims fail at this first step.

And if the Court agrees that the plaintiffs have failed to show that the waiting period law implicates the plain text and that Colorado's waiting period law is a presumptively lawful regulatory measure, the Court doesn't even need to look at the historical evidence, because the law does not run afoul of the Second amendment.

But the historical evidence that we presented today,

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-26-2023

Your Honor, provides even further support for the constitutionality of the bill.  The Court will hear about the very different technological and societal concerns that existed in 1790s America that explain why there were no waiting period laws at the time of the founding.

In short, as Professor Randy Roth will testify, a professor of history at Ohio State University, there simply wasn't a problem of impulsive gun violence at the time of the founding.  The guns at the time were not frequently used in crimes of passion, nor could they instantaneously be obtained in much of 18th-century America with its lack of modern infrastructure and mass production processes.  Waiting period laws would have been addressing a problem that simply didn't exist then.

But importantly, *Bruen* doesn't require that such laws must have existed in the 18th century.  Instead, *Bruen* requires Courts to reason by analogy.  When unprecedented societal concerns or dramatic technological changes lead to new firearms regulations -- and the Court will hear evidence about what those new societal concerns and technological changes have been over the course of the last 200 years.  Evidence of prior laws aimed at preventing impulsive firearm violence of this type did exist in 18th- and 19th-century America.  Namely those involving intoxicated persons, and they were meant to address the same evil that waiting period laws are aimed at preventing: impulsive

23-cv-2563-JLK    Preliminary Injunction Hearing   10-26-2023

firearms violence by people whose reason has been overcome.

Now, in their remarks just a moment ago, the plaintiffs suggested that this law assumes that every citizen is intoxicated when they purchase a firearm, and a threat to themselves and others.  The law does no such thing, Your Honor. Examples of historical regulations on the use of firearms or the obtaining of firearms by intoxicated persons no more assume that every intoxicated person was going to commit a violent act than the waiting period law does.  Both laws -- both sets of laws were intended to cover the impulsive acts of violence that were committed by some within that heading.

Finally, Your Honor, the Court will hear from Professor Christopher Poliquin from UCLA, a co-author of the study that the Colorado General Assembly relied on in passing the law.  In addition to showing the changed societal circumstances as *Bruen* instructs us to look for that exist in 21st-century America, Professor Poliquin will show that waiting period laws significantly reduce both firearm homicide and suicide.

Professor Poliquin's testimony will directly refute any claim from the plaintiffs that the interests of the public are best served by granting plaintiffs the extraordinary relief that they seek here.

We want to thank the Court for its time today, and we look forward to presenting our case and speaking further at the close of evidence.

Kevin P. Carlin, RMR, CRR

THE COURT:  Thank you very much.

MR. KOTLARCZYK:  Thank you.

THE COURT:  The plaintiffs have the burden of proof and the burden of persuasion, so call your first witness, please.

MR. NATION:  Thank you, Your Honor.  Sean Nation for the plaintiffs.  Plaintiffs call plaintiff Alicia Garcia.

THE COURT:  If you will come forward to the witness stand, and then face the courtroom deputy.  Your attention, please.  Face her, please.  Thank you.

(The Witness is Sworn)

THE COURTROOM DEPUTY:  Please be seated.  State your full name for the record, and spell your last name.

THE WITNESS:  My name is Alicia Renee Garcia, spelled G-A-R-C-I-A.

THE COURT:  Go ahead, please.

MR. NATION:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. NATION

Q   Good morning, Ms. Garcia.  Could you please provide your address for the record.

A   10589 Clermont Way, Thornton, Colorado, 80233.

Q   And you are a resident of Colorado?

A   Yes.

Q   And for how long have you been a resident of Colorado?

16

23-cv-2563-JLK    ALICIA GARCIA - Direct    10-26-2023

A    My entire life.

Q    And you intend to remain a resident of Colorado?

A    Yes.

Q    And what do you do for a living?

A    I am a firearms instructor and RSO.

Q    I'm sorry.  The last --

A    RSO.  Range safety officer.

Q    Thank you.  And you also have -- or generate income via social media with respect to firearms; is that correct?

A    Yes.

Q    And at times you review firearms?

A    Yes.

Q    And you teach people how to safely use firearms; is that correct?

A    Yes.

Q    And do you frequently acquire firearms as part of your job?

A    Yes.

Q    And when you acquire firearms, are you subject to a background check?

A    Yes.

Q    And when you acquire firearms, have you always passed a background check?

A    Yes.

Q    Do you know approximately how many times you've passed a background check?

Kevin P. Carlin, RMR, CRR

17

23-cv-2563-JLK    ALICIA GARCIA - Direct    10-26-2023

A    Probably anywhere from 10 to 20 times.

Q    Okay.  And have you recently purchased any firearms?

A    Yes.

Q    And have you recently purchased -- have you purchased any firearms after October 1st of this year?

A    Yes.

Q    And what was your first firearm that you purchased after October 1st?

A    I purchased a AR build kit, also on October 1st.  I also purchased a firearm yesterday.  That was a shotgun.

Q    Can you look at tab one of the binder that's in front of you.  And what does tab one reflect?

A    Ammunition, lower receiver, and just basically AR parts.

Q    So, is that the -- is that a receipt for the AR build kit you were describing before?

A    Yes.

MR. NATION:  Your Honor, we would ask that Exhibit 1 be placed into evidence.

THE COURT:  It's admitted.

MR. NATION:  Thank you.

Q.    (By Mr. Nation) And when you purchased that build kit, were you able to walk out of the gun store that very day with it?

A    No.

Q    And to be clear, that was not a completed firearm; correct?

Kevin P. Carlin, RMR, CRR

18

23-cv-2563-JLK    ALICIA GARCIA – Direct    10-26-2023

A    Correct.

Q    So, you would have to then assemble the firearm once you took it home or to a shop or somewhere?

A    Yes.

Q    And what reason did the store give you for not letting you take your build kit home?

A    That there was a 72-hour hold per the new law in the State of Colorado.

Q    And when they told you that, had you already passed the background check?

A    Yes.

Q    Your Honor -- excuse me.  Ms. Garcia, could you please look at tab two of your binder.  And is that also the October 1st purchase that you were mentioning before?

A    Yes.

Q    And what was that a purchase of?

A    A Henry Big Boy brass lever action .357/.38 Special rifle.

Q    And that is a rifle, not a handgun; correct?

A    It is a rifle.

Q    And did you pass a background check for that rifle as well?

A    Yes.

Q    And were you able to take that rifle home with you that day?

A    Sadly, no.

Q    And I believe it was at Triple J Armory; is that correct?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   ALICIA GARCIA - Direct   10-26-2023

A     Yes.

Q     And did they tell you why you couldn't take your rifle home that day?

A     Because of this new law that was enforced that day.

          MR. NATION:  Your Honor, would you like us to formally move things into evidence, or are you just going to review them?

          THE COURT:  I will review them later.  Go ahead.

          MR. NATION:  Okay.  I guess my question, Your Honor, is should I move it into evidence?

          THE COURT:  I've admitted it.

          MR. NATION:  Thank you, Your Honor.

Q.     (By Mr. Nation) And where is Triple J Armory?

A     It is in Littleton, Colorado.

Q     And approximately how far from your residence is Triple J Armory?

A     A good hour's drive in Colorado.

Q     So, after purchasing that handgun -- or, excuse me.  After purchasing the rifle, you then drove an hour home, had to wait three days, and then drive an hour back?

A     Yes.

          MR. KOTLARCZYK:  Objection.  Leading.

          THE COURT:  It's all right.  Overruled.

Q.     (By Mr. Nation) You mentioned that you purchased a firearm yesterday; is that correct?

A     Yes, I did.

                    Kevin P. Carlin, RMR, CRR

20

23-cv-2563-JLK    ALICIA GARCIA - Direct    10-26-2023

Q    And from where did you purchase the firearm?

A    In Colorado Springs at Dragonman's gun range and gun shop.

Q    And to be clear, that's in the State of Colorado?

A    It is.

Q    Okay.  And what firearm did you purchase?

A    I purchased a shotgun.

Q    And were you able to take that shotgun home with you yesterday?

A    Sadly, no.

Q    And approximately how far from your home is Dragonman's firearm store?

A    I live in Thornton, Colorado.  Dragonman is probably 30 minutes out of central Colorado Springs.  So, a good two-and-a-half, almost three-hour drive, depending on traffic. So, it's quite a trek for me.  So, I usually spend -- I spent probably five hours in commute yesterday.

Q    And you will have to spend another five hours to retrieve your firearm in a few days?

A    Yes.

Q    And did you pass a background check when acquiring that firearm?

A    Yes.

Q    Do you have any additional plans to purchase firearms in the future?

A    Yes.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   ALICIA GARCIA - Direct   10-26-2023

Q    And what are those plans?

A    I have an AK VEPR being shipped to me currently.

Q    And when you receive -- when that firearm is shipped, will you be subject to a background check before --

A    Yes.

Q    -- obtaining it?

A    Yes.

Q    And do you know approximately when you will receive that firearm?

A    Probably within the next two weeks, depending on the state that it's in.

Q    And so how has the waiting period impacted you?

A    Well, I don't own a shotgun -- well, I technically do own a shotgun, because I have paid for it.  I have passed the background check.  It is legally mine.  I just have not taken possession of it because of this.  And frankly, I have an entire day of business that I couldn't conduct yesterday because I had to drive to go get the gun.

Secondly, there is a shotgun shoot in Virginia this weekend that I was booked and paid the flight and hotel and all that to attend.  Sadly, I cannot shoot my shotgun, because it was not given to me upon payment and passing the background check.  So, I'm missing out on that.  That's actually being filmed for a Guns Out TV episode which would be very, very important and impactful to my career, because it's the first

22

23-cv-2563-JLK    ALICIA GARCIA - Direct    10-26-2023

time I will have something that's a very, very big production with my name on it with a lot of very notariable [sic] people in the industry, and it's really hindering my growth and my business and being able to do what I do because of the fact that I just couldn't receive the gun.

MR. NATION:  Thank you.  One moment, Your Honor.

THE COURTROOM DEPUTY:  One moment, Counsel.

(Pause in the proceedings.)

THE COURT:  Go ahead, please.

MR. NATION:  Your Honor, just to clarify, I would like to move into evidence Exhibits 2 and 3.

THE COURT:  They're admitted.

MR. NATION:  Thank you, Your Honor.

Q.    (By Mr. Nation) And, Ms. Garcia, you paid for the firearms even though you were not permitted to take them; is that correct?

A    Correct.

Q    And did they tell you if you had acquired title to the firearms?

A    They are my firearms.  I passed a background check.  I paid for them.  It is -- they are my firearms.

Q    But you're not permitted to possess them?

A    Correct.

MR. NATION:  Thank you.  No further questions.

Kevin P. Carlin, RMR, CRR

23

23-cv-2563-JLK   ALICIA GARCIA - Cross   10-26-2023

**CROSS EXAMINATION**

BY MR. KOTLARCZYK

Q    Good morning, Ms. Garcia.

A    Good morning.

Q    You describe yourself as a Second amendment advocate; right?

A    Yes.

Q    And you have a website boomstickbabe.com?

A    Yes.

Q    What's the purpose of that website?

A    For people to understand who I am.

Q    And specifically, your role as a Second amendment advocate?

A    Yes.

Q    You sell progun merchandise on that website; right?

A    I do.

Q    And you're a firearms instructor?

A    I am.

Q    And a range safety instructor, I believe you said?

A    Range safety officer.

Q    Safety officer.  Excuse me.  Guns are central to your identity.  Is that fair to say?

A    Guns are essential to my life.

Q    How many guns do you own?

          MR. NATION:  Objection.  Relevance.

          THE COURT:  Overruled.

                    Kevin P. Carlin, RMR, CRR

24

23-cv-2563-JLK    ALICIA GARCIA – Cross    10-26-2023

THE WITNESS:  Approximately 10 to 20.

Q.    (By Mr. Kotlarczyk) Before the waiting period law took effect on October 1st of 2023, how many guns did you own?

MR. NATION:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Probably -- maybe around 15.

Q.    (By Mr. Kotlarczyk) Okay.  And you bought a gun on October 1st of 2023; correct?

A    Yes.

Q    You've received that gun?

A    Yes.

Q    And you received that gun three days later?

A    Yes.

Q    You also bought a kit on October 4th of 2023 from Triple J Armory; is that right?

A    I bought a AR build the same day on October 1st.  It was like a -- it was additional background check.  So, that way I could condense my travel to one trip rather than multiple trips.

Q    I see.  And you've received that build kit as well?

A    Yes.

Q    And you bought a gun in Colorado Springs yesterday; correct?

A    Yes.

Q    And you expect to receive that gun in two more days?

A    Yes.

Kevin P. Carlin, RMR, CRR

25

23-cv-2563-JLK   ALICIA GARCIA – Cross   10-26-2023

Q    Since the waiting period law went into effect, you have acquired more guns, not less; right?

A    Not necessarily, no.

Q    Do you have fewer guns today than you had on September 30th?

A    Technically, I have guns that I have not received.  So, I don't really understand the question.

Q    The question is as of today, October 26th, you have more guns than you had -- you have more guns in your possession than you had on September 30th; right?

A    Yes.

Q    And since the waiting period law went into effect, you haven't relinquished any of your firearms; right?

A    No.

Q    Are you in the armed forces?

A    No.

Q    Have you ever received a firearm as a gift?

A    No.

Q    Have you ever borrowed a gun from a friend?

A    No.

Q    Now, you mentioned that you drove an hour to a -- a trip to Triple J Armory in Littleton; right?

A    Yes.

Q    There are closer gun stores to Thornton than Triple J Armory; correct?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    ALICIA GARCIA - Cross    10-26-2023

A    I'm sure there are.

Q    You also filed this lawsuit on October 1st; correct?

A    Yes.

Q    When you went to Triple J Armory on October 1st, you knew you were going to be filing this lawsuit?

MR. NATION:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I mean, I realized that October 1st was the day that this law came into effect.

Q.    (By Mr. Kotlarczyk) And you knew you were going to file a lawsuit challenging this law on that day?

A    Yes.

Q    And so that was -- your trip to Triple J Armory in Littleton was the same day that you filed this lawsuit; right?

A    Yes.

Q    You paid Triple J Armory for both the build kit and the -- and the gun you purchased; correct?

A    Yes.

Q    In fact, you paid, all told, over $1,000 for those two items; is that right?

A    Yes.

Q    Triple J Armory couldn't deliver you the gun that you purchased for three days; right?

A    Yes.

Q    But when Triple J Armory did deliver the gun, it was

Kevin P. Carlin, RMR, CRR

27

23-cv-2563-JLK    ALICIA GARCIA – Cross    10-26-2023

because you had paid them earlier; correct?

A    Yes.

Q    The gun you received, it wasn't a gift from Triple J
Armory, was it?

A    No.

Q    It was a commercial transaction between you and Triple J
Armory?

A    Yes.

Q    You testified on direct that you booked travel for this
weekend to go to a shotgun shoot in Virginia.  Did I understand
that right?

A    Yes.

Q    But you don't currently own any shotguns?

A    I do.  I paid one -- I paid for one and passed a background
check for one yesterday.  So, yes, I do own a shotgun.  I'm just
not in possession of it.

Q    So, other than the shotgun you purchased yesterday, you
don't own any shotguns?

A    Correct.

Q    You knew that this waiting period law was in effect as of
October 1, 2023; right?

A    Yes.

Q    But you booked a trip to go to a shotgun shoot even though
you didn't own any shotguns?

A    Yes.

Kevin P. Carlin, RMR, CRR

28

23-cv-2563-JLK   TAYLOR RHODES – Direct   10-26-2023

MR. KOTLARCZYK:  Okay.  If I could have just a moment, Your Honor?

THE COURT:  Yes.

MR. KOTLARCZYK:  Nothing further, Your Honor.  Thank you.

THE COURT:  Thank you.  Any redirect?

MR. NATION:  No redirect, Your Honor.

THE COURT:  Ms. Garcia, thank you.  You may stand down.  Go ahead, please.

MR. ABBAS:  Thank you, Judge.  The State would like -- or, I'm sorry.  Force of habit.  The plaintiffs would like to call Taylor Rhodes to the stand.

(The Witness is Sworn)

THE COURTROOM DEPUTY:  Please be seated.  State your full name for the record, and spell your last name.

THE WITNESS:  Taylor Rhodes, R-H-O-D-E-S.

**DIRECT EXAMINATION**

BY MR. ABBAS

Q    And, Mr. Rhodes, what is your address?

A    1288 Royal Troon Drive, Castle Rock, Colorado, 80104.

Q    And are you a Colorado resident?

A    I am.

Q    How long have you been a Colorado resident?

A    Since the summer of 2017.

Q    And how long will you be a Colorado resident?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    TAYLOR RHODES - Direct    10-26-2023

A    For as long as I can stand it.

Q    And so why are you here today?

A    I'm here because the Government has infringed upon the rights of my members of Rocky Mountain Gun Owners.

Q    Okay.  So, you work for Rocky Mountain Gun Owners?

A    I do.

Q    What is it that you do there?

A    I'm the executive director.

Q    And what does that mean?

A    I handle all of the executive decision-making, including our lobbying practices, making decisions to file lawsuits such as this one, and then the day-to-day management and operations of our staff and our management of our members in some capacity.

Q    And how long has RMGO been around?

A    We are on our 28th year now.

Q    And how many members do you have?

A    Full bona fide members, we are right between 16 and 17,000.

Q    And where are your members located?

A    Across the state of Colorado.

Q    And how many members are affected by this law?

A    We have already received dozens if not hundreds of calls from members attesting that they are upset of what the government has done, because they cannot acquire firearms in a reasonable manner.

Q    And how have you personally been affected by this law?

30

23-cv-2563-JLK    TAYLOR RHODES - Direct    10-26-2023

A    On October 1st, I attempted to buy a firearm.  I was granted acceptance on the background check.  I paid the purchasing price, and I did not leave with that firearm that day.  Just yesterday, I tried to purchase -- I had already purchased a -- another firearm, and I was not able to take possession of it either.

Q    And where did you purchase that firearm?

A    Triple J Armory.

Q    Okay.  And you said you passed the background check?

A    I did.  On both.

Q    And if you would please open the exhibit book there to Exhibit 12.

A    12.  Bear with me here.  Okay.

Q    What is that?

A    This is a print-off copy of my approved background check from yesterday.

        MR. ABBAS:  Thank you.  Your Honor, the plaintiffs would move to admit Exhibit 12 into evidence.

        THE COURT:  It's admitted.

        MR. ABBAS:  Thank you.

Q.    (By Mr. Abbas) And, Mr. Rhodes, you own a number of firearms?

A    I do.

Q    And have you always passed a background check to acquire a firearm?

                    Kevin P. Carlin, RMR, CRR

31

23-cv-2563-JLK    TAYLOR RHODES - Direct    10-26-2023

A    Never been denied.

Q    And what does that mean?

A    The denial?

Q    No.  What does it mean that you passed a background check?

A    That I'm a law-abiding citizen of the United States of America.

Q    How are you assured of that?

A    I'm assured of that because I don't commit crime.

Q    But who conducts a background check?

A    The Colorado -- I believe it's CBI, in coordination with NICS.

Q    And what do you know about those two organizations?

A    I know CBI has a number of agents that conducts background checks.  They're normally -- my background check yesterday was approved within five to fifteen minutes.  So, I don't know a whole ton of details about them, but I know that there is an agency here in the state that conducts those.

Q    And what is the NICS background check?

A    The NICS background check is the federal FBI background check.

Q    So, you went through both of those background checks?

A    I believe that's how Colorado does it, yes.

Q    And you passed both of them with flying colors?

A    As you see in the evidence, yes.

Q    And the firearm is already paid for?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    TAYLOR RHODES - Direct    10-26-2023

A    Yes.

Q    So, the only thing preventing you from acquiring that firearm today is this law?

A    That's correct.

Q    And how many of your members buy firearms on a regular basis?

A    I can't assume, but if I were to assume, I would guess most of them, because they are -- they want to defend the Second amendment, though there are members that have not purchased firearms.  We actually got a call from a member just a few days ago that had never purchased a gun before and went to Cabela's to purchase a shotgun, and he was denied that opportunity.

Q    And how will this law continue to affect your members?

A    In the way it's affecting us right now with the ridiculous background -- the ridiculous waiting period scheme is putting a -- as we've heard from Alicia, a massive burden on certain people that want to give businesses around the state business, and doesn't matter where they are or how far you have to drive. I know I certainly patron a handful of gun shops because they're friends.

Q    And so you testified that you bought a firearm on October 1st?

A    Yes.

Q    And you had to go back to pick it up three days later?

A    That's correct.

23-cv-2563-JLK    TAYLOR RHODES - Direct    10-26-2023

Q    And when you went back to the gun shop, what happened?

A    Well, I actually -- I actually did not pick it up three days later.  It was about eight days later, because I was out of town during that time, so it prolonged that waiting period. When I went back to the gun shop, they certified the background check, checked off that I was approved eight days before, and they transferred me that firearm.

Q    Okay.  And when you said they certified the background check, what does that mean?

A    It means that they attested that I am who I say that I am, and that my documents match what they had on record of me passing that background check.

Q    And nothing changed?

A    No.

Q    And you didn't have to pay any more money?

A    Not at that moment, no.

Q    And you had already had a receipt for passing the background check and paying for the firearm on October 1st?

A    That's correct.

Q    So, you weren't even given a receipt eight days later when you picked up the firearm?

A    I was not.

Q    Because you already had the receipt?

A    That's correct.

            MR. ABBAS:  No further questions for this witness at

                    Kevin P. Carlin, RMR, CRR

34

23-cv-2563-JLK    TAYLOR RHODES - Cross    10-26-2023

this time, Judge.

**CROSS EXAMINATION**

BY MR. KOTLARCZYK

Q    Good morning, Mr. Rhodes.

A    Good morning.

Q    RMGO's purpose is to defend the right of all law-abiding individuals to keep and bear arms.  Do I have that right?

A    Correct.

Q    And that's what you believe you're doing here today; right?

A    That's correct.

Q    And you believe the waiting period law, I believe you said infringes upon the rights of my members?

A    That's correct.

Q    And you're bringing this lawsuit on behalf of those members; right?

A    That's correct.

Q    You're not bringing this law [sic] on behalf of any specific RM -- RMGO is having separate from its members?

A    I don't understand.

Q    You're not saying that the waiting period law causes RMGO any harm other than the harm that the waiting period law you believe causes the members of RMGO?

A    It certainly affects the organization in and of itself, but it more so affects our members.

Q    Okay.  And you're not personally a plaintiff; right?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    TAYLOR RHODES – Cross    10-26-2023

A    I am not.

Q    Are you a member of RMGO?

A    I am.

Q    You testified that on October 1st, you also purchased a firearm; right?

A    I did.

Q    And you've now received that firearm?

A    I have.

Q    October 1st is also the same day that RMGO filed this lawsuit; right?

A    Correct.

Q    And when you purchased that firearm on October 1st, you knew that RMGO would be filing this lawsuit?

A    Of course.  I knew the day that it was signed into law.

Q    And you testified that you purchased a firearm yesterday?

A    That's correct.

Q    And you knew that you would be here testifying on this preliminary injunction here today?

A    I did.

        MR. KOTLARCZYK:  If I could have just a moment, Your Honor?

        THE COURT:  Yes.

        MR. KOTLARCZYK:  Nothing further, Your Honor.  Thank you.

        THE COURT:  Thank you.  You can stand down,

                    Kevin P. Carlin, RMR, CRR

36

23-cv-2563-JLK   TAYLOR RHODES - Redirect   10-26-2023

Mr. Rhodes.

MR. ABBAS:  Your Honor, may I have just a brief redirect?

THE COURT:  Oh, I'm sorry.

MR. ABBAS:  That's quite all right.

THE COURT:  Mr. Rhodes, please wait.  That was my mistake.

THE WITNESS:  Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ABBAS

Q   Mr. Rhodes, so what kind of harm has RMGO experienced through this?

