195

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-2563-JLK

ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

        Plaintiffs,

        vs.

JARED S. POLIS,

        Defendant.

---------------------------------------------------------------

REPORTER'S TRANSCRIPT

Preliminary Injunction Hearing, Vol. 2

---------------------------------------------------------------

        Proceedings before the HONORABLE JOHN L. KANE, Judge, United States District Court for the District of Colorado, commencing on the 30th day of October, 2023, in Courtroom A802, United States Courthouse, Denver, Colorado.


                        APPEARANCES
For the Plaintiffs:
D. SEAN NATION, Mountain States Legal Foundation, 2596 South Lewis Way, Lakewood, CO 80227



For the Defendant:
MICHAEL T. KOTLARCZYK and MATTHEW J. WORTHINGTON, Colorado Attorney General's Office, 1300 Broadway, Denver, CO 80203




Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358


Proceedings reported by mechanical stenography; transcription produced via computer.

196

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

I N D E X

DEFENDANT'S WITNESSES                                            PAGE

CHRISTOPHER POLIQUIN
     Direct Examination By Mr. Worthington . . . . . . .197
     Cross Examination By Mr. Nation . . . . . . . . . .214


Closing Argument by Mr. Nation . . . . . . . . . . . . .221

Closing Argument by Mr. Kotlarczyk . . . . . . . . . . .224

Rebuttal Argument by Mr. Nation . . . . . . . . . . . . .235

Reporter's Certificate . . . . . . . . . . . . . . . . .239

197

23-cv-2563-JLK    CHRISTOPHER POLIQUIN – Direct    10-30-2023

P R O C E E D I N G S

(Proceedings commenced at 9:33 a.m.)

THE COURT:  Next witness, please?

MR. WORTHINGTON:  Good morning, Your Honor.  Matthew Worthington on behalf of the defendant.  We would like to call Professor Christopher Poliquin.

THE COURT:  Sir, you're going to be sworn in by the courtroom deputy.  I think if you -- can you see her now?

THE WITNESS:  I can.  Thank you.

THE COURT:  All right.  Go ahead, please.

(The Witness is Sworn)

THE COURTROOM DEPUTY:  Please state your full name for the record, and spell your last name.

THE WITNESS:  My full name is Christopher William Poliquin.  My last name is spelled P-O-L-I-Q-U-I-N.

THE COURT:  Can you turn down the volume a bit, please.  Go ahead, please.

**DIRECT EXAMINATION**

BY MR. WORTHINGTON

Q    Good morning, Professor Poliquin.  Can you please describe your educational background.

A    Yes.  So, I am currently an assistant professor at UCLA. And before that I received a doctorate in business administration from the Harvard Business School.  And then before that, I did my undergraduate degree at the University of

Kevin P. Carlin, RMR, CRR

198

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

Pennsylvania.

Q    And what are your primary areas of research?

A    My primary areas of research are really on the topics of business and public policy.  I have one stream of research that focuses on gun control and the political economy of gun policy.  And then I have other kind of strings of research that are more oriented towards business, where I largely study human capital organizations.

Q    And have you published any -- have any of your -- have you published any research articles?

A    Yes.  Several.  So, on the topics of gun control and gun policy, I have published two peer-reviewed papers, one on the effects of waiting period policies on gun violence, and another that is on basically how state legislatures change gun policy following mass shootings.

Q    And do you have experience in performing quantitative research?

A    Yes.  Almost all of my research is empirical, quantitative work.

Q    And do you have experience in designing quantitative research studies?

A    Yes.  Most of my educational kind of background in terms of empirics relates to the design and execution of quantitative studies.

Q    And where did you learn how to perform those empiric

Kevin P. Carlin, RMR, CRR

199

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

studies?

A    So, during graduate school while I was doing my doctorate, I completed course work at Harvard in econometrics, which is basically what economists call statistics, and took other classes in economics.  Specifically labor economics, industrial organization.  And those fields are kind of heavily quantitative and heavily empirical, so a good portion of those classes also deal with the design of quantitative studies.

Q    And you may have answered this, but do you have experience in performing statistical analyses?

A    Yes.  Almost -- as I mentioned, all of my research basically deals with kind of statistical empirical studies.

Q    Do you have experience in performing statistical analyses on public policy?

A    Yes.  So, one of the papers that I published that is Exhibit 2 is an analysis of handgun waiting periods.  So, you know, that is an example of a public policy that I have kind of analyzed using quantitative methods.

Q    Okay.  And, Professor Poliquin, I would like to actually just start with the document that was previously admitted as Exhibit 32.  Do you have that document in front of you?

A    Yes.  That would be my CV.

Q    Okay.  Is this -- this is a true and correct copy of your CV?

A    It is, yes.

Kevin P. Carlin, RMR, CRR

200

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

Q    And then I'd like to turn to the exhibit that was marked as -- or previously admitted as Exhibit 22.

A    Yes.

Q    And do you have that in front of you?

A    I do.  This is my published paper on handgun waiting periods.

Q    And then I'd like to also turn you to Exhibit -- what's been admitted as Exhibit 33.  Do you have that in front of you?

A    I do, yes.  This would be the appendix to the published paper on handgun waiting periods.

Q    So, going back to Exhibit 22, your paper, where was this paper published?

A    This paper was published in the proceedings of the National Academy of Sciences.

Q    And was this paper subject to peer review?

A    It was, yes.

Q    Professor Poliquin, have you ever testified as an expert witness in a legal case before?

A    No, I have not.

Q    Have you ever been offered as an expert witness where the Court refused to accept you as an expert?

A    No.

Q    So, Professor Poliquin, I'd like to talk to you about your research study at Exhibit 22, and can you begin just generally telling me what research you studied in this paper?

