**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 2)**

Kane, J.

      In this suit based on the Second Amendment to the United States Constitution, Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia challenge a newly effective Colorado statute regulating the commercial sale of firearms. The statute mandates that sellers wait a minimum of three days between initiating a background check and delivering a firearm to a purchaser, with certain exceptions. *See* Colo. Rev. Stat. § 18-12-115. Presently before me is Plaintiffs' Motion for Preliminary Injunction (ECF No. 2), seeking an order preliminarily enjoining enforcement of that statute.[1] I find Plaintiffs have failed to demonstrate they are entitled to the extraordinary relief requested and, therefore, deny their Motion.

---

[1] Plaintiffs' Motion originally sought a Temporary Restraining Order and Preliminary Injunction. However, I previously found that Plaintiffs had not demonstrated an ex parte temporary restraining order was warranted and ordered that we would proceed on Plaintiffs' request for a preliminary injunction alone. *See* Order Re: Mot. for Temporary Restraining Order at 2, ECF No. 11.

## I. BACKGROUND

### A. The Second Amendment

The Second Amendment to the U.S. Constitution was ratified in 1791. In full, it states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment was made applicable to the states with the ratification of the Fourteenth Amendment in 1868. *See McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010).

Fifteen years ago, in *District of Columbia v. Heller*, the Supreme Court announced that "the Second Amendment conferred an individual right to keep and bear arms," of which a "central component" is self-defense.[2] 554 U.S. 570, 595, 599, 628 (2008). Based on that conclusion, the Court held "that the District[ of Columbia's] ban on handgun possession in the home violate[d] the Second Amendment." *Id.* at 635. The Court clarified that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626–27 (emphasis added). The Court described these measures as "presumptively lawful." *Id.* at 627 n.26; *see also id.* at 635 (referring to "those regulations of the right that [it] describe[s] as permissible" and indicating that "there will be time enough to expound upon the historical justifications for the exceptions [it] ha[s] mentioned"). It "repeat[ed] those assurances" two years later in *McDonald v. City of Chicago*, 561 U.S. at 786.

---

[2] Despite the use of the term "conferred," the Court in *Heller* determined that the Second Amendment codified a preexisting right. *Heller*, 554 U.S. at 592 ("We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 599, 603; *see also Bruen*, 142 S. Ct. at 2127, 2130, 2135, 2138, 2145.

Last year, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court built on its holding in *Heller* and declared that the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" as well. 142 S. Ct. 2111, 2122 (2022). At issue in *Bruen* was the constitutionality of New York State's "may-issue" licensing regime, which required applicants to demonstrate a special need for self-defense in order to publicly carry a handgun. *Id.* at 2122-24.

Before resolving that question, *Bruen* imparted the test courts should apply in determining whether a firearm regulation is permissible under the Second Amendment. The *Bruen* test is "rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. The Court explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. And the court must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32 (quoting *Heller*, 554 U.S. at 631). This inquiry "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* at 2133.

Following that standard, the Court conducted a lengthy review of the historical record compiled in the case and concluded there was no historical "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor one "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138. The Court consequently held that New York State's licensing regime violated the Constitution. *Id.* at 2122, 2156. Significantly, three of the justices from the majority indicated that the decision was

not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626−627, and n.26); *see also id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, J.J.).

## B. The Colorado Statute

On April 28, 2023, Defendant Jared Polis, the Governor of the State of Colorado, signed into law House Bill 23-1219, An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm (the "Act" or "Waiting-Period Act"). The Act became effective on October 1, 2023. In passing the Act, the General Assembly declared that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). Pursuant to that purpose, the Act makes it illegal for any person who sells a firearm "to deliver the firearm to the purchaser until the later in time occurs:

(I)     Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or

(II)    The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

Colo. Rev. Stat. § 18-12-115(1)(a). The waiting period does not apply to:

(1)     The sale of antique firearms;

(2)     A sale by a person in the armed forces, who is soon to be deployed outside the United States, to a member of his or her family, as defined in the statute; or

(3)     "A firearm transfer for which a background check is not required pursuant to state or federal law."

*Id.* § 18-12-115(2). Violation of the Act by a firearm seller constitutes a civil infraction for which a fine may be imposed. *Id.* § 18-12-115(1)(b).

**C. Plaintiffs**

Plaintiff Rocky Mountain Gun Owners ("RMGO') is a nonprofit organization that seeks to defend the right of "law-abiding" individuals to keep and bear arms. At least one of its members, its executive director, Taylor Rhodes, has been affected by the Act. Prelim. Inj. Hr'g Tr. at 29-30, 35. Mr. Rhodes purchased two firearms recently, and because he was out of town when the waiting period expired for one of them, he was unable to pick up that firearm until about eight days later. *Id.* at 30-33.

Plaintiff Alicia Garcia is a firearms instructor and range safety officer and frequently acquires firearms. *Id.* at 16. She reviews firearms and teaches people how to use them safely via social media. *Id.* She has recently purchased multiple firearms and had to spend additional hours driving because she had to return to stores after the waiting periods expired. *Id.* at 17-20. She also hoped to attend an out-of-state shotgun shoot, which would have provided her with business opportunities, but she was unable to obtain a shotgun in time for the event due to the waiting period. *Id.* at 19-22.

Before the Waiting-Period Act took effect on October 1, 2023, Plaintiffs filed a separate case asserting the same claims as they do here. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, ECF No. 1. In ruling on Plaintiffs' Motion for Preliminary Injunction in that case, Chief Judge Brimmer found Plaintiffs lacked standing to move to enjoin the Act before it was enforced. *RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Specifically, Chief Judge Brimmer concluded RMGO had not identified any individual members

of the organization who were affected by the Act and thus had not met their burden to establish standing. *Id.* at *3. As for Ms. Garcia, he determined that she could not show a credible threat of prosecution, which was necessary for her to have standing to challenge the Act before it took effect. *Id.* at *4.

The Governor here does not contest Plaintiffs' standing. However, like Chief Judge Brimmer, I must ensure that jurisdiction is proper. Federal courts lack jurisdiction when plaintiffs cannot meet their burden to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). For plaintiffs to meet that burden, they must first demonstrate that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation and quotation marks omitted). Then, plaintiffs must show a causal connection between the injury and the challenged conduct and a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560-61. Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. Prelim. Inj. Hr'g Tr. at 19-22. She has been impacted by the Act's waiting period and will be in the near future. *Id.* at 17-22. She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).[3]

---

[3] I note, however, that RMGO's case for standing is less developed. The organization is clear that it "asserts representational standing" on behalf of its members. Mot. for Prelim. Inj. at 2, ECF No. 2. The Complaint and Motion for Preliminary Injunction allege that three members of RMGO have or will be affected by the Act. Compl. ¶ 1, ECF No. 1; Mot. for Prelim. Inj. at 2. Those individuals are identified by their initials alone "for the sake of their privacy." *Id.*; Compl. ¶ 1. Plaintiffs make no effort to demonstrate that those individuals' privacy interests outweigh the public's interest in proceedings that are public and open. Nor do Plaintiffs provide affidavits or

The Governor, against whom Plaintiffs' claims are asserted, contends that he is entitled to immunity in this case under the Eleventh Amendment to the U.S. Constitution but agrees to waive his immunity "for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief . . . only in this case, only in his official capacity, and only for prospective relief." Resp. to Mot. for Prelim. Inj. at 4 n.2, ECF No. 18. That waiver is sufficient for these proceedings, so I do not analyze whether the Eleventh Amendment applies.

