# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

---

## **Table of Contents**

**Page**

Table of Contents .................................................................................................... i

Table of Authorities................................................................................................. ii

Introduction and Background ................................................................................... 1

Procedural Posture ................................................................................................... 2

Statement of Undisputed Material Facts.................................................................. 3

Discussion ................................................................................................................ 18

I.      Standard of Review....................................................................................... 18

II.     The Second Amendment's plain text covers the right to obtain possession of firearms.................................................................................................... 19

III.    The waiting period law is not a commercial regulation, and there is nothing "presumptive" about its lawfulness. ......................................................... 27

IV.     The intoxication laws and licensing regimes are not "relevantly similar" historical analogues to the Waiting Period Law............................................ 31

Conclusion ............................................................................................................... 35

## Table of Authorities

**Case**                                                                                                           **Page(s)**

*Adler v. Wal-Mart Stores, Inc.,*
   144 F.3d 664 (10th Cir.1998) ..................................................................... 18

*Aldridge v. Commonwealth,*
   2 Va.Cas. 447 (1824) ................................................................................ 34

*Allen v. Muskogee, Okl.,*
   119 F.3d 837 (10th Cir. 1997) ................................................................... 18

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................. 18

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................................. 21

*Beckwith v. Frey,*
   2025 WL 486830 (D. Me., 2025) .......................................................... 21, 22, 32

*City of Akron v. Akron Center for Reproductive Health,*
   462 U.S. 416 (1983) ................................................................................. 24

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .................................................... 7, 20, 27, 28, 29, 30, 31

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ................................................................................. 24

*Elrod v. Burns,*
   427 U.S. 347 (1976) ................................................................................. 25

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ..................................................................... 21

*Gullickson v. Southwest Airlines Pilots' Assoc.,*
   87 F.3d 1176 (10th Cir.1996) ................................................................... 19

*Haynes v. State of Wash.,*
   373 U.S. 503 (1963) ................................................................................. 26

*Hill v. Colorado,*
   530 U.S. 703 (2000) ................................................................................. 23

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
   5 F.4th 407 (4th Cir. 2021) ....................................................................... 28

*Illinois v. Caballes*,
   543 U.S. 405 (2005)...................................................................... 25

*Kev, Inc. v. Kitsap County*,
   793 F.2d 1053 (9th Cir. 1986) ................................................... 26

*Maryland Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024) .......................................... 21, 23, 34

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)........................................................ 26, 31, 32

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)..................................................... 26

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022)........................................... 10, 19, 20, 22-24, 26-33

*Nguyen v. Bonta*,
   2024 WL 1057241 (S.D. Cal. 2024) ......................................... 30

*Northland Family Planning Center v. Nessel*,
   2024 WL 5468617 (Mich. Ct. of Cl. 2024)............................... 25

*Planned Parenthood v. Casey*,
   505 U.S. 833 (1992)................................................................... 25

*Preterm-Cleveland v. Yost*,
   2024 WL 3947516 (Oh. Ct. of Common Pleas, 2024)........... 24, 25

*Range v. Att'y Gen. United States of Am.*,
   69 F.4th 96 (3d Cir. 2023)......................................................... 30

*Reese v. ATF*,
   127 F.4th 583 (5th Cir. 2025).................................................... 22

*Rhode v. Bonta*,
   713 F. Supp. 3d 865 (S.D. Cal. 2024) ..................................... 20

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5017257 (D. Colo. 2023) .......................................... 2

*Shapiro v. Thompson*,
   394 U.S. 618 (1969)................................................................... 26

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016)..................................................... 23

*State v. Allmond,*
    7 Del. 612 (Gen. Sess. 1856) ........................................................ 34

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ........................................................ 21

*U.S. v. Dominguez-Maqueda,*
    2006 WL 1308266 (D.N.M. 2006) ................................................ 26

*United States v. Chavira Ornelas,*
    2024 WL 3875796 (D.N.M. 2024) ................................................ 26

*United States v. Duarte,*
    101 F.4th 657 (9th Cir. 2024) ................................................. 29, 30

*United States v. McNulty,*
    684 F. Supp. 3d 14 (D. Mass. 2023) ............................................ 21

*United States v. Rahimi,*
    602 U.S. 680 (2024) ........................................... 20, 28, 32, 33

*Waters v. State,*
    1 Gill. 302 (Md. 1843) ................................................................. 34

*Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,*
    259 F.3d 1226 (10th Cir. 2001) .................................................... 18

**Constitutional Provisions and Statutes**

U.S. Const. amend. II ........................................................................ 19

18 U.S.C. § 922(g)(5) ........................................................................ 27

Colo. Rev. Stat. § 18-12-115(1)(a)(I) ................................................. 3

Colo. Rev. Stat. § 18-12-115 ............................................................ 1

Colo. Rev. Stat. § 18-12-115(1)(ab)(2) ............................................ 1

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................... 18

**Other Authorities**

House Bill 23-1219 ......................................................................... 1, 3

Robert Leider, *Our Non-Originalist Right to Bear Arms,*
    89 Ind. L.J. 1587 (2014) ............................................................. 34

## Introduction and Background

This action challenges the constitutionality of Colo. Rev. Stat. § 18-12-115 (the "Waiting Period for Firearms Sales" or the "Waiting Period Law"), which was enacted by the Legislature of the State of Colorado as House Bill 23-1219, and signed into law by Governor Jared Polis on April 28, 2023. The Waiting Period Law became effective on October 1, 2023. With limited exceptions, the Waiting Period Law makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to them until a minimum of three calendar days after the sale has occurred, even if a clean background check comes back immediately.[1] There is no relevant historical analogue for the Waiting Period Law, either at the Founding, or at the time that the Fourteenth Amendment was ratified. As such, the Waiting Period Law is unconstitutional.

Plaintiffs Alicia Garcia and Rocky Mountain Gun Owners Association have been negatively impacted by the Waiting Period Law's unconstitutional burden on the Second Amendment rights of law-abiding Coloradans to purchase firearms. On at least two occasions since the Waiting Period Law went into effect, Ms. Garcia has been delayed from taking possession of firearms after she paid for them and was cleared by a background check. Because of this, Ms. Garcia's business as a firearms instructor, range safety officer, and social media personality who tests and instructs others on firearms has been injured, and will continue to be injured into the future. [ECF No. 30, Transcript of Preliminary Injunction Hearing Vol. 1 at 16, lines 4-17.] Similarly, members of Rocky Mountain Gun Owners Association, including Taylor Rhodes, have

---

[1] The provisions of the Waiting Period Law do not apply to: (1) the sale of an antique firearm; (2) the sale of a firearm to a family member by a person serving in the military who will be deployed outside of the United States within the next 30 days; and (3) a firearm transfer for which a background check is not required pursuant to state or federal law. Colo. Rev. Stat. § 18-12-115(1)(ab)(2).

been similarly burdened by the Waiting Period Law, and will be burdened into the future by the law.  [Rhodes Deposition Transcript at 76, lines 13-17, and at 77, lines 18-23; ECF No. 30, Transcript of Preliminary Injunction Hearing, Vol. 1, 11/8/2023, at 29, lines 20-25, and at 30, lines 1-10.]