A   So, on a couple of fronts.  One of the primary ways we acquire new members is through gun giveaways.  We are planning on purchasing a firearm for a said gun giveaway.  That will certainly hurt our being able to market that gun and get more members, because we can't take possession of it immediately.

On top of that, as you heard earlier, I've spoken to -- oh my gosh, at this time it's gotta be 50 to 100 members that have said that they have tried to purchase a firearm.  They didn't know the law was going into effect.  I don't know how, because I send them emails every day, but they didn't know the law was going into effect.  And they showed up at their local gun shop, and they could not take possession of that firearm.

Q   So, you're now devoting a portion of your resources to

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    TAYLOR RHODES – Redirect    10-26-2023

responding to complaints of your members about this?

A    A very high portion of our resources.  We actually have one staff that is pretty much only answering the phones right now.

MR. ABBAS:  No further questions, Judge.  Thank you.

THE COURT:  Okay.  Thank you very much, Mr. Rhodes.  Next, please.

MR. NATION:  Plaintiffs call Professor Clayton Cramer via teleconference.

THE COURT:  All right.  Mr. Cramer, I think I am seeing you now on the video screen.  You're wearing a plaid tie?

THE WITNESS:  Yes, I am.

THE COURT:  All right.

THE WITNESS:  Can you hear me?

THE COURT:  Yes.  I can hear you, and I'm going to ask the clerk of the court to administer an oath to you.  She will be right with you.

THE WITNESS:  Okay.

(The Witness is Sworn)

THE COURTROOM DEPUTY:  Okay.  Please state your full name for the record, and spell your last name.

THE WITNESS:  Clayton E. Cramer, last name spelled C-R-A-M-E-R.

MR. NATION:  Thank you, Mr. Cramer.  And, Your Honor, we are offering Mr. Cramer as an expert witness.

THE COURT:  Yes.  My ruling is that anyone can testify

Kevin P. Carlin, RMR, CRR

38

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

as an expert where I've received a report and they've been so designated by counsel.  We're not going to have a so called *Daubert* hearing on each and every one of these.

MR. NATION:  Yes.  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. NATION

Q    Mr. Cramer, could you please provide your current address for the record.

A    24408 Tombstone Ridge Court, Middleton, Idaho.

Q    And could you briefly describe your background, your education, your qualifications.

A    My bachelor's degree and master's degree in history are from Sonoma State University.  My law review articles have been cited in *DC versus Heller* and *McDonald versus Chicago* and several dozen other cases in both State Supreme Courts and Federal Courts of Appeal.  I have spent the last 37 years of my life studying the history of weapons regulation in the United States.

Q    And have you previously testified as an expert in court before?

A    Yes, I have.  I would have to look at my CV to give you a list of such cases, but there's been several of them.  There was one in New Jersey recently.

Q    And are you being compensated for your testimony today?

A    Yes, I am.

39

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

Q    At what rate?

A    $250 per hour.

Q    And have you -- have you examined the waiting period law that the State of Colorado passed?

A    Yes, I have.

Q    And do you have any opinions as to whether there are historically analogous laws in the nation's history?

A    There are -- there are no analogous laws.  The earliest waiting period law that I can find -- that I have been able to find is a 1923 waiting period law from California, which required a one-day wait after completing what was called a dealer record of sale form, which was sent to the police, and the [inaudible] acquisition of the firearm from the dealer.

Q    And what is the basis of your opinion of that?

A    Well, as I said, I spent more than 30 years actually going through dusty old volumes at the [inaudible] law library in San Francisco looking up existing case law in order to understand the -- how the Courts have ruled on a variety of gun-related cases.  I also spent quite a bit of time examining colonial records and early republic records concerning the possession of firearms and how they were acquired.

Q    So, to sum up, that would be -- your opinion is based on your research and your review of historical documents?

A    Correct.

Q    Were firearms readily available for purchase in 1792?

40

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

A    Yes.  There are large numbers of ads that appear in newspapers all over the U.S. offering firearms for sale.  And of course Canada as well.

Q    And in 1792, how would a purchaser -- how would an individual acquire a firearm?

A    In some cases there are gunsmiths who advertised that they have pistols and muskets available for sale.  In other cases there are vendors who have acquired firearms as part of a shipment arriving from England, and they have advertised that these are for sale.

Q    And as a general rule, could any member of the public purchase a firearm in 1792?

A    Yes.  There were still some laws in effect that prohibited free Blacks and slaves from purchasing firearms and possessing them.

Q    But free citizens of the United States could generally acquire a firearm legally?

A    Yes.

Q    And to your knowledge, what sort of restrictions were there on the purchase of firearms in the 1790s?

A    I've not been able to find any examples of limitations on purchase.

Q    And I believe you referenced that the first waiting period of which you're aware is in 1923; is that correct?

A    Yes.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

MR. NATION:  I'm not sure what -- yes.  Please silence your phone.  Apologies, Your Honor.

Q.    (By Mr. Nation) Have you reviewed the declarations of Mr. Spitzer and Mr. Roth?

A    Yes.  I reviewed both Professor Spitzer and Professor Roth's declarations.

Q    And are you aware of any waiting periods they cite prior to 1923?

A    No.  In fact, Professor Spitzer, as I recall, even said -- admits that there are no such waiting periods.  That's what he draws his rather warped analogy between laws preventing possession of arms while drinking with waiting periods, which is a very odd sort of attempt for that great analogy.  To give you an example of the [inaudible] talks about, not everything that is similar is actually an analog.  He talks about things that are green.  This is one of those examples.  A waiting period is really not equivalent to the --

Q    Mr. Cramer, our court reporter is having a hard time hearing you.  Could you perhaps slow down and repeat your last answer.

A    Okay.  I'm sorry.  I have a little bit of an acid reflux problem.  It sometimes makes my speech a little less clear than it ought to be.  Essentially, the Supreme Court in the *Bruen* decision made the point during an analogy that not every analogy actually makes sense.  They give the example that there are

42

23-cv-2563-JLK    CLAYTON CRAMER – Direct    10-26-2023

multiple things that are green, but it doesn't necessarily mean that everything that is green is similar.

And I would say that this attempt to draw an analogy between a waiting period law and laws that prohibit the possession of firearms while drinking or drunk, those are -- they really are not a good analogy at all.

Q    Are you aware of any laws restricting possession of firearms at the founding?

A    The only one I can think of is people that participated in Shays' Rebellion in Massachusetts in 1786 were basically granted a pardon for their treason in exchange for giving up their arms for a period of three years, at the end of which those arms were returned to them.

Q    Are you aware of any Sabbath type laws at the founding?

A    Yes.  One of the laws that Professor Spitzer lists as being a ban on being armed while drinking is actually a Sabbath law that says that you will not engage in sports, hunting, or shooting or drinking on the Sabbath.  Contrary to his claim that it prohibited shooting at a tavern, it did nothing of the sort. The prohibition on shooting on the Sabbath is an "or" clause to the other offense, which is sport or hunting or drinking on the Sabbath.

Q    And I believe Mr. Spitzer cites a Virginia law from the 1660s.  Are you familiar with that law?

A    1655.

Kevin P. Carlin, RMR, CRR

43

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

Q    Oh.  Thank you.

A    Yes.  I had a occasion to look it up last night, because the language sounded very familiar to me, and I did not know why.  The actual statute does not prohibit being armed while drinking or shooting while drinking.  The actual statute basically says that because the usual method for spreading alarm that there was an Indian attack was multiple gunshots, that except when shooting at funerals and weddings, you were not to shoot while drinking.

And so it isn't really a prohibition on being armed while drinking because of concerns that you might shoot somebody by accident, but because it would make it difficult to tell whether there was an Indian attack under way or not.

Q    Mr. Spitzer makes the claim that after the Civil War and through the rise of mail-order guns, that that led to waiting periods.  Are you familiar with his claim there?

A    I've seen the claim, but I do not recall that he ever presented any evidence for a waiting period law during that period.

Q    And do you know when mail-order firearms started rising in popularity?

A    Certainly after the Civil War, they certainly began to show up in catalogs for Sears and Montgomery Ward.  This also was a time where Sears also sells houses by mail order.

Q    And that's the late 19th century; is that correct?

Kevin P. Carlin, RMR, CRR

44

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

A    Right.  Late 19th century.

Q    And as you testified, the first waiting period law of which you're aware is in 1923?

A    This is correct.  I have some confidence that this would have been among the earliest, because as I said, I spent a lot of time going through the case law, and something like that would have definitely shown up, I'm sure.

Q    And so in your opinion, would that 50-year gap between the rise of mail-order guns and the first waiting period indicate any relationship between the two?

A    No.  There is, however, a law which does indicate a connection.  In 1927, the congress passed something called the Mail-Order Firearms Act, which prohibited the sending of handguns through the U.S. mail.  Now, that law was first proposed in 1923.  The guy that proposed it was a member of congress who represented the area around Memphis, Tennessee, and his argument was that there was a problem with the fact that their attempts to keep guns out of the hands of Blacks had not been successful, and that Black people were killing other Black people.  And he said, it's not up to us to discourage racism [inaudible] prevent this from happening.  So, he was clearly seeing this as, well, all of our laws in Tennessee that was used to try to keep Black people from having guns are not working, because mail-order sales were making it too easy for them to get ahold of handguns.

Kevin P. Carlin, RMR, CRR

45

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

Q    And you raised race there.  Historically, have gun control laws been based on the race of the individual?

A    Not in all cases, but many of them have been.  California's [inaudible] weapon law was originally passed at the -- at the -- according to the person who persuaded the government to sign it as a way of disarming Chinese and Mexicans.

Q    And in the post-reconstruction south, were gun control laws used to disarm newly freed African Americans?

A    Yes.  And this is one of the things that motivates the -- both the passage of the Enforcement Act of 1870, and also the 14th amendment, is there was a realization by members of congress that gun control laws were being used both to put the freedmen in a position of subservience with respect to work by -- because of -- because the Klansmen were not so scary once they had bullet holes in their robes, and also the 14th amendment was intended to protect not just the freedmen's right to bear arms, but also republicans, which there were many in the south who were being intimidated by the Klan and similar organizations.

Q    So, it is your opinion that the 14th amendment was passed in part to secure the Second amendment rights of disfavored minorities in the post-reconstruction south?

A    Yes.  And in fact Senator Howard, when he is discussing in language of the 14th amendment, goes ahead and proceeds to say that the objective is to impose protections of the Bill of

46

23-cv-2563-JLK    CLAYTON CRAMER – Direct    10-26-2023

Rights onto the states, and he then proceeds to read each of the provisions of the first eight amendments to the Constitution, including reading the right to keep and bear arms in the Second amendment.

Q    And at the time of the passage of the 14th amendment, are you aware of any laws imposing a waiting period prior to acquiring a firearm?

A    No.

Q    And in fact, in the time of the 14th amendment, it would be important for these newly freed men to swiftly obtain a firearm; is that correct?

        MR. SULLIVAN:  Objection.  Leading.

        THE COURT:  Overruled.

        MR. NATION:  I can rephrase.

Q.    (By Mr. Nation) At the time of the passage of the 14th amendment, was there a need amongst people to promptly acquire a firearm?

A    In some cases, yes.  There are race riots in the south on a number of occasions between the close of the Civil War and passage of this 14th amendment in which white supremacist mobs kill large numbers of people, large numbers of freedmen.

Q    Are you familiar with any instances in which African Americans used armed resistance to white mobs?

A    Yes.  The Colfax massacre.  There is a -- it was an election in Louisiana where there was an attempt by white

Kevin P. Carlin, RMR, CRR

supremacists to correct the voting results by taking over the county courthouse where most of the ballots were being counted. And the freedmen who occupied the courthouse while the voting was being counted said basically, no, we're going to count the ballots, and we're not going to let you guys come in and take control of the situation to create a fraudulent election.

What happened then is the white supremacists brought in a cannon and opened fire on the courthouse, and basically said surrender and go on your way.  Well, they went ahead and surrendered, turned over their arms, and about a hundred were massacred by the white supremacists, who obviously decided it was not okay for these people to have resisted.

Q    Moving on, Mr. Spitzer cites to an Illinois law in 1885, requiring a record of purchase.  Are you familiar with the law he's citing?

A    Yes.  I'm aware of it.

Q    And under *Bruen*, do you have an opinion of whether an 1885 law is relevant?

A    *Bruen* is very clear that if a law is passed between 1791 and 1868, it can be relevant if they corroborate pre-1791 laws, but laws after 1868 are completely irrelevant.

Q    Do you have an opinion on whether waiting periods reduce violent crime?

A    My opinion is that they are not effective.  There actually a -- several years ago when I was doing a study of California's

48

23-cv-2563-JLK   CLAYTON CRAMER - Direct   10-26-2023

waiting period law, I looked up the [inaudible] that have been done, and -- on waiting period laws, and I did not find any published work that believed that these laws have been effective in reducing violent crimes.

In the case of California, one of the things I did is I took the murder rates from the 1950s into the late 1990s, and I plotted those against the changes in waiting period that took place during -- over that interval, and one of the things I discovered is there was a fairly strong positive correlation between length of period and murder rate.

Basically, the longer the waiting periods got, the higher the murder rates went.  Now, I'm not going to claim that the increase in waiting periods caused murder rates to rise, but there's not a very persuasive argument that you are going to reduce murder rates by increasing waiting periods if California increased waiting periods and the murder rates still rose.

Q   I'm sorry.  Could you repeat your last sentence?  It didn't quite come through.

A   Okay.  It is not terribly persuasive evidence that waiting periods reduce murder rates if a state like California kept increasing their waiting period, and yet murder rates kept rising anyway.

Q   And do you have an opinion as to why that might be?

A   Well, most firearms are acquired by felonious practices. They're acquired by burglary.  They're acquired by purchase

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

from -- in some cases unscrupulous gun dealers who are actually violating federal law.  In some cases they are obtained by theft from commercial carriers, common carriers.  A couple years back there was rather a stint when thieves had broken into rail cars in LA and were managing to carry off rifles that they had obtained unlawfully by breaking into box cars.

Weatherby, which is a big maker of rifles, used to be [inaudible] southern Los Angeles County, they had a problem during the Rodney King riots where rioters broke in to carry off a number of their rifles.

Q    And maybe to state the obvious, those acquisitions that I believe you referred to as felonious were not subject to a background check or a waiting period?

A    No.  Not at all.

Q    Do you have an understanding of the purpose of the background check -- let me rephrase.  Do you -- do you have an understanding of the justification Colorado used in passing their background check law -- excuse me.  Their waiting -- their waiting period law?

A    The claim is that the waiting periods reduce murder and suicide rates.  I am -- as I said, I've seen no persuasive evidence that murder rates are reduced.  And suicide rates, I'm suspicious that could actually help, because it turns out that suicide rates by weapons other than firearms are not dramatically lower than suicide rates by firearms.  People who

50

23-cv-2563-JLK   CLAYTON CRAMER - Direct   10-26-2023

are intent on killing themselves seem to be remarkably effective at finding other methods.  People hang themselves or throw themselves out of buildings.  Those are also almost the same effectiveness as firearm suicides.

There's a tendency to imagine that firearms are dramatically effective for suicide that other methods are not. I'm surprised.  In the research I did, I discovered that roughly 90 percent of suicide attempts where the person shoots themself in the head are successful.  About ten percent are cases where people shoot themselves in the head and live, although I suspect many of them afterwards are saying, gee, you know, as bad as things were, this is worse.

Q   Do you have an opinion as to whether cooling-off periods are effective?

MR. SULLIVAN:  Objection.  Foundation.

THE COURT:  Overruled.  You may bring that out in cross.

Q.   (By Mr. Nation) You can answer.

A   Okay.  I suppose if the ordinary person who commits a murder is someone who is very, very short tempered, I suppose it might make a difference, but I would have to see some evidence that this is common.  I mean, there are an awful lot of people committing murder in the United States, and they are hardly typical of the general population.

Many big cities, Philadelphia for example, and

51

23-cv-2563-JLK   CLAYTON CRAMER - Direct   10-26-2023

Baltimore, both have examined the criminal record of people that they have arrested for murder, and they find that typically 90 percent [inaudible] prior criminal arrests.  I mean, nice, ordinary people do not commit murder.  It's usually people who have evidence -- a long history of violence and misbehavior before the law who commit murder.

Q    Do you have an opinion as to whether a justification of a cooling-off period would be allowed after the *Bruen* decision?

A    I would say it would not.  Simply because there was no history of waiting periods in the period before 1791, and there's none before 1868 either.

Q    And have you ever purchased a firearm yourself?

A    Yes.

Q    And were you subject to a background check?

A    Yes.  This would be California, where there was a 15-day waiting period, as well as a background check.

Q    And do you recall approximately how long that background check took?

A    Fifteen days.

Q    The background check.  Not the waiting period.

A    I'm not sure.  California combines the waiting period and the background check together.  They don't tell you when the background check completes.  They only just know you're going to have to wait 15 days to pick up your gun.

Q    Since moving to Idaho, have you purchased any firearms?

Kevin P. Carlin, RMR, CRR

52

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

A    Yes.

Q    And were you subject to a background check?

A    The federal background check through NICS.

Q    And approximately how long did that take?

A    I think it took about 20 -- 20 minutes.  It was quick.

Q    But not three days?

A    No.  I also have the advantage that I live in a state where if you have a concealed weapon permit, you are exempt from the federal background check.  The way that the NICS is written, if you have a concealed weapon which is current and up to date in your home state, they don't have to run a background check as well.

Q    Are you aware of how Professor Spitzer uses Professor Roth's report?

A    Yes.

Q    And do you have an opinion as to the propriety of that use?

A    I would say that the -- there is a problem in that Professor Roth's data on homicides is all homicides, including by his own admission, lawful uses of death -- force to cause someone's death, and what he calls unintentional deaths.  So, they're not in any way comparable to modern murder rates.  They tend to -- they're higher.

    The data that Professor Roth presents in these expert declarations often specifies that these are unrelated adult homicides, that they do not include deaths of minors, and they

Kevin P. Carlin, RMR, CRR

53

23-cv-2563-JLK    CLAYTON CRAMER – Direct    10-26-2023

do not include people that are unrelated to the murderer, which means they're basically excluding pretty much all domestic murders.

Q    Would that be correct to say that that would inflate the homicide rate?

A    It would actually deflate the homicide rate.  Are you saying that today, are murder rates going to be higher than the homicide rates that Roth cites?  Yes.  Murder rates today that are recorded by the FBI are going to be somewhat higher than the homicide rates that Roth reports.

Q    Okay.  Mr. Spitzer makes a claim that black powder weapons were not kept loaded.  Are you familiar with this claim?

A    I am familiar with this claim, which was originally made by Professor Roth.

Q    And do you have an opinion as to that claim?

A    It is a very logical claim.  The problem is that the documents in the period show that colonial Americans did not apparently follow this logical idea.  Governor Winthrop's Journal of Massachusetts Colony lists at least four different examples of situations where a gun was not about ready to be used, was kept loaded anyway, resulting in the death of a child in one case, several injuries in three other cases, all of which demonstrate that either they were an exceptionally unlucky bunch, or people did in fact keep black powder firearms loaded.

There's also a 1786 Massachusetts law which was

Kevin P. Carlin, RMR, CRR

54

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

basically applied just in Boston, which said you may not keep the following items loaded in your home or outhouses, and the list includes muskets, firearms in general, cannon, hand grenades, and various types of mortars.

And I would not imagine you would have passed a law like that unless there was actually a problem of some sort of people keeping loaded weapons in their homes.  This was passed as a fire safety measure.  It was an attempt to make sure that firefighters were not at risk when they tried to put out the fire of a house.

Q    And finally, Mr. Spitzer -- or, excuse me -- Professor Spitzer claims that most of the firearms at the founding were single-shot black powder firearms.  Do you have an opinion as to that claim?

A    I would say it's probably true that many or perhaps even most were single-shot, but there are repeating firearms at that time.  There is a type of handgun called a pepperbox, which had several barrels that you usually rotate by hand to go from one barrel to the next, and these are being produced and sold in the United States by the end of the 18th century.  And they were certainly capable of between four and sometimes seven shots without reloading.

Q    In your report, you describe people carrying a brace of pistols.  Could you tell the Court what that means.

A    Yes.  If you were expecting trouble or if you were looking

Kevin P. Carlin, RMR, CRR

55

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

to cause trouble, I suppose, instead of carrying a single pistol which would have to be reloaded after one shot, you would carry a couple of pistols.  In some cases, in the case of Thomas Jefferson, when he was a diplomat in London, we know that he purchase three braces of pistols.

Q    So, six pistols all together?

A    Yes.  Six pistols all together.  And that's about as much firepower as carrying a revolver would have been.

Q    Turning to Professor Roth's declaration, did you read that declaration?

A    Yes, I did.

Q    And do you -- did you form opinions in reaction to Mr. Roth's declaration?

A    Yes.  He seems to be intent on the idea that advancing firearms technology explains rising homicide rates in the 19th century.  However, he somehow discounts the other dramatic changes that are happening during that same time.  For example, urbanization, Americans moved recently from being people who lived in very small towns to people who were beginning to live in big cities.

There was also a transformation of workplace.  People are working less and less self employed as farmers, and more and more they're working as -- in factories and other such environments.  There's also beginning to be massive immigration in the middle of the 19th century.  A million and a half

23-cv-2563-JLK    CLAYTON CRAMER – Direct    10-26-2023

Irishmen leave Ireland during the Great Potato Famine and move to the United States, and this creates considerable chaos in some of the bigger cities like New York City.

The failure to consider these other possible explanations for rising homicide rates tells me that he's looking for a single factorial explanation for something which is probably at best several different factors, of which firearms technology could or might be an issue, and might not.

I would also point out because he has excluded lawful uses of firearms such as use for self-defense, that improvement in firearms technology might include some number of homicides which are actually because a victim shot back.

Q    So, how would including these factors change Professor Roth's outcomes?

A    Well, it would mean that this rising homicide rate that he sees and attributes to firearms technology might just be that good people are shooting back at bad people.  And so the homicide rate might be rising and without necessarily meaning an increase in murder rates.

Q    Mr. Roth's declaration states the spread of restrictions in the 20th and 21st centuries on new technologies, including rapid-fire firearms and large-capacity magazines that change the character of mass murder by enabling individuals or small groups to commit mass murder.  Are you familiar with -- do you recognize that?

Kevin P. Carlin, RMR, CRR

57

23-cv-2563-JLK   CLAYTON CRAMER - Direct   10-26-2023

A     Yes.  I'm familiar with his claim.

Q     And how would you respond to that?

A     Well, I've been doing a research project since 2018 where I'm attempting to gather data on every mass murder that's taken place in the United States starting in 1657.  So far I have about 2,000 incidents.  Mass murder is actually a fairly common thing in American history.

Q     And what was the most -- in your opinion, what would be the most effective weapon of mass murder throughout U.S. history?

A     Well, airplanes.  I mean, the largest mass murders in U.S. history involve people who flew planes into -- into office buildings, which I'm sure you all remember.

Q     Was -- sorry.  Has mob violence been a tool of mass murder?

A     Yes.  Mob violence has at times -- especially in the 19th century, has been a proponent of mass murder.  Lynchings, for example, throughout the late 19th century and the early 20th century are a very common method by which large groups of people break into jails and drag out several people and murder them.

Q     Do you have any opinion about Roth's research on advancing firearm technology?

A     I would say that certainly firearms technology advancing does make it possible to kill more people in one setting, but there are other explanations for rising problems of mass murder. We had one example yesterday in Maine.  The guy that is currently being sought by the police was involuntarily committed

58

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

to a mental hospital for two weeks during the summer, and this turns out to be a major part of mass murder in American history, is mental illness that was either not recognized or not properly treated.

It started in the 1960s, a combination of well-meaning, and in some cases -- well-meaning people and also idealogues decided to destroy the state mental hospital system in the U.S. They made involuntary commitment of people who were mentally ill increasingly difficult, and one of the side effects of that is that there was a pretty substantial rise in mass murders.  At least I would argue that is the cause.

This increase in mass murders takes place in the 1960s and 1970s, and to the present.  Both in a report on the subject of these mass murders, as well as reports of a New York Times examination in 2000, when they call -- were being called rampage killers show these are disproportionately people with serious mental illness problems.