Kevin P. Carlin, RMR, CRR

201

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

A    Yeah.  Absolutely.  So, this is a analysis of how handgun waiting period policies affect gun violence, specifically gun homicides and gun suicides.  And kind of what we do with this paper is we take 45 years of data from 1970 to 2014 across all 50 states and the District of Columbia, and we analyze how changes in waiting period policies that impose a delay between the purchase and receipt of a handgun affect outcomes of interests related to gun violence, gun homicides, and gun suicides.

Q    All right.  I think you answered a couple of my questions.  Did your study find any relationship between waiting period laws and gun homicides?

A    We do.  So, we find that basically, imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides.  The result for homicides, that 17 percent reduction in gun homicides turns out to be kind of statistically significant across a range of models and time periods in the paper.  The 7 to 11 percent reduction in gun suicides is statistically significant in some models, and insignificant in other models.

Q    And would you describe that impact -- was your study evaluating a correlation or a causation of these policies?

A    Our study aims to provide causal estimates.  So, what that just means is we aim to kind of go beyond sort of correlational analysis and provide evidence on the causal impact of waiting

Kevin P. Carlin, RMR, CRR

202

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

periods.  So, can we attribute a decline in gun violence to a waiting period policy?

Q    And I think you mentioned you found that there was a 17 percent reduction in gun homicides when a waiting period was imposed?

A    Yes.  That's right.

Q    In terms of the number -- can you provide an estimate of like the number of annual homicides in a state that would amount to?

A    Yeah.  So, for a state with kind of a sort of average number of gun deaths, that would basically result in about 36 fewer gun homicides per year.  And that's per state that has these policies.

So, we think that if you kind of look at the sort of states -- all of the states that have waiting periods, collectively, we think those states avoid, you know, maybe about 750 gun homicides a year thanks to their waiting period policies.

Q    All right.  Professor Poliquin, what -- I wanted to talk a little bit about the methodology of your study.  Can you please describe the framework you used to compare waiting periods and gun deaths.

A    Yes.  So, the methodology we use in this study is commonly referred to as difference-in-differences.  And what that means is we look longitudinally over time within states that implement

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

waiting period policies, and we look at how gun violence changes in these states pre and post waiting period policy.  And we compare those changes in the states that are adopting waiting periods to the same changes, the same difference between pre-post in the states that did not adopt waiting period policies.

So, you're basically comparing changes in gun violence over time in states that do adopt waiting periods to a control group of states that did not adopt waiting periods.

Q    So, as part of your study, you also looked at states that did not adopt a waiting period?

A    Absolutely.  So, those states are critical for providing essentially what researchers would call counterfactual.  So, we use these states that did not adopt waiting period policies to essentially assess how gun violence would have changed in states that did adopt waiting periods absent the waiting period; right?  So, it's sort of a way of saying, hey, what would have happened in these states that enacted waiting periods if they hadn't done so?  And that's the importance of looking at that control group.

Q    And is a difference-in-difference framework commonly used in your field?

A    It is.  It's probably the most -- it's probably the most or certainly among kind of the top two or three methodologies that are used in economics to assess the impacts of public policies.  Sort of the reason being that, you know, we cannot kind of

204

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

randomize which states have which policies, and so we need kind of methods like this, these difference-in-differences methods to assess the causal impact of the policies.

Q    All right.  And as part of your study, did you rule out any other variables that could have been impacting homicide rates?

A    Indeed we did.  So, we control in several of our models for demographic social factors that prior studies suggest may be related to trends in gun violence.  And so that includes things like alcohol consumption, poverty rates, median income, the percentage of the population that lives in urban areas, the percentage of the population that is Black, and then seven different age groups, you know, from kind of different bands of age, the percentage of the population that is in those age bands.

And what we find is that after controlling for and adjusting for all of these demographic variables that have been used in prior research, that we still find statistically significant reductions in gun homicide thanks to these waiting period policies.

Q    All right.  Professor Poliquin, if we can look at page three of Exhibit 22, your study.  There's a table two at the bottom of the page.  Do you see that?

A    Yes.

Q    Can you explain to me what information is being displayed in table two.

205

23-cv-2563-JLK   CHRISTOPHER POLIQUIN - Direct   10-30-2023

A     Yes.  So, each of these numbers in table two is an estimate of the effect, basically, of the policy that's on that -- in that first column on a specific outcome.  So, if we look at, say, the part of that table that says gun homicide, we see under that there's two policies.  There's the waiting period, and then there's the background check.

And then, again, these numbers, each of these columns with numbers corresponds to a different model that we estimated, and the number tells you essentially what the -- roughly what the percentage reduction is in that outcome for that policy.

So, for a waiting period, we see in column three, for example, about a -- it ends up being kind of roughly an 18 percent reduction in gun homicides.  The reason we say 17 percent reduction in the paper is that you need to make some adjustments to the estimates for the precision of the estimate, but you can think of these numbers as kind of roughly the percentage reduction in gun violence thanks to these policies for each outcome.

Q     And for table two, what time period is covered by table two?

A     This would be the period 1990 to 1998, which is one of the periods of interest in our paper, because it's a period of time corresponding to implementation -- enactment and implementation of the Brady handgun bill.

Q     And why did you look at that period specifically?

Kevin P. Carlin, RMR, CRR

206

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

A    Yeah.  So, we look at kind of two periods in broad periods in the paper.  One, 1970 kind of onward, and then we specifically zoom in on this Brady period, when the Brady handgun bill was enacted, because that bill, it's very -- it's an interesting bill, because what congress did was they imposed a background check requirement for dealer firearms sales.  And in order to make -- to give states time to implement the background checks, they imposed a five-day waiting period, because we did not have an instant computerized background check system in the early 1990s.

And so what happened was you basically had a bunch of states, 19 states, in fact, in the early '90s that the federal government just imposed waiting periods on them, whether they wanted them or not.  And so we can kind of use this Brady period as a natural experiment, where almost half of states got waiting periods, even if they kind of didn't want them and then basically all of the other states already had waiting periods, and so we wouldn't expect kind of any changes from the federal waiting period policy in those states.