## D.  Expert Opinions

With his Response to Plaintiffs' Motion for Preliminary Injunction, the Governor filed the declarations of two experts—Randolph Roth (ECF No. 18-10) and Robert Spitzer (ECF No. 18-3), who both provided opinions on the Nation's history of regulating firearms. The Governor's Response also included an article titled "Handgun Waiting Periods Reduce Gun Deaths" that was co-authored by Christopher Poliquin (ECF No. 18-2). I held a two-day hearing on Plaintiffs' Motion at which Clayton Cramer[4] testified as an expert witness for Plaintiffs and Professors Roth and Poliquin testified as experts for the Governor. I indicated at the hearing that I would allow the witnesses' testimony and later determine what weight to give their opinions.

Professor Roth received his bachelor's degree in History from Stanford University in 1973 and his doctorate degree in History from Yale University in 1981. He has taught courses in history, the social sciences, and statistics and is presently an Arts and Sciences Distinguished

---

testimony from those RMGO members, as is customarily required for representational standing. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Additionally, there are no allegations that any identified member of RMGO, including Mr. Rhodes, will suffer harm during the period when a preliminary injunction would be in effect.

[4] I note that Professor Cramer's 67-page Declaration (ECF No. 24) was not filed with Plaintiffs' Motion or Reply in Support of their Motion. It, along with Plaintiffs' Witness List, was filed two-days before the preliminary-injunction hearing.

Professor of History and Sociology at The Ohio State University. He has written a book, American Homicide, and has published essays on the history of violence and the use of firearms in the United States. Most of his work has been peer-reviewed. Prelim. Inj. Hr'g Tr. 112-13. He has "dedicated [his] career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today." Roth Decl. ¶ 11, ECF No. 18-10. In this case, he was asked to provide "opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public." *Id.* ¶ 10.

In his Declaration, Professor Roth opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." *Id*. ¶ 48. He described how homicide rates were relatively low early on in our Nation's history and that "the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread." *Id.* ¶¶ 14-15; Prelim. Inj. Hr'g Tr. at 118, 120. Professor Roth believes "the evidence . . . shows that the availability of guns and changes in firearms technology, especially the emergence of modern breechloading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been." Roth Decl. ¶ 12. Yet, he clarified that "firearms are not the fundamental reason why we became a violent society compared to other affluent societies."

Prelim. Inj. Hr'g Tr. at 128. Professor Roth's research has shown the fundamental reasons are "our failures of nation building, our political instability, our lack of faith and trust in our government, [and] our lack of fellow feeling among ourselves." *Id.* at 129.

I find the opinions Professor Roth provided to be thoughtful and reliable. He did not oversell the role of firearms in the history of homicide in the United States, and he was committed to precision and accuracy.

Professor Spitzer received his doctorate degree in Government from Cornell University in 1980. He is a Distinguished Service Professor of Political Science, Emeritus at the State University of New York at Cortland and was a visiting professor at Cornell University for thirty years. He has written six books and more than 100 articles, papers, and essays on gun policy. In this case, the Governor asked him "to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods." Spitzer Decl. at 1, ECF No. 18-3. Professor Spitzer provided a Declaration containing his opinions but did not testify at the preliminary injunction hearing.

In his Declaration, Professor Spitzer noted that "[g]un purchase waiting periods as they are understood and implemented today did not exist early in the country's history." *Id.* at 4. According to Professor Spitzer, this is because, in addition to the low rates of homicide and seldom use of firearms for homicide in the Federal era, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century" and "no organized system of gun background checking could feasibly exist until the modern era." *Id.* at 4-5. As an analogue for waiting-period laws, Professor Spitzer pointed to historical regulations pertaining to firearms and intoxication, based on the theory that these regulations "avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act

rashly, impulsively, and with diminished judgment." *Id.* at 6. For another analogue, he looked to historical laws for weapons licensing and permitting, opining that they "operate in a similar manner to modern waiting periods" since "licensing contemplates the passage of some period of time (even if brief) between the time the application or permission to do something is submitted . . . and the license or permission is granted." *Id.* at 15-16. Professor Spitzer reviewed relevant laws in the United States from the early 1600s through the early 1900s and included as two exhibits to his Declaration the text of the intoxication laws and the licensing laws he discusses. *See* Exhibit C: Intoxication/Weapons Laws, ECF No. 18-6; Exhibit E: License & Licensing Laws, ECF No. 18-8.

Professor Spitzer is certainly qualified to provide the opinions set out in his Declaration. I find his presentation of the relevant laws to be helpful in evaluating the Nation's historical tradition of firearm regulation, and I consider his explanation for the absence of waiting-period laws earlier in American history along with the evidence from the other experts.

Christopher Poliquin is an assistant professor of strategy at the University of California at Los Angeles. Poliquin has a doctorate in Business Administration from Harvard Business School and an undergraduate degree in Philosophy, Politics, and Economics from the University of Pennsylvania. He has also served as a teaching fellow in the economic analysis of public policy at Harvard's John F. Kennedy School of Government. His background is in empirical, statistical analysis of public policy. One such area of research led him to co-author the article mentioned above, "Handgun Waiting Periods Reduce Gun Deaths," a quantitative, multivariable assessment of American handgun waiting period laws. This study, published in the Proceedings of the National Academy of Sciences, a peer-reviewed multidisciplinary scientific journal, found that waiting-period laws had a statistically significant causal effect on reducing homicides (by 17%)

and suicides (by 7 to 11%). The Governor called Professor Poliquin to testify on this research and its results. I find his testimony on this topic to be salient and completely credible.

Professor Cramer has undergraduate and master's degrees in History from Sonoma State University. While his trade has been software engineering, he has written numerous books on firearms, both historical and advocacy based. Professor Cramer has been an adjunct professor at Boise State University and ITT Technical Institute in Boise and currently is an adjunct professor teaching history courses at the College of Western Idaho. Plaintiffs called Professor Cramer to testify on the historical treatment of firearms, specifically firearm technology, availability, and regulation.

I do not give any weight to Professor Cramer's opinions regarding legal standards or application of the law, as he is not qualified to provide these opinions.[5] I likewise do not consider his many opinions that are irrelevant to the present facts, that are unsupported, or that relate to opinions not provided by Professors Roth and Spitzer in this case. Otherwise, I assess Professor Cramer's criticism of the opinions of Professors Roth and Spitzer.[6] Although it might be

---

[5] Although he is not a lawyer, Professor Cramer commented repeatedly on the legal meaning and application of precedent. *See, e.g.*, Prelim. Inj. Hr'g Tr. at 47 (offering opinions on the legal relevance of post-1868 statutes); *id.* at 51 (speaking to the propriety of considering the regulatory purpose of the Waiting-Period Act). Professor Poliquin, on the other hand, was appropriately reluctant to do so. *See id.* at 215 ("Q. And do you have an opinion as to whether it's appropriate to consider the effects of the law in light of the Supreme Court's decision in *Bruen*? A. I can't speak to that. I don't have a law degree, and wouldn't speak to that, no.").