## Procedural Posture

Before the Waiting-Period Law went into effect on October 1, 2023, Plaintiffs filed a separate case challenging the law. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN (Filed Apr. 28, 2023). In ruling on the Motion for Preliminary Injunction in that case, Chief Judge Philip Brimmer held that Plaintiffs could not move to enjoin the Waiting Period Law before it was enforced. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Plaintiffs then diligently brought this challenge once the Waiting Period Law went into effect on October 1, 2023, seeking a temporary restraining order and preliminary injunction at that same time.

A preliminary injunction hearing was subsequently held on October 26 and 30, 2023. At the hearing, the defense and its experts conceded that there is no history or tradition of imposing arbitrary "cooling off" waiting periods—of any length—on the acquisition of firearms in the United States.[2] Instead, the defense relied on a historical practice of preventing sales of firearms to intoxicated individuals, and to licensing regimes generally, as potential historical analogues. [ECF No. 31, Transcript of Preliminary Injunction Hearing Vol. 2, 11/8/2023, at 228, lines 10-21, and at 230, lines 8-21.]

---

[2] Professor Randolph Roth, one of the defense experts called to testify at the preliminary injunction hearing, testified that "it wouldn't have crossed the minds of the Founders to pass such a law." (ECF No. 30 at 190, lines 18-22).

2

On November 13, 2023, this Court issued its Order Denying Motion for Preliminary Injunction, finding that (i) the Second Amendment's plain text does not cover the conduct that the Waiting Period Law implicates; (ii) the Waiting Period Law is also presumptively lawful, because it is a law that imposes a condition or qualification on the commercial sale of arms; and (iii) that there were two relevant historical analogues that sufficed to validate the Waiting Period Law—one that disarmed intoxicated persons, and one related to licensing regimes. [ECF No. 32, Order Denying Motion for Preliminary Injunction, 11/13/2023, at 13, Section A "Likelihood of Success on the Merits".]

**Statement of Undisputed Material Facts**

1.      On April 28, 2023, Governor Jared Polis signed into law House Bill 23-1219, entitled "An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm" (the Waiting Period Law). [ECF No. 2, Motion for Temporary Restraining Order, Attach. #1 Ex A. Act, 10/1/2023, at 3].

2.      With limited exceptions, the Waiting Period Law makes it unlawful for any person who sells a firearm to deliver it to the purchaser until three days after the seller has initiated a background check, even if a clean background check comes back sooner. The Waiting Period Law is triggered by the firearm seller's initiation of either a state or federal background check, and is unrelated to whether the individual who has purchased and acquired title to the firearm poses any individualized or genuine safety concerns. [*Id.* at SECTION 2 – C.R.S. § 18-12-115(1)(a)(I).]

3.      By the time that the waiting period initiates, the commercial transaction has already been completed: money has been exchanged, and ownership of a firearm has passed to the

purchaser. [*Id.*] (referring to a "background check of the <u>purchaser</u>," not at the previous point of sale) (emphasis added).

4.      The Waiting Period Law became effective on October 1, 2023. [*Id.* at SECTION 3.]

5.      Plaintiff Alicia Garcia is an adult resident of Colorado, as well as a firearms instructor, range safety officer, and social media personality who reviews firearms and provides guidance and instruction to others on the safe and effective use of those firearms. [ECF No. 30 at 16, lines 4-10.]

6.      Ms. Garcia regularly purchases firearms as part of her many business endeavors. [ECF No. 30 at 16, lines 16-17.]

7.      On October 1, 2023, Ms. Garcia traveled to the Triple J Armory in Littleton, Colorado, for the purpose of acquiring a new Henry Big Boy brass lever action .357/.38 Special rifle. [ECF No. 30 at 16, lines 13-25.]

8.      After completing the necessary paperwork for her background check and subsequently being informed that she had passed, Ms. Garcia paid the purchase price for her firearm. [ECF No. 2, Attach. #2 Garcia Declaration, ¶ 3]

9.      However, when she requested that J.D. Murphree (the owner of Triple J Armory) deliver the firearm to her, Mr. Murphree refused to do so, explaining to Ms. Garcia that due to the Waiting Period Law she could not remove the firearm from the store for three days. [ECF No. 2, Attach. #2, ¶ 4.]

10.     Ms. Garcia asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Law as to why she could not receive the firearm and take it

with her. Mr. Murphree said there was none. The Waiting Period Law's requirements were the only reason he would not deliver the firearm to Ms. Garcia. [ECF No. 2, Attach. #2, ¶ 4, and ECF No. 30 at 19, lines 2-4.]

11.     On October 25, 2023, Ms. Garcia drove approximately five hours, roundtrip, to the Dragonman's gun store in Colorado Springs to purchase a shotgun. [ECF No. 30 at 20, lines 1-19.]

12.     Ms. Garcia intended to acquire a shotgun from Dragonman's, so that she could attend a televised shotgun shooting event in Virginia later that week—an event which would likely have provided her with business opportunities. [ECF No. 30 at 21, lines 19-25, and at 22, lines 1-5.]

13.     Unfortunately, even though Ms. Garcia passed her background check, she was unable to take possession of the shotgun on October 25 due to the requirements of the Waiting Period Law. [ECF No. 30 at 21, lines 12-19.]

14.     Without this shotgun, Ms. Garcia was forced to cancel her appearance at the shotgun shooting event in Virginia. [ECF No. 30 at 21, lines 19-25, and at 22, lines 1-5.]

15.     Ms. Garcia intends on purchasing additional firearms in Colorado in the future. [ECF No. 30 at 20, lines 23-25.]

16.     Plaintiff Rocky Mountain Gun Owners (RMGO) is a Colorado based nonprofit organization whose mission is to defend the right of all law-abiding individuals to keep and bear arms. [ECF No. 2, Attach. #3 Rhodes Declaration, paragraph 3]

17.     RMGO has approximately 16,000 members—most of whom reside in Colorado. [ECF No. 30 at 29, lines 16-17.]

18.     At least two RMGO members, Ms. Garcia and Taylor Rhodes, have been affected by the Waiting Period Law. [ECF No. 2, Attach. #3 Rhodes Declaration, and ECF No. 30 at 32, lines 13-25.]

19.     On October 1, 2023, Mr. Rhodes—who at the time was the Executive Director of RMGO—attempted to purchase a firearm from the Triple J Armory. [ECF No. 30 at 30, lines 7-8.]

20.     Although Mr. Rhodes paid the purchase price for the firearm and passed his background check, he was unable to take possession of the firearm at that time. In fact, due to travel, he was unable to take possession of the firearm until eight days later. [ECF No. 30 at 30, lines 1-10, and at 33, lines 1-7.]

21.     On the issue of standing, in its previous Order Denying Plaintiffs Motion for Preliminary Injunction, this Court held:

> Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. .. She has been impacted by the Act's waiting period and will be in the near future. ... She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does.

[ECF No. 32 at 6, ¶ 2 and fn 3.]