Q   So, going back to history, were the founding fathers aware of repeating firearms?

A    They were certainly aware of them.  There's a guy named Belton who approaches congress and says, look, I've got a way to make a flintlock that will fire 16 rounds without being reloaded.  Congress is interested, so they go ahead and give him some funding for development, but at some point congress says, you know, the money it's going to cost us to actually buy these

59

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

repeating muskets is [inaudible] we can afford to buy a whole bunch of single-shot muskets from France, and that will be a more cost-effective use of our money.

There are also weapons like the Girardoni air rifle, which is capable of firing 20 shots before we have to replace the air cylinder that goes into the [inaudible] gun.

Q    And just to clarify, that was John Belton, and I believe the 1790s; is that correct?

A    Actually, it was during the revolution itself.

Q    Oh.

A    So, it was in the 1780s.

Q    Thank you.  We've touched on this before, but what can you tell us about the history of laws restricting the carrying of firearms?

A    Well, the first laws that [inaudible] the carrying of concealed weapons, the [inaudible] carrying of weapons are laws certainly that ban concealed carry weapons.  The first of these are passed in 1813 by Kentucky and Louisiana, and there's another burst of such laws in the 1830s, many of which are directed not at firearms, but are directed at Bowie knives and what is called an Arkansas toothpick, which is another type of big nasty fighting knife at the time.  These laws are passed at a time when repeating firearms are really not very common yet. They're just getting to be real common.

Q    And again, though, you're not aware of any laws at the

60

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

founding that would impose a waiting restriction on the ability to acquire a firearm?

A    None.

Q    And what about at the time of the passage of the 14th amendment?

A    I have not yet seen an example.  And I find it interesting that even Professor Spitzer and Professor Roth do not ever give examples of such laws.  That's why Spitzer goes off on this bizarre armed while drinking analogy, because as even he admits, such laws did not exist.

Q    And in your opinion, why is armed while drinking not analogous to a waiting period?

A    Well, first of all, because a person who is going out to buy a gun is not obviously impaired.  I mean, a person who has been drinking, especially more than just a beer, if they've been drinking to excess, they're probably -- they're likely to be impaired.

Whereas the person who is going in to buy a gun is not obviously impaired, and there's no reason to assume that a person who seeks to buy a gun is impaired.  I may be atypical, but when I -- the few times I have -- when I have gone out to buy a gun, it's usually something I have spent weeks laboring over, saying should I buy a gun?  The very first gun I bought was about three or four weeks of my wife and I discussing this before I went out and bought a gun.

61

23-cv-2563-JLK   CLAYTON CRAMER – Cross   10-26-2023

MR. NATION:  Thank you.  Just a moment, Your Honor.

Nothing further for this witness, Your Honor.

THE COURT:  Cross examination, please.

**CROSS EXAMINATION**

BY MR. SULLIVAN

Q   Good morning, Mr. Cramer.  Can you hear me?

A   Yes.  I can hear you just fine.

Q   My name is Grant Sullivan.  I represent Governor Polis in this action.  I wanted to ask you a few questions about your background.  You testified on direct that you obtained your undergraduate and master's degrees in history from Sonoma State University; is that correct?

A   Yes, it is.

Q   No doctorate degree after that?

A   No.  I looked at how poorly professors of history are paid, and I said, why would I take a 60 or 80 percent drop in pay to go ahead and teach at a university?

Q   So, no doctorate degree.  How about a law degree?

A   No.  Again, same issue.  Lawyers are generally not well paid compared to software engineers.  It's very hard to justify the investment of time and money pursuing a degree that would require taking a cut in pay.

Q   So, you're trained as a software engineer.  Did I hear that right?

A   Yes.  I'm not sure I would say trained.  I do not have a

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

formal degree in computer science.  But basically, back in the -- when I was in high school, I learned enough about software engineering on my own, and my very first job was working for jet propulsion labs on the Voyager mission.

Q    And did you work for the Idaho Department of Corrections as a software engineer?

A    Yes, I did.

Q    Do you still do that currently?

A    No.  I had a stroke in 2014, which has significantly impaired my ability to work for prolonged periods of time, and the right side of my body was paralyzed by that stroke.  And now it's working, but my right hand really does not type like it used to.

Q    So, you're on the adjunct faculty at the College of Western Idaho; correct?

A    Correct.

Q    Adjunct means part-time and not tenure track; is that right?

A    It means part-time, basically, yeah.  Not on tenure track. Exactly.

Q    So, you're paid to teach courses, not to research; is that right?

A    That's right.  Obviously I'm -- I mean, I do an awful lot of research, as I mentioned this mass murder project I'm working on, but I am -- no one pays me to do that.  I am not getting

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

paid by the College of Western Idaho to do that research.

Q    So, I do have a couple questions about that mass murder project, but I will get to that in just a moment.  You don't hold a degree in statistics; correct?

A    I do not, no.

Q    No degree in statistical analysis?

A    Nope.

Q    No formal training in statistical analysis; correct?

A    Right.

Q    And you don't teach any courses on statistics or statistical analysis; correct?

A    I do not.

Q    Now, you testified on direct that you've served as an expert before in other court cases.  Do you remember that testimony?

A    Yes.

Q    Now, in fact, you've only testified once as an expert, and that was in a California case called *Baird v. Bonta*?

A    *Baird v. Bonta*, and also there was a recent one in -- well, I brought in expert declarations in an Oregon challenge to their assault rifle ban.

Q    Excuse me.  But you didn't testify in court in the Oregon case, did you?

A    No, I did not.

Q    And that California -- the California case --

64

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

A     I'm subject to --

Q     The California case -- I'm sorry, Mr. Cramer.  The California case was a ban on -- was about a ban on open carry; correct?

A     Yes.

Q     It wasn't a waiting period case, was it?

A     No, it was not.

Q     So, let me turn back for just a second to the mass murder project that you've -- you testified about just a little bit earlier.  Now, part of that research is funded by the NRA civil rights defense fund; is that correct?

A     This is correct.

Q     Any other research that you're doing funded by the NRA or wings of the NRA?

A     I received some funding for some of my expert declaration work on the New Jersey assault weapons ban case from the NRA and ILA.

Q     Any other -- other than the mass murder project that you testified about and this New Jersey matter, any other research that you've currently done -- that you're currently doing or you have done funded by the NRA or wings of the NRA?

A     No.  I did receive a campaign contribution some years back when I ran for state senator here in Idaho.  I received a campaign contribution from the NRA, which of course because of the bureaucracy, by the time it arrived, the election was over.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

So, I cashed the check and wrote the check back and sent it back to them.

Q    What office were you running for when you received that campaign donation from the NRA?

A    I was running for state senate.

Q    In Idaho?

A    Yes.

Q    Okay.  Now, you had been retained by a Rhode Island affiliate of the NRA; correct?

A    I'm trying to remember.  I know that I did some work for the public defender's office in Rhode Island.  I am not aware of any work I've been retained by the NRA for in Rhode Island.

Q    You didn't post on your blog a few weeks ago that you had been retained by an affiliate of the NRA in Rhode Island?

A    I do not remember doing that.  I'm not aware of any -- certainly I have no case that I'm working on out of Rhode Island.  I was contacted by an attorney in Rhode Island who was interested in my help, and never heard back from him.

Q    Other than the NRA, any other groups or organizations that have funded your research?

A    [Inaudible] expert declarations, I believe the Second [inaudible] Foundation has provided some of the funding, and the National Association for Gun Rights has provided funding for several cases where I filed declarations in the Illinois assault rifle ban.

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

Q    So, other than the Second Amendment Foundation and the National Association of Gun Rights and the NRA, any other groups that have funded your research?

A    I think the California Rifle and Pistol Association might have been one.

Q    Any others that --

A    In some cases -- go ahead.

Q    Any others that come to mind?

A    There have been individual situations where I do not know who the organization was, but I received checks from people who were plaintiffs in those cases for the research I did.

Q    And when you say plaintiffs in those cases, you mean plaintiffs in Second amendment cases who are challenging gun laws?

A    Yes.

Q    Okay.  So, no universities have funded your research; correct?

A    Right.

Q    No government agencies have funded your research?

A    Well, I mean, public -- federal public defenders I think qualifies as a government agency.

Q    So, tell me more about that.  In what cases have the public defender's office funded your research?

A    There's one out of Eastern District of California.  All I can remember is the lawyer's name.  It was Hooton (phonetic).

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

This is a case where a guy was convicted of a misdemeanor battery case, was challenging the federal law that prohibits possession. Part of it is that he had made the mistake of being part of the January 6th demonstrations, and he was being charged with a misdemeanor for that. And it seemed like the federal government was trying to use this threat of a federal felony conviction for possession of a firearm as a way to get him to go ahead and plead to a misdemeanor charge on January 6th.

And there was a case out of Florida where the public defender's office paid me. And in that case, an employee of the post office who drove one of the big trucks they use for transporting stuff from the post office distribution center, he was charged with possession of a firearm on post office property, so I assisted in that case.

Q    So, it sounds like what I'm hearing you say is in, is it maybe two cases, you've been retained by defense attorneys in a criminal case involving a gun charge; is that right?

A    Yes. There's one out of Rhode Island as well, where the public defender's office retained me on that one as well. Oh, also, the Ohio attorney general's office retained me for a case where they were suing the City of Columbus. Columbus for some reason thinks that they are not subject to Ohio law, and that they are allowed to -- they are not subject to [inaudible] by Ohio. And so the attorney general's office hired me to assist in that case.

23-cv-2563-JLK     CLAYTON CRAMER – Cross     10-26-2023

Q    So, other than these criminal cases that we're talking about and the Ohio case you just mentioned, your research hasn't been funded by any other government agencies; correct?

A    Not to my knowledge.  Although I will tell you, I've had so many of these cases that I've been retained for over the last year, I mean, I could easily have forgotten one.  I mean, it's been astonishing.  It's been a very, very busy time.

Q    So, I want to switch gears, Mr. Cramer, and I want to talk to you about some of your publications.  You're the author of a book called Firing Back: A Clear, Simple Guide to Defending Your Constitutional Right to Bear Arms; is that correct?

A    Yes.

Q    All right.  Now, this book is not listed on the first page of your declaration in this case, is it?

A    It's possible it's not.  I mean, I was primarily listing things that I've done that were primarily academic and scholarly in nature.

Q    I want to ask you a couple questions about this book in particular.  Now -- and I have it here.  May I put it on the screen here?  Can you see this?

A    Yes.  I can see it.

Q    So, this is the first page of the book.  And under introduction, it says, this book is for anyone interested in the hotly debated issue of gun control.  Do you see that?

A    Yes.  I do.

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

Q    And then the next sentence says, first of all, this book is a how-to for gun owners who want to become gun rights activists, or the gun rights activist who thinks he needs more ammunition. The way things are going, every gun owner needs to become politically active, or in a few years, every current gun owner will be an ex-gun owner; is that correct?

A    Yes.

Q    Okay.  So, this is an advocacy guide for those who are antigun control, let's say; is that fair?

A    Yes.  Yes.  I would say that's an accurate description. The publisher of that contacted me and said, we would like to have a book intended for this purpose, and we think you're the right guy to do this.

Q    Now, I want to flip the page to page five.  Now, on this page, do you see where it says, we can't all be experts in every field of the gun control debates?  Statistics, for instance, isn't my field.  Do you see that?

A    Yes.

Q    Okay.  Now, in this book you give the reader a series of arguments to help rebut the arguments of gun control advocates; correct?

A    Yes.

Q    Now, you have one chapter, I believe it's chapter nine, where you take on the argument about the social costs of gun violence; is that right?

Kevin P. Carlin, RMR, CRR

70

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

A    Yes.

Q    I want to flip to that chapter.

A    I am pleased to see that someone actually bought the book.

Q    Oh, I didn't buy it.  I checked it out from the library.

A    Okay.

Q    Now, in that chapter, you say that the same social cost argument favored by gun control advocates could also be used to ban homosexuality; correct?

A    Right.

Q    So, you say on this page, this is page 114, you have a paragraph talking about some of the social costs of the AIDS epidemic, and then you say, could the same argument about social costs and benefits be used to justify banning homosexuality?  Do you see that?

A    Yes.

Q    So, in your view, homosexuality has the same social costs in the form of the AIDS epidemic as the social costs of gun violence?

MR. NATION:  Objection.  Misstates.

THE COURT:  Overruled.

THE WITNESS:  I would say that I was making an analogy.  I'm saying that someone who is going to make the social cost argument about guns could make the same argument about banning homosexuality.  I mean, the fact is that the social cost and benefits argument applies to so many things that

Kevin P. Carlin, RMR, CRR

71

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

people think of as guaranteed rights that the analogies there are a persuasive debating technique.

Q.    (By Mr. Sullivan) Now, in other parts of this book you give some alternative explanations other than guns for America's violent crime problem; correct?

A    Yes.

Q    Now, specifically, you state in this book -- let me flip to the right page.  This is page 69.  You state that African Americans and Hispanics comprise, quote, most of America's violent crime problem; is that correct?

A    Yes.

Q    And you also state, quote, remember also that many Hispanics in the United States, especially in agricultural areas, are single young men a long way from home trying to find some excitement when they aren't performing backbreaking manual labor; is that correct?

A    Yes.

Q    So, on that same page, you write a little bit further down, what are marginalized groups?  That's liberal jargon for groups that have been mistreated in the past by society and the law. Those are your words?

A    Yes.

Q    So, again, this is a progun advocacy book; correct?

A    Yes.

Q    Okay.  I want to ask you a couple questions about your

72

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

declaration in this case.  It's about 59 pages long; is that right?

A    Yes.

Q    Seventy-three pages, if you include all of the citations?

A    That sounds about right.

Q    And it's dated two days ago, October 24th; correct?

A    Yes.

Q    Are you aware that it was filed and served on my office at 4:17 p.m. two days ago?

A    I'm not at all surprised.

Q    So, that's about 41 hours before this hearing was scheduled to start; correct?

A    Right.  Believe me, it takes a long time to read through something like that and look for all the flaws.  I know.

Q    So, you have a section in your declaration called Guns-R-Us; is that right?

A    Right.

Q    So, in that section, you take issue with Dr. Spitzer's conclusion that guns were not as widely available during the founding era as they are today.  But you acknowledge in that section that you've not been able to count the number of gun retailers in the pre-1791 era; is that correct?

A    Yes.  That's a fairly major undertaking, because you have to -- advertising alone only [inaudible] part of the picture, because so many people lived in small towns.  If you knew that

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

someone in your town was a seller of guns, you probably wouldn't need to see an ad to know that.

Q   So, again, you're not able to count the number of gun retailers in 1791; correct?

A   Yeah.  I'm not -- admittedly, I have not even tried, really.  At various times I've counted the number of gunsmiths, but I suppose if I had to -- I suppose if I had a month or two, I could probably make some sort of a serious attempt at trying to get a count.

Q   Well, you mentioned gunsmiths.  Let me ask you a couple questions about gunsmiths.  For example, on page eight of your declaration, you say that one Edward Annely advertised his services as a gunsmith stating, quote, he likewise makes guns and pistols as any gentlemen shall like.  Does that sound correct from your declaration?

A   Yes.

Q   So, Mr. Annely is advertising that he makes guns to order; correct?

A   Correct.

Q   So, the advertisement doesn't state that he sells guns immediately off the shelf; right?

A   It does not say that he sells them immediately off the shelf.

Q   So, if an order was placed with Mr. Annely, it would take him some time to fill the order; correct?

Kevin P. Carlin, RMR, CRR

74

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

A     Presumably, unless he had guns that he had already made for a customer that had not actually purchased them.  So, my --

Q     Which we just established that his advertisement doesn't say that.  So, Mr. Annely, unless he had some sort of inventory, he wouldn't be able to sell a gun immediately to a customer?

A     Not a gun that he made custom, no.

Q     So, you don't know how many gun retailers in the 1790s were made-to-order gunsmiths like Mr. Annely versus a retailer who sold guns off the shelf, do you?

A     Well, I do list several ads where people are saying that they have pistols for sale.

Q     But you don't know what percentage of those retailers are smiths like Mr. Annely versus retailers who have an inventory that they can sell immediately?

A     Well, if they advertise that they have pistols for sale, then they obviously have something in inventory.

Q     Mr. Cramer, my question is you don't know what percentage fall into the category of gunsmiths like Mr. Annely versus an inventory that could be sold off the shelf.  You don't know what percentage is which?

A     No, I do not.  As I said, that would be a fairly major undertaking to research that, which I do not have time to do.  I got called into this a little over a week and a half ago.

Q     So, you mentioned earlier on direct that people lived in small towns at the time of the founding.  Do you remember that

75

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

testimony?

A    Yes.

Q    So, in small towns, in rural areas such as that, there wouldn't be a big availability of gun retailers like, say, in a big city like New York City; correct?

A    It's probably true that you would find them more concentrated in the cities, but there's also the case that there's only six cities in America that have more than 10,000 people at the time of the 1790 census, so most people are scattered pretty widely.

Q    So, it would be hard for those people who are scattered widely to walk into a gun store that's in one of the major cities?

A    In a major city, yeah.  But guns are made in a fair number of smaller towns as well.  You can certainly ride a horse or a carriage to an adjoining village that might have a gun seller [inaudible].

Q    So, let me ask you some questions about you testified on direct that mail-order catalogs and filling orders for guns through the mail, when did that start?

A    It certainly was present by the 1880s.  It may have been present earlier.  Again, that's something I researched as to when these ads start to appear.

Q    So, if a customer were placing an order through the mail, be it in the 1880s or earlier, it would take several days for

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   CLAYTON CRAMER – Cross   10-26-2023

that order to be filled; correct?

A    It probably would -- yeah.  It would take at least a couple days for the order to reach the seller, and probably a couple days for it to get back.

Q    So, the buyer would have to wait to receive their purchased firearm; correct?

A    If they were purchasing a mail-order firearm, that would be the case.  But if they were just going into a local hardware store and saying, I want that one, there were no waiting periods.

Q    But if they were ordering through the mail, they would have to wait; correct?

A    Yes.

Q    Okay.

A    Fortunately, that's not the only way to purchase firearms in that time.

Q    Let me ask you some questions, Mr. Cramer, about some of the alcohol laws that are discussed in some of the pleadings in this case.  Now, you assert that Dr. Spitzer misquotes or mischaracterizes some of the historical laws involving firearms and alcohol.  Now, did plaintiffs' counsel provide you with all of the exhibits to Dr. Spitzer's declaration?

A    Yes.

Q    Now, one of those exhibits was a long list of state laws called -- had a title at the top called intoxication slash

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

weapon laws; correct?

A    Yes.  I'm scrolling.  I don't see the title on that.  Yes. I see that.

Q    Flip to it real quick.  It's going to be Exhibit 26 in defendant's binder.  And it's Exhibit C to Dr. Spitzer's declaration; correct?

A    Yes.  Exhibit B.  Oh.  Hang on.  That's -- I'm [inaudible] Exhibit B here for intoxication and weapon laws.

Q    Is the first state listed -- well, let's look just at the screen, Mr. Cramer.  Do you see where --

A    Yes.  I see Exhibit C there.

        MR. SULLIVAN:  And, Your Honor, it's Exhibit 26 in the black binder.

        THE COURT:  I have it.  Thank you.

Q.    (By Mr. Sullivan) You reviewed this document, Mr. Cramer?

A    I reviewed the laws that Professor Spitzer listed in his declaration that were in the appropriate year range through 1868.  Obviously laws like the Arizona law do not apply because of the date.

Q    So, I'm asking specifically about the document on the screen that says intoxication slash weapon laws.  Did you review that document?

A    No.  I have not reviewed Exhibit C.

Q    Okay.  So, it's a 36-single-spaced-page document with full quotations of state laws involving alcohol and weapons.  And you

                    Kevin P. Carlin, RMR, CRR

78

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

did not review that?

A     No.   Because in fact these are not full statements of the laws.   If you look down at the Virginia laws --

Q     Mr. Cramer -- I'm sorry, Mr. Cramer.   I don't mean to interrupt.   I just want to focus us on the answer to my question.   So, you didn't review this document; correct?

A     No.

Q     Okay.   Now, your declaration doesn't have a similar exhibit with full quotations of laws, does it?

A     It does have full quotations of some of the laws that Professor Spitzer has misrepresented.

Q     But it doesn't have an exhibit similar to what we're seeing here?

A     No.

Q     Now, you talked a little bit earlier about a 1655 Virginia law that made it an offense to shoot any guns at drinking.   Now, let me flip to that law real quick.   Do you see that -- I'm sorry.   Can you see that, Mr. Cramer?

A     Yes, I can.

Q     So, this law states that it should be offense to shoot any guns at drinking, marriages and funerals only excepted; correct?

A     Correct.

Q     And your position is that this law was meant to not disrupt the alarm system that existed, which was shooting guns in the air in the event of an ambush or something like that?

Kevin P. Carlin, RMR, CRR

79

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

A    Yes.  And that was in the sentences immediately before the part that -- he basically did not give you the full text of that law.

Q    Well, the full text is here in front of us.  Let me ask --

A    No, it's not.  It is not in front of you.  What he's got there with the Virginia law is not the full text.  And that's been a recurring problem with Spitzer is he often quotes things out of context like this.

Q    Mr. Cramer, I am asking you not about Dr. Spitzer's declaration, but about this document in front of us, which you said earlier you haven't reviewed.  So, let me ask you a question about it.  So, this law specifically prohibits shooting at drinking; correct?

A    Yes.

Q    Okay.  So, lawmakers at the time might have thought that people might be more inclined to shoot guns if they're intoxicated because they've been drinking; correct?

A    That is certainly one interpretation of it.  Certainly an interpretation of it, although not for the purpose of being concerned about public safety.  They were expressing concern about the fact that it would be hard to tell whether there was an Indian attack under way.

Q    But if they took the trouble to mention drinking in this law, they must have thought, correct, that folks are more likely to shoot guns if they've been drinking?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

A    That's certainly one interpretation of it.

Q    Let me ask you some questions about your rebuttal to Dr. Roth.  Now, in the California case that you served as an expert in, which we talked about earlier, you actually rely on Dr. Roth's research; correct?

A    In some cases, I do rely upon it.  I know Dr. Roth [inaudible] that I regard him as generally a well-intentioned person.  I do not find him to engage in the sort of intentional deception that Mr. Spitzer does.

Q    So, you rely for example on Dr. Roth's publication, Homicide Among Adults in Colonial and Revolutionary New England; correct?

A    I relied upon it for refuting his claims, yes.

Q    So, Dr. Roth's publication is reliable to rely on in your expert work?

A    Well, within the limitations of what he's saying, yes.  The fact that he excludes lawful uses of -- lawful homicides says quite a bit, and it's an important point that he -- claim that he makes.

Q    Any other -- other than the California case that we've been talking about, have you relied on Dr. Roth's research for any other projects?

A    Yes.  I don't remember the immediate name of the case, but Professor Roth at one point filed a surrebuttal in one of the California cases where he claimed that when a mass murder takes

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

place, the deaths of children shall not be counted as part of a mass murder.

THE COURTROOM DEPUTY:  He's going to have to slow down and speak up.

Q.    (By Mr. Sullivan) Mr. Cramer, I'm going to ask you to slow down just a little bit when you give a response, but long and short of it is you rely on Dr. Roth's work when doing your expert work?

A    Certainly when I'm doing rebuttal, I do look at his work and look for inconsistencies in his claims.

Q    So, let me ask about some of your specific critiques of Dr. Roth.  You say that Dr. Roth presents, quote, an artificially rosy view of murder during the 18th century because he, quote, undercounts murders by leaving out domestic murders and murders of minors; is that correct?

A    Correct.

Q    Now, you read Dr. Roth's declaration; correct?

A    Yes, I have.

Q    And you're aware that Dr. Roth actually includes family, household, and intimate partner homicides in his analysis; correct?

A    However, his book, and also the figure that appears in his declaration and that Professor Spitzer also relies upon does indicate unrelated adult homicides.  He may well have data on domestic violence homicides as well, but that [inaudible] graph

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

definitely is creating a false perception.