And so what we can do is we can compare how violence changed in those states that the federal government imposed waiting periods on.  We can kind of compare how violence changed in those states to how violence changed in the states that long had -- already had waiting periods, and we can assess using this kind of quasi-natural experiment what the impact of the waiting

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

period was on violence.

And what we find is that very similar to the results using our full sample period, there's about a 17 percent reduction in gun homicides, and about a seven percent reduction in gun suicides during this Brady period.

Q    All right.  Professor Poliquin, I'd like to go to -- back to Exhibit 33.  And if we look at the second page of Exhibit 33 near the top, there's a chart with state abbreviations.  Do you see that?

A    Yes.

Q    Can you explain to me what's being displayed in this graphic.

A    Yeah.  So, what we're doing in this graphic is we are essentially taking our statistical models, and we're reestimating them after eliminating each state from our data set.  And then we are plotting here the effect of the waiting period policy for gun homicides and gun suicides after you remove -- you delete each state from the data set.  And then these vertical bars are giving you kind of an estimate of the uncertainty in our estimates.

And the reason to kind of do this is to make sure that the results that we're finding in the main study are not driven by, you know, one state; right?  Or maybe like one large state that is kind of dominating the data.  And so we drop each state individually, and what we show is that, you know, when you do

208

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

that, you get very, very similar estimates, even after eliminating each state sequentially.

Q    And I'd like to look at -- it says page five of Exhibit 33. And it's the chart at the -- table S5, the chart at the bottom of the page.  Do you see that?

A    Yes.

Q    Can you explain to me what information is being displayed in this chart.

A    Yes.  So, this is a table that modifies our main statistical model to instead of just saying, you know, what is the impact of the waiting period, kind of post -- all post waiting period years, estimate the impact of the waiting period policy in each year following the policy, but also estimate what the difference is -- was in gun violence between states with waiting periods and not waiting periods prior to implementation of the policy.

And the reason to do that is because you want to know, you know, is it the case that these states that have waiting periods, you know, they were already kind of seeing lower homicide or lower suicide rates even before they -- the waiting period took effect?  And what we see in this chart is that the estimates for the kind of quote/unquote effect of the waiting period policy prior to its enactment are not statistically significant.

So, prior to enactment of the waiting period policy,

Kevin P. Carlin, RMR, CRR

209

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

there's no statistically significant difference between states with and without waiting periods. And then what we see is that it's only after states enact these waiting period policies in the year, two years, three years after implementation of these policies that we see the reductions in gun homicides and gun suicides.

Q    All right. And if we turn to page six, just the next page, in Exhibit 33, there's table S6. Do you see that table?

A    Yes.

Q    Can you explain to me what the purpose of this table is.

A    Yeah. So, the purpose of this table is that when states enact a gun policy like a waiting period, sometimes there are other gun policies that are changing at the same time as part of the same law.

And so one of the things that we're doing here is we are basically controlling for the implementation of other gun policies in addition to the waiting period and background check policies.

And what we find is that if we do that, we continue to find statistically significant reductions in gun homicide and gun suicide in response to the waiting period policy. And so even after adjusting for other gun policies that these states have.

Q    All right. Switching gears a little bit, Professor Poliquin, did you have an opportunity to look at the declaration

Kevin P. Carlin, RMR, CRR

210

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

of Professor Clayton Cramer before today's hearing?

A    I did, yes.

Q    And specifically, that's previously been admitted as Exhibit 4.  Do you have that document in front of you?

A    I do, yes.

Q    Give me one second.  And did you have an opportunity to review Professor Cramer's analysis starting on page 54 of the declaration?

A    I did, yes.

Q    And did you form any opinions based on reviewing that -- Professor Cramer's declaration?

A    I did, yeah.

Q    And what is your reaction to Professor Cramer's analysis?

A    So, the kind of analysis that Professor Cramer undertakes to assess the impact of a waiting period policy cannot be used to draw causal inferences about the effects of that policy.

And there's sort of several reasons for that.  One of the big and first problems with this analysis is that it's purely correlational.  So, in order to assess how a waiting period causally affects gun violence, we need to construct a counterfactual for what gun violence would look like absent the waiting period policy.

Professor Cramer's analysis can't do this, because he only uses data on California, one state with a waiting period.  And so he has no control group or kind of no model --

Kevin P. Carlin, RMR, CRR

211

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

statistical model that allows him to construct a counterfactual for what gun violence would have looked like in California absent the waiting period policy.

Another sort of major shortcoming with this analysis is that California has a waiting period for handgun purchases at all periods in his analysis.  So, if we look at his figure on page 57, we see that there's actually no time in his data set in which California did not have a waiting period.  And the reason that's potentially problematic, especially for the question at issue here in this case, is that the duration of a waiting period might be much less important than whether a state has a waiting period or doesn't have a waiting period.

And because Professor Cramer has kind of no variation of that kind in his data, he really has no basis for estimating the effects of a state going from no waiting period to implementing a waiting period.

Q    All right.  And in your opinion, did Professor Cramer use a reliable methodology to evaluate the effectiveness of waiting periods?

A    No.  And so, you know, one of kind of the major shortcomings here is that sort of what Professor Cramer says is that, you know, if -- if gun violence kind of increases after you increase the length of a waiting period; right?  It must be the case that the waiting period was ineffective.  But we don't actually -- we don't know what murder rates would have been

Kevin P. Carlin, RMR, CRR

212

23-cv-2563-JLK   CHRISTOPHER POLIQUIN - Direct   10-30-2023

absent implementation of that waiting period policy.

And you cannot just say from a positive correlation that something was causal.  You know, likewise, you can't say that something is kind of noncausal just because of a correlation.  In fact, whether two things are positively correlated, negatively correlated, or not correlated at all need not have any particular relationship to whether there is a causal effect of one variable on another variable.

Q   Professor Poliquin, I would like to now move to Exhibit 21, the document that was previously admitted as Exhibit 21.  Do you have that in front of you?

A   I do, yes.  This is the house bill that was enacted.