[6] Another observation I make about Professor Cramer's Declaration is the prevalence of ad hominem attacks aimed at Professor Spitzer. *See, e.g.*, Cramer Decl. ¶ 55, ECF No. 24 ("[H]istorians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved."); *id.* ¶ 57 (claiming that Professor Spitzer's work would "earn him a poor grade in a freshman history class, or a criminology class, or a biology class"); *id.* ¶ 87 (asserting that Professor Spitzer is "no 'expert'"); *id.* ¶ 94 (insinuating that Professor Spitzer is "lazy"). Those attacks make Professor Cramer's opinions less persuasive, not more. Like his ad hominem attacks, his other antagonistic and inflammatory language undermines his credibility. *See, e.g.*, *id.* ¶ 46 ("If I wanted to buy a scary black rifle . . . ."); *id.* ¶ 75 ("The same public safety argument Professor Spitzer advances for waiting periods would also

reasonable to question whether Professor Cramer is sufficiently qualified under Federal Rule of Civil Procedure 702 to provide that criticism, the Supreme Court has relied on his historical analysis on multiple occasions. *See McDonald*, 561 U.S. at 773; *Heller*, 554 U.S. at 588. With respect, I find his testimony had significant shortcomings in persuasiveness and credibility.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the opposing party under the injunction; and (4) the injunction is adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). It is the movant's burden to establish by a preponderance of the evidence that these factors weigh in favor of an injunction. *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

The Tenth Circuit has instructed that "injunctions that disrupt the status quo are disfavored and 'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" *Beltronics*, 562 F.3d at 1070 (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005)). The status

---

work for ignoring the protections of . . . freedom of religious worship (which would allow religions, *some* of whose adherents have a poor record of confusing runways with office buildings) . . . .").

quo[7] is the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1070-71 (quoting *Schrier*, 427 F.3d at 1260). When the plaintiff seeks a preliminary injunction that disrupts that status quo, the district court may not grant it "unless the plaintiff 'make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Id.* at 1071 (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction they seek would disrupt the status quo and is thus disfavored. Nevertheless, I find, even if the injunction were not disfavored, the applicable factors would weigh against granting it.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

After examining the language of the Second Amendment using the Supreme Court's analysis in *Heller*, I find, for the purposes of Plaintiffs' Motion, that the plain text does not cover the waiting period required by the Act. This conclusion is bolstered by the fact that the Act is a regulation on the commercial sale of firearms and thus is presumptively permissible. However, even if the waiting period implicated the plain text of the Second Amendment, the evidence before me establishes that the Act is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs, therefore, have not carried their burden to show they are likely to succeed on the merits of their claims.

---

[7] "Status quo" in this sense is short for "status quo ante bellum," or "the state of things before the war." *Status quo*, Black's Law Dictionary (4th ed. 1951). The "ante bellum" is generally omitted and, as a result, sometimes forgotten. But what is relevant is the status quo before the war began, or for these purposes, before the lawsuit was filed. Immediately before Plaintiffs filed their suit, the Waiting-Period Act was in effect, and so that is the status quo ante bellum.

### 1. Plain Text of the Second Amendment

The first consideration under the *Bruen* test is whether the "plain text" of the Second Amendment covers the particular conduct such that the Constitution presumptively provides protection. *See Bruen*, 142 S. Ct. at 2126, 2129-30. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ." *Heller*, 554 U.S. at 634-35. As a result, the analysis is "focused on the 'normal and ordinary' meaning of the Second Amendment's language" at the relevant time. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77, 578). The "[n]ormal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77.

Plaintiffs contend that the words "keep" and "bear" in the Second Amendment are implicated by the waiting period required by the Act. In *Heller*, the Supreme Court examined the "normal meaning" of those words at the time of the Nation's founding, reviewing definitions from contemporaneous dictionaries. As the Court explained, the 1773 edition of Samuel Johnson's Dictionary of the English Language "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" *Id.* at 582 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)). And Webster's 1828 American Dictionary of the English Language "defined it as '[t]o hold; to retain in one's power or possession.'" *Id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Based on those definitions, the Court concluded "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* The Court then turned to the word "bear" and determined that it means to "carry." *Id.* at 584. The Court clarified that, when "bear" is "used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation."

*Id.* So, putting all the pieces together, the Court found that the text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered. Still, Plaintiffs attempt to equate the words "obtain" and "possess." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 11 ("The Second Amendment's plain text applies to 'an individual's conduct' of <u>obtaining</u> a firearm. *See Bruen*, 142 S. Ct. at 2134 ('[T]he "textual elements" of the Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—guarantee[s] the individual right to <u>possess</u> and carry weapons <u>in case of confrontation</u>.') (emphasis added, cleaned up)."). But these terms are not equivalent. To "keep," under the definitions provided in *Heller*, meant to retain an object one already possessed. It did not mean to receive a newly paid-for item, and it certainly did not mean to receive that item without delay. Likewise, "hav[ing] weapons" indicates the weapons are already in one's possession, not that one is receiving them.

Under Plaintiffs' theory, the Waiting-Period Act prevents people "from obtaining possession of their firearm that they have already acquired." Mot. for Prelim. Inj. at 6; *see also* Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13 ("In other words, C.R.S. § 18-12-115(1)(a)(I) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property."); *id.* ("HB23-1219 prohibits Coloradans from obtaining (e.g., possessing) arms that they have already legally acquired . . . ."). Plaintiffs advocate that, "[b]y the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership

of a firearm has passed title." *Id.*, ECF No. 21 at 11; *see also* Mot. for Prelim. Inj. at 3.[8]

Plaintiffs' interpretation of the commercial transaction is incorrect. The Colorado Uniform

Commercial Code provides that a "'sale' consists in the passing of title from the seller to the

buyer for a price," Colo. Rev. Stat. § 4-2-106, and "[u]nless otherwise explicitly agreed, title

passes to the buyer at the time and place at which the seller completes his performance with

reference to the physical delivery of the goods." *Id.* § 4–2–401. Thus, absent any agreement or

term to the contrary, purchasers do not acquire title until they receive possession of the subject

firearm.[9] Up to that point, the sale is inchoate, and purchasers have not "acquired" the firearm.

Plaintiffs additionally argue that "when a person has been deprived of possession of a

firearm they have acquired, they cannot carry it." Mot. for Prelim. Inj. at 6. This argument fails

for the same reasons.

The relevant conduct is, therefore, not covered by the plain meaning of the terms "keep"

or "bear" in the Second Amendment. Seemingly recognizing this fact, Plaintiffs contend that

"[t]he right to 'keep' arms necessarily implies the right to possess arms one has acquired." *Id.* at

5. But the purchase and delivery of an object (here, a firearm) is not an integral element of

keeping (i.e., having) or bearing (i.e., carrying) that object. Rather, purchase and delivery are one

means of creating the opportunity to "have weapons." The relevant question is whether the plain

text covers that specific means. It does not.

---

[8] Plaintiffs imply that purchasers must wait at least three days after paying to purchase a firearm. However, nothing in the record indicates whether a purchaser can initiate a background check before commencing the purchase of or paying for a firearm.

[9] Only once the property is delivered can a purchaser evaluate the condition of the property and seek a refund or substitution if it is damaged, broken, or otherwise defective. This illustrates that a sale cannot be complete until a purchaser receives the property and has the opportunity to inspect it.