22.     In their effort to establish that the Waiting Period Law is in line with this nation's historical tradition of firearms regulation, the defense has offered the expert opinion of Professor Robert Spitzer. [ECF No. 18, Brief in Opposition to Motion for Temporary Restraining Order and for Preliminary Injunction, # 3 Exhibit 3, Spitzer Declaration, 10/17/2023.]

23.     As outlined in his curriculum vitae and expanded on during his deposition testimony, Professor Spitzer has been previously retained to offer an expert opinion in over 50 firearms related cases. [Spitzer Deposition Transcript at 19, lines 18-24, and ECF No. 18, # 3, Ex. A to Spitzer Dec: CV.]³

24.     In all of these cases, Professor Spitzer worked on behalf of the proponent of the firearms regulation that was being challenged; and in every case, he concluded that there was an historical analogue to support the law. (Q. … Correct me if I'm wrong here, but in each and every one of those cases, you've been an expert witness on behalf of the government—or probably better said, you've been an expert witness on behalf of the proponent of the firearms regulation that was being challenged; is that correct? A. The defender of various firearms laws, yes. … Q. In any of those 50 cases that you've been asked to research or review historical gun laws, have you ever come up with the problem of saying there is no analogous historical gun law to support whatever the current regulation that's being challenged is? A. No.). [Spitzer Deposition Transcript at 20, lines 6-13, and at 21, lines 14-20.]

25.     Professor Spitzer does not believe that the Second Amendment confers an individual right to bear arms aside from government-based military or state militia service activity. (Q. Would it be fair to say that you … disagreed with the Supreme Court's decision in [the *Heller*] case? A. Yes. Q. In fact—and I went through and reviewed some of your writings and work actually going back all the way to the 1990s, but it's clear that you have been consistent in your opinion that the Second Amendment does not confer an individual right to bear arms aside or apart

---

³ The pertinent parts of Professor Spitzer's Deposition Transcript have been attached to this Motion for Summary Judgement as Exhibit A.

from any sort of government-based military or militia service activity. A. Yes.). [*Id.* at 45, lines 15-25, and at 46, line 1.]

26.     During his deposition testimony, Professor Spitzer acknowledged that although firearms were readily available for individual acquisition and use during the Founding Era, government-imposed waiting periods did not exist in the United States at that time or for the next 150 years. (Q. But fair to say that guns were common in the United States at the founding? A. Yeah, common's kind of a vacuous term, but certainly there were guns to be had. If you wanted to have a gun, you could surely, you know, obtain one. [*Id.* at 102.] (Q. … But regardless of how an American in 1790 acquired a firearm, you know, either from a gunsmith, from—imported from Europe, homemade, fill in the blank, there was no government-imposed waiting period at this time, correct? A. No, not to my knowledge.) [*Id.* at. 102, lines 17-22, and at 110, lines 3-8.]

27.     This fact was subsequently reiterated by the Plaintiffs' expert witness, Professor Lee Francis, who similarly asserted that "while firearms were generally accessible and available to the public both in small and individual sales and in bulk quantities, neither required a waiting period." [Francis Report and Declaration at 7, ¶ 18.][4]

28.     The first law to impose any type of waiting period to acquire a firearm was not enacted until 1923 in California. In that instance, California imposed a one-day delay for retail handgun purchases, so that firearms dealers would have time to identify the purchaser to local law enforcement agencies for their record keeping. [ECF No. 30 at 39, lines 6-13.]

---

[4] Copies of Professor Lee Francis' Expert Report and Declaration and his curriculum vitae are attached to this Motion for Summary Judgement as Exhibit B.

29.     Professor Spitzer asserts that there are two categories of Founding Era laws that are analogous to Colorado's three-day waiting period law: (1) laws pertaining to intoxication, and (2) laws pertaining to weapons licensing "[b]ecause both involved mechanisms or activities or things that, wrapped up within them, included delays with respect to a weapons use or obtaining or the like." [Spitzer Deposition Transcript, at 70, lines 19-25, and at 71, lines 1-5.]

30.     In his Declaration, as well as in his deposed testimony, Professor Spitzer asserted that Founding Era intoxication laws are an analogous historical parallel to modern waiting period laws, since they prevented firearm acquisition or use only for a limited period of time—the period of actual intoxication. Sobriety usually lifted the barrier to gun access within a day or so, if not within a matter of hours. "Because intoxication is by its nature temporary, it interrupts gun access only temporarily, as is the case with waiting periods. Moreover, old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment. These purposes also mimic the purpose of modern waiting period." [ECF No. 18, Attach. #3 Exhibit 3, Spitzer Declaration at 6, Section III – "Guns and Intoxication."]

31.     While there was a condition precedent that needed to be in place before the restrictions of firearms related intoxication laws would be triggered—namely, the inebriation of the person seeking to acquire, possess or use a firearm—there is no condition precedent required for Colorado's three-day waiting period. It applies universally, regardless of the physical state, mental state or personal history of the person seeking to acquire a firearm. ([Regarding the intoxication laws] Q. They were intoxicated. There was a condition that they could either avoid or cure through sobriety, and then they could take possession of the firearm. … What's the condition,

though, for someone in Colorado who passes the background check? So we're not talking about waiting for -- to determine if they're prohibited. A. Well, that's a condition, isn't it?  Q. It is a condition, but they've passed it. ... What is the condition then that's in place to prevent them from taking possession of the firearm for three days? A. Well, it's because state law stipulates three— 72 hours. Q. Correct. But it's not based on any specific condition of the person trying to purchase the firearm. A. Well, it's based on a public policy goal. Q. I understand that. It's not based on a condition like the intoxication laws are, correct? A. Well, I—well, I would just say that the definition of similar to is not identical. And I think similar to is a reasonable metric). [Spitzer Deposition Transcript, at 135, lines 17-25, and at 136, lines 1-16.]

32.    Professor Spitzer was unable to identify any intoxication-related weapons laws from the Founding Era (or even during the Reconstruction Era) that prohibited the <u>acquisition</u> of a firearm by an intoxicated person; instead, the laws he cited dealt with the <u>possession and use</u> of an already acquired firearm while intoxicated. [ECF No. 18 at # 5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws.]

33.    Plaintiff expert Professor Francis offers expert testimony that, of the numerous intoxicated-related weapons laws enacted between the 1600s and the early 1900s that Professor Spitzer identified, only two states implemented laws which prohibited firearm sales to those who were intoxicated.[5] [Francis Report and Declaration at 10, ¶ 27, and at 13, ¶ 37.]

---

[5] "The statutes referenced in Spitzer's report enacted between 1623-1750 clearly did not prohibit an individual from obtaining a firearm while intoxicated. The earliest statute that is even remotely supportive of the proponent's view was not enacted until 1878 and falls outside of the relevant historical period under Bruen." [Francis Report and Declaration at 13, para 37.]