Q    Well, I'm not asking about his book, Mr. Cramer.  I'm
asking about his declaration in this case.  He states on the
page I put up on the screen that family, household, and intimate
partner homicides were rare, and only 10 to 15 percent of those
homicides were committed with guns; correct?

A    Right.

Q    So, he does take account for family and domestic homicides
in his analysis; correct?

A    He does.  The figure that he uses to demonstrate this very
low homicide rate does exclude unrelated -- only includes
unrelated adult homicides, and that graph showing this very low
rate of about one per hundred thousand is a little bit
misleading.

Q    But you're talking about his book; correct?

A    I'm talking about the figure that has appeared in a number
of the declarations he has filed.

Q    But in this declaration, he includes in his analysis family
and domestic homicides; correct?

A    This text here does.  My --

Q    That's the only text I'm asking about, Mr. Cramer.  So, let
me ask you another question.  So, you also criticize Dr. Roth's
analysis of firearm technology at the time.  I want to ask you a
couple questions about that.

A    Okay.

83

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

Q    So, for example, you criticized Dr. Roth's conclusion that muzzleloading firearms of the time had limitations that made them poorly suited for crimes of passion.  Do you remember that criticism in your declaration?

A    Yes.

Q    Okay.  Now, you argue that revolutionary-era firearms were actually highly accurate.  Is that your testimony in your declaration?

A    Yes.  And I gave several examples that show that in fact people were successfully using muskets from fairly long ranges, and were therefore accurate.

Q    You're not suggesting that they were -- revolutionary-era firearms are more accurate than today's firearms, are you?

A    No, I'm not.  Although they were actually pretty impressive considering the technology that was being used to make them.

Q    So, each of the sources that you cite for this accuracy issue involves rifles or riflemen; correct?

A    Yes.

Q    None involved --

A    Other examples were muskets were used with some high degree of accuracy.

Q    None involved pistols or firearms that were meant to be held with one hand; correct?

A    Yes.  Pistols in general are not terribly accurate.  Even modern pistols are generally limited to about 25 yards, unless

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

you have a fairly exceptional marksman or a fairly exceptional pistol.

Q    Let me ask you some questions about your multi-shot firearm criticism.  You suggest that multi-shot firearms called pepperboxes were available during the founding era; is that correct?

A    Yes.

Q    You don't cite anything suggesting that pepperboxes were commonly used at the time; correct?

A    No.  They were available.  How common, I'm not sure. [Inaudible] have production figures for these things.

Q    In fact, one of the footnotes in your declaration says that pepperboxes were, quote, likely experimental; correct?

A    Some of the examples that have survived are described as likely experimental.  That does not necessarily mean that every pepperbox was experimental.

Q    But the footnote that you cite, the source that you cite in your footnote says, likely experimental; correct?

A    Yes.

Q    Now, you have another book called Armed America; correct?

A    Yes.

Q    Published in 2006?

A    Yes.

Q    Now, in Armed America, you have a page about pistols.  This is page 241.  And I want to point you, Mr. Cramer, to the

23-cv-2563-JLK   CLAYTON CRAMER – Cross   10-26-2023

sentence here that says, until the late 18th century, pistols, like almost all other firearms of the period, could fire one shot before reloading.  Do you see that?

A    Yes.

Q    So, firearms at the time, the ones that were commonly used, could fire one shot; correct?

A    I was unaware of the availability of the pepperboxes in the 18th century when I wrote that book.

Q    The likely-experimental pepperboxes?

A    No.  Pepperboxes in general.

Q    So, what you wrote in 2006 is no longer accurate?

A    I would say I've learned additional information since then.

Q    So, let me ask you some questions about how guns were kept. You pushed back on Dr. Roth's conclusion that firearms at the time were generally kept unloaded, and you cite four examples of accidental firearm discharges.  Do you remember that testimony in your declaration?

A    Yes.

Q    But you don't -- you don't rely on any firearm manuals or guide books that recommended keeping firearms loaded at the time, do you?

A    No.  I think you would have a very hard time finding examples of -- I mean, it isn't like the manufacturers put out manuals to go with guns.

Q    So, you're not aware of any manuals at the time that

Kevin P. Carlin, RMR, CRR

86

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

recommended keeping the firearm loaded when being stored; correct?

A     No.  All I have is the fact that people did obviously keep them loaded, and there are instances that come about because they were kept loaded.

Q     I just want to be clear.  You're not suggesting that four instances of accidental discharges establishes a general practice of people keeping their firearms loaded when stored; correct?

A     I would say that it provides evidence that people did at least sometimes do so.  And the fact that one book has four such incidents would suggest that it was probably not spectacularly rare.

Q     But four such instances doesn't establish a general practice, does it?

A     No.  But I would say the 1782 law Massachusetts passed saying you cannot keep your artillery pieces and firearms loaded in your house is probably a pretty good indication that there was actually an issue there that they were concerned about.

Q     Let me ask you a little bit about how they were stored.  I mean, if they have black powder in them, black powder is hygroscopic; correct?  Meaning it absorbs moisture?

A     Right.  Yes.  I would say it would probably be -- I would say it would be a bad idea to keep a black powder firearm loaded, but as I said, the evidence is that clearly some people

23-cv-2563-JLK     CLAYTON CRAMER - Cross     10-26-2023

were doing so.

Q     And the reason it would be a bad idea is because when it absorbs moisture, it can corrode the barrel of the gun; correct?

A     Absolutely.

Q     And it can also corrode the firing mechanism; correct?

A     Yes.  This is all made out of steel, and contact with black powder is going to definitely cause some rusting problems.

Q     So, as you said, it would be a bad idea to keep your firearm with black powder loaded when not in use; correct?

A     Yes.  People do lots of things that are bad ideas.

Q     Mr. Cramer, would you agree that lawmakers generally pass laws in response to societal problems that are happening at the time?

A     Yes.  Like prohibiting the keeping of your firearms and cannon loaded in your home.

Q     Lawmakers generally don't pass laws in response to nonexistent problems; correct?

A     I would say that's probably true.

Q     Okay.  I want to turn to your waiting period analysis in your declaration.  And this starts on page 54 of your declaration.  Now, this part of your declaration is copied from a different paper you wrote; is that correct?

A     Yes.

Q     It's copied word-for-word?

A     I may have adjusted a few sentences for clarity, but --

88

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

Q    It's a paper you wrote in 2015; correct?

A    Correct.

Q    Now, before signing your declaration in this case two days ago, did you look at whether there had been any studies published since 2015 about the relationship between waiting periods and homicide rates?

A    No, I did not.

Q    Did you review a 2017 study titled Handgun Waiting Periods Reduce Gun Deaths?

A    I have not seen that, no.

Q    Okay.  Now, your declaration on page 57 has a chart; is that correct?

A    Yes.  I don't have that in front of me, although I probably should.  There is a chart there [inaudible].

Q    So, this is Exhibit 4, Your Honor, in the white notebook. And I will put it up for you, Mr. Cramer.  Just hold on one second with me.  Is this the chart in page 57 of your declaration?

A    Yes, it is.

Q    Now, your study includes just California; correct?

A    Just California.  Yes.

Q    And you didn't look at any states beyond California for your study?

A    No, I did not.

Q    And the date range for your study is 1952 to 2012.  Is that

Kevin P. Carlin, RMR, CRR

89

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

what we show on this chart?

A     Yes.

Q     Okay.  Your study doesn't control for any exogenous variables; correct?

A     Right.

Q     You just compared the murder rate to the handgun waiting period; correct?

A     Correct.  And I would agree that this is not a particularly spectacular piece [inaudible] for I was really demonstrating that if in fact there is a -- waiting period is making such a big difference in murder rates, it seem to [inaudible] fairly subtle.

Q     Let me ask you about the statement you made immediately below this chart.  It's paragraph 177.  You say there's a strong positive correlation between handgun waiting periods and murder rates.  The longer the waiting period in days, the higher the murder rate.  Do you remember that testimony?

A     Yes.

Q     But you agree that correlation does not prove causation; correct?

A     I agree that correlation does not ever prove causation. However, strong correlations make you start to ask questions like is there a possible causal connection here that would be worth examining?

Q     You didn't consider whether there might be an alternative

90

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

explanation for the rise in California murder rates, did you?

A    Well, there's a number of possible explanations.  Murder rates in general in the United States rose dramatically in the 1970s, and began to fall fairly substantially in the 1990s.

Q    Well, you didn't analyze, for example, whether the national murder rate was also increasing over the same period, did you?

A    Unfortunately, the graph that I have for that, I was unable to reproduce it from the original source.  The FBI used to have a nice little tool that I was able to use to [inaudible] U.S. murder rates during that period.  And, yes.  They rose at roughly the same rate as California, and they fell at roughly the same rate as California.

Q    Now, your declaration also doesn't consider whether the California legislature increased the declaration of its waiting period because the murder rate was increasing?  You didn't consider that, did you?

A    It's certainly a possible explanation.  Although I notice that the murder -- the waiting period increases in the late 1950s were in response to a very small increase in murder rates.

THE COURT:  Mr. Sullivan -- excuse me.  I didn't mean to interrupt you.  Please continue.  Please continue with your answer.

Q.    (By Mr. Sullivan) Did you conclude your answer, Mr. Cramer?

A    There are -- there is certainly -- there are waiting period

Kevin P. Carlin, RMR, CRR

91

23-cv-2563-JLK   CLAYTON CRAMER – Cross   10-26-2023

increases in 1975, I think that is, which preceded a pretty dramatic increase in murder rates.

THE COURT:  Mr. Sullivan, I have to recess now.  We will be back at 1:30.

(Recess at 11:55 a.m., until 1:36 p.m.)

THE COURT:  Please continue.

MR. SULLIVAN:  Thank you, Your Honor.

Q.     (By Mr. Sullivan) Mr. Cramer, can you hear me?

A     Yes.  I can hear you fine.

Q     Great.  So, when we broke for the lunch hour, I was asking you a few questions about your study, and I have just a few more.  I believe we were talking about page 57 of your declaration, which has this graph that we've been talking about. Can you see that okay?

A     Yes.

Q     Okay.  Well, first of all, I should back up a little bit. Is your study peer-reviewed?

A     No.

Q     Okay.  So, your study, based on your declaration, it doesn't analyze whether the murder rate increased in states without a waiting period law; is that correct?

A     That's correct.  I looked at one example in California.

Q     And your study doesn't compare your results in California to any control group of states; correct?

A     No, it does not.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

Q    Your study doesn't compare your California results with any state that lacks a waiting period law; correct?

A    Correct.  It does not.

Q    Now, you say in your declaration that California's waiting period law dates from 1923?

A    Yes.

Q    But your analysis only goes back to 1952; correct?

A    Yes.  That was as far back as I could find data from California.

Q    So, your study --

A    Turns out that the uniform crime reports that the FBI compiles really doesn't have any particularly trustworthy data before 1960 for murder.

Q    Okay.  So, because of that limitation, your study doesn't evaluate any time period when a state went from having no waiting period law to then enacting a waiting period law; is that right?

A    This is true.

Q    And that's the situation in Colorado in 2023; correct?

A    Yes.  You're going from no waiting period to a minimum of a three-day waiting period.

Q    Okay.  Now, your study does analyze the changes in the duration of California's waiting period law; is that right?

A    What do you mean, the duration?

Q    Well, this graph here on page 57, the line that is more

23-cv-2563-JLK    CLAYTON CRAMER – Cross    10-26-2023

angular is the handgun waiting period period; right?  So, it starts at one day in 1952; is that right?

A    Yes.  1952, yes.

Q    And then it looks like maybe 1954, 1955, it bumps up to a three-day waiting period law; right?

A    Correct.

Q    And that also correlates to when California's murder rate on this graph was at its lowest point; right?

A    In 1952?  Yes.

Q    So, one conclusion that could be drawn is that a one- to three-day waiting period correlates with a low murder rate; correct?

A    Yes.  Just as accurately as saying that a 15-day waiting period correlates with a very high murder rate.

        MR. SULLIVAN:  All right.  Your Honor, could I have one moment?

        THE COURT:  Yes.

        MR. SULLIVAN:  Your Honor, during my prior line of questioning, I neglected to mark and offer a couple of exhibits.

        THE COURT:  Yes.  I'm glad you raised that.  I was going to wait, but now is a good time, because I would like the exhibits that have been offered from you and also from the plaintiff.  We want to clear the record on that, because it isn't right now.

        MR. SULLIVAN:  Absolutely.  Happy to make that record,

Kevin P. Carlin, RMR, CRR

94

23-cv-2563-JLK    CLAYTON CRAMER - Cross    10-26-2023

Your Honor.  So, I will offer as Exhibit 34, the Firing Back material that I asked Mr. Cramer about.  And then Exhibit 35 is the Armed America book that I also asked Mr. Cramer about.  And I've given copies to counsel.  May I approach the court reporter?

THE COURT:  Sure.  Give them to the clerk, though.

MR. SULLIVAN:  Very good.  May I approach the --

THE COURT:  Sure.

MR. SULLIVAN:  Your Honor, I don't have any other questions for this witness.

THE COURT:  Okay.  Those are the exhibits that you've offered so far?

MR. SULLIVAN:  So far.  That's correct.

THE COURT:  They're admitted, and then now I know that the plaintiffs have offered exhibits in the past.  I want to make sure -- well, I said they were admitted.  We may not have gotten them in the record.  So, let's check.

MR. NATION:  Yes, sir.  Thank you, Your Honor.  I have Exhibit 1 as a Triple J receipt.

THE COURT:  It's admitted.

MR. NATION:  Okay.  Exhibit 2 is a separate receipt from Triple J.

THE COURT:  Yes.  It's admitted.

MR. NATION:  Exhibit 3, a receipt for a shotgun from Dragonman.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   CLAYTON CRAMER – Redirect   10-26-2023

THE COURT:  Yes.  It's admitted.

MR. NATION:  And Exhibit 4 is the declaration of Clayton Cramer.

THE COURT:  It's admitted too.  Can we speed things up with you and -- on both sides and just see what -- are there exhibits that need not be admitted or that we're not going to admit?  Can we just stipulate -- this is a hearing to the Court, is what I'm saying.

MR. NATION:  Yes.  We can -- I have no problem stipulating to admission for today's purposes.

THE COURT:  For the purposes of this hearing, this preliminary injunction hearing, all the exhibits tendered are admitted.

MR. KOTLARCZYK:  That's fine with defendant, Your Honor.

THE COURT:  Okay.  Good.  All right.  Now, go ahead, please, Mr. Nation.

**REDIRECT EXAMINATION**

BY MR. NATION

Q    Professor Cramer, do you have a particular claim to fame with regard to your research?

A    I suppose what I'm probably best known for is that back in the -- in 2000, there was a professor named Michael Bellesiles, who taught at Emory University.  He published a book called Arming America, which made the claim that guns were very rare in

96

23-cv-2563-JLK    CLAYTON CRAMER - Redirect    10-26-2023

America before the Mexican war, that gun control was actually the norm, and that most Americans were not allowed to possess firearms, and that hunting was extremely rare.

The claims he made were very odd to me, because I had just finished doing my master's thesis on the development of concealed weapon regulation in the United States, and it did not match up with what I had found at all.  So, I started examine -- looking up his footnotes and verifying that they were actual -- actual accurate descriptions of what were in those documents.

And I discovered that in fact it was a massive piece of fraud.  And at the end of it all, he was fired by his university, now tends a bar in some part of Connecticut, and the prize that was given to him by the Columbia -- the Bancroft prize, which is sort of like the Nobel Prize in American history, they revoked it for the first time they've ever done so, and demanded their 4,000-dollar prize money back.  His publisher pulled the book back and destroyed it.  They did not [inaudible] this, but destroyed it completely.

Q    And do you know whether Professor Bellesiles was funded by Emory University?

A    I'm not sure who funded him.  I know that he spent a year in Chicago concocting this rather bizarre story, which Courts began to actually -- the Court of Appeals actually went ahead and cited some of his material before attorneys pointed out to them that -- pointed out to the judge who wrote the opinion that

97

23-cv-2563-JLK   CLAYTON CRAMER – Redirect   10-26-2023

no, this guy has been found out to be a fraud.

THE COURT:  Excuse me for a moment, but for the clarity of the record, could you spell the last name of this professor at Emory.

MR. NATION:  Yes, sir.  It is Bellesiles, B-E-L-L-E-I-S-L-E-S.

THE WITNESS:  Excuse me.  B-E-L-L-E-S-I-L-E-S.  It's a confusing name, because he has pronounced it three different times during his professional life three entirely different ways.

MR. NATION:  Well, yes.

Q.    (By Mr. Nation) In your experience, do universities fund progun individuals?

A    I've not seen any evidence they've ever done so.

Q    Do you recall being asked about your statistical background?

A    I remember being asked about it.  And while I've had no formal training in statistics, I did, while I was working on my master's degree, spend a bit of time learning about it.  And I do not claim to be a statistician, but I know enough to recognize the difference between correlation and causality, and the techniques used for evaluating whether picker correlation is significant enough that it is worth a serious consideration as to possible causality.

Q    To your knowledge, do Professor Spitzer or Roth put forward

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

any statistical analyses in their declarations?

A    I cannot recall Spitzer doing so.  Spitzer is a professor of political science, not a historian.  I suspect Roth probably has had some training in statistics.

Q    Okay.  But to your knowledge, neither of them are statisticians either?

A    To my knowledge, no.

Q    Do you recall being asked about Exhibit 34?  That was -- pardon me.  That was your book called Firing Back.

A    Right.

Q    And in it, you make some analogies between firearm restrictions and HIV, AIDS.  Do you recall that?

A    Yes.  And a number of other analogies as well.

Q    And what was the purpose of those analogies?

A    The purpose was to demonstrate that when people try to use certain types of theories to justify restricting firearms, those same sort of analogy -- by analogy, the arguments for other types of restrictions that the Courts have not accepted.  So, there are --

Q    Just to be clear, you were not advocating for those things. You were simply pointing out that there's no limiting principle?

A    Right.  Pointing out that if you are going to use this argument for restricting guns, you need to be willing to admit the possibility that other sorts of behavior that are generally accepted might also qualify for that same sort of restriction.

Kevin P. Carlin, RMR, CRR

Q    Do you recall being asked about the number of gun retailers in early America?

A    I don't remember being asked about it.  I know that the declaration -- I was asked if I had counted them up.  I have not been able to count them up, just because there was not enough time.  You guys contacted me fairly recently about this.

Q    Sure.

A    And it's a hard thing to measure.

Q    Would the number of gun retailers in early America be relevant to your opinion on firearm restrictions?

A    Well, it would only be relevant to the fact that Professor Spitzer had made this distinction for what he calls Guns-R-Us, this claim that gun retailing is so widespread in America that it's not at all comparable to the situation in colonial America. If in fact there were 704 people selling guns in any given year in colonial America, that would be comparable to the number of guns that are sold in retail now.

Q    So, the practicalities in early America where a person might have to make a trip into a city to purchase a firearm, is that at all relevant to your analysis as to whether there's a history and tradition of waiting periods in this country?

A    No.  It's not relevant, because you might not have to go to a city to buy a gun.  For that matter, you might not have to go into a city to be able to buy a used gun within your town.  I can tell you that one of my ancestors was an expert witness at a

100

23-cv-2563-JLK    CLAYTON CRAMER - Redirect    10-26-2023

trial in Connecticut in the 1640s where one person had bought a used musket, and it had gone off and took the guy's eye out. And this is just an ancestor of mine who was a gunsmith in town and had given -- testified in trial that he had already warned the seller, this gun was too dangerous to fire.  And this was used to demonstrate liability by the seller.  So, when people were buying guns that used --

Q    If a person had to travel a number of days to acquire a firearm, would they then have to wait after purchasing a firearm in early America?

A    No.  There were no limits on how rapidly to make an acquisition if you went into a store that sold them at retail, and just bought it.

Q    And there -- at the time of the Second amendment, there were general stores that would sell firearms -- or were there general stores that would sell firearms?

A    Well, we know that there are actually -- there are not specialized just single guns-only stores.  There are -- guns are sold in a variety of places.  Until the 1960s, it was quite common for lots of hardware stores in America to sell guns along with all the other things that they sold.

Q    Do you recall being --

A    Even today -- even today there are an awful lot of places that sell guns that are not gun stores.  Within four miles of where I live, there are three different stores where I can go in

101

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

to buy a scary black rifle.  One of them is a gun store.  The other two, one is a hardware store, and the other is a general merchandise store that sells everything from groceries to electronics.

Q    Thank you.  Do you recall being asked about an advertisement for a gunsmith?

A    Yes.

Q    And there are bespoke firearms today, are there not?

A    There certainly are.  They're not quite so common.  The industrialization and mass production that developed in the early 19th century America has a lot to do with why guns now are -- they are a commodity item.  There are differences, but they're inexpensive, and they're mass produced.

Q    Are there any -- is there anything else about your books that the State asked about that you would like to address?

A    I guess what I would say is that Firing Back was intended as a guide to political activism.  It was not necessarily -- not what I would call a scholarly work.  It was something that was basically to tell people, if you want to be an activist, here are some things you can do to make you more effective.

Q    Can you see this on the screen?

A    Yes, I can.

Q    So, this is Exhibit D to Professor Spitzer's declaration. Do you see the column that says pre Civil War Blacks?

A    Yes.

102

23-cv-2563-JLK   CLAYTON CRAMER – Redirect   10-26-2023

Q    Do you think that laws based on racial categorization are relevant to today's analysis?

A    I do not think so, because the 14th amendment fundamentally changed the nature of the relationship that Americans have on race.  It basically says that race can no longer be used as a basis for making decisions.  Equal protection applies.

It's interesting that in many of the cases around the country where states have been trying to defend their restrictive gun laws, they have repeatedly pointed to laws that would apply only to Blacks and to slaves as evidence that gun regulation is part of the American tradition.

Q    I'm going to point you to the state of Alaska, and it's Exhibit D.  And 1838 for pre Civil War Blacks.  Was Alaska part of the United States in 1838?

A    No.  It was part of Russia.  And if there were any Black people in Alaska during the Russian period, I would be very, very surprised.

Q    And does that -- do you think that this error undermines your confidence in any of Mr. Spitzer's conclusions?

A    That plus the fact that so many laws he does cite he quotes out of context.

Q    Do you recall the -- your discussion over the law of -- I believe 1655 in Virginia?

A    Right.

Q    And you claim that Mr. Spitzer did not include the entire

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

law in his exhibit?

A    He did not.

Q    And is there -- what did he omit?

A    If you bring up the text right here --

Q    Well, just generally.  You don't have to read it, but generally was there more to the law?

A    Well, what he omitted was that the concern was that the common method of warning that an Indian attack was under way was people fired multiple shots into the air, and that this law which prohibited shooting and drinking, with the exception of marriages and wedding -- and funerals, basically created a situation where it was hard to tell whether there was actually an Indian attack under way or not.  It was not concerned with a general hazard to others caused by people drinking and firing guns, but by the fact that it could confuse people about whether an Indian attack was under way.

Q    Do you recall the discussion of whether or not you relied on Mr. Roth in previous reports?

A    Yes.  I remember the discussion.

Q    And were you relying on Mr. Roth, or were you refuting Mr. Roth in your prior reports?

A    I was refuting Mr. Roth.

Q    Have you ever actually relied on an opinion of Mr. Roth in forming your own opinions?

A    No.  In many cases, I do not know whether he is right or

104

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

wrong.  And if I don't have any clear evidence that he's wrong, I tend to assume that he probably does know what he's talking about.  Also, I did notice in one of the columns on Exhibit B says gunpowder explosives licensing.  What part of this waiting period law applies to explosives?

Q    I believe we've touched on this before, but just to reiterate, were you aware of any government prohibitions on acquiring firearms prior to the Civil War?

A    Only ones that limited Indians, Catholics, and Blacks from obtaining weapons.

Q    But not the general public?

A    A free white person had nothing to worry about.  I'm not even sure that indentured servants who were white had anything to worry about in terms of buying weapons.  In fact, some of the colonial laws actually specified that when you received your -- when your indentureship was up and you were a free citizen, a master was required to give you a gun if you were a male.