Q   And do you understand that this bill created a three-day waiting period for firearm purchases in Colorado?

A   Yes.  Indeed it will.

Q   And I'd like to look at -- it's paragraph F under the legislative declaration.  It's on the second page.

A   Yes.

Q   Do you see paragraph F?

A   I do, yes.

Q   Would you be able to read it?

A   Yeah.  It says one study estimates that mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm.  The study also suggests that delaying the purchase of firearms by a few days reduces firearm homicides

Kevin P. Carlin, RMR, CRR

213

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

by approximately 17 percent.

Q    And were those the results of your research study?

A    They were exactly the results of my study.

Q    And were you aware that the Colorado General Assembly referenced your study in the legislative declaration of House Bill 23-1219?

A    I was aware that the legislature as they were considering this bill was aware of my study, because several reporters contacted me for comment while this bill was pending.  I was not aware that the results of the study made it specifically into the legislative declaration.

Q    And based on your research and your opinion, will Colorado's adoption of a three-day waiting period result in a reduction of gun homicide deaths in Colorado?

A    It will, yes.  Based on my study, I would predict a reduction in gun homicides in Colorado.

Q    And based on your study, would you predict a reduction in gun-related suicide deaths in Colorado?

A    I would.  I would expect a reduction in gun-related suicides, although I'm slightly less confident in that prediction based on the results of my study.

Q    Okay.  And based on your study, did waiting periods have any impact on -- did they have any impact on increasing non-gun-related homicides?

A    No.  So, when we look at non-gun homicides in our study, we

Kevin P. Carlin, RMR, CRR

214

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Cross    10-30-2023

find no statistically significant effects on non-gun homicide.

MR. WORTHINGTON:  Give me one second.

Q.    (By Mr. Worthington) Professor Poliquin, previously you discussed some results on your -- some results in your study as it related to suicide deaths were insignificant.  Do you recall that?

A    Yes, I do.

Q    Can you explain what you mean by "insignificant."

A    Yeah.  So, whether an effect is statistically significant or insignificant is just a way of saying whether no effect, zero, is consistent with the data.

MR. WORTHINGTON:  All right.  Thank you.

THE WITNESS:  Thank you.

**CROSS EXAMINATION**

BY MR. NATION

Q    Good morning, Professor Poliquin.  My name is Sean Nation, Mountain State Legal Foundation.  You're not offering any opinions on whether there are historical analogs to waiting periods, are you?

A    No.  At least not before 1970.

Q    And you're not offering any opinion on the history or tradition of waiting periods with respect to the Second amendment?

A    No.

Q    You're only here to testify about the effects of the law;

Kevin P. Carlin, RMR, CRR

215

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Cross    10-30-2023

is that correct?

A    Correct.  Yeah.  Since 1970.

Q    And are you familiar with the Supreme Court's decision in *Bruen*?

A    Vaguely familiar, yes.

Q    Okay.  And do you have an opinion as to whether it's appropriate to consider the effects of the law in light of the Supreme Court's decision in *Bruen*?

A    I can't speak to that.  I don't have a law degree, and wouldn't speak to that, no.

Q    Okay.  So, turning to your study, you're considering all homicides, regardless of effect; is that correct?

A    We break it down by all homicides, gun homicides, and non-gun homicides.  We look at all three.

Q    But you don't separate out justifiable homicides; is that correct?

A    We do not, no.

Q    And do you measure the effect of either background checks or waiting periods on other crimes, such as, you know, rape or aggravated assault?

A    No.

Q    And with respect to your control variables, do you control for the overall crime rate?

A    We do not, no.

Q    And/or incarceration rates?

Kevin P. Carlin, RMR, CRR

216

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Cross    10-30-2023

A    No, we do not.

Q    Do you control for policing, number of police officers in a given area?

A    We do not -- to the extent that that changes over time within the state, no, we do not control for that.

Q    Looking at your table one, scenario two, for non-gun homicide, does that indicate a statistically significant increase in non-gun homicides with relation to background checks?

A    It does, yes.  That .153 coefficient, yes.  That's statistically significant.

Q    And for all suicides, it would indicate that background checks increase suicides by 11.3 percent?

A    Roughly 11.3 percent, yes.  That result is not statistically significant at conventional levels, but it's sort of marginally statistically significant.

Q    And at the bottom line, background checks would increase non-gun suicides by 19.9 percent.  Is that at a statistically significant level?  Correct?

A    Roughly 19 percent, yes.

Q    How does that make any sense, that a background check would increase all suicides and non-gun suicides?

A    So, you know, one thing that I would say about the coefficients on the background check, and it relates to something I said earlier, is that when you analyze a policy like

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    CHRISTOPHER POLIQUIN – Cross    10-30-2023

this, you sort of want to, you know, attempt to figure out how gun violence, you know, might have been trending differently prior to implementation of the policy.  Because if states are on different trends, time trends with respect to violence prior to implementation of the policy, then what's happening in states that do not implement the policy is not a good basis for constructing a counterfactual for what's happening in states that do implement the policy.

And so one of the things that we do in the appendix, Exhibit 33, for waiting periods, we look at whether there's evidence of differences in trends prior to implementation of the waiting period policy.  And we find that there is no evidence of different trends for the waiting period policy.  We do not look at whether there are differences in trends for the background check policy.

And so one potential interpretation of what's happening here is that potentially states were on different trends with respect to background checks and with respect to violence around the times of implementing background checks.  And indeed, there is some evidence for that in table S4 of Exhibit 33, where we add state-specific time trends to our analysis.  And once we account for these differences in trends, we see that the background check effects that you just described completely vanish, and are no longer statistically significant.

Q    So, if I understand you correctly, none of your studies

218

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Cross    10-30-2023

show any statistically significant benefit to background checks, then?

A    Correct.  My study does not find any effects of background checks sort of on gun violence.  That's right.  I would say my study, and there's actually some other studies with similar conclusions.

Q    Are you familiar with any story or news article where a person purchases a gun, passes a background check, and uses it for violence within three days?