Even if purchasing a firearm could be read into the terms "keep" or "bear," receipt of a firearm *without any delay* could not be, as the Founders would not have expected instant, widespread availability of the firearm of their choice. The parties dispute this fact, but I find the expert opinions of Professors Spitzer and Roth on this topic to be convincing.

In his Declaration, Professor Spitzer asserted that "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s." Spitzer Decl. at 4. He explained that "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.* Consistent with Professor Spitzer's observations, Professor Roth testified that, in 1792, "production rates [of firearms] were far lower than they are today," so individuals might have had "to wait a few weeks to get [a firearm]." Prelim. Inj. Hr'g Tr. at 156.

In an effort to disprove those opinions, Professor Cramer surveyed excerpts from various advertisements for gunsmiths and gun retailers from 1728 to 1837. Cramer Decl. ¶¶ 15-22, 25-33. Professor Cramer did not, however, undertake to count the number of gun retailers in the United States in 1791, Prelim. Inj. Hr'g Tr. at 72-73, and he acknowledged that "[i]t is hard to use th[e] fragmentary advertising as persuasive proof." Cramer Decl. ¶ 45. The advertisements show that guns were being made and sold during the period addressed. But they also indicate that oftentimes a wait would be involved, for example, when guns were being imported and would arrive at irregular intervals, when firearms were being sold on a single date in the future, or a gunsmith was offering to fabricate firearms for purchasers. *See, e.g.*, *id.* ¶¶ 17, 19, 21-22, 29. For the stores with inventory in stock, no conclusion can be drawn regarding the general quantity, type, or desirability of the available firearms.

Professor Cramer also pointed to the 1810 "haphazard and incomplete" manufacturing census, showing that there were "117 'Gun manufactories' in the U.S., 37 gunsmiths (a severe undercount . . .), and 42,853 firearms manufactured." *Id.* ¶ 35. His analysis of this data states that "[t]he *minimum* 1810 U.S. production rate was 592 guns per 100,000 people" and, "[b]y comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people." *Id.* ¶ 37. Without additional evidence, he goes on to state: "The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels." *Id.* ¶ 37. I find this latter opinion to be unsupported, only marginally relevant, and inconsistent with the record, including the statement from Professor Cramer's own Declaration that, "[d]espite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870." *Id.* ¶ 39 (quoting James Whisker, The Gunsmith's Trade 67 (1992)). Ultimately, the opinions of Professors Spitzer and Cramer are credible and establish that individuals in the Founding Era would not have understood the purchase of firearms to include a right to receive a firearm without any delay.

Plaintiffs point to a handful of cases they claim support their argument that the purchase of a firearm is covered by the Second Amendment. These decisions predate *Bruen*, rely on cases predating *Bruen*, and/or conduct no analysis of the text. *See, e.g.*, *Miller v. Bonta*, No. 19-cv-01537 BEN (JLB), 2023 WL 6929336, at *6, 8 (S.D. Cal. Oct. 19, 2023) (relying on *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021), and *Teixeira v. Cnty. of Alameda*, 837 F.3d 670, 677 (9th Cir. 2017 (en banc), but later concluding: "Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-

owned for lawful purposes. The conduct is covered by the plain text of the Second Amendment."); *McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex. Aug. 14, 2023) (finding "Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment" without performing an analysis of the plain text); *Connecticut Citizens Def. League, Inc. v. Thody*, No. 3:21-cv-1156 (OAW), 2023 WL 2687446, *12 (D. Conn. Mar. 28, 2023) (dismissing as moot the plaintiffs' claim for "declaratory judgment confirming that they have an individual right to 'obtain, possess, and carry firearms'" because, "[i]n *Bruen*, the Supreme Court held that the Second Amendment's plain text guarantees to individuals a right to carry a firearm in public for self-defense," and "grant[ing] a declaratory judgment confirming an individual right to carry would be to reiterate what the Supreme Court of the United States already has found"). Moreover, the Supreme Court has made clear that "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6

The record presently in front of me conclusively shows that the plain text of the Second Amendment does not cover the conduct at issue, and consequently, Plaintiffs have not demonstrated they are likely to succeed on the merits of their claims.

### 2. Presumptive Lawfulness of Commercial Sale Regulations

This conclusion is reinforced by the fact that the Waiting-Period Act regulates the commercial sale of firearms. As stated in *Heller*, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 and n. 26; *see also McDonald*, 561 U.S. at 786 (confirming that it was not casting doubt on these regulatory measures); *Bruen*, 142 S Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.)

(quoting *Heller*, 554 U.S. at 626−627, and n.26). The Court, in *Heller*, indicated that there is a historical justification for that presumption. *Heller*, 554 U.S. at 635. It is not immediately clear whether that historical justification would be based on a determination that the plain text of the Second Amendment does not cover the conduct or on a finding that laws imposing conditions or qualifications on the commercial sale of firearms are consistent with the Nation's historical tradition of firearm regulation. Some courts have understood the presumption to be warranted because the conduct is not covered by the plain text of the Second Amendment. *See, e.g.*, *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D. W. Va. 2022) ("This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession."); *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Price*, 635 F. Supp. 3d at 459). I am inclined to agree and, for that reason, view the presumption as supporting my analysis of the plain text above.

*Bruen* did not call into question that some regulatory measures are presumptively lawful, as first indicated in *Heller*. In fact, in *Bruen*, the Court adopted similar guidance for "shall-issue" licensing regimes, noting that nothing in its "analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]." 142 S. Ct. at 2138 n.9 (internal quotation marks and citation omitted). The Court reasoned:

> Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [*Heller*, 554 U.S. at 635]. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid*. . . . That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

*Id.* The Court implied these "shall-issue" regimes are constitutional unless they are abusive, which resembles the presumption articulated in *Heller*.

The Tenth Circuit's recent opinion in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that *Heller*'s presumptively lawful measures withstood *Bruen*. In *Vincent*, the Tenth Circuit found *Bruen* "didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Id.* at 1201. The Tenth Circuit ultimately held in *Vincent*, *id.* at 1202, that "*Bruen* did not indisputably and pellucidly abrogate" its earlier precedential opinion in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), which concluded that the federal ban on felons' possession of firearms was constitutional based on the language in *Heller*.[10] The assessment in *Vincent* applies equally to the other categories of presumptively lawful regulations identified in *Heller*, including laws imposing conditions and qualifications on the commercial sale of arms.

Colorado's Waiting-Period Act regulates only the sale, and specifically sellers, of firearms. *See* Colo. Rev. Stat. § 18-12-115(1). The Act does not apply to anyone who does not "sell[] a firearm." *See* Resp. to Mot. for Prelim. Inj. at 8 (quoting Colo. Rev. Stat. § 18-12-115(1)(a)). Because it imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*,[11] and as explained above, Plaintiffs have failed to rebut that

---

[10] In his concurrence in *McCane*, Judge Tymkovich explained that language in *Heller*, although dicta, is binding. *McCane*, 573 F.3d at 1047 (Tymkovich, J., concurring).

[11] Plaintiffs find this to be "silly" and  an "absurd proposition." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 9-10. They posit that, if waiting-period laws constitute regulations on the commercial sale of firearms that are presumptively lawful, states would be authorized to enact 100-year waiting periods. *Id.*, ECF No. 21 at 10. But, by "presumptively lawful," the connotation is plain: it is a presumption, not a guarantee. Abusive regulations may still be subject to constitutional challenges.

presumption by demonstrating that the plain text of the Second Amendment covers the

immediate receipt of a purchased firearm.