34.     Professor Spitzer confirmed during his deposition testimony that up until the early 20th century, the only two states that implemented laws which prohibited firearm sales to those who were intoxicated were Mississippi in 1878, and Delaware in 1911. (Q. … So let me ask this question. As I'm looking at that table [in your report], of all these laws that are listed and the states that were passing intoxication-related laws, how many states prohibited firearm sales to those who were intoxicated? A. Well, … it's totaled at the bottom. … [I]t looks like just two states. I see Delaware and Mississippi. … Q. The only two states that passed laws that related to the status of the person who was purchasing the firearm, basically the status or condition of the person at the time they were trying to obtain the firearm originally, were Delaware and Mississippi; is that correct? A. With respect to sale, yes.). [Spitzer Deposition Transcript, at 143, lines 17-25, 144, lines 1-6, and at 145, lines 10-16; and ECF No. 18 at # 5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws.]

35.     Based on his review of historical state laws regulating firearm use and intoxication, Professor Francis reached a similar conclusion. "None of the historical statutes from the Founding Era cited in Professor Spitzer's report indicate a similar intrusion on the right to bear arms. To put it another way, merely being intoxicated during the Founding Era would not have prohibited an individual from obtaining a firearm . . . [only their] *use* of a firearm while intoxicated." [Francis Report and Declaration at 8, ¶ 21.][6]

---

[6] "Our Founders were brilliant men. They knew the world and enjoyed many of its vices, including alcohol. Drunkenness was not foreign to them, nor did it elude them. When the Second Amendment was drafted and ratified, they simply did not consider alcohol or drunkenness to be a reason to deprive one of their rights to keep and bear arms." [*Francis Report and Declaration.* at 10, ¶ 26.]

36.     In addition to intoxication laws, Professor Spitzer also proffered that Founding Era weapons licensing or permitting laws offer an analogous historical parallel to modern waiting period laws. In his Declaration, Professor Spitzer wrote:

> While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application or permission to do something is submitted (such as a hunting license application) and the license or permission is granted.

[ECF No. 18, Attach. #3 Exhibit 3 at 20, ¶ 33.]

37.     Professor Spitzer's expert opinion is that firearms licensing regimes, which typically include a separate administrative process, are sufficiently analogous to waiting period laws because they both impose some delay on the acquisition of a firearm. (Q. The waiting period law in this case requires no application process, correct? A. If you say so. But that's not the key fact. The key fact is the passage of time.) [Spitzer Deposition Transcript at 160, lines 15-18.]

38.     Unlike the Waiting Period Law, licensing regimes generally involve a specific approval process that relates to an individual's circumstances. (Q. --But the weapons licensing laws, the ones you reference, required some sort of application process of some sort, correct? A. Right.) [*Id.* at 160, lines 10-14.]

39.     It was not until 1885 that a licensing law was enacted in the United States that required individuals to obtain a permit before acquiring a firearm. (Q. Well, to your last point, it appears, based on my scanning of the table, is that there's only one such law under that category of Seller Registers Buyer that occurred in the 19th century, in the late 19th century. That was

Illinois. It appears that all the other similar laws were passed in the 20th century, based on my review. Does that seem right? A. I believe that's right, yep.). [*Id.* at 167, lines 13-21.]

40.    The vast majority of other licensing laws cited in Professor Spitzer's report related to individuals who already acquired a firearm, but who were seeking permission to carry or use the firearm in some unique or additional manner (e.g. concealed carry). (Q. … It seems like the vast majority of the laws under the Carry or Have category that you outlined in your report … [w]ith rare exception, they all appeared to be related to concealed carry permits of some sort. A. I think the majority of them are or were. I think that's right. I mean, I would want to, you know, parse that more specifically …. Q. So … In those situations, the person who's applying for that permit, they already have the firearm in their possession. A. Some of them were possession. I think the majority—I think the majority of the laws I examined here, they already had the weapons.) [*Id.* at 169, lines 20-25, and at 170, lines 1-11.]

41.    None of the Founding Era weapons licensing laws cited by Professor Spitzer in his Report required someone to delay taking possession of a firearm. [ECF No. 18 at # 5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws; and Francis Report and Declaration at 21-22, ¶ 65.]

42.    As Professor Francis noted, "[e]ven when a permit or license [was] required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm regardless of whether he'd be permitted to hunt." [Francis Report and Declaration at 21-22, ¶ 65.]

43.    Of the approximately 265 weapons licensing laws Professor Spitzer examined and included in his report, 41 of those laws were specifically targeted at either African Americans or

other targeted groups.[7]  [ECF No. 18 at # 5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws, and Spitzer Report and Declaration at 22, ¶¶ 36 and 37.]

44.     Of the pre-Civil War examples included in Professor Spitzer's "Table of Weapons Licensing Laws," the weapons licensing laws directed at African Americans were solely concerned with the government controlling "when enslaved persons or free persons of color were allowed to have possession of weapons." [Spitzer Report and Declaration at 22, ¶¶ 36 and 37; ECF No. 18 at # 5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws.]

45.     Such was also the case for licensing laws that pertained to other racial and ethnic minorities—both before and after the Civil War and Reconstruction Era:

> The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

[Spitzer Report and Declaration at 40-41, ¶ 65.]

46.     Although these laws were "indisputably racist," proponents of these licensing regimes were able to legally justify them at that time on the basis that they were intended to keep firearms out of the hands of potentially "dangerous people."  [Francis Report and Declaration at 22-23, ¶ 69.]

---

[7] Although paragraph 36 of Professor Spitzer's report mentions that 283 licensing laws were examined, the "Table of Weapons Licensing Laws" attached to the report as Exhibit D lists a total of 265 laws. [ECF No. 18 at # 5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws.]

47.     Professor Christopher Poliquin, who has also been retained as an expert witness for the defense, has provided a declaration and testimony in this case related to a research study he conducted which analyzed the impact of waiting period policies that impose a delay between the purchase and receipt of a handgun on firearm violence, homicide, and suicide rates. The study reviewed 45 years (1970 to 2014) of relevant firearm violence data that had been collected from all 50 states and the District of Columbia. [ECF No. 31, Transcript of Preliminary Injunction Hearing, Vol. 2 at 200, lines 23-25, and at 201, lines 1-9.]

48.     Professor Poliquin's study concluded that waiting period laws that delay the receipt of a purchased handgun may reduce gun-related homicides by as much as 17 percent and gun-related suicides by as much as 11 percent. [*Id.* at 201, lines 10-20.]