Q    What is your interest in the history of firearms regulation?

A    Well, I was -- I was in -- growing up, I was in California working on my bachelor's degree in history at the time in 1989 when California passed the Roberti-Roos Assault Weapons Control Act of 1989.  This was such a absurd law in that they were responding to one particular incident with a general law that applied to hundreds of thousands of Californians who were not a

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

threat of any sort.

And in that case, the California Department of Justice, the final report on the matter admitted that the [inaudible] mass shooting was the result of the fact that the person that committed the mass murder was someone who had fallen through the cracks of the mental health system in California, which in fact was a common problem at the time.  They were chasing the wrong -- wrong bird up the tree.

Q    Is it fair to say that you're a true believer in the Second amendment, and not in this for the money?

A    If I were in this for the money, I would be very confused. I'm independently wealthy.  I don't need any of the money that I make for this.  Right now it's just paying for landscaping.  A lot of it is that when I teach American history, one of the things I have my students read is the part of Federalist 46 where James Madison explains that one of the great -- he was explaining why a Bill of Rights was really not needed as part of the new Constitution, because in the event that a tyrannical president came into power, the population -- the armed population of America so outnumbered any sort of standing army that could be created that there was no -- that such a government would not survive.  And I think this America that -- that view that a well-armed population is a restraint on a tyrannical government.

I used to buy ice cream cones from a woman with a

Kevin P. Carlin, RMR, CRR

106

23-cv-2563-JLK    CLAYTON CRAMER – Redirect    10-26-2023

tattoo on her arm.  It was not a very fashionable tattoo.  It was just a number.  She had been tattooed in concentration camps, and she's a reminder of what happens in societies where there's no effective resistance to a tyrannical government.

MR. NATION:  Thank you, Your Honor.  Nothing further from this witness.

THE COURT:  Thank you.

MR. NATION:  Thank you, Mr. Clayton [sic].

THE COURT:  Thank you, sir.  Your testimony is completed.  Thank you very much.  Next witness, please.

MR. ABBAS:  Your Honor, that concludes the plaintiffs' witnesses.

THE COURT:  All right.  That's fine.  Are you ready with your first witness?

MR. KOTLARCZYK:  Yes, Your Honor.  One housekeeping matter about defendant's case before we do that, and I think this was probably just addressed by the Court admitting all of the exhibits.  Professor Spitzer was not available because of a preexisting commitment to be here today.  We had conferred with plaintiffs ahead of time and let them know we were amenable to moving the hearing if they needed cross examination, but they had no objection.  So, that's the reason he's not here today, Your Honor.

THE COURT:  Well, these things are always difficult because they're rushed, and we don't have the chance, and both

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

sides -- let me just put it this way.  It's not my first rodeo.
I understand the shortcomings or the need to prepare more, but
we will do with what we have.  Okay?

THE COURT:  All right.  You're going to be sworn by
the clerk of our court at this point.  So, I will let her do
that.  Go ahead, please.

MR. KOTLARCZYK:  Appreciated, Your Honor, and we're
ready to begin with our first witness.

MR. SULLIVAN:  The Governor calls Dr. Randolph Roth.

THE COURT:  There he is.

THE WITNESS:  Hello there.  I've got a crutch behind
me.  I fractured my leg.  I'm wearing a boot here, going around,
backpacking accident.

THE COURT:  All right.  You're going to be sworn by
the clerk of our court at this point.  So, I will let her do
that.  Go ahead, please.

THE WITNESS:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  If you could please raise your
right hand.

(The Witness is Sworn)

THE COURTROOM DEPUTY:  Please state your full name for
the record, and spell your last name.

THE WITNESS:  Randolph Roth, R-O-T-H.

THE COURT:  Mr. Roth, before you begin your testimony,
you have mentioned that you hurt your leg, and that you have a
crutch.  If at any time you're in pain or you need to stop the
proceedings, just let me know, and we'll do so.

THE WITNESS:  Thank you very much, Your Honor.

Kevin P. Carlin, RMR, CRR

108

23-cv-2563-JLK    RANDOLPH ROTH – Direct    10-26-2023

THE COURT:  All right.

THE WITNESS:  I appreciate that.  And I have hearing aids too.  I'm 72, so I understand that.  They're on.

THE COURT:  The picture is frozen.

THE WITNESS:  Yes.  I can hear you.

THE COURT:  Okay.  The problem is you're still on the screen with your right hand raised.  Is there something --

THE WITNESS:  Oh, no.  I can see myself animated and talking right now.  I don't know what's going on.

THE COURTROOM DEPUTY:  So, he's going to have to go out and come back in.  It's his connection.  I don't have any control over that.

MR. SULLIVAN:  Dr. Roth, could you do us a favor and try logging out and back in, please.

THE WITNESS:  I will do that.  My apologies.

THE COURT:  No problem.

THE WITNESS:  Let me leave and try to come back.

(Pause in the proceedings.)

THE WITNESS:  Am I here?

MR. SULLIVAN:  We can hear you, but your picture is still frozen.

THE WITNESS:  I don't know what's going on.  I'm sorry about that.  You know, I really would rather be animated and speak.  I don't know what's going on.

THE COURT:  Well, let's just go ahead.  It's an

Kevin P. Carlin, RMR, CRR

109

23-cv-2563-JLK   RANDOLPH ROTH - Direct   10-26-2023

unavoidable problem.  So, let's just go ahead.

MR. SULLIVAN:  Dr. Roth, we're going to proceed.  So, you just need to speak slowly and clearly for our court reporter, because he cannot see your mouth currently when you're speaking.  So, answers just need to be slow and clear.  All right?

THE WITNESS:  Okay.

MR. SULLIVAN:  Dr. Roth, what do you do for a living?

THE COURTROOM DEPUTY:  Hold on, Counsel.  I need to disconnect, and then we're going to try to get him in again.

THE WITNESS:  I just disappeared.

MR. SULLIVAN:  One minute, Dr. Roth.

(Pause in the proceedings.)

THE COURT:  There we go.  You're moving.

THE WITNESS:  I am?  Oh, that's good.

THE COURT:  Okay.  I don't think the framers had this problem either.

THE WITNESS:  No.  I'm afraid, Your Honor, that this is the first time I've ever been anything but a juror.  I've never done this before.  And when I heard the plaintiffs' opening remarks, the attorney's opening remarks, I said to myself, oh no.  He's smart.  So, I think, you know, this is going to be a rough ride here.

THE COURT:  Go ahead.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

**DIRECT EXAMINATION**

BY MR. SULLIVAN

Q    Dr. Roth, I'm going to ask you some questions, and again, I just want you to speak slowly and clearly for our court reporter.  Okay?

A    Sure.

Q    Okay.  What do you do for a living, Dr. Roth?

A    I'm a teacher, professor of -- college professor.

Q    And how did you become involved in this case?

A    Oh, the Colorado attorney general's office asked me to develop an expert opinion on the history of violence in the United States, including homicides, weapons used in such crimes at different points in history, and responses of voters and their representatives to these changes in levels of violence and the nature of weapons that are used in homicides.  I was not asked -- I just should add I was not asked to address the specific law at issue in this case.  My charge was to speak to longterm trends.

Q    Let me stop you there.  Were you able to reach an expert opinion?

A    Yes.

Q    Okay.  Well, before we get to that expert opinion, I want to talk a little bit about what qualifies you to deliver that expert opinion on the topics that you just listed.  So, let me ask you, tell us about your educational background.

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

A    I received a bachelor's degree in history with honors and distinction from Stanford University, where I won the prize for the outstanding honors thesis in the history department.  I received my PhD from Yale University with distinction, and my dissertation won the field prize in -- for the outstanding dissertation in humanities.

Q    Can you tell us about the academic posts that you've held, starting with your current post.

A    Yes.  I am currently the college of arts and sciences distinguished professor of history and sociology at The Ohio State University.  The administration insists on the "The."  I have been here 38 years.  Before that, I taught seven years as a -- first as an instructor, and then as an assistant professor at Cornell College, a wonderful liberal arts college in Iowa. Immediately before that I had my first job outside of graduate school as a visiting instructor at the University of Vermont, where I taught Vermont history.  And before that, I was a graduate teacher associate, a number of courses taught by the faculty at Yale, where my duties were not only to be a grader, but in each case I was a discussion section leader.

Q    What have been your areas of focus at your academic posts? Just briefly for us.

A    My focus is to do anything that I was asked to do.  In other words, I've taught global history, American history, environmental history.  Any time we need a new topic that we

112

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

don't have a faculty member, I've stepped up to the plate and done that.  I have chaired an African American studies program at Cornell College, taught African American history, women's history, history of the west, history of the south, religious history, and of course most relevant here, criminal justice history, course on the history of violence.  And I teach statistics at the college level for graduate students and for undergraduates.

Q    Have you authored any books or articles on homicide or violence in the United States?

A    Yes, I have.  My book American Homicide is a study of homicide among adults from colonial times to the present.  And it's interregional, international comparative history, trying to get at the -- how rates have changed, the causal structure of homicides.

I'm currently working on a companion volume which is called Child Murder in America, which is about homicides of or by children in the United States from colonial times to the present.  It's a different book, because the causal mechanisms are different largely when we're talking about murders of children.

And of course I have published quite a bit on violence, on statistical methods, public, you know -- for public forums, when I'm asked to write about the history of capital punishment or things like that.  But I have published voluminously in

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

peer-reviewed forums.

Q    That was just about to be my next question.  Are your publications all peer-reviewed?

A    Most of them are.  Sometimes my essays are for edited collections where the editors of the volume are really doing the peer-review, although it goes out to peer-review, so I suppose actually just about everything is peer-reviewed that I do, yes.

Q    Can you summarize briefly for us what if any research you've conducted to author the publications you mentioned on homicide and violence?

A    Well, you know, as I've said many times, to do the kind of work we do, you have to go to the county and look at every scrap of paper in the courthouse.  You have to look at docket books, case files, indictment records, court minutes, everything that's there.  Coroners requests.

And then in addition to that, you have to read every single issue of every local newspaper.  And most of the ones I work with are not on, you know, newspapers.com.  You have to sit at the local library and go through every single issue to look for violent crime and violent death.  And of course, so, I am looking not only at homicides.  I am looking -- taking notes on every sexual assault, every arson case, attempted murder, aggravated assault, every suicide I find, every accidental death I find, particularly firearms accidents.  So, I have voluminous notes every time I go.

114

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

I have to look at the bridal records, which are kept usually by clerks rather than by the legal system.  I look at jail records.  I look at local histories based on oral tradition and oral testimony.

And when I have finished with that, where I have multiple sources, I use capture-recapture mathematics, which I can speak to if you wish, which will help me -- which allows us as historians to understand the degree to which the sources undercount the number of homicides that have come to the attention of the public.  Of course, the dark figure of only the murderer knows he poisoned someone, we can't get that, but we can get a remarkably high number of those.

Q    Dr. Roth, let me ask, you mentioned some statistics training and instruction in mathematics.  Has your research involved statistical data analysis as it pertains to your focus on homicide and violence?

A    Absolutely, it does.  And I'd like the Court to know that I've been blessed with wonderful teachers and opportunities.  I took advanced -- thanks to the National Science Foundation, I took advanced mathematics at a local college when I was a junior and senior in high school.  I studied mathematics in the honors program in mathematics at Stanford.

And I had wonderful training in statistics -- social science mathematics, with some wonderful professors in the political science department and the economics department at

115

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

Yale.  I learned econometric techniques of analysis.  And of course with my friends and self-taught, I have tried my best, as my colleagues have in our field, to keep abreast of all the wonderful new changes that happen in computing, the changes in new statistical methods.

So, I try to keep current all the time.  I can't program computers, but today, you know, so much is available online, and I have help from some sophisticated -- I collaborate with folks in the math department, computer science department.  So, I do get a lot of help when I work on these things.

If I might say one more thing, to do the kind of work we do, I pride myself in unusual cases.  For instance, I just want to tell Judge Kane that for instance, in the Essex County courthouse, a very poor county in Northeastern Vermont, the case files are in the dirt crawlspace under the -- and three-foot high.  And they sent me down there for a week, and I down -- there was a light bulb, and I'm down there digging around trying to keep the records straight.

This is not an easy thing.  I'm not playing around.  I loved being down in that basement reading those things and typing things up, but to do the kind of work that my colleagues and I do in social science history, it is grunt work.  It is systematic.  It is exhausting.

THE COURT:  That's called burrowing scholarship, I think.  I think that's called burrowing scholarship.

Kevin P. Carlin, RMR, CRR

116

23-cv-2563-JLK    RANDOLPH ROTH – Direct    10-26-2023

THE WITNESS:  Yes.  That's true.  We -- we're willing to take it for the team, you know.

Q.    (By Mr. Sullivan) Well, Dr. Roth, we're not going to send you into any crawlspaces today, but let me ask just a couple more questions about your background.

A    Sure.

Q    Have Courts recognized you as an expert in the fields that we've been talking about, homicide and violence?

A    Yes, they have.

Q    How many times?

A    I have currently been retained -- this just started last year, because of the Supreme Court decision.  So, now I think I've been retained by eight states in the District of Columbia, the Department of Justice, and a number of counties and local municipalities in Colorado and in Illinois.

Q    Are you paid for your work, Dr. Roth?

A    Yes.  I offered to go pro bono, and I'm glad I didn't.

Q    Are you being paid in this case, Dr. Roth?

A    Yes.  I'm making the same money that Mr. Cramer is, $250 an hour.

Q    And is your pay in any way dependent on the content of your expert opinions in this case?

A    No.  Not at all.  No one has ever asked me to change anything that I have to say.

Q    Dr. Roth, I sent you, I believe yesterday, Exhibit 31 from

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

our notebook binder.  Would you pull up Exhibit 31 for us.  And this is in the black binder, Your Honor.  Let me know when you have it, Dr. Roth.

A    I don't see it.  Which -- is this my vitae?

Q    This is your vitae, yes.

A    Okay.  I have my copy of the vitae.  I think I've typed it up so many times that I've got it memorized.

Q    Is this the copy that I sent you yesterday?

A    Yes, it is.

Q    Okay.  Is it a -- do you recognize it?

A    Yes, I do.

Q    Is it a true and accurate copy?

A    It is a true and accurate copy.

MR. SULLIVAN:  Your Honor, we would move to admit Exhibit 31.

THE COURT:  It's already in.  I have admitted all the exhibits.

MR. SULLIVAN:  Great.  Thank you, Your Honor.

Q.    (By Mr. Sullivan) So, Dr. Roth, I want to ask you -- now that we've kind of talked about your background, I want to dive into your expert opinion.  Can we start with a high-level summary?  So, what is your expert opinion on how the history of homicide and violence in the United States has shaped government responses to gun violence, and in particular as it relates to waiting periods for gun purchases?

Kevin P. Carlin, RMR, CRR

118

23-cv-2563-JLK   RANDOLPH ROTH - Direct   10-26-2023

A    Well, what I really found, I guess -- it's so complicated, but what I really found when we're looking at the founding period -- let's focus on that, around 1791.  The late colonial period right into the early national period.  What's remarkable about it is how low the homicide rates were going into the revolutionary crisis.  As I said -- and I gave those numbers for, you know, domestic homicide, homicides with relatives, homicides among unrelated adults, and they're remarkably low by today's standards.

And we have to also think of the work of my colleagues and I have done that half of those people who died would not have died today with the help of modern emergency medicine, modern wound care, et cetera.

So, when you add that in, remarkable, when you think that perhaps, especially after the revolution, immediately after in the north and the mountain south, the homicide rates in the United States among white Americans was probably the lowest in the western world.

And what we see through that is that when we look at the founders, they are looking back to the colonial period where they were a relatively nonviolent society, at least for the adult colonists.  Homicide rate was starting to decline again after a surge during the revolution, and they're very optimistic about the future.  And so they're not focused in 1791 on interpersonal violence.  They're focused on other things.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

Foreign threats, slavery [inaudible], domestic insurgency, as with the Shays' Rebellion. And what we see is in these homicides, when the homicide rate is low in the muzzleloading era, black powder era, only 10 or 15 percent of homicides among unrelated adults, among intimate partners, among relatives are committed with firearms. Tremendously low.

When you have a surge in violence as you did during the revolution, you see a rise in rate at which firearms are used in homicides, rise to 40 percent. And that has happened continuously, because they're going armed and prepared with their guns loaded to confrontations over property, politics, et cetera. Those hostile and defensive motions, the motions go through society.

So, I guess what I'm saying is that, you know, the reason why there would be no specific laws having to do with waiting periods is because impulsive homicides were extremely rare, and they occurred when guns were loaded for another purpose. That is militia training and hunting. When people got drunk when they were hunting, when they got drunk at militia training, they had these tiffs. People were disrespected, and boom, they were dead. But these weapons were extremely difficult to use on the spur of the moment.

Q    So, let me get into some -- there's a lot there to unpack. Let me try to ask a couple questions about what you just said.

A    Sure.

120

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

Q    So, we talked about how the founding era, homicide rates were extremely low.  How did -- those low homicide rates, how did they compare to today, for example?

A    Well, they were fairly low by today, particularly when we consider how many people would have survived today.  And Mr. Cramer is citing the FBI statistics.  He doesn't realize the work of Michael Mullins, my friend and colleague, his database on the uniform crime reports, which is available on the historical violence database, of which I am the founder, shows that the level of reporting is terrible.

You know, there are tremendous gaps in these records, and also in the supplementary homicide reports.  The FBI data can't be relied on, and we're working on fixing it, but especially low -- it's especially low when it comes to rural areas, and low when we talk about rural townships.  They just -- the way the FBI does it is they ask you to fill out all these forms.  It gives you no money or staff to do so, and then there's no requirement that you turn it in.  What happens?  It's a Swiss cheese.

And so you get an urban bias, which overstates the degree, gives you the false impression that people of color in the inner city are far more violent than rural people.  You know, when I've looked at -- we have this Homicide Data Improvement Project in Ohio right now, and we're finding that -- and I published on this.  We're finding that in the 17 -- 1970s

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

and 1980s, the homicides in rural counties in Ohio, only 59 percent of them were reported to the FBI. So, what we're seeing is our homicide rate is much higher than we would think.

Q    So, let me ask --

A    So, Mr. Cramer is not wrong in form.

Q    So, let me ask a question about specifically family and intimate partner homicide at that time. Was that category of homicide also low in the founding era?

A    Very low. So low that we don't do rates, can't do rates per hundred thousand. We have to do rates per million. It's such a rare thing. Now, what we do see is the level -- because these are mutually-dependent relationships, family-owned farms and shops, the level of nonlethal violence is very high in the colonial era, because that mutual dependence, people get angry when they feel that their spouse is not pulling their weight, and you see a high level of intimate partner violence, but not lethal.

Because you can see when there are homicides, they're almost always manslaughters, in which a typical abuse goes too far. And they run for help to keep their spouse alive to help on the farm with the shop. So, these are -- there's a -- there's a, you know, restraint there.

Q    So, of the rare homicide at that time amongst family members, intimate partners, or the violence that you're talking about, how is that typically committed? What weapon was used,

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

if any?

A    These are often done impulsively on the spur of the moment, and almost never done with guns.  What they were doing, they pick up an ax.  They pick up a chunk of wood.  They pick up a metal frying pan or pot, or they just kick one another to death or beat one another to death with fists.

Q    And by --

A    Household implements.

Q    Why were firearms not used?

A    Well, you know, as I said -- and I know that -- respectfully disagree with Mr. Cramer on this issue.  They're very hard to load spontaneously.  You need to gather your powder and shot and wad.  You have to pour that powder into the firearm.  You have to tamp down the wad.  You tamp down the ball.  You need to change the percussion cap or sometimes put in a fresh flint, and then you pull and aim.  But by the time you do that, the person you're threatening should be a half mile away.  And so what you will see -- and again, that's the rule.

I would say at this point, maybe we should put in later, Mr. Cramer is wrong in saying that I never said that people kept them loaded.  What we find is that when you need it on the frontier, for instance, of northern New England in the colonial era, when there was a constant threat from the -- of attack from the French and their Native allies, people tried to keep them loaded as long as they could, and they put it in the

123

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

dryest, warmest place they could, over the mantle, to have it ready.

But even then, that's a risky business, because the powder is hygroscopic, and so if it gets damp, the charge won't fire, or else it will corrode the barrel.  So, you really had to keep that firearm clean and unloaded as often as you could.

Q    So, Dr. Roth, other than what we've been talking about, the low homicide rate at the time, and the kind of limited technology, firearm technology at the time, is there anything else that you attribute to the lack of waiting period laws at the founding era?

A    Well, you know, they didn't understand that, especially -- and this is something I would have prepared had I had been asked -- they didn't understand impulsivity to the same way that we do psychologically, particularly when it comes to suicide.  I have studied suicides.  I have published on suicide rates in northern New England from 1784 down to 1824.  I published on this with a capture-recapture analysis.  I'm 95 percent confident that the suicide rate was somewhere between three and 5.5 per hundred thousand per year, which is a third of what it is today in the United States.

And only 16 percent of those were committed with firearms.  They hang themselves.  They cut their throats.  They drown themselves.  So, and when they thought about suicide, they had a very strict legal understanding of it.  Either you were

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

not culposo mentis, because you suffered from some kind of melancholy or deep schizophrenia, or they said you're a felo de se, you willfully killed yourself.  They had no category for understanding what we do today that so many suicides, the feelings are transient.  They can come and go in a single day.

And so this is the kind of impulsivity that the founders didn't understand, and of course because suicide was rare at this time, and rarely done with firearms, which is a very lethal way of trying to kill yourself, they didn't see a need.  They couldn't perceive it the way that the State of Colorado can do today, where white male non-Hispanics in the United States are now killing themselves at a rate of 30 per hundred thousand a year.

And to put that in risk, you multiply that risk over the life expectancy, which is 75.3 years.  Which means if these rates that we have now, which are 50 percent higher than they were in 1999 nationally, one out of every 44 white male non-Hispanic Americans born in this country is going to kill himself.  This is a problem they didn't have.

Q    Dr. Roth, let me ask -- I'm going to switch gears a little bit.  I want to ask you about some of the criticisms leveled against you by Mr. Cramer.  Were you listening in earlier to Mr. Cramer's testimony?

A    I was listening, and my list was growing.  It's not that I don't have great respect for Mr. Cramer, but my list was

23-cv-2563-JLK    RANDOLPH ROTH – Direct    10-26-2023

growing, yeah.

Q    Let me ask about some of the specifics.  And I know there was a lot here, but let me try to take them one by one, and we will move through them.  So, one of his first criticisms of you is that your book, American Homicide, looks at homicide rates rather than murder rates.  How do you respond to that criticism?

A    Well, our goal as social sciences is to be comprehensive.  So, when he says unintentional homicides, what that really means is manslaughters, willful assaults to harm that ended in death.  We look -- I look at justifiable homicides.  I look at homicides by law enforcement officers and of law enforcement officers.  We look at homicides of relatives, intimate partners, romantic as well as marital.  We look at homicides among unrelated adults.

And why we do that is to see if each of these distinctive kinds of homicides go up and down together.  That's why we look at it.  And what Mr. Cramer does not mention is that what I found is that rates of justifiable homicide among unrelated adults go up and down with the unjustified homicides among unrelated adults.  They're part of the same system.

And when the homicide rates are high, law enforcement officers are more likely to be killed and to kill.  And when the homicide rate is low, police officers are less likely to get killed and less likely to kill.

So, in other words, what I wanted to do, what my colleagues wanted to do is to look at every category of homicide

Kevin P. Carlin, RMR, CRR

126

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

and see which ones go up and down together.  So, and he

misrepresented my work and ignores the fact -- he says, oh, you

threw these in.  They go up and down together.

Q    So, let me move forward in Mr. Cramer's report.  So, he's

got a paragraph 126 in his report where he suggests that

six percent of civilian firearm homicides are actually

justifiable, and thus not murder.  Do you have a response to

that?

A    Every case, all of my data, are online.  Every single case.