A    Ooh.  There have been a couple mass shootings that are of that type.  I would have to kind of go back into some -- you know, for another paper of mine and get you details on that. It's rare among mass shootings, for sure.  It's very rare. There are a couple instances on it.

Q    You mentioned the Brady period.  Are you aware that the Brady bill was ruled to be -- was held to be unconstitutional?

A    That would be *Printz v. United States*, I believe.

Q    Yes.

A    Yeah.  Aspects of it, yeah.

Q    Do you have any opinion as to the constitutionality of a three-day waiting period?

A    I don't.  My understanding, though, is that the unconstitutionality of parts of the Brady bill in *Printz v. United States* had nothing to do with the fact that it implemented a waiting period, but I could be wrong on that.

Kevin P. Carlin, RMR, CRR

219

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Cross    10-30-2023

Q    And did your study focus on -- your study focused on handguns; is that correct?

A    Correct.  Yeah.  We looked at handgun waiting periods.

Q    And are you -- do you have an opinion as to whether a waiting period with effect to long guns would have any effect whatsoever?

A    I don't have -- no.  I don't have any opinions on that based on my study.

Q    And do you have any opinions as to the rate of violence used by either rifles or shotguns?

A    I'm familiar with Department of Justice statistics showing that roughly 70 to 80 percent of homicides are committed with handguns.

Q    And are you familiar with the ATF statistics from time -- purchase to time-to-crime in the State of Colorado?

A    Those would be the gun trace statistics.  Yeah.  I'm somewhat familiar with those.

Q    And would you disagree with the ATF that the time-to-trace statistics is over six years between acquisition and time-to-trace?

A    There's a large distribution of time-to-crime for recovered guns.  So, you know, my understanding is that there are 10 to 20 percent of traced guns are actually -- the time-to-crime is less than three months.

        The other thing is we cannot use ATF's trace statistics

Kevin P. Carlin, RMR, CRR

220

23-cv-2563-JLK   CHRISTOPHER POLIQUIN - Cross   10-30-2023

to draw inferences about the population of firearms that are used in crime or even the population of firearms that are recovered at crime scenes.  So, this is something the ATF itself says about time-to-crime and gun trace statistics, that they should not be used to make inferences about the population of guns used in crime.

Q    But you don't disagree that the trace statistics put it at six -- roughly six and a half years from the ATF?

A    Put what at six and a half years?  The average?

Q    Yes.  The time-to-crime -- or the time-to-trace.

A    The average time-to-crime conditional on having a trace return a time, presumably.

Q    Yes.

A    Yeah.  I actually don't know what the average is, so I don't have any opinion on that.

MR. NATION:  Okay.  Nothing further, Your Honor.

THE COURT:  Thank you.  Redirect?

MR. WORTHINGTON:  Nothing further, Your Honor.

THE COURT:  All right.  Professor, you should be advised that before you testified, I made a ruling that the experts testifying in this case were qualified as experts, and so you may amend your resumé henceforth to say that you have been qualified and testified as an expert in a federal case.

THE WITNESS:  Thank you for that.

THE COURT:  Thank you.  All right.  You're excused.

Kevin P. Carlin, RMR, CRR

221

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

Next, please?

MR. KOTLARCZYK:  That concludes our witness testimony, Your Honor.

THE COURT:  Okay.  Do we want to have closings?  You want to take a recess and get your thoughts together a little bit, and then we will come back with that?

MR. KOTLARCZYK:  That would be great, Your Honor. Thank you.

THE COURT:  Okay.  Let's take a recess.  Let me know. About 20 minutes, I think would do it.

(Recess at 10:15 a.m., until 10:43 a.m.)

THE COURT:  I'd like to hear from the plaintiffs first, and then from the defense, and then plaintiffs can have a final say.

MR. NATION:  Thank you, Your Honor.  Sean Nation for the plaintiffs, Alicia Garcia and Rocky Mountain Gun Owners. The evidence has clearly established that they are part of the people that the Second amendment is designed to protect.  They are law abiding individuals who frequently purchase firearms. They passed background checks.  Rocky Mountain Gun Owners members frequently purchase firearms, and again, pass background checks.

We are not challenging any time it takes for a background check to be completed, whether that's 20 minutes or two or three days.  You know, federal firearms licensees have

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

that in place to make sure that the people to whom they are selling are not prohibited purchasers.

The waiting period is clearly a firearms regulation that implicates *Bruen*'s step one.  It's not simply a commercial regulation.  As Chief Judge Brimmer ruled in the first RMGO case that we cite in our brief, the Court agrees with the individual plaintiffs that the Second amendment includes the right to acquire firearms.  That was the case that enjoined the State's law against long arms for 18- to 21-year-olds.

This case -- this regulation, this waiting period is not presumptively constitutional under *Bruen*.  It is clearly implicated in the right of the Second amendment.

The text of the waiting period also implicates the plain text of the Second amendment.  Unlike what the defendants argue, this is not an issue of immediate access.  The background check may take time and may ultimately reveal that a person is a prohibited possessor, and we think that's a good thing.  It is simply, though, that the arbitrary three-day waiting period is not -- is not consistent with the history of tradition of firearms regulations in this country.  That is *Bruen* step two.

The closest the State comes is possessing while intoxicated, but that's not the same as an arbitrary waiting period for everyone.  In fact, the evidence shows that the first waiting period was in 1923 that applied to concealable arms only in California, and only for one day.  And that is far too late

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

to be consistent with the history of firearms regulations at the time of the founding, at the time -- or at the time the 14th amendment was passed.

The State's main evidence is means and testing, that it's a good policy. And it may be a good policy, but not every good policy is constitutional, and not every bad policy is unconstitutional. In this case, the only evidence the State puts forward is the effectiveness of a three-day waiting period, and even that is questionable given the study's other findings.