### 3.  Nation's Historical Tradition of Firearm Regulation

Even if the plain text of the Second Amendment were implicated, however, I find, on the

record before me, that the Waiting-Period Act would not violate the Constitution. When the

Second Amendment covers the at-issue conduct, the state must justify the regulation "by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

*Bruen*, 142 S. Ct. at 2130. As Plaintiffs repeatedly emphasized and the Supreme Court has made

clear, the constitutional right to bear arms in public for self-defense is not "a second-class right,

subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 2156

(quoting *McDonald*, 561 U.S. at 780). Instead, "[l]ike most rights, the right secured by the

Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626); *see also*

*Heller*, 554 U.S. at 595 ("Of course the right was not unlimited, just as the First Amendment's

right of free speech was not.").[12]

---

[12] As Judge Wood explained in comparing limitations on the First Amendment in her dissent in
*Atkinson v. Garland*:

> The Second Amendment's history and tradition are steeped in a rich regulatory
> background. For what it is worth, I would say exactly the same thing about the First
> Amendment, which the Court has often equated to the Second Amendment.
> Although Justice Hugo Black was famous for taking a strict view of the First
> Amendment, insisting that the words "NO LAW" with which it begins meant
> literally "NO LAW," the truth is that the First Amendment has always been
> circumscribed by limiting principles. The Supreme Court understands that a person
> cannot shout "FIRE" in a crowded theater, see *Schenck v. United States*, 249 U.S.
> 47 (1919); that "fighting words" are not protected, see *Chaplinsky v. New
> Hampshire*, 315 U.S. 568 (1942); that a person who credibly issues a verbal threat
> to kill the President may be prosecuted, see *Rankin v. McPherson*, 483 U.S. 378
> (1987); that obscenity and child pornography do not qualify as protected speech,

Because, as the parties agree, no law requiring a waiting period was enacted in the United States until 1923, I must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32 (quoting *Heller*, 554 U.S. at 631). *Bruen* explained this inquiry as follows:

> In some cases, [it] will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

> * * *

> [O]ther cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment— "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

> * * *

> [H]istory guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a

---

see *Miller v. California*, 413 U.S. 15 (1973) (obscenity), *New York v. Ferber*, 458 U.S. 747 (1982) (child pornography); and that the First Amendment did not totally displace common-law libel and slander, see *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

70 F.4th 1018, 1029–30 (7th Cir. 2023) (Wood, J., dissenting).

distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.*, at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); see also *id.*, at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " '*central*' " considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783).

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2131-33 (footnote omitted).[13]

---

[13] While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. *See Atkinson*, 70 F.4th at 1028–29 (Wood, J., dissenting) ("Only a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources."). The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or

*An Unfamiliar Problem*

Plaintiffs argue that this is a straightforward case like *Heller* and *Bruen* since "the problem of impulsive gun violence dates from the invention of guns." Mot. for Prelim. Inj. at 8. They claim that the "complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the []Act is 'inconsistent with the Second Amendment.'" *Id.* at 9 (quoting *Bruen*, 142 S. Ct. at 2131). The Governor has shown, however, that impulsive gun homicide was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century.

Professor Roth persuasively opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." Roth Decl. ¶ 48. Professor Roth explained:

> In the eighteenth century, . . . . laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in

---

*McDonald. See Bruen*, 142 S. Ct. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *see also* Stephen R. Munzer and James W. Nickel, *Does the Constitution Mean What It Always Meant?*, 77 Colum. L. Rev. 1029, 1033 (1977) ("[I]t should be noted that there is a special danger in allowing a controversial case to turn on an historical claim if the claim is not beyond dispute. Since good historical research is not within the competence of most judges, the antecedent probability of mistakes is high. This increases the chances that professional historians will challenge and refute the Court's reading of history, thus undermining the basis, or ostensible basis, for the decision."). There are other reasons to disfavor this approach, but the last I will note is that it presupposes the success—let alone consensus—that the Founders held during America's fledgling years as a new nation. *See* Larry D. Kramer, *The Supreme Court 2000 Term Foreword: We the Court*, 115 Harv. L. Rev. 4, 12 (2001) ("The American people learned a great deal during the early years of their Republic--including that many of their most cherished beliefs and firmly held ideas were either wrong or unworkable (which makes one wonder why any sensible person, even a lawyer, would privilege the speculative writings of the 1780s over the hard-earned experience of subsequent decades."). With those concerns in the background, I don my historian hat and endeavor to follow the standard as prescribed.

> patriotic fellow feeling within the British empire, and greater trust in government.
> . . . Second, the impact of firearms on the homicide rate was modest, even though
> household ownership of firearms was widespread.

*Id.* ¶¶ 14-15 (footnotes omitted). Regarding waiting-period laws specifically, Professor Spitzer

reasoned that they did not exist because, in addition to the low homicide rates and use of firearms

for homicide in the colonies, "[r]apid, convenient gun sales processes did not exist in the U.S.

until the end of the nineteenth century," and "no organized system of gun background checking

could feasibly exist until the modern era." Spitzer Decl. at 4-5.

The Governor emphasizes that waiting-period laws were unnecessary before the early

twentieth century "because a waiting period inherent in the acquisition of firearms already

existed for many Americans." Resp. to Mot. for Prelim. Inj. at 16.  As was discussed above, I

find the opinions of Professors Roth and Spitzer on the availability of firearms for purchase

throughout the Nation's history to be compelling. Even after ordering firearms via postal mail

became possible in the 1870s and 1880s, purchasers still had to wait several days before

receiving them. *See* Spitzer Decl. at 4-5; Prelim. Inj. Hr'g Tr. at 75-76. In contrast, "in the

modern era, gun and ammunition purchases can be made easily and rapidly from tens of

thousands of licensed gun dealers, private sales, gun shows, and through internet sales." Spitzer

Decl. at 4, ECF No. 18-3 (footnote omitted).

I am likewise persuaded by Professor Roth's research on homicide rates and his opinion

that homicide rates during the late Colonial Period into the early National Period were fairly low

compared to today's rates. Prelim. Inj. Hr'g Tr. at 118, 120. Professor Cramer challenged

Professor Roth's conclusions. However, his discussion was based on data from Professor Roth's

book or his submissions in other cases, not his Declaration in this case. *See* Cramer Decl. ¶¶ 63-64, 124-25, 135; Prelim. Inj. Hr'g Tr. at 52-53.[14]

Of the relatively small number of homicides committed in the late Colonial Period into the early National Period, Professor Roth determined that only 10 to 15 percent of both domestic and nondomestic homicides were committed with a firearm. Roth Decl. ¶ 15; Prelim. Inj. Hr'g Tr. at 119. He offered an explanation for why this was the case:

> Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of

---

[14] Professor Cramer additionally sought to undermine Professor Roth's opinion that the United States has become by far the most homicidal society in the Western world since the nineteenth century. In his Declaration, Professor Cramer stated: "In 2019, the U.S. had a reported murder rate of 5.0/100,000. Because 73.7% of U.S. murders are committed with firearms, this suggests that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but later determined not to be, murder) is really 3.72/100,000." Cramer Decl. ¶ 128. Professor Cramer indicated that his calculation is of the adjusted "U.S. murder rate" and then compared his calculated rate to the rates from certain European countries (including Ukraine, Latvia, Lithuania, Moldova, and Montenegro). *Id.* ¶¶ 128-29. Professor Cramer did not show his work, but from the information he provided, his analysis seems unsound. There are three variables in his equation for adjusted "U.S. murder rate": the 2019 U.S. reported murder rate (5.0/100,000), the 2019 percentage of those homicides in which firearms were used (73.7%), and a 1989 percentage of the firearms-related homicides that were "justifiable or excusable" (6%). If one multiplies these anachronistic values, the result is the supposed rate of justifiable, firearms-related homicides, or 0.22 per 100,000 people. If that number is subtracted from the U.S. reported murder rate, the result is the actual U.S. murder rate (with all weapons or means and not including justifiable, firearms-related homicides), or 4.78 murders per 100,000 people. That number could be used to compare with the murder rates in other countries (although it would still contain justifiable or excusable murders perpetrated without a firearm). In contrast, if one is seeking the U.S. firearms-related murder rate (not including justifiable, firearms-related homicides), one would multiply the first two inputs above together, but instead of using 6% for the third, would substitute 94%. The result would be 3.68 murders per 100,000 people. Absent some showing of arithmetic or other methodology, I cannot ascertain how Professor Cramer arrived at a "U.S. murder rate" of 3.72 per 100,000 people or how he determined that representation is analogous to the overall murder rate from other countries. It appears he did not compare apples to apples, and this discrepancy, among others, calls into question his opinions. Additionally, Professor Roth explained that the Federal Bureau of Investigation statistics cited by Professor Cramer are unreliable because there are "tremendous gaps" in the reporting records. Prelim. Inj. Hr'g Tr. at 120.

> a few double-barreled pistols, they could not fire multiple shots without reloading. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience. And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose. It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.

Roth Decl. ¶ 16 (footnotes omitted); *see also* Prelim. Inj. Hr'g Tr. at 122-23. Professor Roth described how, in certain periods and locations in the U.S., homicide rates increased and the proportion of homicides committed with firearms increased as well. Roth Decl. ¶ 18 ("When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes, so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier." (footnotes omitted)). He clarified that homicides of Native Americans and enslaved persons also frequently occurred with firearms. *Id.* But Professor Roth stated: "Otherwise, . . . colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*

Professor Roth commented that weapons were often kept unloaded, but he qualified this general trend by noting that people who lived on the frontier where there was a constant threat of attack "tried to keep [firearms] loaded as long as they could, and they put [them] in the driest, warmest place they could, over the mantle, to have [them] ready." Prelim. Inj. Hr'g Tr. at 122-23. Professor Cramer disagreed that individuals generally kept firearms unloaded. He cited anecdotal evidence of four people who died accidentally from firearms being kept loaded, as well as a 1782 Massachusetts fire-prevention statute that provided any loaded firearms kept inside could be seized. Cramer Decl. ¶¶ 66-73, 149-56. The statute cuts both ways. It seems to indicate that in

some locales, individuals were required to keep their firearms unloaded, and thus were less likely to use them for impulsive homicides. In any event, Professor Cramer's scant evidence is insufficient to call into doubt Professor Roth's well-reasoned opinion.

Professor Cramer also sought to contradict Professor Roth's opinions regarding the availability of repeating firearms and the accuracy of firearms during the Founding Era. Professor Cramer stressed that pepperboxes, an early multi-shot firearm, existed by the end of eighteenth century, and individuals would carry a brace of pistols, meaning a pair of pistols, that they could use in succession. *Id.* ¶¶ 74, 146; Prelim. Inj. Hr'g Tr. at 54-55, 58. He could not provide information on how common pepperboxes were, though. *Id.* at 84. Professor Roth testified that they were very rare and that he could not think of a single homicide he had studied that was committed with a pepperbox. *Id.* at 132-33. Regarding the accuracy of firearms at the time, Professor Cramer pointed to the capabilities of riflemen in the Revolutionary era. Cramer Decl. ¶¶ 139-145. Professor Roth did not deny the accuracy of rifled muskets but noted that few people actually had them. Prelim. Inj. Hr'g Tr. at 130. He acknowledged, though, that the firearms generally possessed were accurate enough to be lethal at short range. *Id.* at 131.

Overall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period. Professors Roth and Spitzer also make a strong case that, as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response.[15]

---

[15] *See* Roth ¶ 34 ("[T]he proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West. And that is why every state in the

Since the Waiting-Period Law is a "modern regulation[] that w[as] unimaginable at the founding," I must reason by analogy and "determin[e] whether a historical regulation is a proper analogue" for, or "relevantly similar" to, the Act. *Bruen*, 142 S. Ct. at 2133. In doing so, I focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and look for a "historical analogue"—not a "twin." *Id.* The Governor and Professor Spitzer point to two types of historical analogues: laws involving intoxicated persons and licensing regimes.

*Laws Related to Intoxication as Analogues*

The aim of the Waiting-Period Act is to "help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). The Governor alleges that "[s]tates have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence." Resp. to Mot. for Prelim. Inj. at 14. Professor Spitzer opined that "old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment" and those purposes "mimic the purpose of modern waiting periods." Spitzer Decl. at 6.[16] In Professor Spitzer's view, laws

---

Union restricted the right to carrying certain concealable weapons."); *id.* ¶ 47 ("Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. States began imposing waiting period laws to prevent individuals from acquiring firearms in a fit of anger."); Spitzer Decl. at 4-5 ("The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.).

[16] Professor Cramer calls the comparison between intoxication regulations and the Act a "warped analogy." Prelim. Inj. Hr'g Tr. at 41. He takes issue with Professor Spitzer's insinuation that gun purchasers might act "rashly, impulsively, and with diminished judgment." Cramer Decl. ¶¶ 109-11. Professor Cramer asks: "What evidence is there that purchasing a firearm is done 'rashly, impulsively, and with diminished judgment . . .'? I know that I have never done so." *Id.* ¶ 111.

pertaining to firearms and intoxication mimicked waiting periods because they "interrupt[ed] gun access only temporarily, as is the case with waiting periods." *Id.*

The Governor, through Professor Spitzer, provided the following laws as relevant, historical examples of regulations pertaining to firearms and intoxication.[17]

- In 1623, 1631, and 1632, Virginia enacted measures "directing that '[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments.'" *Id.* at 9; Exhibit C: Intoxication/Weapons Laws at 34.

- In 1655, a Virginia law made individuals subject to fines for "'shoot[ing] any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'" Spitzer Decl. at 9-10; Exhibit C: Intoxication/ Weapons Laws at 34.[18]

- In 1868, Kansas passed a law stating:

  > Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other

---

But Professor Cramer misunderstands Professor Spitzer's argument. It is not about an individual's state of mind when the gun is purchased; it is about his or her state of mind if or when the firearm is later used. Similarly, the implication is not that an intoxicated individual impulsively purchases a firearm; it is that the intoxicated individual would impulsively use the firearm.

[17] Professor Cramer generally criticizes Professor Spitzer for not including the full text of the statutes referenced and for inaccurately citing them, *see* Cramer Decl. ¶¶ 86, 88, 91, 95, 96, but Professor Spitzer included as exhibits to his Declaration lists of the text of the statutes he references, *see* Exhibit C: Intoxication/Weapons Laws; Exhibit E: License & Licensing Laws. Professor Cramer admits he did not review the exhibit to Professor Spitzer's Declaration containing the intoxication and weapons laws. Prelim. Inj. Hr'g Tr. at 77-78.