49.     Although this was a quantitative, multivariable assessment of American handgun waiting period laws over a 45-year period, the effect of the following items were not considered or implemented as "control variables" as part of the study:

a.     The fluctuating crime rates and incarceration rates of the individual states over the 45-year study period were not used as control variables. (Q. … [D]id you include the overall crime rate of the individual states as one of the control variables in the study? A. No. Q. How about the incarceration rates in each of the states? A. No.) [Poliquin Deposition Transcript at 35, lines 19-25.][8]

b.     The overall number of law enforcement officers in each state over the 45-year study period was not used as a control variable. (Q. And did you control for the number

_____

[8] The pertinent parts of Professor Poliquin's Deposition Transcript have been attached to this Motion for Summary Judgement as Exhibit C.

of law enforcement officers in a given area or in a given state, whether urban or suburban or rural? A. No, no.) [*Id.* at 36, lines 1-4.]

c.    The Violent Crime Control in Law Enforcement Act passed by Congress and signed into law by President Bill Clinton in 1994 was also not considered or used as a control variable in the study, even though its crime-fighting provisions were implemented nationwide in the middle of the study period.[9] (Q. I just want to make it clear, though, that that piece of legislation or any specific piece of [federal crime] legislation was not used as a control variable in the study? A. Correct, not explicitly entered as a—as a variable.) [*Id.* at 48, lines 1-6.]

d.    California's 1994 "Three Strikes law", as well as similar "tough on crime" legislation passed by dozens of states between 1994 and 2004, was not used as a control variable in the study. (Q. And were you aware that after California implemented the Three Strikes Law in 1994, 26 other states had passed and implemented similar tough-on-crime laws by 2004, 10 years later? A. I was not aware of that, no. Q. And that would be a period of time, 1994 to 2004, that fell right in between your study period, correct? A. That period overlaps in my study period, correct. Q. And these tough-on-crime initiatives that were passed by a

---

[9] The Violent Crime Control and Law Enforcement Act of 1994, signed by President Bill Clinton, is the largest-ever crime bill in the country's history. It provided for 100,000 new police officers and allocated $9.7 billion for prisons and $6.1 billion for prevention programs. The Crime Bill included the Violence Against Women Act, which created the Office on Violence Against Women, and establishes the Office of Community Oriented Policing Services, or COPS Office. [U.S. Department of Justice, Office of Justice Programs, https://www.ojp.gov/ojp50/1994-violent-crime-control-and-law-enforcement-act.]

majority of states in this country during that period … were … not a control variable that you considered, correct? A. Correct.) [*Id.* at 78, lines 4-18.]

e.   At the end of the Brady Act interim period in 1998, with the implementation of the NICS instant background check system, approximately 10 states abandoned the waiting periods that they had previously imposed to ensure sufficient time to conduct federally mandated background checks. The study did not analyze what impact, if any, the loss of those waiting periods had on the gun related homicide or suicide rates in those states. (Q. And I know that the -- the Brady [Act] period that you were focused on was approximately four years, correct? A. Correct. Q. So '94 to '98, approximately. So let me ask this then: In the four years that followed—so now we're looking at 1999 to 2003, … did the study discover or notice a rebound … in gun homicides or gun-related suicides in the states that abandoned the waiting periods that had existed during Brady? A. We didn't specifically look at that.) [*Id.* at 93, lines 1-12.]

f.   The study did not analyze or consider "time-to-crime" statistics as a control variable.[10] (Q. Okay. And . . . multiyear crime data show that the average is over six years between when a firearm is acquired and when it is used for criminal activity. Would—does that surprise you, hearing it's that length of time? A. A statistic of six years does not surprise me, no. Q. Were … these time-to-crime statistics or data related to the length of time between when a firearm is acquired

---

[10] "Time-to-crime" refers to the duration of time between when a firearm was first purchased from a retail dealer and when that firearm is recovered at a crime scene.

and when it is used, … for a criminal purpose, were they considered as part of your study, these statistics? A. We did not analyze time-to-crime in our study, no.) [*Id.* at 99, lines 13-25, and 100, lines 1-3.]

50.     Although 44 states and the District of Columbia had a waiting period of some type in place during the period of the study (1970 to 2014), the nature, purpose and/or length of each of those waiting periods was not considered by Professor Poliquin or his associates in their study. (Q. Okay. But just so I'm clear, the . . . nature and type of the waiting period was not a control variable in the study. A. No. Q. So, for example, we just spoke about whether the waiting period applies to all transactions or some was not considered, correct? A. Correct. Q. And whether the waiting period was related to permitting or licensing or some other delay requirement was not considered either, correct?  A. Correct, no. That's right.) [*Id.* at 66, lines 15-25, and 67, lines 1-3.]

## Discussion

### I.     Standard of Review

Summary judgment is appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it is essential to the proper disposition of the claim under the relevant substantive law." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231-32 (10th Cir.2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). A dispute regarding a material fact is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[The Court construes] the factual record and reasonable inference therefrom in the light most favorable

to the nonmovant." *Id.* at 839-40 (citing *Gullickson v. Southwest Airlines Pilots' Assoc.*, 87 F.3d 1176, 1183 (10th Cir.1996)).

In this context, it is not clear what factual issues in dispute could go before a jury. The relevant questions in the case are legal ones, and Plaintiffs prevail as a matter of law, based on undisputed facts.

## II.    The Second Amendment's plain text covers the right to obtain possession of firearms.

In its Opinion denying the Plaintiffs' Motion for Preliminary Injunction, this court concluded that the Waiting Period Law was not presumptively unconstitutional under the first step enunciated by *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The Court held that "the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered" by the plain text of the Second Amendment. (ECF No. 32 at 15.). In the context of the instant motion, Plaintiffs respectfully urge this Court to revisit that holding. Colorado's Waiting Period Law regulates acquiring a firearm, and the Second Amendment's text encompasses that conduct.

The text of the Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not infringed." U.S. Const. amend. II. When considering a facial challenge to a firearm regulation, the Court must first determine whether the challenged law regulates conduct covered by the Second Amendment's plain text. *Bruen*, 597 U.S. at 17. This means that plaintiffs need only show three things: (1) The Waiting Period Law applies to "the people"; (2) it covers "arms"; and (3) it regulates the "keep[ing]" or "bear[ing]" of those arms. *Id.* at 31–33.

19

The Waiting Period Law regulates "arms," and very clearly applies to "the people's" ability to acquire them. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008). Under the Waiting Period Law, for 72-hours after passing their background checks, law abiding Coloradans are prevented from taking possession of their own, already-purchased firearms, and therefore deprived of their ability to "keep and bear" those firearms. Any other conclusion is in deep tension with *Heller* and other precedent. *Cf. Rhode v. Bonta*, 713 F. Supp. 3d 865, 873 (S.D. Cal. 2024) ("[A]cquiring ammunition is conduct covered by the plain text of the Second Amendment.").

The *Heller* Court held that the Second Amendment's "textual elements": (1) "guarantee the individual right to possess and carry weapons," *id.* at 592 (emphasis added); (2) protect the rights of "all Americans," *id.* at 580; and (3) "extend[] prima facie, to all instruments that constitute bearable arms," *id.* at 582. Under *Heller*, therefore, the Plaintiffs' conduct is covered by the plain text. *Cf. United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation.") (emphasis added). In order to avoid reaching *Bruen* Step 2, the Defendant bears the heavy burden of establishing that the Waiting Period Law—which regulates firearms—is paradoxically (1) not a "firearms regulation" and (2) not a regulation on "arms-bearing conduct." Neither is correct.

Nevertheless, the Defendant asserts that because the Waiting Period Law only "slightly delays the acquisition of new firearms," and does not directly prohibit anyone from keeping or bearing arms in the long term, its law does not interact with the plain text of the Second Amendment. (ECF No. 31 at 227-28).