And I outline the ones that are by self-defense.  I understand

that self-defense is not murder.  But it's still a homicide;

right?  And so what I do is I distinctly talk about those.  They

are a minority of homicides today.  Among unrelated adults, they

were a minority of homicides back then.  So, I'd say, yeah,

six percent.  And I don't see how that changes these dramatic

swings in homicide rates where they double or triple or

quadruple and then drop precipitously.  That won't affect the

overall argument.

Q    So, let me move forward.  In paragraph 134 of his report,

Mr. Cramer takes issue with your analysis of murder rates in the

slave south.  Is he correct?

A    No.  The thing that's -- he characterizes -- he puts words

into my mouth and claims that I said that the homicide rate in

the slave south rose after the revolution because of people

carrying concealed weapons.  That's not what I said at all.

Kevin P. Carlin, RMR, CRR

127

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

What I said is that when you have a democratic revolution, and you fail to realize that promise, it's like throwing a match in a can of gas.  And that was a caste and class-bound society.

So, what happens when enslaved people see people free in the north and in Haiti?  In Haiti by violence.  They saw how many enslaved people fled to freedom during the chaos of the revolution.  Enslaved people became more restive, more angry, more resentful.  And you will see that whites become more fearful of African Americans.  So, you're going to see a lot more violence.

What you're going to see also is from the elites, especially public figures like militia captains or attorneys or editors or politicians, they don't get the deference that they did before the revolution, and they're constantly angry about people disrespecting them.  This [inaudible] people.  And you will see that middling and poor white southerners can't get ahead in this caste and class-bound society that's promising them freedom, that's promising them upward mobility.

And so you see people, the hostile, defensive emotions course through that society.  People become angrier about any sign of disrespect.  Do not disrespect me.  Do not try to dominate me.

And so let me finish just one more thing.  So, what happens is homicide rates go up.  And because these emotions are there, people start to carry concealed weapons of all types for

Kevin P. Carlin, RMR, CRR

128

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

defensive reasons and for hostile reasons and to demand respect, and that allows an increase in impulsive homicides.

So, in other words, the concealed weapons are not the fundamental cause for why homicide rates run up in the slave south.  That had to do with the failure of nation-building, not building a legitimate society, not building a society where there is solidarity, patriotic solidarity among all people.  So, that's what's driving it.  And when you throw weapons into it, new uses of weapons and new kind of weapons, you make the homicide rate worse than what it has been because you allow impulsive violence when you are disrespected.

Q    Dr. Roth, that actually gets to my next question.  So, in paragraph 135 of Mr. Cramer's declaration, he suggests that you attribute the increase during the 19th century, the increase in America's homicide rate solely to advancements in firearm technology, and you're saying that's not right.  Is that what you're saying?

A    That is a complete misrepresentation of my point.  As you know from -- as he knows from my work, my latest thing is why guns aren't the problem.  One of the reasons why I had such a great reception in the conservative media, why reason.com named my book book of the year, I got praise in the, you know, Washington Standard, in gun magazines, because I made it very clear that firearms are not the fundamental reason why we became a violent society compared to other affluent societies.

Kevin P. Carlin, RMR, CRR

129

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

It's because of our failures of nation building, our political instability, our lack of faith and trust in our government, our lack of fellow feeling among ourselves, which blew apart during the sectional crisis, and was already growing in the slave south in the ante bellum period. And I said -- but I said, guns contributed, and new kinds of technology made things worse. And the use of those weapons made things worse than they would otherwise be.

So, what I found is that my focus is kind of a Rorschach test. If you are a gun-rights person, you see the first argument, and you don't see the second. And gun-rights people say, hey, he's saying guns are important. You know, they are important. And technology is important. And we need to have reasonable regulations. But they ignore that that's not going to be the fundamental solution to problems, because we have to build a stronger nation. And right now, we're not doing that.

So, I'm kind of stuck in between, Grant, and I get misrepresented all the time. But guns are a problem, and to claim that guns have nothing to do with it on the one hand by Mr. Cramer, which is just not true, and then to claim that I'm blaming guns for everything, which I've never said, what can I do? I'm a scholar.

Q    Let me switch gears, Dr. Roth. I want to take us to a different part of Mr. Cramer's declaration. I want to take us

130

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

to where he's talking about firearm technology.

A    Right.

Q    So, he wants to kind of take issue with your description of the technology at the time, how they were -- firearms were muzzleloading.  They had limits on accuracy, could only fire one shot, and the like.  And he first has a section that criticizes the idea that firearms at the time were not accurate.  Do you agree with him?

A    What I agree with and what -- he took that statement and modified it, didn't he?  I know that rifle muskets were tremendously accurate.  I've fired black powder muskets as a scholar.  Those things, you can hit things from a distance.  And as we know from the Civil War -- I studied the Civil War. General Reynolds at the first day of battle of Gettysburg was shot dead through the neck from hundreds of yards away by a sharpshooter.  Officers, confederate and union officers on horseback were sitting ducks, because those were so accurate.

        But what we know from that period is that very few people had actually rifled muskets.  They had mostly smoothbore weapons.  And smoothbore weapons, the ball rattles out.  It doesn't spin, and it could go any which way.  It's why we fought -- our revolutionary army fought the way it did.  You had to fire with volleys, because, you know, at distance, I can aim that smoothbore musket at someone, but I don't know what I'm going to hit.  But if I'm standing next to people who are also

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

firing, we're going to hit just about everyone, even though it can't do much past 25 yards.

So, accuracy is not the question.  And these are lethal at short range.  There's no question about that.  But the thing is, it is just surprising to me to claim that these black powder weapons could be kept loaded at all times.

Q    Let me stop you and ask a question about that.  So, about how they are stored, either loaded or unloaded --

A    Yeah.

Q    So, he has a whole section on this in his report, Mr. Cramer does, suggesting that black powder arms were actually frequently kept loaded, not unloaded as you suggest.  What's your opinion on that issue?

A    Well, all you need to do is look at section -- I think it's section 32 of my declaration and look at what the arms industry said.  Look at what Smith & Wesson said when they solved that problem with their amazing innovation in 1857, which was the five-shot repeat fire .22 caliber breechloading revolver.  And in other words, they encased the black powder in a bullet so it couldn't corrode the barrel, and it could be kept dry at all times.

So, I want to read that from the Smith & Wesson.  They said, some of the advantages that are constructed on this plan, the convenience and safety with which both the arm and ammunition may be carried, the facility with which it may be

132

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

charged.  It required no ramrod, powder [inaudible], or percussion cap.  In other words, saying, it takes time to load a cap and ball revolver, the Colt.  It takes time to do these other -- to a black powder weapon.  This is easy.

Secondly, it says it's certain to fire in damp weather, because why?  Because the charge was hygroscopic.  If you kept it loaded and let the natural humidity come in, the powder wouldn't explode.  And then it says that no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.

Q    Let me have you --

A    There it is.

Q    Dr. Roth, I want to stop you, because I want to give the court reporter time to catch up.

A    Sorry.  I get excited here.  I'm nervous too.

Q    No.  Let me ask --

A    And I know the plaintiffs are waiting for me.

Q    Just let me -- so, take a deep breath, and slow down for just a second so our court reporter can catch up.

A    My apologies.

Q    That's okay.  So, I just got one or two more questions.  I wanted to ask you about Mr. Cramer's suggestion that multi-shot firearms were widely used at the founding.  He calls them pepperboxes.  And this is really just a short question.  Do you agree with his conclusion on pepperboxes?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

A    No.  They were very rare.  And every probate citing we have shows that handguns were rare.  Most people -- most probated estates have long weapons.  So, if pepperboxes are a minority of a minority of pistols, they're just not significant.  And in fact, I can't think of a single homicide I studied that was committed with a pepperbox.  I'm sure there are some, and I'm sure Mr. Cramer can tell us about them, but in my systematic work, I have only seen, you know, very rarely -- when there are homicides with firearms or suicides with firearms, it's almost always with a long weapon.

Q    All right.  So, one last question on Mr. Cramer.  Recognizing that you got his 59-page report less than two days ago, any other disagreements in Mr. Cramer's report that you want to highlight?

A    Well, you know, let me think a minute.  One of the tough things here is that, you know, I did not have access to this in time, and I'm a scholar.  It takes me time to think these things through.  But what I would like to say, for instance, you know, some of the things that Mr. Cramer said were just misleading.

For instance, he said in his testimony today that I claim that a murder -- that this murder was not a mass murder that he talked about in California.  And the point that I made was quite different.  He was trying to say that you can kill as many people with a knife as you could with any kind of weapon today.  You can commit mass murder with it.  And the examples

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

that he picked showed that you couldn't.

What I said was, look, here you see multiple murders over time, but the two assailants, they attacked one person or two people at a time, serially.  If they tried to attack an entire room full of adults as two people with knives, they would have been stopped.

The other cases that he called mass murders, yes, they were mass murders.  They were millicides, but most of the victims were children.  All he proved was not that knives were as deadly as modern firearms.  What he showed is that, you know, children can't defend themselves against an attack by an adult with any kind of weapon.

And so, you know, he's essentially trying to make me look like I don't know what I'm doing, when in fact, I do.  And the cases that he brought forward, we can go into this blaming Hispanics for the crime problem when we know you account for poverty, that first-generation Hispanics are less violent than other Americans.  That's why El Paso and San Diego have such low homicide rates.

Reporters there have called me and asked, why do we have such low homicide rates?  Well, it's because first-generation immigrants from the Caribbean, from Latin America are less violent given the circumstances than native-born Americans.

And so there's all this kind of stuff that -- he's just

135

23-cv-2563-JLK    RANDOLPH ROTH - Direct    10-26-2023

not a criminologist.  And so it's just kind of Whac-A-Mole.  I don't know how to keep responding.

MR. SULLIVAN:  Thank you, Dr. Roth.  Your Honor, could I have one moment?

THE WITNESS:  And could I do one more thing, Grant?  One more response?

Q.    (By Mr. Sullivan) One more response to Mr. Cramer?

A    I need to, because of something he said.

Q    Please go ahead.  Briefly.

A    Yes.  He took credit for bringing down the fraud of Michael Bellesiles.  Certainly Clayton deserves some credit.  I corresponded with him.  We supported him.  But what he doesn't mention is it requires statistical knowhow and deep immersion in the probate records and in the homicide records to bring him down.

And who did that in the Yale Law Journal?  My friend, Jim Lindgren, who is a libertarian scholar, law professor at Northwestern; and myself; and Gloria Main in the William and Mary Quarterly.  We were the ones who brought that out.  I don't want to deny credit to Mr. Cramer, but he clearly wants you to believe that no one else was responsible.

And it's amazing to me, because I was the scholar who was most responsible for bringing him down and exposing this fraud.  In many cases, you know, for instance -- and I know Judge Kane would be interested in this -- he found no homicides

Kevin P. Carlin, RMR, CRR

136

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

in Plymouth Colony in the 17th century, and why?  Because he looked at the county court records that didn't have jurisdiction in felony cases.

So, that kind of sloppiness, yeah, but I exposed that. So, again, I don't want to deny Mr. Cramer that, but I went after this book, which made the outrageous claim that the arms industry and guns were the sole reason why we are a homicidal nation today.  That is wrong.  And the argument was based on fraud, just faked statistics, and citations of records that didn't exist.

MR. SULLIVAN:  Thank you for that clarification, Dr. Roth.  I'm going to let plaintiffs' counsel ask you some questions now.

**CROSS EXAMINATION**

BY MR. ABBAS

Q    Hello, Mr. Roth.  Can you hear me?

A    Yes.  I can hear you.  How are you?

Q    Doing well.  How are you?

A    A little nervous, but I'm coping so far.  But I gave you a compliment already.  I'm worried about this.

Q    I heard that, and I thank you for the compliment.  I can definitely tell you're smart as well.  However, we might see things from a different perspective.  Regardless --

A    I'm sure we do.

Q    -- I have some questions here for you.

Kevin P. Carlin, RMR, CRR

137

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

A    Certainly.

Q    And so I'm going to ask you a series of yes or no questions.  We're kind of short on time, so I need you to answer in a clear yes or no for the court reporter.  Do you understand?

A    Yes, I do.

Q    All right.  And are you an expert in firearms technology?  Yes or no.

A    I know a great deal about it.

Q    Okay.  And what sort of firearms technology are you an expert in?

A    I know a great deal from what I've read, from what I know, people I've talked to.  So, in other words, I know a lot about black powder weapons.  I know a lot about rimfire and percussion cap revolvers, because I need to know that sort of thing.  But certainly I do not -- I have friends who I rely on who actually testify in court specifically as firearms specialists, Rodney James and other people I know.  So, I do learn a lot from people who know more than I do.

Q    And one of the premises of your opinions was essentially that between the Second amendment and the 14th amendment, it was that the adopters could not foresee how firearms would develop; is that correct?

A    That is true.

Q    And this is the same argument you've made in other cases; correct?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   RANDOLPH ROTH – Cross   10-26-2023

A    Yes.  It's a constant change in the way things are used.
There's constant change in the natures of technology, and they
present new challenges that over 232 years, the voters and their
representatives have responded to in a measured, constructive
way.

Q    And that's even though that they encompass other laws in
the type of law that we're here talking about today; correct?

A    That is true, yes.

Q    And on this case, you are testifying to uphold the
three-day waiting period; correct?

A    I think it is prudent, yes.

Q    Okay.  And you don't actually make an analysis of the
three-day waiting period itself in your report; correct?

A    No.  I have not been asked to do so, and it would take me
time to prepare it --

Q    Okay.

A    -- if I were asked to do so.  That was left to other
people.

Q    And your only citation is of three waiting period laws from
1923; correct?

A    Certainly, yes.  And that I got from, you know, other
scholars.

Q    And you're an expert in a number of other cases as well;
correct?

A    Yes, I am.

139

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    And those were on your CV.  I believe there's about 15 other cases; correct?

A    Yes.  I've unfortunately become the go-to guy for history since the Supreme Court made its decision based on history.

Q    And each time you've been an expert witness in favor of the Government; correct?

A    Yes, I have.

Q    And so you've been on the side of gun control each time; correct?

A    That would be true.

Q    And in many of these cases, you've given opinions against what you would call large-capacity magazines; correct?

A    Yes.  I think that they are dangerous.

Q    And that's a personal belief.  You personally believe that they are dangerous?

A    Well, you look at the statistics about the difference we have when you know the firearms that are used.  Large-capacity magazines, when they are used with the same kind of weapon, kill and wound more people than when they're -- when these mass shooters are using a ten-round magazine.  It's just a statistical analysis of the data from extreme mass shootings, the kind that we're really trying to deal with where you see one person trying to kill a maximum number of people in a matter of minutes or seconds.

Q    But we've had much more efficient mass murderers in history

Kevin P. Carlin, RMR, CRR

140 of 194

140

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

that have not used firearms; correct?

A    When it's a group activity, but certainly with dynamite. Certainly with fertilizer bombs. Certainly with airplanes. We have seen those kinds of things with --

Q    Arson; correct?

A    -- [inaudible]. Arson, certainly, with that [inaudible] killing at the school. Certainly, you can do those sorts of things.

Q    So, we're jumping ahead a little bit. So, let's go back. So, each time that you've testified, you've been paid by the Government; correct?

A    Yes, I have.

Q    At a rate of about $250 per hour; correct?

A    Exactly $250 an hour.

Q    And you are not a lawyer; correct?

A    No, I am not.

Q    You do not possess a law degree?

A    No, I do not. I got a real good score on the LSAT.

Q    And you're not a psychologist; correct?

A    I know a great deal about psychology because of -- since I have to, because -- no, I don't have a PhD in psychology, but I am a criminologist.

Q    But that's still not a degree in psychology; correct?

A    Oh, absolutely true. But it doesn't mean that I don't know a lot about psychology.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

Q    So, you study homicide rates; correct?

A    I study all kinds of violence, violent crime and violent death.  Homicide is one of my central foci.

Q    So, when you discuss homicide, as you stated earlier, those include acts of justifiable homicide; correct?

A    Yes, they do.

Q    And justifiable homicide means acts of self-defense; correct?

A    Absolutely.  And they're coded that way in my database.

Q    And you also include accidental or excusable homicides; correct?

A    Not accidental homicides, no.  Negligent manslaughters are accidental deaths caused by negligence, and they do not appear in my work as homicides.  I'm very careful with that.  There's a big difference between a negligent homicide and actual homicides, and it's one of the problems with building a comprehensive database with contemporary data, because so many medical examiners classify negligent homicide, involuntary manslaughter as a homicide, so you have to pull those out.

Q    But you're perfectly comfortable with including acts of self-defense; correct?

A    Absolutely.  Because they are homicides, but I code them separately and watch how they go up and down with other kinds of homicide, which they do.  When it's dangerous, people are more likely to kill in self-defense.

Kevin P. Carlin, RMR, CRR

142

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

Q    So, you are aware of what a spurious correlation is; correct?

A    Absolutely.

Q    And a spurious correlation is where two variables are associated but not causally, due to either coincidence or a third variable; correct?

A    That is true.

Q    And so for instance, an increase in justifiable homicides could also be associated with an increase in other homicides, but not actually caused by one another; correct?

A    What you see in the behavior is the confrontations that lead to defensive homicides are the same kinds of confrontations that are leading to willful homicides.  It's a case-by-case to look at that correctly.  So, yes, it's not a spurious correlation in any way.

Q    So --

A    And I have the [inaudible] narratives from there on the web.  All of my data are there.  You can see it for yourself.

Q    So, as a historian, do you remember what the old west saying was about Samuel Colt?

A    You know, about making people equal?

Q    And why was that?  Because he invented the Colt revolver; correct?

A    That's right.  He invented the Colt revolver.

Q    A lot of people relied on that for self-defense; correct?

Kevin P. Carlin, RMR, CRR

143

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    And for aggressive action, yes.  But not -- he was not the major -- it was not really as mass marketed and mass produced early on as many people think.  That took time.

Q    And, let's see.  At the start of the American Revolution in 1776, flintlocks were the standard firearm; correct?

A    Yes.

Q    And what we see throughout history is that wars inevitably change technology; correct?

A    They can, absolutely.  But, you know, I don't see a tremendous amount of change over the revolution.  That was a brief period of time.

Q    And by 1833, the U.S. military adopted a percussion rifle; correct?

A    I don't know that for a fact.  I would assume that you have that fact and -- correct.

Q    That sounds correct to you, though?

A    I don't know.  I don't -- I haven't studied that.  I'm not trying to doubt you.  No.  I'm sure you've done your homework.

Q    So, by the end of the Civil War, cartridge firearms were commonplace; correct?

A    Cartridge firearms, what do we mean by cartridge firearms?  Because, you know, there were still muzzleloading weapons that had a sort of cartridge.  In other words, they prepackaged the powder and wad, et cetera, which increased the rate of fire during the Civil War.  But when we talk about cartridge, we can

144

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

also talk about self-contained bullets that seal in the black powder.  So, depends on what you -- I just want to know how are you --

Q    Let's -- for these purposes, we're talking self-contained cartridges.

A    Okay.  Yes.  They become more common, but the muzzleloading black powder weapons stock is not completely replaced until around 1910, around World War I.  It takes time for these weapons to age out.

Q    Do you know what was in cartridges at that time?  What powder?

A    What are you asking me about?

Q    Was it the same exact gunpowder that was used in firearms that didn't take cartridges?  Yes or no.

A    I think it was different, but I can't remember offhand.

Q    And do you know what pinfire -- do you know what pinfire is?

A    Centered rimfire versus rimfire, yes.  I understand that.

Q    Not center fire versus rimfire.  Do you understand what a pinfire firearm is?

A    No.

Q    Well, let's go back.  Do you know what a brace of pistols is?  Yes or no.

A    A brace of pistols?

Q    Yes.

145

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    Yes, I do.

Q    And a brace of pistols is a term for essentially a pair or more of -- a pair or more of pistols, usually kept together in the same holster; correct?

A    Yes.

Q    And do you know what a Puckle gun is?  Yes or no.

A    No.  No.

Q    Have you heard of a Cookson repeater?  Yes or no.

A    No.

Q    Have you heard of the Kalthoff repeater?  Yes or no.

A    No.

Q    Have you heard of Joseph Belton?  Yes or no.

A    No.

Q    Have you heard -- do you know what a pepperbox revolver is?  Yes or no.

A    Yes.

Q    Okay.  And those were revolvers that were popular before the Civil War; correct?

A    I wouldn't call them popular.

Q    They were well known before the Civil War, though; correct?

A    They were well known, but they were not ubiquitous.

Q    And do you know what a harmonica gun is or a slide gun?  Yes or no.

A    I don't know that term.

Q    Okay.  Did you study the Lewis and Clark expedition?  I

Kevin P. Carlin, RMR, CRR

146

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

know on your CV it says that you've taught about Thomas

Jefferson in particular.

A    You know, I have read books about it.  I know something

about it.  But, you know, I'm not an expert on the Lewis and

Clark expedition, no.

Q    Do you recall the 22-shot air rifle that he took on that

expedition?  Yes or no.

A    No.  I haven't studied that in any detail.

Q    And have you heard of a Girardoni air rifle?  Yes or no.

A    No.

Q    Do you know --

A    But again, I don't claim to be a firearms expert.  I defer

to my friends who are experts.

Q    You did testify here about technology and the role that

technology plays in firearms; correct?

A    But in a straightforward way, as we move from black powder

weapons, there are muzzleloaders or cap and ball revolvers.  And

as we move towards the modern breechloading revolvers, that's

the critical change.  And, of course, remember, I measured --

when I talk about the homicide rate rise that started nationwide

in the late 1840s and 1850s, was before those weapons were

available, and that surge in homicide happened without a lot

of -- without a majority of homicides being committed with

firearms.  It's when those new firearms come in that it becomes

a problem, and I can speak to that, why they were a problem.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

Q   Well, before we get to that -- so, we will get to that.
The first -- we talked a little bit about the Colt revolvers.
The first Colt Walker was a revolver designed in 1846; correct?

A   I'm thinking 1836, but I could be wrong.

Q   Okay.

A   For the first Colt cap and ball revolver.  I thought it was
the 1830s.

Q   Well, we will get to that.  Let's see.  And by the Civil
War, both the north and south adopted the Colt models 1851,
1860, and 1861 revolvers; correct?

A   That is correct.  Yes.  They were using those revolvers.
Mm-hmm.

Q   And all of these Colt models had quickly replaceable
cylinders; correct?

A   Yes.  You could swap it out, and the usual kit came with
two cylinders.

Q   So, you could reload them really quickly; correct?

A   Yes, you could.

Q   In fact, there was a case about the first revolvers ever
patented in the U.S. around 1851; correct?

A   I don't know the exact date of that.  I know when Smith &
Wesson -- that's 1857 for their patent, and it expired in 1873.
I know that.

Q   And that's the Rollin White patent; correct?

A   Pardon?

148

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

Q    That is the Rollin White patent; correct?

A    That is part of -- Rollin White patented part of that revolver.

Q    And that was a bored-through cylinder; correct?

A    Yes.

Q    Okay.  But before that, does *Colt v. Massachusetts Arms Company*, 6 FCAS 161, from 1851 ring a bell?

A    No.

Q    Would it surprise you to know that in that court case, the Court was citing revolvers as being relatively common as back as [sic] 1818?

A    That would surprise me.

Q    Or at least being commonly known by 1818?  That would surprise you?

A    Yes.  That would very much surprise me.

Q    Have you heard of the Volcanic Repeating Arms Company?  Yes or no.

A    Yes, I have.

Q    And they manufactured high-capacity repeating pocket pistols and rifles; correct?

A    I believe so, yes.

Q    And they were founded about 1855; correct?

A    I don't have knowledge of the exact year.

Q    Before the Civil War, though; correct?

A    Yes.  Before the Civil War.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    And are you familiar with Sharps Derringer?  Yes or no.

A    No.

Q    And you've heard of Remington Arms; correct?

A    Yes.

Q    They sold a revolver that became the 1858 Remington revolver; correct?

A    I believe so.

Q    And that was also as --

A    And, again, I don't know these dates.  I don't know the dates.  I don't have them here.

Q    But that was also used in the Civil War; correct?

A    I would not -- I don't know that.  I must plead ignorance. I'm not a firearms expert, as I said.  I learn a lot from others.  So, if that's what you want to say --

Q    Well, do you know --

A    -- we can just move on.