The Supreme Court in *Bruen* instructs that the effects of the law are not to be considered. That's both in terms of its constitutionality, and I would say the natural implication is when you're balancing the equities that is also -- the means-end of the policy, the effectiveness of the policy is not to be considered.

The factors for an injunction are the likelihood of success on the merits, which we believe we have demonstrated that this law is clearly unconstitutional, that it irreparably -- it ends in irreparable harm, and any deprivation of rights is -- any deprivation of any constitutional rights fits that bill. That's the Tenth amendment -- or, excuse me, the Tenth Circuit decision in the *Free the Nipple* case in 2019.

And finally, the last two factors, when the Government is the opposing party, they merge, the balance of the equities and the public interest. That's the *Nken v. Holder* case from

224

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

the Supreme Court.

The protection of the constitutional rights against government infringement is always in the public interest. That's the Tenth Circuit's command in the 2012 case of *Awad v. Ziriax.*

So, for those reasons, Your Honor, we suggest that Your Honor issue an order enjoining the law, and have that take immediate effect.  Thank you.

THE COURT:  Thank you.  Go ahead, please.

MR. KOTLARCZYK:  Thank you, Your Honor.  May it please the Court, Michael Kotlarczyk on behalf of Governor Polis. After over a day of evidence, the plaintiffs have not met their burden justifying the extraordinary remedy they are asking for from this Court, enjoining Colorado's new waiting period law on the basis of a preliminary record.

And I'd like to start more or less where the plaintiffs left off, which is to discuss the standard that the Court has to apply in determining whether plaintiffs are entitled to preliminary injunction.  The primary purpose of a preliminary injunction is to preserve the status quo until the Court can reach a final decision on the merits.

The plaintiffs have not in their papers or here today denied that they are seeking to disrupt the status quo, which makes this a disfavored preliminary injunction.  And the Tenth Circuit has said that when a plaintiff is seeking a disfavored

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

preliminary injunction, not only do they have to meet all the regular criteria of a preliminary injunction, including likelihood of success, irreparable harm, and the public interest slash balance of equities, they have to make a strong showing on the likelihood of success and the balance of the harms categories. That's the *Fish* case, Your Honor, among others.

The plaintiffs can't meet their burden under any of these factors, and importantly, they have to make their showing on all these factors. And they especially can't do so under the heightened burden that applies here.

I'd like to touch on three -- on each of the three factors briefly this morning, Your Honor, starting with the likelihood of success. Now, the likelihood of success, we agree this is a *Bruen* analysis, which is a two-step analysis. And we start at step one by looking at the plain text of the Second amendment and asking, does the individual's conduct here come within the plain text of the Second amendment? And for two reasons, Your Honor, it does not.

First is the presumptively lawful category that continues to apply to gun regulations. Six Justices in the *Bruen* decision recognized that this category, which was first articulated in *Heller*, continues to have viability. And the Tenth Circuit just last month relied on this category in upholding the ban on felons in possession in the *Vincent* case.

Relevant here, this category includes, quote,

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

conditions and qualifications on the commercial sale of arms. And that's exactly what HB 23-1219, the waiting period law is. It only regulates sellers. And in fact we know this because as the Court is aware, this isn't the first lawsuit these plaintiffs have brought against the waiting period law. In an earlier case that was in front of Judge Brimmer, Judge Brimmer denied the preliminary injunction because that was a preenforcement challenge, and in the preenforcement standing context found that they did not have standing to bring the challenge, because there was no credible threat of enforcement against the plaintiffs.

Why was there no credible threat of enforcement against the plaintiffs? Because none of them were sellers of firearms. So, we know that this is a regulation that only targets sellers. It doesn't regulate purchasers. It doesn't regulate the plaintiffs here. It doesn't regulate noncommercial transfers. It only regulates commercial sales.

Therefore, Your Honor, it is a presumptively lawful regulation, and the plaintiffs importantly have not presented any argument as to why that presumption would be overcome here.

And the Tenth Circuit in the *Vincent* case, after finding that the felon in possession ban fell within the presumptively lawful category, stopped its analysis there. It went no further. The Court here can do the same as to likelihood of success.

227

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

But there's a second reason why plaintiffs cannot prevail on step one of *Bruen*, and that's that the Second amendment's plain text doesn't cover the plaintiffs' conduct here.  The Second amendment covers two things.  It covers bearing and keeping of arms.  Now, bearing is not really what's at issue here.  This isn't about carry.  This is about, if anything, the keeping of arms.

But the plaintiffs here can keep all their firearms. We heard from plaintiff Garcia that she has, she's not sure exactly how many, but double-digit firearms.  None of her possessory interest in any of those firearms is in any way compromised by the waiting period law.  She can keep them all, unaffected by this law.

What the law does is it slightly delays the acquisition of new firearms, but the plaintiffs have not shown that the meaning of "keep" includes her rights to immediately acquire firearms.  And I understand plaintiffs are saying, well, there's still the background check.  I believe there was testimony from Mr. Rhodes, and his background check is now in the record, that background checks often -- not always, but often happen very quickly.

So, the -- it's important to note the Court is not being asked to decide whether the Second amendment generally includes some right to acquire firearms.  This is about immediate possession, whether there's a right to near

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

instantaneous possession, about guns on demand.  And historically, there just has been no such right, Your Honor. Practically, it wasn't possible for many Americans in the 18th century, as Professor Spitzer testified, as the Ninth Circuit in the *Silvester* case found.

So, that was not a right that the plaintiffs had shown was historically understood to be included within the text of the Second amendment.  And therefore, plaintiffs fail at step one of *Bruen* for that additional reason.

Moving on to *Bruen* step two, is the law consistent with the nation's historic tradition of firearm regulation?  And for this step, Your Honor, the burden shifts to the defendant, to the Government.  And it's important to note that if we win on step one, there is no need to go here.  And, again, I would direct the Court to the *Vincent* decision for that.