[18] Professor Cramer testified that the 1655 law was related to protecting the colonists' system for warning of attacks by Native Americans, Prelim. Inj. Hr'g Tr. at 43, but I do not see how that undercuts the fact that the law regulates the use of firearms in circumstances in which individuals were thought to be more disposed to shoot their guns.

> deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

*Id.* at 6.[19]

- In 1878,[20] Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge . . . ." *Id.* at 10-11. The state enacted similar laws in 1880 and 1908. *Id.* at 11-12.

- In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." *Id.* at 35-36.

- In 1879, Missouri passed a law stating:

> "If any person . . . shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

---

[19] Professor Cramer claims in relation to the Kansas statute that "[e]xamining the actual primary source shows that Spitzer has misrepresented the statute." Cramer Decl. ¶ 97. Professor Cramer points instead to an 1865 Kansas prohibition statute and emphasizes that it is not about firearms. *Id.* ¶¶ 97-98. But Professor Cramer is the one who misrepresents the statute. Professor Spitzer's text is correct, and it is a statute criminalizing the carrying of a pistol or other deadly weapon while under the influence of intoxicating drink. *See An Act to prevent the carrying of Deadly Weapons*, 7th Legislature, Reg Session 25, § 2 (Kan. 1867).

[20] Although Professor Cramer insists that all post-1868 evidence is irrelevant under *Bruen, see, e.g.*, Cramer Decl. ¶ 99; Prelim. Inj. Hr'g Tr. at 47, the Supreme Court has instructed that this evidence may be considered unless it conflicts with earlier evidence, *see Bruen*, 142 S. Ct. at 2127-2128; 2136-37, 2154, and n.28. Nothing in the record indicates the later regulations here conflict with any earlier tradition.

*Id.* at 13. The state enacted a similar statute in 1883, *id.* at 14, and several other like regulations were adopted by counties, cities, and towns in Missouri before the turn of the century, *id.* at 13-16; Spitzer Decl. at 12.

- In 1888, a law in Maryland provided:

> Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

Exhibit C: Intoxication/Weapons Laws at 7.

- In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." *Id.* at 32.[21]

These measures are sufficient to show that our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals. Plaintiffs do not seem to dispute this determination, but instead focus on whether those regulations are "relevantly similar" to the Waiting-Period Act. *See Bruen*, 142 S. Ct. at 2132. For the purposes of this proceeding, I hold that they are.

Plaintiffs contend the "why" justifying those regulations and "how" their aims are accomplished differ from those of the Waiting-Period Act. Plaintiffs assert: "[E]very person to

---

[21] The Governor also cites measures limiting the sale of alcohol near armed militiamen that he alleges were enacted "to avoid impulsive violence by armed men." Resp. to Mot. for Prelim. Inj. at 14. I am not persuaded that these regulations are proper analogues because they do not involve the regulation of firearms.

whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks." Mot. for Prelim. Inj. at 9. Plaintiffs' assumption is not a given. Indeed, in this case, there was testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence. *See* Prelim. Inj. Hr'g Tr. at 217-18. I am not suggesting that all individuals who seek to purchase a firearm are a threat. But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Plaintiffs are adamant that "a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone." Mot. for Prelim. Inj. at 10; Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 19. Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here. The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated. Despite Plaintiffs' arguments, the "how" and the "why" of the intoxication laws and the Waiting-Period Act are sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

*Licensing as an Analogue*

In addition, Professor Spitzer details the longstanding history of firearm licensing regimes in the United States and contends "historical licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods." Spitzer Decl. at 15. I find that, although these licensing laws are not implemented in the same way that a waiting period is, they are a

secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.

Because the Supreme Court in *Bruen* indicated that there is a sufficient historical basis for "shall-issue" licensing regimes, I do not detail the history of the Nation's licensing laws here. *See* 142 S. Ct. at 2138 n.9. Waiting periods are similar to "shall-issue" licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met—the passage of at least three days. Additionally, waiting-period laws, like "shall-issue" licensing laws, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635). The Court in *Bruen*, noted that "shall-issue" licensing regimes are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). That is the purpose of Colorado's Waiting-Period Act. The Act provides time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law" (emphasis added)). And the waiting period works to ensure that the individual to whom the firearm is delivered is a "responsible citizen." *See, e.g.*, Prelim. Inj. Hr'g Tr. at 201 (evincing that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides").

The Court in *Bruen* did not rule out "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny

ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. The record is devoid of any evidence that the waiting period here is being "put toward abusive ends." 142 S. Ct. at 2138 n.9.

In *Bruen*, the Court "acknowledge[d] that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" 142 S. Ct. at 2134 (quoting *Heller*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). This is not a straightforward case—during the Founding Era and the century that followed, firearm access and technology, along with violent crime, was drastically different and a waiting period for firearm purchases would have been unnecessary. With that in mind, evaluation of the analogues presented is unsurprisingly difficult. Nonetheless, I find the Governor has provided a sufficient record to conclude that our Nation's historical tradition of firearm regulation is consistent with the Waiting-Period Act.

In sum, Plaintiffs have failed to show that they are likely to succeed on the merits of their claims because the record before me establishes the Second Amendment does not cover the at issue conduct, the Act is presumptively lawful, and even if the Act implicated the Second Amendment, the Nation's historical tradition of firearm regulation would permit it.

## B. Irreparable Harm

Plaintiffs also fail to demonstrate that they will experience irreparable harm if the injunction is denied. Because I find they have not shown they are likely to succeed on the merits

of their claims, the potential violation of their Second Amendment rights does not establish they will be irreparably harmed absent issuance of the injunction.[22]

Regarding specific harms, the named individual Plaintiff—Ms. Garcia—testified that the firearm waiting period impacted her in two ways. First, she was unable to conduct her business as a firearms instructor and range safety officer because she spent the better part of a day driving to a specific firearms vendor several hours away.[23] Second, she reserved and paid for travel and lodging for a shotgun shoot in Virginia, which she is now not going to attend because she could not obtain a new shotgun in time. Prelim. Inj. Hr'g Tr. at 21. The event would have been "very, very important and impactful to [her] career" because it would have been the first time a big production would have had her name on it and would have given her exposure to people in the industry. *Id*. at 21-22. Taylor Rhodes, the Executive Director of RMGO, echoed Ms. Garcia that the waiting period imposes a "massive burden on certain people that want to give businesses around the state business." *Id*. at 32. He also described how he, a member of RMGO, had recently purchased a firearm, and because he was traveling when the waiting period expired, he was unable to pick up his firearm for about eight days. *Id.* at 30-33. Neither Ms. Garcia nor Mr. Rhodes testified that they or any RMGO members would be unable to defend themselves due to

---

[22] I recognize that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."). And, while at least one Court of Appeals has specifically found irreparable harm should be presumed for Second Amendment violations as it often is for First Amendment violations, *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), I am not so sure, especially where, as here, the record is not clear on the extent to which the "central component" of the Second Amendment—self-defense—would be implicated, *see Bruen*, 142 S. Ct. at 2133.
[23] On cross-examination, Plaintiff Garcia disclosed the probable existence of alternative, closer firearms vendors. Prelim. Inj. Hr'g Tr. at 25-26.

the waiting period. Ms. Garcia's possession of numerous other firearms (ten to twenty by her account) supports the inference that her ability to defend herself with a firearm would not be hampered by the waiting period. *See id.* at 23-24.