But this line of thinking defies basic common sense. If someone does not already own a firearm, or does but wishes to purchase another, he can only "keep and bear" that firearm if he is first able to acquire it. And the Waiting Period Law cuts off all avenues of doing so unless he complies with its terms—a nearly universal mandatory three-day delay, completely unconnected to any individualized security concerns or case specific justification. Thus, the Waiting Period Law necessarily regulates conduct protected by the Second Amendment's plain text. *See, e.g.*, *United States v. McNulty*, 684 F. Supp. 3d 14, 20 (D. Mass. 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase, sell, or otherwise transfer firearms in order to keep oneself properly armed."); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 230 (4th Cir. 2024) (Rushing, J., concurring) ("Maryland's law regulates acquiring a handgun, and the Second Amendment's text encompasses that conduct."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them ... and to purchase and provide ammunition suitable for such arms."); *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.'" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).[11]

Recently, the Fifth Circuit, as well as a district court in the First Circuit, reached a similar conclusion. In *Beckwith v. Frey*, No. 1:24-cv-00384-LEW, 2025 WL 486830, (D. Me. Feb. 13, 2025), the district court held that a three-day "cooling off" waiting period in Maine violated the

---

[11] Nor is it clear how a "well-regulated militia" could ever survive if its members had to wait three days before obtaining a firearm. Certainly "one if by land, two if by sea" would hardly serve as much of a warning cry at Lexington and Concord, if militia members could not legally obtain their firearms for 72-hours (those battles would have turned out far differently in that scenario).

Second Amendment, and issued a preliminary injunction barring further enforcement of the law. In rejecting the state's argument that the Second Amendment's text does not protect the acquisition of firearms, the district court held that "[i]f a citizen cannot take possession of a firearm then his or her right to possess a firearm or to carry it away is indeed curtailed, even if, as [the state] claims, the curtailment is modest." *Id.* at *3. The court went on to note by way of example that in *Bruen*, the Supreme Court "did not … draw the obviously silly conclusion that the petitioners must lose because the Second Amendment does not expressly specify home use versus public use or open carry versus concealed carry. Instead, the Court looked to history to inform the meaning of the language of the Second Amendment, while also considering what the language must naturally mean in order for the Second Amendment to protect the right to keep and bear arms." *Id.* at *3, n. 4.

Just last month, the First Circuit Court of Appeals denied a stay of the preliminary injunction in the *Beckwith* case, rejecting Maine's assertion that it had made a "strong showing" that it was likely to succeed on the merits.[12]

And in *Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025), the Fifth Circuit similarly held that the Second Amendment's right to keep and bear arms includes the right to purchase arms. The court reasoned that "[b]ecause constitutional rights impliedly protect corollary acts necessary to their exercise," it follows that "the Second Amendment 'covers' the conduct (commercial purchases [of firearms]) to begin with." *Id.* at 590. The Court went on to emphasize that "constitutional rights impliedly protect corollary acts necessary to their exercise," and that "[t]o

---

[12] A copy of the First Circuit Court of Appeal's Order in *Beckwith v. Frey,* No. 25-1160, dated April 10, 2025, is attached to this Motion for Summary Judgement as Exhibit D.

suggest otherwise proposes a world where citizens' constitutional right to 'keep and bear arms' excludes the most prevalent, accessible, and safe market used to exercise the right." *Id.*

Defendant is wrong to suggest that the "slightness" of the delay imposed by the Waiting Period Law is somehow relevant to this analysis. The length of the delay—whether 1 day or 101 days—is *simply irrelevant* to this first step of the *Bruen* analysis. All that is relevant is that a person who has a right to keep and bear a firearm is prevented from doing so while he awaits the expiration of that time. *See also Maryland Shall Issue*, 116 F.4th at 234 ("[W]hether the delay is one day or thirty, a person entitled to a license will temporarily be prevented from exercising his rights while he awaits government approval."). Even before *Bruen*, the Ninth Circuit upheld a 10-day waiting period under intermediate scrutiny after recognizing that the waiting period burdened Second Amendment rights. *See Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016). It is implausible that *Bruen*, despite broadly and robustly protecting Second Amendment rights, somehow weakened the relevant legal standard to provide blanket approval for waiting periods as long as the delay they impose is only "slight."

Indeed, if one were to apply this "a slight delay does not implicate a Constitutionally protected right" logic to any other fundamental right, it would never withstand scrutiny. For example, a mandatory three-day delay on offering a political stump speech—to prevent a candidate from engaging in "impulsive" rhetoric—would never pass muster. Even though this law would not "take away" anyone's right to speak—only "slightly delay" it—it would still clearly implicate the First Amendment. *Cf. Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting) ("The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips;

and they cannot be avoided by regulating the act of extending one's arm to deliver a handbill, or peacefully approaching in order to speak.").

The plain text analysis is a binary one; it considers only whether the conduct is covered, yes or no. Any limitation on covered conduct is considered only in the historical survey conducted in Step 2 of *Bruen*; and it is the government that bears the burden of justifying the wait that it imposes at this second stage of the *Bruen* analysis.

In addition to the First Amendment right of free speech, the Plaintiffs can analogize to another right—the right under some state constitutions to have an abortion.

In the period since the United States Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), several states have ratified amendments to their constitutions securing a woman's ability to have an abortion. Not surprisingly, since these amendments were ratified, there has been a series of legislative efforts in many of these same states to either expand or limit that right—depending largely on the current political makeup of each state's legislature and governor's office.

In Ohio, for example, the state passed a law that mandated a 24-hour waiting period before a woman seeking an abortion could go forward with the procedure. A case challenging this law was subsequently filed, and a preliminary injunction was quickly issued. *See Preterm-Cleveland v. Yost*, No. 24 CV 2634, 2024 WL 3947516, *11 (Oh. Ct. of Common Pleas, Aug. 23, 2024) ("The 24-hour waiting period directly or indirectly burdens, penalizes, prohibits, interferes with, and discriminates against a pregnant patient's voluntary exercise of their reproductive rights."); *cf. City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 450-51 (1983) ("[I]f a woman, after appropriate counseling, is prepared to give her written informed consent and proceed with

the abortion, a State may not demand that she delay the effectuation of that decision.") (abrogated by *Planned Parenthood v. Casey*, 505 U.S. 833 (1992)).

And when imposing a preliminary injunction on a similar one-day waiting period in Michigan, the state court in that case held that "the waiting period force[d] needless delay on patients after they [we]re able to consent to a procedure, thus burdening and infringing upon [their] access to abortion care . . . and infring[ing] upon [their] freedom to make and effectuate decisions about abortion care." *Northland Family Planning Center v. Nessel*, No. 24-000011-MM, 2024 WL 5468617, *17-*18 (Mich. Ct. of Cl., June 24, 2024).

In both of these cases, the fact that a woman's right to have an abortion under the respective state constitutions was merely "slightly delayed" by 24 hours to ensure that she was not making an impulsive and potentially uninformed decision about terminating her pregnancy was *irrelevant* to these courts. The length of the delay in the exercise of the state constitutional right was immaterial. *Preterm-Cleveland*, 2024 WL 3947516, *12.

These abortion-related laws were enjoined because they prevented women from accessing resources and services to terminate a pregnancy under the state constitutions for a period of 24-hours. The Waiting Period Law at issue in this case similarly prevents the Plaintiffs—and all Coloradans—from accessing the resources (firearms) that they needed to exercise their constitutionally protected right to keep and bear arms for a period of 72-hours.

There is no shortage of other contexts where courts have held that a right delayed is a right denied. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Elrod v. Burns*, 427 U.S. 347,

373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) ("We do not doubt that the one-year waiting period device is well suited to discourage the influx of poor families in need of assistance. … But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible."); *Haynes v. State of Wash.*, 373 U.S. 503, 506 n.4 (1963) (confession was deemed involuntary where a defendant was denied right to counsel for 16 hours); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (striking down a 5-day waiting period between the filing of an exotic dancer's permit and the granting of a license); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (risk of being unlawfully detained based on immigration status was a deprivation of constitutional rights); *U.S. v. Dominguez-Maqueda*, No. CR 06–86 JB, 2006 WL 1308266, *6 (D.N.M. Mar. 7, 2006) (referring to "that ancient wisdom that justice delayed is justice denied.") (internal quotation marks omitted). But here, Plaintiffs do not even ask the Court to go that far, at this step. Plaintiffs ask the Court to hold merely that a right delayed implicates the Second Amendment, and triggers the historical analysis required by *Bruen*. *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 778–79, 780 (2010) (The Second Amendment is not "a second-class right" to "be singled out for special—and specially unfavorable—treatment.").

Because the right to acquire arms is inherent to the right to possess arms—or at least a necessary component of that right—even if the Waiting Period Law is characterized as nothing more than a "slight" three-day delay, the plain text of the Second Amendment is implicated, and the State must therefore "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *cf. United States v. Chavira Ornelas*, No. 1:23-cr-01711-KWR-1, 2024 WL 3875796, *1 (D.N.M. Aug. 20, 2024)

(reaching *Bruen*'s historical inquiry where an illegal immigrant had possessed and received a firearm, and thus violated 18 U.S.C. § 922(g)(5)).

### III.   The waiting period law is not a commercial regulation, and there is nothing "presumptive" about its lawfulness.

In its Order Denying Plaintiffs' Motion for Preliminary Injunction, this Court held that the Waiting Period Law is a presumptively lawful commercial regulation because it "regulates only the sale, and specifically sellers, of firearms . . . [and] imposes a condition on the commercial sale of a firearm." [ECF No. 32 at 21.]; *Heller*, 554 U.S. at 626–27 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."). But the Waiting Period Law is not truly part of any commercial transaction. It is not a "condition" on whether a firearms dealer may sell a firearm. It has nothing to do with the "qualifications" of a firearms dealer to sell firearms. It serves no commercial purpose. The Waiting Period Law merely targets the "transfer" of a firearm to a customer after a purchase, <u>not the underlying sale of that firearm</u>. The proponents of the Waiting Period Law have and continue to emphasize that the benefit of the law is to reduce impulsive gun violence by the purchaser—not a need for merchants to have more time to conduct background checks or engage in other relevant *commercial activity*.

For this reason, the Waiting Period Law is nothing more than an overly broad and constitutionally infirm law masquerading as a commercial regulation. But what commercial purpose does it serve to force a gun dealer to wait three days to transfer a firearm to an individual who has already passed a background check and paid for the gun? None. Instead, this law is simply an effort to make an end-run around the Second Amendment.

27

In 2021, the Fourth Circuit rejected a similar effort by the federal government to portray prohibitions on the sale of handguns to 18–20-year-olds as being presumptively lawful conditions on commercial sales. "A condition or qualification on the sale of arms [by sellers] is a hoop someone must jump through to sell a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) (vacated as moot, 14 F.4th 322). By contrast, restrictions that operate as a flat bar on a purchaser's right to obtain a gun are not "conditions and qualifications on the sale of arms." This Court ought to reach the same conclusion here.

But even if the Waiting Period Law is determined to be a commercial regulation, it still must survive the *Bruen* analysis—the Defendant still must establish that the law is consistent with this Nation's historical tradition. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, 602 U.S. at 708. The Supreme Court has never articulated an exception to the requirement that an historical analogue be established for those regulations deemed "presumptively lawful" in *Heller*. Instead, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" scope "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17. This was reaffirmed in *Rahimi* without any categorical exceptions being listed. *Rahimi*, 602 U.S. at 689.

*Heller*, for instance, deemed three categories of "longstanding" laws "presumptively lawful": "prohibitions on the possession of firearms by felons and the mentally ill"; "laws imposing conditions and qualifications on the commercial sale of arms"; and "laws forbidding the carrying of firearms in sensitive places." *Id*. at 626–27 & n.26. In *Bruen*, the government "attempt[ed] to characterize New York's proper-cause requirement as a 'sensitive-place' law."

*Bruen*, 597 U.S. at 30. The Court consulted the historical record to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 30–31. *Bruen* thus held the alleged "sensitive place" restriction to the same historical standard—"the standard for applying the Second Amendment," 597 U.S. at 24 (emphasis added)— that applies to all firearms regulations.

"Had the Court in *Bruen* endorsed simply deferring to *Heller's* 'presumptively lawful' footnote, the outcome of that case would have been much different." *United States v. Duarte*, 101 F.4th 657, 669 (9th Cir. 2024). Instead, "[a]s with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze 'sensitive place' laws by analogizing them to a sufficiently comparable historical counterpart." *Id*. Thus, "[i]t would be fundamentally inconsistent with *Bruen*'s analytical framework to treat" commercial regulations "any differently, as nothing in the majority opinion implies that we can jettison *Bruen*'s test for one 'presumptively lawful' category of firearm regulations but not others (e.g., sensitive place regulations)." *Id*. (quotation marks omitted). Although the opinion in *Duarte* has been vacated for rehearing en banc, it maintains a persuasive posture by presenting a consistent application of the *Bruen* two-step framework to a challenged regulation without deferring to any of the presumptively lawful categories listed in *Heller*.

*Bruen's* treatment of the "presumptively lawful" sensitive-place regulation is consistent with *Heller*, which conveyed that those regulations must be historically justified. The *Heller* Court acknowledged that it did "not provid[e] extensive historical justification for those regulations," but asserted that "there will be time enough to expound upon *the historical justifications* for" the

regulations in a later case. *Heller,* 554 U.S. at 635 (emphasis added). Thus, any restriction on the commercial sale of arms must have "historical justifications," just like any other firearms regulations.

Both *Heller* and *Bruen* make clear that *Heller's* "presumptively lawful" language has no doctrinal significance. Consequently, the Ninth Circuit recently held—in a case now being considered en banc—that "[s]imply repeating *Heller's* language about the 'presumptive lawfulness' of felon firearm bans will no longer do after *Bruen*." *Duarte*, 101 F.4th at 668 (cleaned up). And the en banc Third Circuit declined to rely on *Heller's* "presumptively lawful" language when holding the federal firearms ban for felons unconstitutional as applied to a nonviolent felon and instead applied the historical analysis. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *cert. granted, judgment vacated sub nom. Garland, Atty Gen. v. Range, Bryan D.*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024); *see also Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-MMP, 2024 WL 1057241, at *6 (S.D. Cal. Mar. 11, 2024) ("*Bruen* suggests that the proper question in evaluating whether a regulation falls within the commercial sales category is not the extent of interference with the Second Amendment right, but instead whether the regulation historically would have been tolerated. In the wake of *Bruen*, several Courts of Appeals have conducted the full text-and-history analysis when confronted with a regulation that falls within one of *Heller's* enumerated categories.") (citations omitted).

In sum, the Waiting Period Law is not a presumptively lawful commercial regulation like maintaining purchase records or requiring certain storage facilities for gun dealers. Instead, it is an arbitrary limitation on Coloradans' right to keep and bear arms. Even if it were presumptively constitutional, however, that presumption has been rebutted because the regulation, to the extent

it regulates anything "commercial," operates solely as an impermissible restriction on an individual's right to keep and bear arms without a viable historical analogue to support it. As such, it runs afoul of the Second Amendment.

## IV.    The intoxication laws and licensing regimes are not "relevantly similar" historical analogues to the Waiting Period Law.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, [and] [t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

In the present case, the Defendant has proffered intoxication laws and licensing regimes as their historical analogues for the waiting period law. And in its Order Denying Plaintiffs' Motion for Preliminary Injunction, this Court agreed with the defense that these mostly 19th and early 20th century regulations provide a sufficient historical tradition to support the present law. [ECF No. 32 at 36.]. But in truth these laws fail to satisfy the requirements under *Bruen*'s second step because they are not "relevantly similar to laws that our tradition is understood to permit." *Bruen*, 597 U.S. at 29.

In *Bruen*, the Supreme Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation require[s] a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28. To this end, "*Heller* and *McDonald* point toward two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphasis added). The Supreme Court concluded that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an

analogical inquiry." *Id.* (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010)) (emphasis added). It is this comparison, focusing on "how" and "why" regulations burden the Second Amendment, that serves a court in finding a proper historical analogue in any given historical firearms regulation. "Even when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi, 602 U.S. at 691.*

The first part of this analysis is identifying the stated justification for the waiting period law, or the "why." *Id.* Defendants assert that the purpose of the Waiting Period Law is to help prevent impulsive gun violence. (ECF No. 18 at 16). And they contend that both intoxication laws and waiting periods are "aimed at the same evil"—because apparently just like drunks, law-abiding citizens seeking to purchase firearms are "much more likely to act rashly, impulsively and with diminished judgement." (*Id.* citing ECF No. 18, Attach. #3 Exhibit 3, Spitzer Declaration at 15). But there is simply nothing "relevantly similar" about the intoxication laws that Professor Spitzer references, the individuals impacted by them, or the underlying conduct that they were intended to control.

Drunks are dangerous. Law-abiding citizens who have passed background checks are not. *Cf. Rahimi*, 602 U.S. at 698 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). And licensing regimes may be intended to vet purchasers, but not for the purpose of imposing a "cooling off" period on firearms owners. Time after time, the Defendant's experts conflate incidental similarities with actual relevant historical analogues that could suffice under *Bruen*. But the analogies fail because the "why" just isn't the same. *Cf. Beckwith*, *2 ("Maine's waiting period broadly restricts arms access by the

public generally, without attempting to calibrate the new access-to-arms restriction to history and tradition by limiting the law's application to members of the public who pose a credible threat to themselves or others.") (cleaned up).

Similarly, "How" these intoxication weapons laws burdened the Second Amendment right is too drastically dissimilar to the Waiting Period Law to be analogous. The intoxication laws applied only to those who were intoxicated, and only for as long as they were under the influence of alcohol. The Waiting Period Law, on the other hand, is indiscriminate in its application—there is no common condition that the firearms purchasers all share that would make them any more prone to acting impulsively than anyone else. By subjecting everyone to a waiting period, the Defendant indiscriminately prevents a much wider swath of people than necessary from acquiring firearms they wish to possess. *Cf. Rahimi*, 602 U.S. at 692 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

A targeted approach focused on determining who actually poses a real threat of impulsivity—a task more readily accomplished through the background checks that are already in place—would be more likely to survive constitutional review. *See Bruen*, 597 U.S. at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century[,] . . . [and] earlier generations addressed the societal problem ... through materially different means, that . . . could be evidence that a modern regulation is unconstitutional.").

Similarly, the 19th century licensing regimes that the Defendant offers also fail as a historical analogue. "There is no evidence that any jurisdiction before the late nineteenth century required all members of 'the people' to obtain a license, or anything like it, before keeping or

carrying firearms." *Maryland Shall Issue*, 116 F.3d at 251 (en banc) (Richardson, C.J., dissenting). Instead, licensing regimes—particularly the ones that required a license before a firearm could be simply acquired—applied almost exclusively to "slaves, free blacks, or Native Americans." *Id*. at 249. For this reason, these laws never underwent any serious constitutional review, and were upheld only for racially motivated and legally faulty reasons. *See* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J. 1587, 1611 (2014).

In fact, when reviewing one of these licensing regimes in 1824, the Virginia Supreme Court explained that firearm restrictions that would otherwise be "inconsistent with the letter and spirit of the Constitution . . . as respects the free whites" were constitutional when applied to other racial groups. *Aldridge v. Commonwealth*, 2 Va.Cas. 447, 449 (1824) (emphasis added); *see also Waters v. State*, 1 Gill. 302, 309 (Md. 1843) (describing free blacks as "a vicious and dangerous population," which is why laws "make it unlawful for them to bear arms"); *State v. Allmond*, 7 Del. 612, 641 (Gen. Sess. 1856) (explaining that states could disarm non-Caucasian individuals under the police power). So, these and other courts at the time openly admitted that these licensing regimes were inherently unconstitutional—they were allowed to stand only because they targeted individuals without recognized rights. For these reasons, it would be improper to use these racially motivated and wrongly upheld licensing regimes as historical analogues to a modern-day waiting period law.

Moreover, it is clear from Professor Spitzer's report, as well as his deposition testimony, that it was not until 1885—well beyond the period of Reconstruction—that the first licensing law that required individuals to obtain a permit *before acquiring* a firearm was enacted in the United States. [Spitzer Deposition Transcript, at 167.] The vast majority of the other licensing laws cited

by Professor Spitzer related to securing a license _after_ the acquisition of a firearm—for some unique or additional purpose (like a concealed carry permit or hunting license). [_Id._ at 167.] The present case has nothing to do with the acquisition of a special use permit for a firearm _after the fact_—but simply with the basic acquisition of the firearm itself, so that it can be "kept and born" as protected under the Second Amendment. For this reason, as well, the licensing regimes cited by the Defendant are simply not relevantly similar to the Waiting Period Law.

## CONCLUSION

For the reasons provided above, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

Respectfully submitted this 8th day of May 2025.

_/s/ Michael D. McCoy_
Michael D. McCoy
Robert A. Welsh
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
Email: mmccoy@mslegal.org

_Attorneys for Plaintiffs_