Q    Do you know about the Spencer repeating rifle?  Yes or no.

A    Yes, I do.

Q    And that was adopted before the end of the Civil War; correct?

A    It was.

Q    And do you know about the 1860 Henry rifle?  Yes or no.

A    Yes, I do.

Q    And that was used in the Civil War; correct?

A    Yes, it was.

150

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

Q    And what did the confederate soldiers call that rifle?

A    I don't know.

Q    All right.  We will move along.  But it had a significant magazine capacity; correct?

A    Some of those, you know, Sharps, they had large magazines, yes.

Q    Approximately 15 to 16 shots; correct?

A    They were large-capacity magazines, yes.  They were lethal, and killed a lot of people.

Q    And then in 1866, the Winchester lever-action rifle was released; correct?

A    I believe that the Winchester lever-action rifle was about that time, yes.

Q    About 14 rounds, correct, in that firearm?

A    That sounds correct to me.

Q    And then let's get back to the Rollin White patent.  That was a patent for bore-through cylinders, as you had agreed to.  And that meant that revolvers could use metallic cartridges; correct?

A    Mm-hmm.  And be breechloading, yes.

Q    Did you hear about something before that called a Thuer cartridge conversion?  Yes or no.

A    No.

Q    And there were patent cases about the Rollin White patent, because Colt desperately wanted to use cartridge revolvers back

Kevin P. Carlin, RMR, CRR

151

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

in the 1850s; correct?

A    That is correct.  And they didn't win.

Q    But as soon as the patent expired, they started making them; correct?

A    And which shows the advantage of modern breechloading firearms over muzzleloading or cap and ball revolvers or muzzleloading weapons.  Absolutely.  So, that makes the point.

Q    And you could own a cannon in the early United States; correct?

A    I have no idea.  I imagine you could.  There was no law against it.

Q    All right.  And so you could also own grapeshot at that time; correct?

A    I imagine so, because there was no law that I know of against it.

Q    Okay.  So, people at that time were still capable of causing great harm; correct?

A    People have always been capable of causing great harm.  But not the kind of harm that they can cause with dynamite, airplanes, fertilizer bombs, or with a modern, you know, high muzzle velocity semiautomatic weapon.

Q    So, metallic -- let's go back, though.  Metallic firearm cartridges are practically the same as they were in the 1800s; correct?

A    Which again?

Kevin P. Carlin, RMR, CRR

152

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    I said --

A    I'm sorry.  I didn't hear.

Q    Metallic firearm cartridges are practically the same as they were in the 1800s; correct?

A    Today, they're very similar, yes.  The one big difference that really occurred, and my late friend and late colleague Eric Monkkonen has said one of the big innovations was factory-manufactured ammunition for breechloading firearms. Before then, when you had to load it yourself, people often underloaded it so the bullet would just kind of go poof.  What you will see is when math --

Q    Are you testifying here today that in the Civil War, they didn't have factory-loaded cartridges?  Yes or no.

A    No.  I'm saying that when factory-loaded cartridges became available, those weapons could be used much more effectively. That's all I'm saying.

Q    But if cartridges have been around since essentially -- cartridge firearms have been around -- they've always been able to get cartridges from the factory; correct?

A    Not necessarily.  Many people had to load their own.

Q    Okay.

A    I mean, I've loaded my own, so it still happens.

Q    But for the most part, you have a primer of some sort, a powder, a projectile, and a case; correct?

A    That is what a bullet is.

Kevin P. Carlin, RMR, CRR

153

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    Yeah.  And many of the cartridges are actually still in use today, including the .22 rimfire and .45 Colt; correct?

A    Absolutely.  You can still get rimfire cartridges.  That's right.

Q    In fact, the .22 Short was used in the first model Smith & Wesson, and was developed in about 1857; correct?

A    That is absolutely correct.  And I do know -- I am familiar with that.

Q    So, it's safe to say that for the last 250 years, man has been constantly improving firearms technology; correct?

A    That is absolutely true.

Q    And in particular, in -- the firearms technology in particular that people have been obsessed with is making firearms more effective; correct?

A    More lethal, more accurate, more deadly, yes.

Q    And are you aware of current developments in weapons technology?  Yes or no.

A    I have no idea what you're referring to.  And, again, I do not say that I am a firearms expert.

Q    I'm not talking about --

A    I know a lot about firearms.

Q    Are you aware of developments in weapons technology such as laser guns, directed energy weapons, coilguns, railguns, that sort of thing?  Yes or no.  Are you aware of them?

A    I have heard of them all, yes.  I'm not familiar with them.

Kevin P. Carlin, RMR, CRR

154

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

I've never actually seen one, but I have heard of that, yes.

Q    Okay.  And in fact, some of those are starting to be used by the military today; correct?

A    Yes.  They're using all kinds of new things.  Although their standard weapons are still M4s, M16s, yeah.

Q    But one of the things they recently adopted was an electric railgun; correct?

A    I have no knowledge of what they've done in recent years, no.

Q    Are you aware that the first electric railgun was invented in 1917?  Yes or no.

A    Not aware of that, no.

Q    Okay.  So, for coilguns, are you aware that the first coilgun was patented in 1904?  Yes or no.

A    No.

Q    So, it would shock you to know that the first development of that was back in 1845, then; correct?

A    I have no knowledge of that.

Q    Okay.  So, it's foreseeable that -- one day that we might be debating over civilian ownership of personal laser guns, coilguns, and other things that don't even use explosives; correct?

A    I would imagine so.  Especially if they are extremely deadly, lethal, yeah.

Q    So, wouldn't it be safe to say that it was foreseeable and

Kevin P. Carlin, RMR, CRR

155

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

evident to everyone in 1868 that we would have firearms that could hold multiple shots?  Correct?

A     Yes.  That's true.

Q     Including 30-round magazines; correct?

A     I am not sure that I know of 30-round magazines back then. I have no knowledge of that.

Q     Do you know of something called the Gatling gun?

A     Oh, sure.  I know about Gatling guns.  I know about Maxim guns, and they are extremely deadly.  They are fully automatic weapons.

Q     Gatling guns were used in the Civil War; correct?

A     Absolutely.  And Maxim guns have been used by imperial powers in Africa.

Q     And did gunsmiths or blacksmiths that made firearms exist in 1791?  Yes or no.

A     Yes.  There was a handmade trade of gunsmiths making firearms, absolutely.  Yes.

Q     And there were general stores in 1791; correct?

A     General stores, yes, there were.

Q     And they often sold firearms; correct?

A     I have seen the ads.  That is quite true.

Q     All right.  So, firearms were readily available to anybody that could make it to a general store or to a blacksmith or gunsmith; correct?

A     Readily available is hard to know.

Kevin P. Carlin, RMR, CRR

156

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    They weren't restricted from walking out that same day with a firearm if they walked in there with cash; correct?

A    If one was available at the time.

Q    All right.  That's --

A    But production rates were far lower than they are today. So, you might have to wait a few weeks to get it.

Q    But even back in 1791, a person didn't have to go out and smelt their own iron or carve a stock from a tree in order to have their own firearm; correct?

A    No.  There was an import business, and there was a domestic business.  And of course very soon the federal government, because of the lack of military grade firearms, had to open the armories at Harpers Ferry and Springfield to try to provide the arms that the militia would need nationwide to protect the nation.

Q    And are you aware that the ATF keeps time-to-crime statistics of firearms here in Colorado?  Yes or no.

A    I am not aware of that.

Q    Okay.  Are you aware that the ATF keeps time-to-crime statistics?  Yes or no.

A    I am not aware of that, but then I have not been asked to make an opinion on this, so I haven't researched it.

Q    Okay.  Now, let's go back to your homicide statistics in modern day.  If you exclude gang-related shootings in current homicide statistics, they drop dramatically; correct?

Kevin P. Carlin, RMR, CRR

157

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    Pardon?  Again?  Could you ask me again?  I'm afraid that I gotta shut my phone off.  My son just texted me and said, are you done?  And I'm thinking, no.  He said, how are things going?  And I would have said, well, I'm being exposed for not being a firearms expert, which I never claimed to be.

Q    Well, sorry.  I've got quite a few more questions here for you.  So, if you don't mind --

A    Oh, I think you're doing a great job.

Q    So, if you exclude gang-related shootings in current homicide statistics, they drop dramatically; correct?

A    It depends on the locale.  Certainly in -- some of them, no.  Not -- it depends on the locale.  If you're looking at urban homicide rates and urban homicides, yes, we're seeing an increasing concentration within the small group of people in gang areas.  But outside of it, when we have our homicide increase of 60 percent since 2015 is a rural phenomena as well as an urban phenomena, and those are not gang-related in urban areas -- in rural areas.

So, again, you know, it's a question of where are we looking at?  And then there are cities that have more gang-related homicides than others.  And it's very hard, because I work on these statistics, to decide what is a gang homicide, and what is a simple relationship beef?  So many of these things that you're calling gang homicides, when you look at the case files, are about rivalries over women.  They are about shoes.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

They're about disrespect.  They're about social media beefs.

And so to call them gang homicides in a blanket way really doesn't help, understanding that this is the kind of work I'm working on now as someone who has access to and is helping the police departments of Cleveland, Columbus, and Cincinnati.

Q   Regardless, these individuals tend to be in a gang of some sort, though; correct?

A   A lot of them, because, you know, this is their family. This is their home, yes.  But is that the reason that they're engaging in these killings?  Not necessarily so.

Q   In fact, a lot of these individuals would be prohibited possessors just generally; correct?

A   A lot of them are too young to really have, you know, extensive criminal records.  So, I would say, you know, it depends.  Certainly by the time a number of these young people are in their 20s or their late teens, yes, they have committed a lot of offenses.  They have been arrested and have been convicted.  But many of them have not been convicted.  It's, you know, when they're arrested for some crime, it's the first time.

Q   And a lot of them are under age as well; correct?

A   Not an overwhelming amount.  You're still not getting many 13- or 14-year-olds committing homicides.  When you do, they tend to be acting -- please let me finish.  When they do -- so, I have seen that they are generally acting in concert with older young men.  So, if you see a 13- or 14- or 15-year-old, my

159

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

research that I'm doing now -- again, this is in progress -- from our homicide project in Ohio, which is collaborative, but what you see is that when young people get involved, it is with older people.  And yeah, I guess you could say that that happens to be because of gangs or these neighborhood organizations or friendships, sure.

Q    And so their victims, even if it's just one victim, a lot of time would be facing murder from a group of individuals; correct?

A    No.  It's still mostly one-on-one.

Q    But you said that they act in concert with older individuals; correct?

A    I said that when 13- and 14-year-olds get involved, very often it's with older people.  That's different from saying that most of these homicides are multiple people assaulting a single individual or a few individuals.  It's a different issue.  I'm just trying to be clear.  I don't mean to be argumentative.  You're asking great questions, and they're very fair questions.

Q    So, let's go back.  At what age is it lawful to purchase and possess a pistol?

A    It depends on the state.

Q    Most states.

A    Mm-hmm.  Most states, it's 18.

Q    Eighteen, not 21?

A    I know a lot that are 18, yeah.  But again, I would think

Kevin P. Carlin, RMR, CRR

160

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

that 21 is a more reasonable age.  I certainly think so.

Because of the way youth homicides have increased faster over

the past 50 years, while we've seen almost constant decline in

homicides of people over the age of 25, at least until 2015,

when they went up again.

And so I've published on that gap, and I have testified

about youth age restrictions in another case.  I can't bring

that up right now, but I certainly would be happy to share that

with Judge Kane and with you.

Q   But once again, a lot of times, even with those youth ones,

they tend to be gang-related in some fashion; correct?

A   I think I -- I said no.  A lot of them, when you get down

to it, are about respect.  They are about women.  They are

about, you know, things like that.  So, blanket argument about

gang violence is not quite accurate.

I certain -- I just wanted to add that not only do I,

you know, work with the Columbus Police Department, I've been

involved in what -- an effort called the Youth Violence

Prevention Advisory Board, spearheaded by my colleague Professor

Wilkinson working with the community.

And we know from that, working with community leaders,

church leaders, violence interrupters that it's very

complicated.  We make blanket statements about gangs, but

actually when you get down to the nitty gritty, you know, these

are just the kinds of old fashion typical homicides by unrelated

161

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

people.

Q    So, let's go back to random mass shootings are, statistically speaking, very rare events; correct?

A    They're very rare, but they're traumatizing for the public and traumatizing for young people.

Q    And they're usually carried out with advanced planning; correct?  Hence why we see the manifestoes?

A    Yes.  Unlike most, you know, many homicides that are impulsive, because of -- and don't have a lot of premeditation. What we see with these planned mass shootings at synagogues and churches, Hispanic people at a shopping center, of people at concerts, at gay nightclubs, et cetera, there is a great deal of premeditation, planning, and ideation.  In other words, a doctrine of cultural scripts [inaudible] to and talking themselves into doing something really heinous or trying to --

Q    I'm sorry.  We have a short amount of time here, and I'm trying to finish before 5:00.  But no matter what, a three-day waiting period would not do anything to deter these monsters; correct?

A    No.  Not those -- not what it's designed to do.  And, again, I'm not testifying to that.  It's mostly intending to prevent suicides.

Q    And you've heard of Sears and JCPenney; correct?

A    Absolutely.  If they're still here.

Q    And these companies used to sell firearms in catalogs;

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

correct?

A    Oh, absolutely.  Montgomery Ward, sure.

Q    And they would be delivered directly to your home; correct?

A    Back in the old days, yes.

Q    And when did they stop?

A    I do not know.

Q    Would it have been about 1968?

A    Certainly when you think about it, that's when the Omnibus Crime Bill imposed new regulations on firearms.

Q    So, until that time, a person could order a firearm and have it delivered to their door; correct?

A    I imagine that you could, sure.

Q    And there were also no background checks at that time period; correct?

A    I do not believe so.

Q    So, also --

A    These are all modern things to deal with the tremendous rise in homicide that occurred in the '60s, '70s, and '80s.

Q    So, we will get there, but also, before 1968, someone could walk into a hardware store and purchase a firearm there; correct?

A    Oh, I'm sure that's true.  A lot of these waiting periods are new, like Colorado's law.  They're new.  Based on new insights into impulsiveness, particularly of suicides.

Q    And in 1968, what was the name of the law that was passed?

Kevin P. Carlin, RMR, CRR

163

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

A    I think -- was it part of the Omnibus Crime Bill?

Q    Would it ring a bell if it were the Gun Control Act of 1968?

A    That could be it too, yeah.

Q    And it was one of the strictest gun control measures at the time; correct?

A    Absolutely, it was.  And of course up until 1994 when there was the ten-year ban on certain classes of semiautomatic rifles.

Q    And also there was another act passed in 1986; correct?

A    Which one are you referring to?

Q    The Firearm Owners Protection Act, which also included gun control as well?

A    That one I'm not familiar with.

Q    Okay.  And so you've given lectures, and your book is about how social upheaval increases homicide rates; correct?

A    It certainly is.  Well, failures of nation building.  It's a complicated argument, fourfold, [inaudible] that recur time and again.  This relationship is causal, because they happen again and again and again.

Q    And so your arguments are that during times of great social upheaval, essentially it's relatively easy to gather like-minded people to commit violence; correct?

A    It used to be, yes.  Particularly in the 19th century.  But today it's harder.  It's more isolated individuals committing mass murder, because of their technology, et cetera.  You very

Kevin P. Carlin, RMR, CRR

164

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

rarely today have the kind of mob violence, mass murders that you had in the past.  It's just something that's really gone -- you know, we don't have many Tulsa riots of 1923 anymore or Chicago riots of 1919 or mass Klan murders, white supremacist murders.  We just don't have those anymore.  It's really become more lone wolf or two lone wolves together committing mass murder.

Q    Let's go back.  When you talk about those mass murders, or murders created -- I guess murders by the masses, a lot of times if a victim had a firearm, they could avoid being a victim; correct?

A    Not necessarily.  African Americans armed themselves after the Civil War, and they were outgunned.  Whole militias were murdered by white supremacists.  The police department in New Orleans in 1874 had to fight it out with white supremacists, and they lost, and many of them were killed even though they were armed.

When you have a larger group of committed white supremacists, for instance, gathering together, concerted to attack the police, to attack Black militia units, to attack churches, yes, you can be armed and it doesn't do you any good.  In other words, you're going to die in larger numbers than the people who are attacking you.  Absolutely.  So, I just want to insist on that.  I do understand that.

Q    And so let's go back to there are other factors that have

Kevin P. Carlin, RMR, CRR

165

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

been found to be statistically significant to homicide rates;

correct?

A    Absolutely.  And that's what -- that's what the social

sciences are trying to do.  You know, look at persistent

correlations.  We don't -- we can't perform controlled

experiments.  I want the judge to know that.  We're not

physicists or chemists, but like the historical sciences,

geology, cosmology, and others, excuse me, what you can see,

evolutionary biology, we look at lots of places over long

periods of time and look for persistent patterns that happen

time and again, such as the relationship between political

instability and a rise in homicides among unrelated adults.  So,

that's what we do.

Q    So, regardless, other factors such as homogeneous and

heterogeneous population and economic opportunity have been

actually statistically significant to homicide rates; correct?

A    Absolutely, yes.

Q    And do you know how many firearm suicides can be attributed

to mentally ill individuals?  Yes or no.

A    That is a very hard thing to know --

Q    I agree.  So --

A    -- with any kind of precision.  It's very hard to know, but

certainly if mental illness was the fundamental cause of

suicide, there would be millions of suicides per year, because

so many people are clinically depressed.  There's lots of other

166

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

factors there.  And as we know from the work, a lot of them caused -- even if there is not an underlying deep mental illness, it's a sudden loss of job, it's a sudden loss of relationship, it's a death to a loved one that leads to an impulsive act.

You know, so I think that it's important to mention that we can't know -- most of these people, they haven't been in treatment.  I can testify to that, you know, from personal experience, people I know.  So, as I'm sure you can too.  So, no.  There's no way for us to know the mindset of many of these people, but we do know that a great number of them are impulsive, and people go out and buy -- there still are cases where people go out and buy a firearm and kill themselves impulsively.

Q    So, Mr. Roth, the State is going to have an opportunity to ask you questions after I'm done, so they get to do what we call rehabilitation of you.  So, I'm going to ask that you just answer the question instead of going off on a tangent.  Once again, I apologize, but we have a limited amount of time here, and I am trying to conclude with your cross before 5:00 if we can.

A    I'm a scholar.

Q    I understand it's difficult.  I can get on a tangent myself, but I just ask if you answer the question and that we move forward.  Okay?

Kevin P. Carlin, RMR, CRR

167

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    Okay.

Q    All right.  Thank you.  So, do you believe that gun control decreases homicide rates?  Yes or no.

A    Yes.

Q    And you never specifically state that gun control decreases homicide rates; correct?

A    I wasn't asked to speak to that.

Q    Okay.  And --

A    We generally leave that in these cases to people like John Donohue and Philip Cook, who have done that primary quantitative research on the efficacy of gun control laws.  And as you know, the next witness for the defense is going to speak to that.  So, it's not my job.

Q    Do you have the exhibits there in front of you, Mr. Roth?

A    I can't see an exhibit, and the exhibits that you said you'd present, I haven't seen them.  They were never sent to me. I saw the list, but it was never sent to me.  So, I have to -- I have to respond without knowledge of some of those things, but my own --

Q    Luckily for you, it should be easy.  They're your sources.

A    Okay.  That's great.

Q    So, do you recall this paper, for instance --

MR. SULLIVAN:  I'm sorry, Counsel.  What document are you --

MR. ABBAS:  This is --

Kevin P. Carlin, RMR, CRR

168

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

THE WITNESS:  Yes.  I understand this.  I wrote this --

MR. ABBAS:  I'm sorry, Mr. Roth.  Just one moment, please.  This is State Exhibit Number 6.  Or, sorry.  Plaintiffs' Exhibit Number 6.

MR. SULLIVAN:  Thank you.

Q.    (By Mr. Abbas) So, but you recall this document, Mr. Roth?  Yes?

A    Certainly, yes.

Q    What do we have here?

A    That is the aggregate homicide rate in the United States.  The aggregate --

Q    One moment.

A    It's not just by age.

MR. SULLIVAN:  And, Counsel, can you direct me to a page?

MR. ABBAS:  The first page.

MR. SULLIVAN:  So, first page I have on Exhibit 6 does not resemble what you have.

THE COURT:  Can we -- let's give the reporter a quick break.

THE WITNESS:  I can see that this is not from the published version of the --

MR. ABBAS:  I'm sorry Mr. Roth.  One moment.

THE COURT:  We're going to declare a brief recess, and

Kevin P. Carlin, RMR, CRR

169

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

come back in about ten minutes.

(Recess at 3:41 p.m., until 3:52 p.m.)

THE COURT:  Go ahead, please.

MR. ABBAS:  Thank you, Judge.

Q.    (By Mr. Abbas) So, Mr. Roth, I'm not going to show you what I was going to show you, because we had a mixup, and I don't think it would be fair.  However, do you know what was happening with murder rates in 1934 and the next couple years after?  Yes or no.

A    We have the mortality statistics of the United States.  And at that point, what we know is that all of the states in the union as of 1933 met the requirements for being in the death registration area.  In other words, at least 90 percent of the deaths that occurred in their states were reported to the Bureau of Statistics.  So, what we do know by 1934, five, six, we have a good grasp of homicide rates across the nation.

Before 1933, we have an increasing number of states that were not involved yet in the DRA.  So, we retrodict those homicide rates of using the techniques that my colleague Doug Eckberg uses to try to figure out how to get an accurate idea of homicide rates before then, yes.

Q    Okay.  But essentially from the periods before to the period to about 1936 or later, the homicide rate was relatively steady in the United States; correct?

A    It started to drop 1934, five, six.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Q    Okay.  And then in 1968, the homicide rate in the United States after having dipped down a few years before, started increasing significantly; correct?

A    That is true.

Q    And it stayed high until the '90s; correct?

A    Until the early '90s.  And it started to drop around '94, five, six.

Q    Okay.  And it crested at about '92; correct?

A    It crested about '92, although there were spikes in '88, you know, that were very close.  '72, spikes that were very, very close.

Q    Regardless, the gun control passed in 1968 had no effect on the homicide rate; correct?

A    That is not an accurate statement, because it's not based on social scientific research.  Lots of things are driving -- I am saying that you can't say that, because you don't know if the homicide rate will have been higher without that gun control act.

Q    Let me rephrase the question.  There is no evidence that that gun control act did anything to affect the murder rate; correct?

A    I haven't studied the multicausal phenomena at the state level as to how these were [inaudible].  So, I would have to say that we don't know yet if the homicide rate would have been even worse without that act.

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

Again, what you're saying -- you're forcing us to make an experimental statement like, oh, I changed one thing when everything else is changing, and then you can say, oh, well, the other things didn't change, therefore this is nothing.  That's not the way we engage in this kind of work.

Q    Regardless, do you recall sometime in 2012 or 2013 talking at the Michael Moritz College of Law at The Ohio State University?  Yes or no.

A    Oh, absolutely.

Q    And you were discussing your recently-published book; correct?

A    Among other things.  I was asked to comment on the tragedy that happened in December of 2012.

Q    Okay.  And you admitted there that you're a self-avowed pacifist at that lecture; correct?

A    I am not sure what phrase I said.  What I said, I'm sure that I was speaking ironically, but what I'm saying is I really, really hate it when people hurt people.  And that's why I'm a criminologist.  It really upsets me when people are raped, when people are beaten, when people are murdered.  So, I was speaking loosely.  I think I was making a joke.  And, again, I hope that I can get Judge Kane the full video of that.  I tried to find the link -- hmm?

Q    We've provided it to him.

A    Okay.  Well, that's great.  So, you can see when I'm

172

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

joking, when I'm speaking off the cuff.  This was supposed to be a friendly gathering of people.  The audience, it turned out, was far more hostile than we anticipated.  And they doctored the videos on YouTube to say that I didn't say the things that I didn't say.  So, this was a really rough, rough crowd.

Q    But at that lecture, you did mention that you wish that we could all go back to muzzleloading firearms; correct?

A    I said I would love to do an experiment.  I remember that. And if I could perform one controlled experiment, I would disinvent modern breechloading firearms, force us all to have black powder weapons, muzzleloaders, and see what would happen to the homicide rate.  I don't know what would happen, but I can guess what would happen.  We would be safer.

Q    And you also stated that you wanted all repeating firearms to be treated as machine guns; correct?

A    No.  That -- I can't believe that I said something that foolish.

Q    Okay.  Well, I -- no.  Do you recall giving a talk to American History TV in 2017?  Yes or no.

A    Oh.  Yes, I do remember.  [Inaudible], yes.

Q    And in that interview, you discussed the relationship between law enforcement and criminal behavior; correct?

A    I don't remember the interview offhand.  I remember we were talking about mass murder, I think.  Is that correct?  Sort of a C-SPAN thing?

Kevin P. Carlin, RMR, CRR

173

23-cv-2563-JLK     RANDOLPH ROTH - Cross     10-26-2023

Q     It was a C-SPAN thing.

A     Okay.  C-SPAN 3 or something like that.  Yes.  Mm-hmm.

Q     Would it be something that you would do would be to --
well, do you remember discussing that criminals always find new
ways and strategies to break the law, and they always will?  Yes
or no.

A     Oh, that is absolutely true.  And it's a constant war of
wills, property crime, electronic crime.  That's absolutely
true.  So, we constantly have to adapt our laws.  We constantly
have to adapt our law enforcement strategies, because criminals
aren't stupid.  When you stop one kind of thing, something else
is going to happen.  It's a constant of human nature.  And so
that is an accurate statement.  And I will stand by it.

Q     And you also cite that during civil wars and civil unrest,
individual violence increases across the board; correct?

A     That is true.  I have demonstrated that time and again, and
so have my colleagues.

Q     And that includes robberies, murders, and other crimes;
correct?

A     And rapes, yes.  In other words, everything when law and
order breaks down, when the state cannot protect lives and
property, when you have hostile frontiers, you know, hostile
military conquests, contested frontiers, revolutions, civil
wars, terrible, but there are other kinds of political
instability that can be just as deadly and dangerous and create

174

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

such things, which I am writing about more now.

Q    Just a few moments ago, you had discussed your abhorrence to violence, and I don't disagree.  However, in this interview that you gave in American History, you also discussed how you went into your career for pacifistic reasons; correct?

A    "Pacifistic" would be a loose way of describing it if I did that.  But what I said is I was trying to figure out -- I went into this trying to figure out why some Americans were not homicidal, which is why I studied northern New England.  And I found out that their homicide rate jumped during the Civil War, just as I had -- and I didn't anticipate that when I started to study it, that they were caught up in these things too.  And so, but yes.  My hope is that we can find a way to not be as violent a society.  I plead guilty.

Q    All right.  And you also stated that you see most violence as dysfunctional; correct?

A    Oh, you know, most times, when you're angry, you kill your own; right?  In other words, you're angry at the world.  You're angry at other people, at your fellow Americans, and you kill your friends, neighbors, and acquaintances.  That's what happens so often.

Q    Once again, Mr. Roth, I'm sorry.  We're on a little bit of time -- I think we have like an hour left, and I don't even think we're going to get to the -- we're going to get back today to the Government's attorney.  So, once again, I ask that if you

Kevin P. Carlin, RMR, CRR

175

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

can just limit your answers as much as possible to the question

that I'm asking so that we can try to finish by 5:00.  And so

would that include self-defense?  Yes or no.

A    Oh, no.  I have said repeatedly that I understand why

people who live in dangerous neighborhoods and who have

dangerous occupations wish to have firearms.  I've said that

when I testified at the Ohio legislature recently under oath.  I

absolutely understand that.  And I respect the right to

self-defense.  Absolutely.  And I understand why in a violent

society many Americans are armed.

Q    And, let's see.  So, do you recall an interview for Ohio

State News in 2019, how technology shapes mass murder?

A    You know, not offhand.  I talk to a lot of media, our local

people, yes.  But refresh my memory.  I'm sure you've got it

there.  You've done your homework.  I congratulate you.

Q    So, in that, it attributes to you the language, the

founding fathers, who guaranteed the right to bear arms in an

era of muzzleloading technology, could not foresee the dangers

of semiautomatic firearms, machine guns, large-capacity

magazines, and bump stocks?

A    That is true.  I said that, and I stand by it.

Q    Even after 1868?

A    Even after 1968 -- 1868, yes.  That's true.

Q    All right.  And so you claim that those that adopted the

14th amendment would have been unable to foresee any of those

Kevin P. Carlin, RMR, CRR

176

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

firearms; correct?

A    I think that many of those firearms they could not foresee. That's true.  You know, we can't see the future.  But I respect the right of the Court, and respect the right of the Court to make a decision about 1868.  Judge Kane and his peers have the right to say what the [inaudible] date is.  As a historian -- I simply am saying as a historian, we can't foresee the future. They couldn't see the destructive power of things like dynamite, airplanes, et cetera.  They just couldn't foresee it.  And so when it became threats, you know --

Q    In your declaration, you describe mass killings of people by groups of armed men; correct?

A    Yes.  By groups of armed men, which was the way most of these mass murders were carried out through the early 1920s.

Q    And you say it's mostly a thing of the past; correct?

A    It is mostly a thing of the past.  We very rarely see dozens of people killed by a mob.

Q    Okay.  And so if someone -- someone who is facing mob violence, they would be happy to have a large-capacity magazine, wouldn't they?

A    You wouldn't necessarily need one.  And if you did have one and they had a bigger large-capacity magazine, you'd be dead anyway.  So, it's a question of firepower.  One person armed against a mob that's armed, that ends badly.  So, you know, you're suggesting that you have a mob that has no firearms with

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

it is going against a single individual with a firearm, you know, that could happen, and I would agree in that rare case, that someone --

Q    Did you see the Rooftop Koreans in 1992?  Yes or no.

A    Which one?

Q    The Rooftop Koreans in 1992?  Yes or no.

A    I am not familiar with that term, and I'm having trouble hearing it.  Could you tell me what that was?

Q    Korean business owners in LA in 1992.  Did you do a case study on them?

A    No, I did not.

Q    What happened in LA in 1992?

A    I did not do a study of that.

Q    Do you have any idea?

A    But I do know that that's the Rodney King riots is what we're talking about; right?

Q    So, mass riots in LA; correct?

A    That is right.

Q    So, would it surprise you to know that a large number of business owners actually protected their businesses and their lives with what you would term assault rifles and high-capacity magazines?  Yes or no.

A    They could have done the same with revolvers, handguns, and simple rifles.

Q    Do you own a modern firearm?  Yes or no.

Kevin P. Carlin, RMR, CRR

178

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

A     No.

          MR. SULLIVAN:  I'm going to object on relevance.

          THE COURT:  Overruled.

Q.     (By Mr. Abbas) I'm sorry.  Your answer, Mr. Roth?

A     No.  No, I do not.

Q     And you are against all semiautomatic firearms; correct?

A     No.  I understand semiautomatic handguns are legitimate, and I know that there are many semiautomatic rifles that are -- don't have rapid fire, you know, with the capacity to be a military-style weapon with a fire rate making 40 rounds per minute or more.  So, it's a -- but I have no objection to people defending themselves with nine-millimeter semiautomatic handguns.  Although an inexperienced user should be using a revolver, and not a semiautomatic handgun.

Q     So, semiautomatic firearms, though, are widely used across this nation; correct?

A     They certainly are.

Q     Both rifles and handguns?  Yes or no, sir.

A     More handguns.  More handguns than semiautomatic rifles. They are widely owned, yes.  That's true.

Q     Thank you.  And they often carry large-capacity magazines; correct?  Or what you would term large-capacity magazines?

A     Yes.  Many of the handguns have a 33-round clip, and many of the AR-15 type rifles have 30-round clips.  That's correct.

Q     And in your studies, have you studied the best ways to

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

counteract mass violence?  Yes or no.

A    I have studied motivation.  I have studied, you know, weaponry.  And you can see in statistics there are, you know, the greater the firepower that a mass shooter has in these mass shooting events, the more likely more people are to be wounded or killed.  It's simple --

Q    Once again, sir, I apologize, but we don't have a lot of time.

A    I answered your question.  I don't mean to be combative, but I answered your question.

Q    So, you have no idea what tactics police officers should employ when dealing with mass shooters, for instance; correct?

A    I know that they should do it with a [inaudible], absolutely.  Although single officers have to rush in at great risk to themselves.  They have to rush in.  Incredible bravery.  We have had those incidents in Columbus.

Q    Let's talk about your most recent publication.  The -- I apologize.  The Opioid --

A    The Opioid Epidemic and Homicide Rate.

Q    Do you recall that publication?  Yes or no.

A    Yes.  Very well.

Q    And in that publication, you discuss that the opioid epidemic has contributed to a rise in homicides; correct?

A    That is absolutely correct, yes.

Q    And we are currently at the heights of the opioid epidemic;

Kevin P. Carlin, RMR, CRR

180

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

correct?

A    It's been very bad recently.  Our data that we could get was through 2015.  We'd like to extend that study in the future.

Q    Okay.  And your publication cites approximately six overdose deaths per 1,000 people in 2016; correct?

A    Correct.

Q    And that doesn't include those killed in gang and cartel violence; correct?

A    Let's see.  You know, we're looking at all homicides. We're looking at all homicides from the national center for statistics data on the confidential compressed mortality statistics that have county identifiers.

Q    Let me rephrase the question.  So, you don't include those six deaths per 100,000 in homicide statistics; correct?

A    The deaths from opioid overdoses, no.  Those are drug deaths.

Q    So, they're drug deaths, even though the death was a direct result of somebody's unscrupulous activities; correct?

A    Oh, absolutely.  You know, the opioid epidemic is very closely related to the overprescription -- you know, geographically, overprescription of opioids at the county level. So, there's a very high correlation there.

Q    Yet we still have a opioid problem; correct?

A    Oh, we certainly do.

Q    And a gang and cartel violence problem; correct?

Kevin P. Carlin, RMR, CRR

181

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    Yes, we do.

Q    Especially if it's helping boost the murder rate in the United States; correct?

A    What we see is looking at this, yeah.

Q    Because criminals still commit crime; correct?

A    What you see, note in this, you know, higher levels of gun ownership at the county level also contribute to the higher homicide rate.  It's about poverty, it's about drugs, and it's about guns, the availability of guns that lead to these kinds of deaths.  And I know in southern -- you know, in southern Ohio, Appalachia, this isn't drug cartels.  This is one-off kind of stuff.  Yes, a lot involve drug dealers.  We're working on this.  But a lot, you know, is just random homicides.

Q    All right.  And so let's go back to the questioning that the -- I believe it was Mr. Sullivan?  That Mr. Sullivan was doing with you.  You never did a peer-reviewed study on the effectiveness of waiting periods; correct?

A    I didn't claim that I did.

Q    I understand.  I'm just going through and clarifying some things.  So, you never addressed --

A    Sure.  That's fair.

Q    -- the statistical analysis of the study that this law was based on; correct?

A    No, I have not.  I have not been asked to do that.

Q    Okay.  So, you cannot confirm that the study itself is

182

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

actually correct; right?

A    The study that I was being cited by other experts in this case?

Q    Correct.

A    I was just told about that two days ago.  So, I haven't even had time to read it, because I've been working on my own work.  Certainly I could have a professional opinion in a week or two, but I can't do it now.  And of course unless I have the data and I can [inaudible] it with my analysis, I won't know the answer.

Q    Well, they're paying you, so I will leave it up to them.

A    Okay.  But just don't -- please don't say that I was hired to do things I wasn't hired to do.

Q    I'm just clarifying some things here that they had the opportunity -- and so you teach --

A    You're doing great.

Q    -- and study statistics; correct?  Or at least you have?

A    Extensively, yes.  I'm a math guy.  That's my reputation.

Q    But that was not something that the State had hired you for; correct?

A    No.  They did not ask me to use my expertise to take a look at that stuff.

Q    And this is not an attack on you, but the peer review process within the last decade has been heavily criticized for being a rubber-stamping process; correct?

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

A    People have said that, but I have been a peer reviewer, and nothing gets rubber stamped that I see.

Q    I believe it, sir.  And like I said, it wasn't an attack on you.

A    It's important to note that I was a member of the most important editorial board in the entire field of history, the American Historical Review.

Q    So, I want to go back to some of your statistics.  If back in the day of some of the cases you had looked at, if around the turn of the century, if -- or, I guess the -- in the 1800s, if an individual defendant himself -- so, if a Black individual defended himself against a white man in the early 1800s South Carolina, would that be considered a murder or a homicide?

A    In terms of, you know, I would consider that in my own coding self-defense.

Q    Okay.

A    But how the legal process which was controlled by white supremacists would have called it, they would have called it a murder.  So, I don't follow necessarily the way that the white supremacist court would define an act of violence.

Q    Thank you.  That's what I was looking for.  And, let's see. Just one thing I want to ask you is what happens when new laws are passed -- new criminal laws are passed?  Does that create --

A    Judge Kane gets to decide whether they get to stand; right?

Q    Well, so that creates new criminals; correct?

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

A    You know, they define new laws for new kinds of criminal acts.  The law is always changing, ever-changing, defining new acts.  Whenever we think about electronic crime, when we think about internet crime, it's all new.  So, yes, the law has to adapt to changes in technology, changes in behavior, new strategies by criminals.  Absolutely.  I agree with you 100 percent.

Q    Yeah.  And so when you talk about lower homicide rates in the colonial era, there were a number of factors that were just entirely different from the world we live in today; correct?

A    Oh, certainly so.

Q    So, including population density; correct?

A    Population density doesn't really define it, because the early and mid 17th century was --

ELECTRONIC SYSTEM:  I'm sorry.  Your session is ending now.  Please hang up.

THE COURT:  What was that?

THE WITNESS:  We were told to hang up, Your Honor.

THE COURT:  Let's not do what we're told.

THE WITNESS:  Population density doesn't seem to be a driver of homicide rates.

Q.    (By Mr. Abbas) But cohesive identity does; correct?

A    Absolutely.  Cohesive identity, you know, and there's a lot of hate speech.  There's a lot of anger and frustration, political polarization, which I've written about in other

Kevin P. Carlin, RMR, CRR

185

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

avenues, yes.  You can have really intense homicide rates.

Q    And other factors; correct?

A    There are many factors that I talk about.

Q    And so when you had talked about some of the research that you had done about finding some of the murder rates in colonial America and the time period thereafter, you had talked about how you obtained the records; correct?

A    How I look at the records, yes.  Every scrap of paper.

Q    And there's a chance you missed some; correct?

A    No.

Q    Not one paper?  Everything survived since 1792?

A    Oh.  Now you're putting words in my mouth.  That's why I use capture-recapture mathematics, which helps estimate the number of records that are missing, have been lost, and also underreporting.  So, what you see is that suicides are heavily underreported.  Homicides among adults are heavily reported, and firearms accidents are somewhere in between.  The mathematics are very intelligent.  And so we don't just go from the raw data.  We use statistical methods that are well tried and use [inaudible] world to try to figure out what to do for fragmentary records.

Q    And you had talked about current reporting of murders, and a number of cities also refuse to report as well; correct?

A    A lot for the National Center of Health Statistics are just late, and they won't accept new data after 18 months for the

186

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

calendar year.  So, there's all kinds of reasons why these things happen.

Q    But in -- on another note, in your report, you do cite to Mr. Cramer a couple times; correct?

A    Oh, absolutely.

Q    And that's because --

A    I think his first book was very good.

Q    Thank you.  And if you give me one moment here.  Ah.  So, most murders that we see either tend to be well planned or spur of the moment; correct?

A    Yup.  There's stuff in between, but yeah.  We see a lot of impulsive, and we see a lot of planned, premeditated, certainly.

Q    And in fact, we also see -- well, are you familiar with current murder statistics?  Yes or no.

A    Actually, right down to 2021, I've looked at them at the national level.  I have looked at them by age distribution.  Yes.  But again, you know, just starting to work on those, and I haven't got the county level data to -- really past 2015.

Q    And have you --

A    I have to get the new -- new protocol to get those data, which I plan to do when I finish --

Q    And have you looked at the murders based on weapon?  Yes or no.

A    I do look at that.  In fact, I looked at suicide rates with the CDC WONDER just the other night, taking a look at how many

187

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

suicides were committed from the National Center of Health Statistics, which has gotten better in recent years since 1999.

Q    And there's a number of murders with blunt weapons; correct?

A    That is available on CDC WONDER.  I looked primarily to look at firearms, non-firearms, because that's what I've been asked to do recently.  But I could take a look at all of that, sure.  It's really handy.

Q    You don't even look at the other individual weapons?  You only looked at firearms, is what you're testifying here today; correct?

A    You know, the data from 2018 to 2021 are just available. I've done all that work on my own work.  I'm doing all that work in Ohio, but yeah.  If you want me to do that, I can do that.

Q    Well, let me ask you this:  You are significantly more likely to be murdered by blunt force trauma from somebody else than somebody's rifle today; correct?

A    That's because handguns are the primary way that people are killed from firearms.  And I've never, never said that people should be deprived of their rifles or shotguns, nor their handguns.  I am not antigun.

Q    Okay.  What about assault rifles?  Assault rifles are rifles, are they not?

A    They are a particular category of rifle with a muzzle velocity of 3,200 feet per second.  That don't just tear flesh.

Kevin P. Carlin, RMR, CRR

188

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

They liquefy it.  These are very dangerous weapons.  They're military weapons, and yes, the military uses them in a semiautomatic way.  They very seldom -- you're not supposed to use full automatic bursts unless in a situation of desperation.  So, these are military weapons.

Q    Are you a ballistic expert?

A    I never claimed to be a ballistics expert, but I do know about liquefying.  I know the muzzle velocity, and I know what they do to flesh.

Q    And there was a constant threat of attack in early America; correct?

A    Not in Pennsylvania.  Of Native American attack?  No.  They lived peacefully.  Rhode Island, they lived peacefully.  Maryland, up until 1675, lived peacefully with their Native American neighbors.

Q    Well, eventually, there were some wars, though; correct?

A    Oh, there's no question that there were some wars.  And I spoke about those.  The constant wars in northern New England and the effect that they had on the psychology of people and the cost of life was terrible for Native people, French, the English colonists.

Q    Wouldn't it be logical for people to keep firearms ready in their homes?

A    I said explicitly that those -- on the frontier, where it's contested, people did try to keep their firearms loaded at all

23-cv-2563-JLK     RANDOLPH ROTH - Cross     10-26-2023

times.  You know, they would have to regularly clean them.  They'd have to regularly reload them, but they were keeping them in the dryest, the warmest place to try to avoid the humidity that would damage the gun, and it would render the powder useless.

So, I've never said that nobody ever kept it load -- always kept it unloaded.  There were dangerous situations in which you would try to extend that period in which they were loaded, yes.

Q    And in your studies, you haven't specifically designed any studies to look at self-defense; correct?

A    I always look at self-defense.

Q    As an ancillary issue; correct?

A    It's a fundamental issue, and that's why every act of self-defense that I can find is coded that way in my database, and is defined that way in the case narratives which are all available online.  I take self-defense very seriously, and I recognize the common law right.  I recognize the statutory right to defend your life.

And I'm not against concealed carry today with a permitting system and training and firearms accuracy tests.  Although I know that the more concealed weapons we have, the higher the murder rate.  So, I understand why people feel the need for it.  Both the studies [inaudible] John Donohue have shown that the more guns we put out there, the more people end

190

23-cv-2563-JLK    RANDOLPH ROTH – Cross    10-26-2023

up dead.

Q    So, we're trying to get out of here before 5:00, so I apologize, but I'm going -- and I'm going back to address some of the things that the Government has elicited from your testimony.  But during the Civil War, do you recall something called the Minié ball?  Or Minié ball?

A    Yeah.

Q    What was that?

A    It's a very deadly small projectile, yes.

Q    Okay.  And it was a technology used to make muzzleloading rifles more accurate; correct?

A    There was an effort for that, so it would fit more tightly into the barrel, right.  So, a smoothbore weapon would not -- you know, it wouldn't rattle around.  That's what the Minié ball was designed to do.

Q    And, let's see.

A    So, it would perform more like a muzzleloading rifle.

Q    So, when the Government hired you today, they didn't hire you to find historically analogous law to their waiting period law; correct?

A    No.  They hired me to show that it wouldn't have crossed the minds of the founders to pass such a law.

Q    And yet you don't specifically state that in your opinion, do you?

A    I was asked to state it, and it's a corollary of my

Kevin P. Carlin, RMR, CRR

191

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

opinion.  Yes.  You can see it from the data there.

Q    And in your book, you attribute homicide mostly to feelings people have towards their government, the degree to which people identify with their communities, and the opportunities they have to earn respect without resorting to violence; correct?

A    That is absolutely correct.  That's the fundamental reason -- drivers of homicide.

Q    And when you were looking at your homicide figures, have you looked at any -- or how many homicides are a result of or a direct result of intoxication?  Yes or no.

A    Oh, absolutely.  And I take a look at -- everything is coded.  But very often, you don't know from the sources whether people are inebriated.  So, I can say that when I see evidence of intoxication is there, but you don't always see.  But the fact that there is no testimony about intoxication does not necessarily mean that they weren't under the influence of alcohol.

Q    And throughout your life, you've studied what interests you; correct?

A    I have studied pressing social issues of our time.  And as those new issues come about, I try as a scholar to address them. That's why I ended up teaching African American history, why I teach about race, why I teach about global history today, threats to democracy around the world.  I respond to reality. It's not just something that I do for my own amusement.

Kevin P. Carlin, RMR, CRR

192

23-cv-2563-JLK   RANDOLPH ROTH - Cross   10-26-2023

Q   So, have you studied how guns save lives?  Yes or no.

A   Oh, certainly.  There are cases in which that happens, and I don't deny that.

Q   And they're relatively frequent; correct?

A   No.  They're not relatively frequent.  That -- the studies overstate that.  But the fact is there are defensive gun uses. There are -- and I think Philip Cook has done a very good job of talking about the level of that.  It's the best work out there.

Q   So, the CDC also did their own independent studies of firearms used for self-defense; correct?

A   I haven't read that.

Q   So, it would surprise you to learn that they did similar studies between 1994 and 1997?

A   I'm not familiar with those, no.  Because at that time, I was working on the 19th and 18th and 17th centuries, intensively.

MR. ABBAS:  One moment, Mr. Roth.

THE WITNESS:  Judge Kane, may I ask you a question?

THE COURT:  Yes.

THE WITNESS:  I know we were talking about coming back on Monday, and we're going to be on the road.  We have to go back home.

THE COURT:  I don't think you'll have to.  I think he's almost through, and the redirect isn't going to take much. You will be through today.

Kevin P. Carlin, RMR, CRR

193

23-cv-2563-JLK    RANDOLPH ROTH - Cross    10-26-2023

THE WITNESS:  Oh.  Thank you.  That's merciful.

THE COURT:  Sorry to have you worried about that.  Go ahead.

MR. ABBAS:  I will conclude now, Your Honor.

THE COURT:  All right.  See, you're through with cross examination.  Now we will have redirect.

MR. SULLIVAN:  Your Honor, I don't have any redirect.

THE COURT:  There is no redirect.  You are finished with your testimony, sir.  And you may travel as you wish, because you're excused from further proceedings in this case.  Thank you very much for your time.

THE WITNESS:  Thank you, Judge Kane, and thank you to the plaintiff.  You asked excellent questions.  And to the defense.  Thank you so much.

THE COURT:  Thank you all.  I think it's probably too late to start the next one.

MR. KOTLARCZYK:  I think that's right, Your Honor.

THE COURT:  All right.  Let's be here at 9:30 on Monday morning.

MR. KOTLARCZYK:  Very good, Your Honor.  Thank you.

(Proceedings concluded at 4:35 p.m.)

Kevin P. Carlin, RMR, CRR

194

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 8th day of November, 2023.

_____
Kevin P. Carlin, RMR, CRR
Official Court Reporter

Kevin P. Carlin, RMR, CRR