But if the Court finds we have to move on to step two, the Government can carry its burden there as well.  And it's important to note that *Bruen* emphasized when conducting this historical analysis, Courts don't look for a historical twin; right?  So, there's been testimony about 1923 being the first waiting period law.  That's a historical twin, Your Honor.  That is not the standard that the Government has to meet under *Bruen* step two.

Instead, the Government needs to show a historic analog.  And the analog can be because of, quote, unprecedented

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

societal concerns and dramatic technological changes -- that's what *Bruen* said -- that pose different regulatory challenges in 21st-century America than existed in 1791 or 1868.

And when looking at historic analogs, you look at the how and the why, is what *Bruen* instructed Courts to do.  Now, the general assembly here identified in their legislative declaration what the why of the waiting period law is.  It's to prevent -- curtail impulsive firearm violence.

Professor Roth testified that this was just not a problem at the time of the founding.  Guns were a poor choice, and not frequently used in a homicide back then.  They were hard to load.  They could only fire one shot.  They were not easily accessible to many.  So, this concern about going out and buying a firearm to be used in a crime of passion did not exist in 18th-century America the way it does today.  The waiting period laws simply would have made no sense in this environment, Your Honor.  They would have addressed a nonexistent problem.

But there was some concern over impulsive firearm violence in 18th- and 19th-century America, not from going out and immediately purchasing firearms, not in a historical twin sense, but in the intoxicated person statutes the Court has heard testimony about, and many of which are attached to our brief.

The why of those statutes is the same as the why here.  It's avoiding firearm violence by those whose reason is

Kevin P. Carlin, RMR, CRR

230

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

temporarily overcome.  Now, does that mean that every intoxicated person is a threat with a firearm?  No.  Not necessarily.  Some people can hold their liquor better than others, and we're certainly not saying that everybody who is subject to a waiting period law is a threat to themselves or others.  But some subset of them are, Your Honor, and that's the violence that the general assembly sought to prevent.

So, we see the same why in those analogous laws.  The how varies from law to law, but in some cases, it was the same how as we have here.  In the Mississippi statute we cite in our brief, for example, the Mississippi law provided for no sale to intoxicated persons.  Once you're no longer intoxicated, you can purchase your firearm, but while intoxicated, you couldn't.  Again, a commercial regulation on sales.

Some statutes -- some of the historical statutes went even further and said no public carry at all while intoxicated.  That's going even further than a waiting period law, which doesn't impose any burden on the right to bear arms at all.  So, Your Honor, we think that if the Court were to proceed to *Bruen* step two, the Government has carried its burden of establishing a historic analog.

So, that's the likelihood of success factor.  I want to turn briefly to the irreparable injury, Your Honor.  We heard from the plaintiffs, both Ms. Garcia and Mr. Rhodes, that the plaintiffs purchased guns on October 1st, the same day they

231

23-cv-2563-JLK     Preliminary Injunction Hearing     10-30-2023

filed this lawsuit; and on October 25th, one day before they came in to testify.

Put simply, Your Honor, those purchases were manufactured to justify this lawsuit and the injunction hearing. Now, that might be fine if we're talking about standing, but we're not making a standing argument here. We're talking about the equitable factor of does this waiting period cause irreparable injury to the plaintiffs? And it simply doesn't, Your Honor. For one thing, nothing could be more repairable than a waiting period that expires on its own terms.

Excuse me. One moment, Your Honor.

So, Your Honor, we don't believe they have met the second factor either of irreparable injury. And before moving on to the final factor of the public interest, which I agree with plaintiffs is blended here with the balance of the harms factor, since the Government is the defendant, I want to just pause for a moment on the issue of experts.

I didn't hear it in plaintiffs' closing, but they certainly emphasized in their opening and in their papers that the Court should disregard the defendant's experts, I think largely because it's -- there's a reliance on historic laws. But *Bruen* itself defeats that argument, Your Honor.

*Bruen* in footnote six says that the Courts should not conduct the historical inquiry in the abstract, and instead Courts must rely on, quote, various evidentiary principles,

Kevin P. Carlin, RMR, CRR

232

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

including the principle of party presentation. And this is again quoting from footnote six, Courts are entitled to decide a case based on the historical record compiled by the parties.

That's what we've done here with the declarations of Professor Roth and Professor Spitzer. Professor Roth was highly credible. He is non-ideological. He -- despite plaintiffs' many efforts to get him to say that he thought guns were the sole driver of violence, he did not say that. He said they were a factor that guns can make things worse, which is what his career spent studying the issue has indicated.

Mr. Cramer, on the other hand, is a political activist, which is fine. He's certainly entitled to that, but he's literally written a book about how to advance public policy in the direction of further gun rights. And particularly, with respect to his statistical study, he admits that he has no training in statistics. We heard this morning from Professor Poliquin about the inadequacy of his statistical study. So, his study is entitled to no weight.

So, turning, finally, Your Honor, to the public interest factor. The plaintiffs really don't want the Court to consider the public interest here. We heard just a moment ago we shouldn't consider the policy effects, I believe, of this public policy when looking at the public interest, because that's a backdoor way to means-end scrutiny.

But, Your Honor, we're here because the plaintiffs are

233

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

asking for preliminary relief.  There's no Second amendment exception to the Court's equity jurisprudence, to the Court's equity docket.  And it's not surprising the plaintiffs don't want the Court to consider this factor, because it's just not even close, Your Honor.  Professor Poliquin this morning testified that waiting periods can reduce homicides by up to 17 percent and suicides from 7 to 11 percent.

The general assembly relied on this study, and it's clear why.  As the general assembly notes in other parts of its legislative declaration, Colorado is seeing high rates of firearm homicides.  2021 was the highest number of homicides since 2000.  And suicide, Colorado ranks seventh-highest in firearm suicides in the entire country.

If you apply Professor Poliquin's analysis to these numbers that are contained in the legislative declaration, Your Honor, this would translate to over 100 lives saved.  Thinking again about the posture we're here before the Court on, in a preliminary injunction, at some point there will be a trial on the merits of this case, Your Honor.  It could be 12 months, 18 months, depending on a number of factors, as the Court is well aware, but if we assume just 12 months, the public -- the evidence that's been presented to the Court shows that 100 lives will be saved during the course of the time the injunction would otherwise be in effect.

And it's not just those hundred lives themselves, Your

Kevin P. Carlin, RMR, CRR

234

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

Honor, that the Court should consider when considering where the public interest lies.  It's the countless friends and family of those who are impacted by firearm violence, be it homicide or suicide, who will still have their loved ones by denying this injunction.

Now, the plaintiffs said in their reply brief that we're trying to guilt the Court into denying the injunction here.  But again, Your Honor, they're the ones that are asking for a preliminary injunction, which requires the Court to consider the public interest.  These aren't just numbers on a page, as we heard today from Professor Poliquin.  The evidence here shows that this act will save lives.

The plaintiffs ask the Court to ignore these lives saved, these lives that are altered by gun violence, and to instead enjoin the law without there even being a full record, because they want to do something, acquire firearms without delay, that was unavailable to those in the 1790s.  They cannot meet any standard of showing that the public interest supports this injunction, Your Honor, let alone the heightened standard they must meet for disrupting the status quo.

So, in short, Your Honor, this law will save lives, and for that reason alone, plaintiffs can't meet their burden to preliminarily enjoin it, and their motion should be denied.  Unless the Court has any questions?

THE COURT:  No, I don't.  Thank you.

Kevin P. Carlin, RMR, CRR

235

23-cv-2563-JLK     Preliminary Injunction Hearing    10-30-2023

MR. KOTLARCZYK:  Thank you very much, Your Honor.

MR. NATION:  Your Honor, *McDonald*, *Heller*, and *Bruen* clearly show that the Second amendment is not a second-class right.  And rights delayed are rights denied.  At the end of the day, individuals in this country who are not prohibited possessors have the right to acquire firearms after they purchase a background check.  In the 1790s, they could go to a general store or a gunsmith and acquire a firearm that was for sale.

The Government cannot meet their burden to show that there is a historical analog that would save this law.  The *Bruen* standard for identifying a closely-analogous historical regulation is a demanding one.  That's *Baird v. Bonta* from the Ninth Circuit.  The dispossession of intoxicated persons or the ban on intoxicated persons carrying is simply not analogous to a three-day waiting period.

The Government argues that the preliminary injunction that disrupts the status quo is subject to a heightened standard, and it might be.  But this is not the -- the status quo is not a regime where there is a waiting period.  That's only been in effect for 30 days.  The status quo was the pre-waiting-period time where a person could pass a background check and receive their firearm once they passed that background check.

The plain text of the Second amendment talks -- gives

Kevin P. Carlin, RMR, CRR

236

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

individuals a right both to keep and to bear arms, and a waiting period implicated both the right to keep and the right to bear a firearm.  They may not -- a person may not do so for three days after acquiring title and after passing a background check.

The felons in possession laws that the *Vincent* case discusses really aren't analogous at all.  That's simply a longstanding tradition that those who were a danger to the community could not possess a firearm.

The regulation clearly regulates purchasers by not allowing possession for those three days.  It's not just a burden on the sellers.  It's also a burden on the purchasers, because they would have to -- they have to go back.  As Ms. Garcia testified, it's going to take her several hours to retrieve her firearm from Dragonman in Colorado Springs.  It's going to take Mr. Rhodes several hours to acquire his firearm from Triple J Armory.

As the Court -- excuse me.  As Judge Brimmer held, the Second amendment right to keep and bear arms includes the acquisition of firearms, and that they have other firearms is really of no moment.  The firearms uses are -- are useful for different things, and, you know, if we were to analogize to say the First amendment, the fact that some newspapers exist or you have access to other newspapers doesn't mean that the Government could shut down a particular newspaper.

The Government argues that the practicalities at the

Kevin P. Carlin, RMR, CRR

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

founding were limited, but even Professor Roth agreed that if there was a general store that had a firearm, you could go and purchase it and acquire it that same day.  It is not analogous to a three-day waiting period.

And discussing the experts, and looking at *Bruen* -- or, excuse me.  The Government attempts to argue that Professor Roth is nonideological.  I of course encourage you to watch his interviews that we submitted, and to keep in mind that he was referring to gangs as neighborhood organizations.  He is -- he is an ideologue.  He is a pacifist, and God bless him, but that should be taken into account as well as Mr. Cramer's activism. Yes, he is an activist, but he has done the research, and he has put in the work that the earliest waiting period was the 1923 California regulation from one day for easily-concealable firearms.

The Government argues that the intoxicated person statutes are analogous, and that some subset of people may do harm to themselves or others, but just because some subset does not trump the constitutional right to keep and bear arms under the Second amendment.  We came to that agreement at the founding.  We balanced the public interest at that point in time, and nothing that the State does can disrupt that balance.

That some lives may be saved for a three-day waiting period, though we disagree that the State's evidence is as clear, does not overcome the right of the people to possess

23-cv-2563-JLK    Preliminary Injunction Hearing    10-30-2023

firearms, to keep and bear arms.  Much like a law regulating hate speech would be unconstitutional, because you have the right to speak.  It may be in the public interest to do so, but it's still forbidden under our Constitution.  And here, it is forbidden under our Constitution for the State to deny you the right to possess your firearms after you've passed a background check.  Thank you, Your Honor.

THE COURT:  Thank you very much.  Preliminary injunctions take precedent on the Court's docket, according to the rules.  And I have the exhibits, the arguments of counsel, and the testimony.  I will get a decision out on this as soon as I can.

MR. NATION:  Thank you, Your Honor.

THE COURT:  Thank you very much.  We'll be in recess.

(Proceedings concluded at 11:12 a.m.)

Kevin P. Carlin, RMR, CRR

239

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 8th day of November, 2023.

_____
Kevin P. Carlin, RMR, CRR
Official Court Reporter

Kevin P. Carlin, RMR, CRR