As the Supreme Court has repeatedly emphasized, "individual self-defense is 'the central component' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767); *see also Heller*, 544 U.S. at 599. Plaintiffs have alleged no harm associated with the right of self-defense.[24] The harm alleged by Ms. Garcia pertains only to her time and business opportunities. Here, those are quintessential compensable harms, i.e, not irreparable. Plaintiffs have not demonstrated they will suffer irreparable injury if the injunction is denied.

### C. Balance of Harms and the Public Interest

The last factors to be considered in evaluating a request for a preliminary injunction are the so-called "balance of harms"—whether the threatened injury to the movant outweighs the injury facing the opposing party under the injunction—and the public interest. Generally, when the government opposes a motion for a preliminary injunction, the public interest and the harm to the government merge such that the harms to be balanced are the threatened injury to the plaintiff and the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

In its Motion, Plaintiffs' analysis of the balance of harms and public interest focuses exclusively on how the State does not have any "interest in enforcing a law that is likely

---

[24] Plaintiffs' Reply in Support of their Motion cites hypothetical "situations where a purchase [sic] knows that an imminent confrontation may occur" to justify interpreting the Second Amendment to require that individuals be able to obtain firearms without delay. Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13. Plaintiffs presented no evidence that related harm would exist or the extent to which it would exist as a consequence of the waiting period being in place.

constitutionally infirm." Mot. for Prelim. Inj. at 15 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). Plaintiffs' approach has two problems. The first is that I already found Plaintiffs have failed to demonstrate the Waiting-Period Act is constitutionally infirm. The second is that it is a reductive interpretation of the law[25] and allots me no discretion to observe how the parties might be affected by the granting or absence of urgent court intervention.[26]

Conversely, the Governor made efforts to illustrate the concrete public interest at stake: citizens' lives. He presented expert testimony from Professor Poliquin based on an empirical study he authored that was published in a peer-reviewed journal.[27] Professor Poliquin's study

---

[25] Reducing the analysis for preliminary injunctions into a simple inquiry on the merits is antithetical to the equitable nature of such relief. As I quoted at the hearing:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), *see also Lemon v. Kurtzman* 411 U.S. 192, 200 (1973) ("In constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Brown v. Board of Education*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.")

[26] In *Bruen*, the Supreme Court stated: "The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2118 (quoting *Heller*, 554 U.S. at 635). On first glance, it might seem that statement dictates the outcome for any balance of harms analysis where a violation of the Second Amendment is likely. The specific language, however, indicates that the right to use arms *for self-defense* must be implicated, and again, Plaintiffs have presented no related evidence. Moreover, in proceedings in equity, the public interest consideration is that of today's public, not the frozen-in-time interest of the very different society that existed at the time of our Nation's founding.

[27] The value of submitting research for peer review before other specialists in the same field is not lost on me. Indeed, it is an explicit factor in *Daubert* hearings that has helped define the scope of presumed expertise for a proffered witness. *See, e.g.*, *Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, No. 14-cv-00638-CMA-NYW, 2016 WL 9734684, at *4 (D.

concluded that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides," which the Governor argued "would translate to over 100 lives saved" during the applicability of a preliminary injunction in this case. Prelim. Inj. Hr'g Tr. at 201, 233. Professor Poliquin's study accounted for multiple different factors, including policy changes across multiple states and demographic variance.

Plaintiffs responded to this evidence through expert testimony of their own.[28] Professor Cramer opined that, based on his review of California crime statistics and state-implemented adjustments to firearm waiting periods, either no causality should be inferred from the correlative increase of murder rate with length of waiting period, or the causal relationship does exist but flows in the opposite direction to what Professor Poliquin concludes. While Professor Cramer admits he is not a statistician and has not received formal training as such, he nevertheless insists that his analysis of California's murder rate against handgun waiting-period length undermines— or "it should certainly make us skeptical" of—claims that a reduction in homicides can be causally attributed to the existence or increased length of firearm waiting periods. Cramer Decl. ¶ 178. Professor Poliquin correctly explained that there are at least two immediate methodological errors made in reaching this conclusion. *See* Prelim. Inj. Hr'g Tr. at 210-12. First, there is no control group used to show the effects of a community adopting a waiting period after not having one. *See id.* at 210-11. And, second, there is no attempt to reckon with other factors that may

---

Colo. Oct. 24, 2016) (noting lesser reliability of "calculations [that] were self-generated and had not been peer -reviewed").

[28] The specific analysis of the Governor's witness, Professor Poliquin, is not directly rebutted by Professor Cramer since the latter did not review the former's work. *See* Prelim. Inj. Hr'g Tr. at 88. However, Professor Cramer did present his analysis on California's waiting period, which he believes suggests a contrary conclusion. *See* Cramer Decl. ¶¶ 176-82.

influence murder rates in California during the observed period (e.g. national criminal trends) or to quantitatively explain why these factors are not present. *See id.* at 211-12.[29]

Professor Cramer further critiques Professor Poliquin's study by claiming that suicide reduction would be an unlikely result from instituting a waiting period because people intent on killing themselves would find an alternate means if they could not legally procure a firearm. Professor Poliquin testified that, although he "would expect a reduction in gun-related suicides," he was "slightly less confident in that prediction based on the results of [his] study." *Id*. at 213. Nevertheless, the statistical certainty with which Professor Poliquin makes that qualified prediction can be measured, tested, and verified. By contrast Professor Cramer does not support his skepticism with any specific evidence.

With a statistically rigorous study quantifiably illustrating the public safety benefits of a firearm waiting period, I weigh this against the purported harms the Plaintiffs would suffer. Even accepting the harm Plaintiffs describe as entirely true, it is not remotely close. For the sake of

---

[29] Professor Cramer suggests that California is "very nearly a perfect example of a laboratory for waiting period" because interstate firearms trafficking is illegal under 18 U.S.C. § 922 and violence is largely concentrated in urban areas that are far from the state's borders. *See* Cramer Decl. ¶ 175. Again, there are at least two problems here. The first is that he provides no discussion or evidence of how enforcement of anti-trafficking laws has prevented the illegal import of firearms into California. By contrast, his testimony that "most firearms are acquired by felonious practices," such as theft or sales by "unscrupulous gun dealers who are actually violating federal law" would seem to suggest illegal firearm sales pervade America despite legal restrictions. Prelim. Inj. Hr'g Tr. at 48-49. In any event, Professor Cramer cites no data for this contrary proposition either. He does, however, refer to a single incident of mass firearm theft, which ironically took place in Los Angeles County, California. *Id*. at 49. The second problem is that Professor Cramer baldly opines that "most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states," without any further development or corroboration. Cramer Decl. ¶ 175. I am left not knowing if a bare majority of crime occurs in these far-flung urban areas, leaving comparably—albeit measurably less—homicidal rural areas with easy access to out-of-state firearms.

clarity, saving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.

## V. CONCLUSION

Accordingly, Plaintiffs have failed to show the applicable factors weigh in favor of preliminarily enjoining enforcement of the Waiting-Period Act. Their Motion for Preliminary Injunction (ECF No. 2) is, therefore, DENIED.

DATED this 13th of November, 2023.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE