## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor for the State of Colorado,

      Defendant.

---

## THE GOVERNOR'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

To reduce impulsive, avoidable firearm deaths, Colorado enacted a three-day waiting period between purchase and delivery of a commercially sold firearm.

"Waiting periods cause large and statistically significant reductions in homicides," an up-to-17% reduction. Ex. 1, Report & Decl. of Poliquin, ¶ 11 & Ex. 2, Luca, Malhotra & Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162, 12162 (Nov. 2017). The 17 states with waiting periods "avoid ~750 gun homicides" per year; waiting periods would prevent "an additional 910 gun homicides per year" if all states had them. Ex. 2 at 12164. "Waiting periods also lead to a 7-11% reduction in gun suicides . . . equivalent to 22-35 fewer gun suicides per year for the average state." *Id*. at 12163; *see also* Ex. 1, ¶ 16. They do so "without imposing any restrictions on who can own a gun." Ex. 2 at 12164. For Colorado, that means approximately 52 fewer gun homicides a year and 48 fewer gun suicides per year.[1] Ex. 1, ¶¶ 11, 16.

Waiting periods, which do not prevent possessing guns, are entirely consistent with the Supreme Court's recognition that "'the right secured by the Second Amendment is not unlimited.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Indeed, "the Second Amendment allows a 'variety' of gun regulations." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 80 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring). Such regulations include conditions and qualifications on

---

[1] Waiting periods do not impact non-gun homicide rates—that is, the existence of waiting periods does not transfer what would have been gun homicides to increases of non-gun homicides. Ex. 1, ¶ 13.

1

the commercial sale of arms, which are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *accord Rahimi*, 602 U.S. at 699.

## BACKGROUND

In 2023, Colorado's General Assembly, recognizing that "firearm-related injury was among the five leading causes of death for people ages 1 to 44," exercised its police power to protect the public health, safety, and welfare of Colorado citizens by passing House Bill 23-1219, Colo. Rev. Stat. § 18-12-115 ("the Waiting Period Law"). Colo. Sess. Laws 2023, Ch. 125, § 1(1)(a), § 18-12-115 (ECF No. 18-1). Of those firearm deaths, "75 percent were caused by intentional self-harm or suicide," while "more than 20 percent" resulted from homicides and assaults. *Id.* § 1(1)(b).

In passing the Waiting Period Law, the General Assembly recognized that "mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm" and an approximate "17 percent" reduction for firearm homicides. *Id.* § 1(1)(f). It found that "[d]elaying immediate access to firearms" presented a matter of both state and local concern and that a waiting period would "help prevent impulsive acts of firearm violence, including homicides and suicides." *Id.* § 1(2)(a)-(b). Importantly, the Waiting Period Law does not prohibit anyone from possessing or using guns for self-defense, or even from owning guns. Instead, it recognizes that a cooling-off period dramatically reduces homicide and suicide firearm deaths. *Id.* §§ 1(1)(f), 1(2)(a)-(b); *see also* Ex. 2 at 12162-65; Ex. 1, ¶¶ 11, 13, 16. And it specifically exempts numerous non-commercial transfers (discussed *infra*).

Plaintiffs Rocky Mountain Gun Owners ("RMGO") and Alicia Garcia claim the Waiting Period Law's modest three-day delay in acquiring a firearm violates their Second Amendment

right to keep and bear arms. But the Waiting Period Law infringes neither of those rights. On the contrary, the Waiting Period Law is precisely the type of commercial regulation historically recognized by the Supreme Court. And the short delay in securing possession of arms not only is consistent with the historical realities of firearm purchase at the time of the Founding, but also with state laws nationwide providing for waiting periods. Plaintiffs' argument, at its core, is they have a constitutional right to immediate possession; but nothing in the Second Amendment provides a right to *immediate* acquisition of arms.

This Court, in denying Plaintiffs' motion for a preliminary injunction, determined that the "plain text of the Second Amendment does not cover the conduct at issue," that Plaintiffs were not likely to succeed on the merits, and that the Waiting Period Law was a presumptively lawful regulation on the commercial sale of firearms. ECF No. 32 (Order Denying Mot. Prelim. Inj.), pp. 13-22. Nothing has changed since this Court issued that Order[2] that would necessitate this Court altering that ruling.

## LEGAL STANDARDS

### I.    Summary judgment standard and facial and as-applied standards.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After that, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). A dispute is "genuine" only if the record establishes that a reasonable factfinder could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477

---

[2] Plaintiffs appealed, ECF No. 34, but, after full briefing, withdrew the appeal, ECF No. 49.

U.S. 242, 248 (1986). And facts are "material" only if they might affect the outcome of the case under the governing substantive law. *Id*. Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23 (quotations omitted).

Plaintiffs raise a facial challenge, ECF No. 1 (Complaint), ¶¶ 12, 14, 20, and "bear a heavy burden," *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quotations omitted). A facial challenge is the "most difficult challenge to mount successfully." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To succeed, Plaintiffs must "establish that no set of circumstances exists under which the [statute] would be valid." *Id.* (citing *Salerno*, 481 U.S. at 745). "Facial challenges to statutes are generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the Supreme Court sparingly and only as a last resort.'" *Golan*, 609 F.3d at 1094 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). That a statute might operate unconstitutionally "under some conceivable set of circumstances is insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745. Courts "presume that a state statute is constitutional," *Eaton v. Jarvis Prods. Corp.*, 965 F.2d 922, 929 (10th Cir. 1992), so when "legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict," *Rahimi*, 602 U.S. at 701 (quoting *United States v. Hansen*, 599 U.S. 762, 781 (2023)) (brackets in original).

An as-applied challenge recognizes that a regulation may be generally constitutional, but asserts it is unconstitutional in a specific circumstance as to the party challenging the law. *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). An "'as applied' challenge acknowledges that the law may have some potential constitutionally permissible applications." *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010). Here, while Plaintiffs passingly assert an as-applied challenge, their as-applied challenge is indistinguishable from their facial challenge: at bottom they assert that the Waiting Period Law is unconstitutional in all its applications, a full "head-on attack" of the legislative judgement. *See Carel*, 668 F.3d at 1217.

## II.    Permanent injunction standard.

To be entitled to a permanent injunction, Plaintiffs must establish (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) that the injunction would not adversely affect the public interest. *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014).

## III.    Second Amendment standard.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. But it is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626); *accord Bruen*, 597 U.S. at 20-24 (reiterating limits of Second Amendment protections discussed in *Heller*); *Bruen*, 597 U.S. at 72 (Alito, J., concurring)

(stating *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald v. City of Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns").

### A. The *Bruen* test.

*Bruen* announced a two-part test to assess Second Amendment claims. 597 U.S. at 24. Under step one, plaintiffs must establish that the Second Amendment's text, "as informed by history," encompasses the conduct in which they seek to engage. *Id*. at 17, 19.[3] In this case, that conduct means a brief, three-day waiting period—the length of a holiday weekend—to acquire a gun following its purchase. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, the analysis concerns the "'normal and ordinary' meaning of the Second Amendment's language" at that time—i.e., a "textual analysis." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-78). Courts give the Second Amendment text its meaning as "known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576-77. If plaintiffs do not establish that the plain text covers the proposed course of conduct, the law does not infringe on the Second Amendment and the inquiry ends. *Bruen*, 597 U.S. at 18 ("regulated activity is categorically unprotected" if it regulates activity outside the Second Amendment's scope as originally understood); *accord Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("*RMGO*").

---

[3] It also asks whether the challenger is part of "the people" the Second Amendment protects and whether the item at issue is an "arm" that is in common use today for self-defense. *Bruen*, 597 U.S. at 31-32; *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("*RMGO*"). Those considerations are not at issue here.

If, however, plaintiffs satisfy their burden under step one, the burden shifts to the government in step two to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This historical inquiry involves "reasoning by analogy," *id.* at 28, specifically an assessment of "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29. Courts must ask (i) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (ii) whether it is "comparably justified." *Id.* Because "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," *id.* at 27, the inquiry "require[s] a more nuanced approach" and needs only a "historical *analogue*, not a historical *twin*" or "dead ringer," *id.* at 27, 30 (emphasis in original). Under *Bruen*, the Court "decide[s the] case based on the historical record compiled by the parties." *Id.* at 25 n.6.

The Supreme Court has repeatedly emphasized the "limits" of its Second Amendment decisions. *Id.* at 71 (Alito, J., concurring); *id.* at 79 (Kavanaugh, J., concurring). States retain latitude to impose reasonable regulations based on unique factors to their jurisdictions—to legislate "solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785 ("State and local experimentation with reasonable firearms regulations will continue under the Second Amendment.").

## B. Presumptively lawful measures.

### 1. Supreme Court jurisprudence.

"Reasonable firearms regulations" can coexist comfortably with the Second Amendment. *McDonald*, 561 U.S. at 785. From *Heller* through *Rahimi*, the Supreme Court has repeatedly

affirmed that its Second Amendment framework should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see also Rahimi*, 602 U.S. at 699; *Rahimi*, 602 U.S. at 735 (Kavanaugh, J. concurring (recognizing continued vitality of same); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (recognizing same); *accord RMGO*, 121 F.4th at 118-19 (synthesizing same, explaining "the 'presumptively lawful regulatory measures' language . . . has not been abrogated [and] remains good law"). Indeed, such laws are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 n.26; *accord Rahimi*, 602 U.S. at 699.

### 2. Tenth Circuit precedent.

Late last year, the Tenth Circuit reiterated that firearms regulations that are "presumptively lawful regulatory measures" are a recognized "safe harbor." *RMGO*, 121 F.4th at 119-21. In reviewing Colorado's minimum-age-purchasing law, which requires purchasers of firearms be 21 years or older, the Tenth Circuit held that the law was a "condition or qualification on the sale of arms . . . and, as such, falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." *Id.* at 119-120. The court held that the analysis of presumptive lawfulness occurs at *Bruen*'s first step, not the second. *Id.* at 120. It found that upholding the minimum age law as presumptively lawful was appropriate because nothing suggested it was being employed to "abusive ends." *Id.* at 122-23.

## ARGUMENT

### I. Plaintiffs have not established standing.

Standing "is evaluated as of the time a case is filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). "[F]ederal court[s] can't 'assume' a plaintiff has demonstrated Article III standing," *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (citation omitted), and plaintiffs bear the burden of establishing standing, *Spokeo, Inc., v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must show they suffered "(1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,' (2) that the injury is 'fairly traceable to the challenged action of the defendant,' and (3) that the injury is likely to be 'redressed by a favorable decision.'" *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citations omitted). Plaintiffs must clearly allege facts demonstrating each element of standing. *Spokeo, Inc.*, 578 U.S. at 338. Because there is no legally protected interest in the *immediate* acquisition of firearms and thus no injury in fact, both Plaintiff Garcia and RMGO fail to establish standing.

Initially, it is undisputed that neither Plaintiff Garcia nor RMGO is a gun *seller*, which is the group directly affected by the Waiting Period Law. *See* § 18-12-115(1)(a) ("It is unlawful for any person who *sells* a firearm, including a licensed gun dealer . . . to deliver the firearm to the purchaser until . . . three days after a licensed fun dealer has initiated a background check . . . .") (emphasis added). It is the seller who must hold the gun for three days and is subject to the Waiting Period Law's requirements. *See id.* Plaintiff Garcia is not a gun seller, does not intend to sell a firearm, is not a licensed firearm dealer, and has not been cited or prosecuted under section 18-12-115. Ex. 3, Garcia Dep. Tr. 26:22-25, 46:20-22, 74:7-8. Neither does RMGO sell guns nor

does it specifically assert that it is acting on behalf of gun sellers. ECF No. 1, ¶ 1; ECF No. 2-3 (Rhodes Decl.), ¶¶ 3-4; *cf. Younger v. Harris*, 401 U.S. 37, 42 (1971) (in pre-enforcement context, plaintiff lacks standing to challenge criminal statute when they have not "ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible").

In denying the preliminary injunction, this Court found that Plaintiff Garcia had standing because she faced a hardship due to a temporary delay in acquiring a gun, as well as a potential speedbump to her gun-related business—specifically not being able to purchase a shotgun for an out-of-state shotgun shoot. ECF No. 32, pp. 5-6 & n.3. But a temporary delay in acquiring a gun is not an injury-in-fact for purposes of Article III standing; indeed, the law plainly allows purchasers to acquire the gun after three days *and* makes numerous exceptions to the three-day requirement. *See* Colo. Rev. Stat. §§ 18-12-115(2)(a), (b)(I)-(V), (c); *see also* §§ 18-12-112(6)(a), (6)(b), (6)(c), (6)(e)(III), (6)(h) (discussed *infra*).

Further, as Plaintiff Garcia admits, she knew about her then-upcoming shotgun shoot of well in advance of the three days necessary to acquire a firearm; she simply didn't act. Ex. 3 at 97:14-98:3 (Garcia "knew of the event like a week or so before the event"). So, any resulting injury is one of her own making, since she had enough time to acquire the gun. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). Regardless, that October 2023 shotgun shoot[4] has since passed, and Plaintiff Garcia has not picked up her gun for the simple reason that she purchased it in Colorado

---

[4] *See* ECF No. 30, Prelim. Inj. Hr'g Tr. 10-26-23 at 21:19-20, 27:9-12; Ex. 3 at 89:2-7.

Springs, which is a two-and-a-half-hour drive away from her home and "inconvenient" to go to, even though she has repeatedly gone down to Colorado Springs since and even though there were gun shops closer to where she lives. Ex. 3 at 29:23-32:2, 86:17-87:6, 89:2-16, 95:5-14.

To the extent Plaintiff Garcia suggests the Waiting Period Law's three-day delay interferes with her right to immediately access a firearm for purposes of self-defense, ECF No. 2-2 (Garcia Decl.), ¶ 3, that claim fails for two reasons. *First*, as discussed below, the Second Amendment does not enshrine a right to *immediately* acquire a firearm. *Second*, Plaintiff Garcia *already owns* dozens of firearms, Ex. 3 at 23:18-22 (acknowledging owning "twenty to thirty" guns), any one of which satisfies the "'central component' of the Second Amendment right," the right to "individual self-defense." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599).

RMGO's claim to standing fares even more poorly. An organization may have standing to sue where a law causes it direct injury and the question is the "same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). An organization also may have standing when a law makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, when the organization faces a drain on its resources, or when the challenged action has "perceptibly impaired" the organization's ability to carry out its mission. *Id.* at 379. None of those is true for RMGO. RMGO claims, generally, that the Waiting Period Law imposes "arbitrary, unnecessary, burdensome[,] and useless delays" to its members. ECF No. 1, ¶ 1; ECF No. 2-3, ¶¶ 3-4. But such inconveniences do not rise to the level of a constitutional injury, let alone an injury in fact.

RMGO's purpose is to educate citizens about the Second Amendment and defend the "right of all law-abiding individuals to keep and bear arms," ECF No. 1, ¶ 1; ECF No. 2-3, ¶ 3,

with a "main purpose [of] operating in the legislature," Ex. 4, Rhodes Dep. Tr. 12:14-15, 48:15-17. It includes defending the Second Amendment "in courtrooms." *Id*. at 27:22-28:2. RMGO's resources originate from membership dues and are buttressed by member donations. *Id*. at 55:10-22. When the Waiting Period Law was proceeding through Colorado's legislature, RMGO held numerous informational meetings with and distributed significant amounts of promotional materials to its members about RMGO and the Waiting Period Law, resulting in significant donations, membership engagement, and an elevated profile. *Id*. at 31:5-33:17, 36:6-38:7, 38:25-39:23.[5] In this vein, the Waiting Period Law actually *helped* RMGO carry out its mission of gun awareness and *helped* RMGO collect resources. Regardless, RMGO has not alleged that the Waiting Period Law actually made it difficult for RMGO to fulfill any of its essential goals or actually caused a drain on its resources, and Mr. Rhodes admitted the Waiting Period Law has not impacted its activism or prevented RMGO from pursuing its mission. *Id*. at 48:5-21, 57:6-58:11. Mr. Rhodes further acknowledged that RMGO has had *more* member engagement over the past few years, including the year the Waiting Period Law was enacted. *Id*. at 58:8-12.

An organization also has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

---

[5] Mr. Rhodes asserted that the Waiting Period Law affected RMGO's ability to acquire firearms to give away to members to promote attendance at these meetings because RMGO "can't transfer [the gun] to [the giveaway winner] that night" but admitted RMGO does not need gun giveaways to engage in policy discussions with members. Ex. 4 at 33:8-17, 38:22-24.

Here, while it is possible some members of RMGO could have standing to sue in their own right,[6] and while—generally speaking—upholding members' Second Amendment rights and challenging firearms legislation is germane to RMGO's purposes, the claim asserted and the relief requested require participation of individual members. But RMGO has not demonstrated that any members would have standing to sue individually. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (organizational plaintiffs must "identify members who have suffered the requisite harm"). Neither has RMGO either alleged or provided any evidence "nam[ing] the individuals who were harmed" or showing "*all* the members of the organization are affected by the challenged activity." *Id.* at 498-99 (emphasis in original). ECF No. 1, ¶¶ 1, 16-18. Consequently, RMGO has not established standing, either.

## II.    The Waiting Period Law is constitutional.

The Waiting Period Law does not implicate the plain text of the Second Amendment, is a proper condition on and regulation of the sale of firearms, and is consistent with the Nation's history and tradition of firearms regulation.

---

[6] RMGO originally listed three members by initials who, it asserted, would be harmed by the Waiting Period Law. ECF No. 1, ¶ 1; ECF No. 2-3, ¶ 4. RMGO later withdrew one ("B.R."), named the other two, and made broad assertions that those two did not want to be inconvenienced by any delay in acquiring firearms. Ex. 4 at 79:18-81:23, 82:24-83:14, 83:15-86:4. But RMGO didn't identify a specific instance of either buying a gun or attempting to buy a gun, didn't identify a specific intent to buy a gun, didn't identify any inability to purchase and acquire a gun, didn't know if they planned to purchase additional guns, didn't include declarations of those members, admitted they did not have to surrender any guns, and admitted they had not been cited for violating the Waiting Period Law. *Id.* It did not even appear these remaining members, J.H. and S.H., were impacted by the Waiting Period Law. *See id*. And RMGO conceded they all were able to purchase and take possession of guns since the Waiting Period Law went into effect. *See id.*; *see also id.* at 78:4-17. Nor were those members gun *sellers* subject to the terms of the Waiting Period Law. *See Rio Grande Found.*, 57 F.4th at 1161-62 (standing measured at time action brought). Additionally, RMGO could not identify *any* member who was unable to acquire a gun because of the Waiting Period Law. Ex. 4 at 72:12-14.

**A.  The Waiting Period Law does not fall under the Second Amendment's plain text.**

To prevail on the merits, Plaintiffs must establish that the Waiting Period Law falls within the plain text of the Second Amendment. This they cannot do.

The Waiting Period Law does not implicate either the keeping or bearing of arms. The Second Amendment protects the right to "keep" and "bear" arms. Keeping arms means to "have weapons." *Heller*, 554 U.S. at 582. Bearing arms means "the carrying of weapons," specifically "carrying for a particular purpose – confrontation." *Id.* at 584. As noted above, the "'*central component*' of the Second Amendment" is the right of "individual self-defense." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599) (emphasis in original). But the Waiting Period Law simply imposes a brief delay in taking possession of the gun; it does not infringe on the right to "keep and bear" for purposes of "public carry" for self-defense. *See Bruen*, 597 U.S. at 32.

Nor does the Second Amendment's plain text cover *purchasing* firearms. *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("on its face 'keep and bear' does not include purchase"). It certainly does not impart a constitutional right of immediate acquisition. *Id.* at 838-39 (restriction on *purchasing* was not a prohibition on *keeping* firearms and thus not covered by the plain text of the amendment; nor was the 10-day waiting period so lengthy as to be abusive or a de facto prohibition on possession). *Bruen* explained that licensing regimes, including for background checks and safety courses, are constitutional absent evidence that "*lengthy* wait times" were put to abusive ends to "deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9 (emphasis added). Here, a brief, three-day waiting period is not sufficiently lengthy to "deny ordinary citizens their right to public carry"—to "keep" and "bear."

14

Multiple courts have come to similar conclusions. For example, in *Maryland Shall Issue, Inc. v. Moore*, the Fourth Circuit held that "'shall-issue' licensing laws"—which by definition impose delays and restrictions on immediate acquisition—"are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework." 116 F.4th 211, 222 (4th Cir. 2024) (en banc). And the Fifth Circuit, in *McRorey*, recognized that while the right to keep and bear arms can "implicate the right to purchase . . . such an implication is not the same thing as being covered by the plain text of the amendment." 99 F.4th at 838.

Likewise, in *Ortega v. Lujan Grisham*, the court, recognizing that the Second Amendment's plain language "focuses on retention rather than acquisition of arms," held that the Second Amendment's plain text "does not cover purchasing firearms." 741 F. Supp. 3d 1027, 1072-73 (D.N.M. 2024) (collecting authorities), *appeal pending*, 24-2121; *see also Knight v. City of N.Y.*, 22-CV-3215 (VEC)(VF), 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024) (upholding 90-day waiting period before purchasing a second handgun because regulation did not implicate plain text of the Second Amendment and neither limited "an individual's ability to carry a firearm in public for self-defense," nor "place[d] any restrictions on possession of a handgun in the home").[7] Put simply, the "plain text of the Second Amendment only prohibits *meaningful* constraints on the right to acquire firearms." *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (emphasis added; citation omitted), *cert. denied*, 2025 WL 1211774 (Apr. 28,

---

[7] *Knight* was a report and recommendation by a United States magistrate judge; the district court adopted the magistrate's conclusion that the plaintiff lacked standing and thus did not reach the alternative holding that the complaint failed to state a claim. *See Knight v. City of N.Y.*, No. 22-CV-3215 (VEC), 2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024).

2025); *see also Mills v. N.Y.C.*, 758 F. Supp. 3d 250, 266 (S.D.N.Y. 2024) ("[N]othing in the text of the Second Amendment suggests . . . a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time.").

Unlike the laws challenged in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, all of which *precluded* individuals from possessing guns, the Waiting Period Law does not make *possession*, *carrying*, *keeping*, or *bearing* arms illegal; does not deprive anyone of guns; and does not limit the number of guns a person can have. The Waiting Period Law only imposes an obligation on the seller, requiring a brief delay in delivering possession of the gun to the buyer. But at the time of the Founding, there was no expectation of immediate acquisition of guns. Delays were par for the course; as Professor Spitzer explained, "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s. *Rapid convenient gun sales* processes *did not exist* in the U.S. until the end of the nineteenth century." Ex. 5, Report & Decl. of Spitzer, ¶¶ 11-12 (emphasis added).

Importantly, at no point have Plaintiffs presented *any* evidence to suggest that the plain text of the Second Amendment *was* originally understood to guarantee a constitutional right to immediately acquire commercially sold firearms. Thus, they fail to carry their burden at *Bruen* step one because they have not shown that the Waiting Period Law infringes on any right historically understood to be protected by the Second Amendment. Consequently, there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 322 (when a party fails to make a showing sufficient to establish existence of an element "essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required).

But the Governor *did* present evidence—unrebutted evidence—that, as this Court found in its Order denying a preliminary injunction, "the Founders would not have expected instant, widespread availability of the firearm of their choice." ECF No. 32, p. 17; *see also Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (recognizing there is "nothing new in having to wait for the delivery of a weapon" and that the "18th and 19th forebears . . . [faced d]elays of a week or more[, which] were not the product of governmental regulations, but such delays had to be routinely accepted"). Further, at the preliminary injunction hearing, Professor Roth testified that people "might have [had] to wait a few weeks" to get a firearm due to low production rates.[8] ECF No. 30, Prelim. Inj. Hr'g Tr. 10-26-23 at 156:5-6. And as Professor Spitzer explained, there were numerous[9] licensing requirements associated with owning or discharging a firearm in the eighteenth and nineteenth centuries, and "licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand." Ex. 5, ¶ 33.

Put simply, neither the Second Amendment's plain text nor the real-time understanding or availability of firearms at the time of the Founding would have meant immediate possession of firearms was an entitlement, let alone a constitutional right. Nor is the Waiting Period Law an abusive "de facto prohibition," *McRorey*, 99 F.4th at 840 (10-day waiting period not abusive), or a "meaningful constrain[t]," *B&L Prods., Inc.*, 104 F.4th at 119, or an "infringe[ment]" on the

---

[8] Under F.R.C.P. 65(a)(2), the record developed at the preliminary injunction hearing becomes part of the trial record, and this Court can consider that record in ruling on dispositive motions—including motions for summary judgment. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 n.3 (10th Cir. 1986) (rejecting as "patently frivolous" an argument that a court could not consider the preliminary hearing transcript).

[9] At least 32 states had licensing requirements for ownership, 16 in the 1800s; and 26 states had licensing requirements to discharge guns, 13 of which in the 1700s through the 1860s. Ex. 5, ¶ 35.

Second Amendment right to keep and bear arms, *Md. Shall Issue, Inc.*, 116 F.4th at 222. Here, Plaintiffs cannot rebut the Waiting Period Law's presumptive constitutionality because it only imposes a non-abusive condition—a short, three-day delay—and provides "only narrow, objective, and definite standards." *Bruen*, 597 U.S. at 38 n.9 (quotations omitted); *Md. Shall Issue, Inc.*, 116 F.4th at 227 n.15 (rejecting argument that a two-week delay in taking possession of the gun was "so lengthy as to deny individuals their Second Amendment rights").

Tellingly, Plaintiffs have not even argued that Colorado's three-day waiting period is lengthy or abusive. Instead, they suggest that *any* waiting period is unconstitutional. Ex. 4 at 72:21-73:9. But *Bruen* itself recognized that licensing regimes, background checks, and firearm safety course requirements, all of which impart some delay, do not violate the Second Amendment. 597 U.S. at 38 n.9. Background checks are unquestionably lawful, and numerous cases—including those discussed above—have upheld waiting periods and delays associated with licensing and background checks. *See id.*; *Heller*, 554 U.S. at 626-27; *accord Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (confirming same); *McRorey*, 99 F.4th at 836 (background checks presumptively constitutional); *see also Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) (recognizing *Bruen* "approved the constitutionality of regulations requiring criminal background checks").

Because a three-day delay in acquiring a gun does not prohibit either having weapons or carrying them, Plaintiffs' theory must be that the challenged law *indirectly* burdens either the having or carrying of weapons. But Plaintiffs have not presented a *single instance* of a person being refused the purchase of a gun or being unable to exercise their right of self-defense because of the Waiting Period Law. Ex. 4 at 72:12-14. Plaintiff Garcia was able to acquire the

gun she purchased after three days. Plaintiffs previously asserted that the State wrongfully prevented the transfer of ownership for three days, ECF No. 21 (Pls.' Reply in Support of Mot. Prelim. Inj.), pp. 6, 8, and to the extent they maintain that argument, it finds no purchase in law. Under Colorado law, a sale is complete when title passes from seller to buyer. Colo. Rev. Stat. § 4-2-106(1). Transfer of title occurs when the seller completes performance by physically delivering the goods. § 4-2-401(2). In its Order denying a preliminary injunction, this Court already found as much. ECF No. 32, pp. 15-16. Thus, a gun *purchase* is only complete upon acquisition of the gun after expiration of the three-day period.

Finally, Plaintiffs' assertion that the "right to 'keep' arms necessarily implies the right to possess arms one has acquired," ECF No. 2 (Mot. TRO & Prelim. Inj.), p. 5, also misses the mark for the simple reason that a right *implied* is not a right written in plain text. *See Bruen*, 597 U.S. at 24 (question is whether "Second Amendment's plain text covers an individual's conduct"). Plaintiffs' argument that the right is implied flouts *Bruen*'s "plain text" requirement. *See id.* at 20 (reiterating that *Heller* started with a "textual analysis," focusing on the "normal and ordinary" meaning of the Second Amendment's language) (quoting *Heller*, 554 U.S. at 576-78). By calling the right to acquire a firearm an implied right, Plaintiffs concede the right is not located in the Second Amendment's plain text. This is even more true for Plaintiffs' proposed right to *immediately* acquire a firearm, which is nowhere located in or suggested by the plain text of the Second Amendment.

For all these reasons, the Waiting Period Law does not implicate the plain text of the Second Amendment. Nor have Plaintiffs established otherwise, as is their burden. This Court should enter summary judgment in favor of the Governor under *Bruen* step one.

**B. The Waiting Period Law is a presumptively lawful commercial regulation.**

This Court can dismiss Plaintiffs' complaint for another, independent reason: the Waiting Period Law is a presumptively lawful regulatory measure. As discussed above, the Waiting Period Law is a narrow, constitutional condition or qualification on the sale of guns. The Second Amendment does not prohibit "longstanding" regulations enacted to protect public safety, including "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Such laws are "presumptively lawful regulatory measures," *id.* at 626-27 & n.26[10]; *accord Bruen*, 597 U.S. at 38 n.9, and "comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms," *United States v. Focia*, 869 F.3d 1269, 1285-86 (11th Cir. 2017). The "'presumptively lawful regulatory measures' language, first stated in *Heller* . . . remains good law." *RMGO*, 121 F.4th at 119 (citation omitted). And any law that is "'presumptively lawful' . . . necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would 'presumptively *protect*[] that conduct.'" *B&L Prods., Inc.*, 104 F.4th at 119 (quoting *Bruen*, 597 U.S. at 17) (alteration and emphasis in original).

Last year, the Supreme Court reaffirmed the government's ability to regulate commercial activity involving firearms. *Rahimi*, 602 U.S. at 699 (reaffirming that the "many [] prohibitions" listed in *Heller* are "presumptive lawful") (quoting *Heller*, 554 U.S. at 626-27 & n.26). This

---

[10] The Supreme Court has repeatedly identified a non-exhaustive list of firearms regulations as presumptively lawful, including (i) prohibitions on carrying concealed weapons, (ii) prohibitions on the possession of firearms by felons and the mentally ill, (iii) laws forbidding the carrying of firearms in sensitive places like schools and government buildings, (iv) "shall-issue" licensing regimes, and (v) laws imposing conditions and qualifications on the sale of guns. *Heller*, 554 U.S. at 626-27 & n.26. Here, only the last category is at issue.

includes "'laws imposing conditions and qualifications on the commercial sale of arms' [as] presumptively constitutional." *Id*. at 735 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27); *accord Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

Even more recently, the Tenth Circuit confirmed that the government "may still lawfully regulate firearms, as it has done for centuries." *RMGO*, 121 F.4th at 113 (citing *Rahimi*, 602 U.S. at 680). In *RMGO*, the Tenth Circuit explained that Colorado's minimum-purchasing-age law was a presumptively lawful commercial regulation that did not implicate the plain text of the Second Amendment, was consistent with states' long-standing authority to regulate commercial transactions, and was not put to abusive ends. *Id.* at 120-24, 127-28.[11] Here, too, the Waiting Period Law is a "condition or qualification on the sale of arms"; as such, it a "safe harbor" that "falls outside the scope of the Second Amendment's right to 'keep and bear' arms." *Id*. at 119-21. Nor does it regulate either RMGO's conduct or any other firearm owner's conduct, including Plaintiff Garcia's. Rather, it regulates those who "sell[] a firearm." Colo. Rev. Stat. § 18-12-115(1).

Moreover, numerous *non-commercial* transactions are exempted from the Waiting Period Law, including the sale of antique firearms, curios, or relics, § 18-12-115(2)(a); the sale of a firearm to family members by a person serving in the armed forces who is about to be deployed, § 18-12-115(2)(b); and where a "background check is not required pursuant to state or federal law," § 18-12-115(2)(c). Additionally exempted are situations where the exchange is:

---

[11] Presumptions, of course, can "be rebutted by appropriate evidence," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011), so in the event such a condition or qualification is abusive, a plaintiff could present evidence to demonstrate that it goes too far. A three-day wait, however, is not such a situation. Nor have Plaintiffs provided any evidence to the contrary.

- a bona fide gift between immediate family members, § 18-12-112(6)(b);

- an intestate transfer or transfer through a will, § 18-12-112(6)(c);

- a temporary transfer in the transferee's home for purposes of self-protection, § 18-12-112(6)(d);

- a temporary transfer while hunting, § 18-12-112(6)(e)(III); and

- a temporary transfer of up to 72 hours, § 18-12-112(6)(h).

These exemptions underscore the commercial regulatory nature of the Waiting Period Law and that the three-day waiting period is a presumptively lawful condition of that commercial sale. *See Heller*, 554 U.S. at 627 (presumptively lawful commercial regulation applies to "conditions and qualifications on the commercial sale of arms"); *Silvester*, 843 F.3d at 829-30 (Thomas, C.J., concurring) (10-day waiting period, which "provide[s] a 'cooling off' period," is a longstanding and presumptively lawful condition or qualification on gun sales).

While excessive conditions or qualifications could be abusive, *RMGO*, 121 F.4th at 122-23, Colorado's Waiting Period Law, merely three days long, is the *shortest* of waiting-period laws across the country, the very definition of non-abusive.[12] In coming to its decision in *RMGO*, the Tenth Circuit found informative the consensus of states with minimum age laws. *See id*. at

---

[12] Florida, Illinois, Maine, and Vermont all have a three-day waiting period. Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); 25 M.R.S. § 2016(2); Vt. Stat. Ann. tit. 13, § 4019a. In upholding Vermont's three-day waiting period, the federal district court determined that the law's "objective nature" combined with "its relatively short period of delay, reveals that it does not unduly burden" the Second Amendment right. *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 209 (D. Vt. 2024); *but see Beckwith v. Frey*, 1:24-cv-00384-LEW, 2025 WL 486830, at *3 (D. Me. Feb. 13, 2025) (granting preliminary injunction against Maine's 72-hour waiting period because it temporarily "dispossessed" buyers of guns and "[a]cquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm"), *appeal pending*, No. 25-1160 (1st Cir.).

124 (collecting other state provision). Here, too, 13 other states have waiting period laws, the majority of which have *longer* waiting periods.[13] And multiple other states have extended waiting periods built into their background check or permitting timeframes.[14]

As with Colorado's minimum-purchasing-age law, the Waiting Period Law at issue here "is presumptively lawful because the [waiting period] condition or qualification on the conduct it proscribes falls outside the scope of the plain text of the Second Amendment." *RMGO*, 121 F.4th at 121.[15] Nor is a three-day waiting period a meaningful or abusive constraint such that it infringes on the plain text of the Second Amendment. *See B&L Prods., Inc.*, 104 F.4th at 119; *see also Md. Shall Issue, Inc.*, 116 F.4th at 222 & 227 n.15; *McRorey*, 99 F.4th at 840 (10-day waiting period not abusive). As such, it does not burden anyone's Second Amendment rights, and Plaintiffs' challenge necessarily fails. *Cf. RMGO*, 121 F.4th at 127-28. Thus, "the prohibition on conduct contained within [the Waiting Period Law] does not require [the court] to proceed beyond *Bruen* step one." *Id.* at 120.

---

[13] *See* Minn. Stat. § 624.7132 (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns); N.M.S.A. § 30-7-7.3 (7 days for all firearms, with listed exceptions); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms).

[14] *E.g.*, Del. Code tit. 11 § 1448A (up to 25 days to complete background check); Neb. Rev. Stat. § 69-2405 (up to 3 days); Or. Rev. Stat. § 166.505(3)(a) (up to 30 days to issue permit); 18 Pa.C.S. § 6111(b)(1.1)(iii) (up to 10 days to complete background check).

[15] *RMGO* largely rejects Plaintiffs' claim here: if, as *RMGO* confirmed, a law that requires people to wait years before purchasing a firearm (i.e., to age 21) is a presumptively lawful condition or qualification on the commercial sale of firearms, a mere three-day waiting period certainly passes constitutional muster. *See Coastal States Energy Co. v. Hodel*, 816 F.2d 502, 505 n.6 (10th Cir. 1987) ("power to do the greater includes the power to do the lesser").

**C.  Even assuming the Waiting Period Law falls under the Second Amendment's plain text, it still satisfies *Bruen*'s step two.**

Should this Court proceed to *Bruen*'s second step, the record establishes that the Waiting Period Law is "consistent with the principles that underpin the Nation's regulatory tradition" of firearm regulation. *Rahimi*, 602 U.S. at 681 (citing *Bruen*, 597 U.S. at 26-31). *Bruen* step two asks whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Courts evaluate whether the challenged law "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did and whether it is "comparably justified." *Id.* at 29. The Court must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (citation omitted). But similar does not mean identical. *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* at 691. Properly understood, the Second Amendment "permits more than just those regulations identical to ones" within our nation's early history.[16] *Id.* at 691-92; *see also id.* at 740 (Barrett, J., concurring) ("[h]istorical regulations reveal a principle, not a mold").

_____

[16] While the Supreme Court left open whether a court should "primarily" look to Founding-era or Reconstruction-era history, *Rahimi,* 602 U.S. at 692 & n.1, courts have looked to both sources in construing state laws, *Antonyuk v. James*, 120 F.4th 941, 972-74 (2d Cir. 2024) ("[T]he prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."). Since "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in original), that approach makes sense as states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," *id.* at 37; *see also McDonald*, 561 U.S. at 778 ("[I]t is clear that the *Framers and ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." (emphasis added)). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973. Indeed, the

The undisputed facts show the Waiting Period Law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. Firearm waiting period laws, as they are understood and implemented today, did not exist early in the Nation's history due to low firearm homicide and suicide rates, inherent delays in acquiring firearms, and the absence of modern background check systems. But analogous laws did exist at the Founding, specifically laws (i) limiting firearm use while intoxicated and (ii) licensing laws. These historic analogues demonstrate that the Waiting Period Law is consistent with our Nation's history and tradition of firearm regulation and is constitutional.

     **1.   An unfamiliar pattern: the infrequency of homicide and suicide by firearm at the Founding.**

Unlike today, rates of firearm homicide and suicide were low at the Founding. Impulsive gun homicide was not prevalent at the Founding, but it has become an epidemic in modern times. Likewise, at the time of the nation's Founding, suicides, particularly firearm suicides, were rare. Consequently, "[p]ublic officials today are confronting a criminological and sociological problems that did not exist in the Founding Era, nor during the first century of the nation's existence." Ex. 6, Report & Decl. of Roth, p. 38, ¶ 39. The Waiting Period Law addresses these serious modern problems.

In the eighteenth century, homicide rates were low due to "political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government." *Id.* at 9, ¶ 5. Although household ownership of firearms was common, the impact of firearms on the homicide

---

Court made clear that post-ratification history is a "critical tool of constitutional interpretation" that reflects "the public understanding of a legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 605 (emphasis removed).

rate was "modest" as muzzle-loading firearms, such as muskets and fowling pieces, "had significant limitations as murder weapons in the colonial era" because they were liable to misfire; required reloading after each shot; and time consuming to load. *Id.* at 10-11, ¶¶ 6-7 (noting muzzleloaders required "at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand."). Thus, family and household homicides were committed "almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." *Id.* at 12, ¶ 8. "Guns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id.* Overall, only 10-15% of homicides were committed with a firearm. *Id.* at 10, ¶ 6.

Likewise, at the Nation's founding, suicides—and especially gun suicides—were rare. *Id.* at 35, ¶ 36. Professor Roth's historical analysis of suicide in Vermont and New Hampshire from 1783-1824, reveals the suicide rate was "remarkabl[y] low by today's standards" and that only 6 percent of suicides were committed with firearms. *Id.* Most suicides involved hanging, drowning, or cutting. *Id.* "Muzzle loading firearms were not the preferred means for committing impulsive suicides, just as they were not for committing homicides." *Id.*

### 2.   Waiting Period Laws were not needed at the Nation's Founding.

Firearm waiting period laws, as they are understood and implemented today, did not exist early in the country's history. Ex. 5, ¶ 10. The reason for this is four-fold. *First*, as discussed above, rates of homicide and suicide by firearm were low. There was less need for a cooling off period at the time of the nation's founding because firearms were not—unlike today—the weapon of choice for homicide or suicide. *Second*, waiting period laws did not exist because "no

organized system of gun waiting periods and background checking could feasibly exist until the modern era." *Id*. at ¶ 13.

*Third*, guns were not available on demand to Americans in the 1790s and later. "Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century[.]" *Id.* at ¶ 12. In the eighteenth century, "the vast majority of firearms available in America[] were European imports." *Id*. at ¶ 11. Most American gunsmiths were focused on repairs, not the construction of firearms from scratch. *Id*. For the few gunsmiths that did manufacture firearms from start to finish, "it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch." *Id*. Thus, the lack of waiting period laws before the early 20th century does not show that Americans could buy and take possession of a gun whenever they wanted. Rather, it shows that such laws were unnecessary because a waiting period inherent in the acquisition of firearms already existed for many Americans. "Though delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring).

*Fourth*, waiting period laws did not exist to prevent suicide because suicide means-prevention was not understood. At the Founding, suicide was viewed as "an immoral act against God" and criminalized by the American colonies. Ex. 7, Report & Decl. of Ruben, ¶¶ 18-19. Founding-era governments did not view reducing access to suicidal means to be a primary part of suicide prevention. *Id*. at ¶¶ 15, 23. Instead, the law's treatment of suicide was focused on after-the-fact criminal punishment. *Id*. at ¶ 15. Today, suicide is linked to mental illness. *Id*. at ¶ 39. Although medications and psychotherapy are available, data show that medicine alone is

not sufficient to prevent suicide. *Id*. Over time, the societal approach to suicide followed a process of secularization, decriminalization, and medicalization. *Id*. at ¶ 15. Along with these trends, modern research has illuminated the relationship between access to lethal means and suicide risk. *Id*. at ¶¶ 43, 47. This scientific understanding, which is the result of population-level analyses unavailable and likely unimaginable at the Founding, has informed suicide-prevention measures like the firearm waiting period law at issue here. *Id*. at ¶ 47

In short, the "impulsive acts of firearm violence" the Act seeks to prevent were not a societal problem at the Founding. ECF No. 18-1, § 1(2)(a). Today, by contrast, firearms are among the five leading causes of death for people between the ages of 1 and 44 and Colorado's suicide rate ranks seventh in the country. ECF No. 18-1 § 1(1)(a), (d). Considered together, these factors make it unsurprising that waiting period laws did not exist. Rather, "unprecedented societal concerns" and "dramatic technological changes" prompted States to adopt waiting period laws beginning 100 years ago.[17] *Bruen*, 597 U.S. at 27.

### 3. Historic laws regulating firearm usage while intoxicated are analogous to the Waiting Period Law.

The Waiting-Period Act was enacted to "help prevent impulsive acts of firearm violence, including homicides and suicides." ECF No. 18-1, § 1(2)(a). States have long regulated the possession, use, and sale of arms to intoxicated persons to avoid impulsive violence. Professor

---

[17] The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and other restrictions in the late 1800s and early 1900s. Ex. 5, ¶ 12. The passage of firearm waiting period laws started over 100 years ago. *See, e.g.*, *id*. at Ex. F, pp. 2-3 (PDF pp. 192-93) & Ex. E, pp. 9-10 (PDF pp. 249-50) (1923 Cal. Laws 695, 696, ch. 339, §§ 2, 10); *id*. at Ex. F, pp. 4-5 (PDF pp. 194-95) & Ex. E, p. 16 (PDF p. 256) (1923 Conn. Laws 3707, ch. 252, § 7); *id*. at Ex. E, p. 76 (PDF p. 316) (1923 N.D. Laws 379, ch. 266, § 10).

Spitzer explains that "alcohol intoxication was a basis for preventing gun acquisition or use because it diminished capacity, judgment, and reason" and those laws provide an "instructive and analogous historical parallel to modern waiting period laws." Ex. 5, ¶ 16. Laws pertaining to firearms and intoxication mimicked waiting periods because they interrupt gun access only temporarily, as is the case with waiting periods. *Id.* at ¶¶ 15-16. Professor Spitzer's report identifies numerous relevant historical examples of regulations pertaining to firearms and intoxication, including the following:

- In 1623, 1631, and 1632, Virginia enacted measures "directing that '[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments.'" *Id.* at ¶ 24 & Ex. C, p. 35 (PDF p. 132).

- In 1655, a Virginia law made individuals subject to fines for "'shoot[ing] any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'" *Id.* at ¶ 24 & Ex. C, p. 36 (PDF p. 133).

- In 1868, Kansas passed a law stating:

  > Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

  *Id.* at ¶ 26 & Ex. C, p. 7 (PDF p. 104).

- In 1878, Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any

weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge." *Id*. at ¶ 26 & Ex. C, p. 12 (PDF p. 109). The state enacted similar laws in 1880 and 1908. *Id*. at ¶ 26 & Ex. C, pp. 12-13 (PDF pp. 109-10).

- In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." *Id*. at ¶ 26 & Ex. C, p. 37 (PDF p. 134).

- In 1879, Missouri passed a law stating:

> If any person  shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

*Id*. at ¶ 27 & Ex. C, p. 14 (PDF p. 111).

- Missouri enacted a similar statute in 1883, and several other like regulations were adopted by counties, cities, and towns in Missouri before the turn of the century. *Id*. at ¶ 27 & Ex. C, pp.14-25 (PDF pp. 111-22).

- In 1884, a law in Maryland provided:

> Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

*Id*. at ¶ 28 & Ex. C, pp. 8-9 (PDF pp. 105-06).

- In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." *Id*. at ¶ 28 & Ex. C, p. 33 (PDF p. 130).

These measures demonstrate our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals—and avoiding impulsive or rash use of firearms—as this Court so held in denying Plaintiffs' Motion for Preliminary Injunction. ECF No. 32, p. 33.

The intoxication laws are "relevantly similar" to the Waiting-Period Act. *See Bruen*, 597 U.S. at 29. Both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable burden on the right of armed self-defense." *Id*. The historic intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. The "why" for these laws targeting arms and intoxication are aimed at the same evil sought to be avoided by waiting period laws— avoiding impulsive firearm violence committed by someone not thinking clearly. As the Waiting Period Law states, "establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence." ECF No. 18-1, § 1(2)(a). And the "how" of intoxication laws are either the same as waiting period laws—targeting sales of such arms— or are even more burdensome than waiting periods on constitutional right to bear arms, as they also make *carrying* while intoxicated a crime.

Professor Francis, Plaintiffs' proffered expert, presents four critiques of intoxication laws as analogues. *First*, he argues that the Waiting Period Law imposes a limitation on

purchase whereas the Founding-era intoxication laws imposed a limitation on carrying or use. Ex. 8, Report & Decl. of Francis, ¶ 21. This is a distinction with little practical difference; laws preventing an intoxicated person from carrying a gun would also prevent them from purchasing and taking immediate personal possession of a gun. Moreover, these laws are aimed at the same evil sought to be avoided by waiting period laws—avoiding impulsive firearm violence committed by someone not thinking clearly.

*Second*, Professor Francis argues that many of the intoxication analogues identified by Professor Spitzer "fall outside the relevant time period as explained by the Supreme Court in *Bruen*." Ex. 8, ¶ 29. But the "relevant time period" and the Supreme Court's holding on the relevant timeframe for historical analogues is a legal opinion and thus not an appropriate subject for expert testimony in this case. Even were it an appropriate opinion, the Court should afford it no weight. The Supreme Court left open whether a court should "primarily" look to Founding-era or Reconstruction-era history, *Rahimi,* 602 U.S. at 692 & n.1, and instructed that Reconstruction-era evidence may be considered unless it conflicts with earlier evidence. *See Bruen*, 597 U.S. at 18-19, 35-36, 66 & n.28. Because states' understanding of the Second Amendment at the time of adopting the Fourteenth Amendment is highly relevant to historical analysis, courts have looked to both sources in construing state law. *See supra* n.16. Nothing in the record indicates the later regulations here conflict with any earlier tradition. *See* ECF No. 32, p. 32 n.20.

*Third*, Professor Francis asserts that Reconstruction-era intoxication laws "likely won't pass constitutional muster" under *Bruen*. Ex. 8, ¶ 31. Again, this legal opinion is not a proper subject for expert testimony here. Even if it were, it should be given no weight, as this

sweepingly broad statement—the report does not even identify any law specifically—is unsupported by any citation or analysis. Further, it is not relevant to the constitutionality of the Waiting Period Law, as Professor Francis conceded at his deposition. Ex. 9, Francis Dep. Tr. 140:22-141:10 ("I don't know that the constitutionality of intoxication laws is necessarily responsive to the inquiry here as far as my ability to give an opinion on waiting period laws.").

*Finally*, Professor Francis argues that two of the intoxication laws identified by Professor Spitzer may have been directed at other aspects of colonial life, namely preventing "the false alarm of an Indian attack" (1655 Virginia statute) or preserving the Sabbath (1636 Rhode Island statute). Ex. 8, ¶¶ 33-36. But these laws nevertheless regulate the use of firearms and drinking "in circumstances in which individuals were thought to be more disposed to shoot their guns," ECF No. 32, p. 31 n.18, and these details do not undercut their viability as analogues. *See also* Ex. 5, ¶ 24 (reasoning that the 1655 Virginia law "applied only to the intersection of shooting and drinking, not all shooting, recognizing yet again the early understanding that alcohol-fueled firearms use led to undesirable behavior.").

While the laws around arms and intoxication are not historical *twins* for waiting periods, they need not be under *Bruen*, particularly as they were animated by the same rationale and are analogous. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated. The "how" and the "why" of the intoxication laws and the Waiting-Period Act are sufficiently alike to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 29; *accord Rahimi*, 602 U.S. at 750.

**4.   Historic licensing requirements are analogous to the Waiting Period Law.**

In addition, there is a longstanding history of firearm licensing regimes in the United States, which "operate in a manner similar to modern waiting periods." Ex. 5, ¶¶ 33-35 & Exs. H (PDF pp. 237-40) & I, pp. 1-118 (PDF pp. 241-358). Licensing laws are a second, separately appropriate analogue because they support that the Founders and Reconstruction generation accepted a modest delay on the delivery of a firearm to ensure that those receiving a firearm are law-abiding, responsible citizens. *See* ECF No. 32, pp. 34-35.

*Bruen* held there is a sufficient historical basis for "shall-issue" licensing regimes. *See* 597 U.S. at 38 n.9. Waiting periods are like "shall-issue" licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met—the passage of at least three days. ECF No. 32, p. 35. Additionally, waiting-period laws, like "shall-issue" licensing laws, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635). And, like "shall-issue" requirements, the Waiting Period Law is governed by objective criteria—that is, once the requirements have been met, the gun can be acquired. The *Bruen* Court observed that "'shall-issue' licensing regimes are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). That is the purpose of the Waiting Period Law. The law allows time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background

check required by state or federal law" (emphasis added)). And the waiting period works to ensure that the individual to whom the firearm is delivered is a "responsible citizen." *See, e.g.*, ECF No. 31, Prelim. Inj. Hr'g Tr. 10-30-23 at 201:11-15 (evincing that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides"); *see also* ECF No. 32, pp. 34-36; Ex. 2 at 12162-64; Ex. 1, ¶¶ 11, 16.

Professor Francis argues that licensing laws are inapt analogues for two reasons. *First*, he argues that many licensing laws date to Reconstruction and the Court cannot consider them under *Bruen*. Ex. 8, ¶ 60. As discussed above, this legal opinion is not an appropriate subject for expert testimony here. Even if it were, the Supreme Court has not definitively held that Reconstruction era laws cannot be historical analogues, as stated in *Rahimi*. Second, Professor Francis posits that none of the licensing laws "actually require one to postpone taking possession of a firearm." *Id*. at ¶ 65. But licensing laws inherently involved a pause, and they are appropriate analogues because they show that the Founders and Reconstruction generation accepted a modest delay on the delivery of a firearm to ensure that purchasers are law-abiding and responsible. *See* ECF No. 32, p. 35.

*Bruen* did not rule out "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. Here, there is no evidence that the Waiting Period Law is being "put toward abusive ends." *Id*.; *see* ECF No. 32, p. 36. The record in this case demonstrates that the Nation's historical tradition of firearm regulation is consistent with the Waiting Period Act.

III.    **A permanent injunction is unwarranted.**

Plaintiffs do not satisfy any of the permanent injunction factors. As discussed throughout Section II, *supra*, Plaintiffs have not established that they can succeed on the merits. Proving success on the merits is the "first and most important" factor. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018). And Plaintiffs fail the other factors, too.

Under the second permanent injunction factor, irreparable harm, the balance is, on the one hand, a brief delay in acquiring a gun, versus on the other hand, the scores of lives saved each year by imposing a brief delay on the acquisition of guns—a delay that allows for reflection and a cooling off period that reduces homicides and suicides in the state. Likewise under the third factor, the proposed injury associated with a brief, three-day delay is minimal compared to the significant harm—the loss of lives—that an injunction would cause to the State of Colorado and its citizens. And, contrary to Plaintiffs' suggestion that the public interest is in having no waiting period because a waiting period violates the Second Amendment, as discussed above the Waiting Period Law does *not* implicate, let alone violate, the Second Amendment. Rather, the public interest is in the lives saved each year by affording a waiting period to avoid rash actions exercised through irreversible gun violence.

\*        \*        \*

The state of the record and of the law establishes that there is no genuine dispute as to any material fact. Moreover, Plaintiffs have not made any showing sufficient to establish the existence of any element essential to their case that the Waiting Period Law is not a valid commercial regulation or that it falls under the plain text of the Second Amendment, as required by *Bruen*, *Rahimi*, and *RMGO*. *See Celotex Corp.*, 477 U.S. at 322-23 (where plaintiff fails to

make showing of essential element, there can be no genuine issue of material fact and summary judgment is required). Nor have Plaintiffs carried their "heavy burden," *Golan*, 609 F.3d at 1094, of establishing facial invalidity of the Waiting Period Law—particularly because, here, courts can "seek harmony, not [] manufacture conflict" when assessing the Waiting Period Law as a valid commercial regulation, *see Rahimi*, 602 U.S. at 701 (citation omitted); *see also RMGO*, 121 F.4th at 119-27 (determining that Colorado's minimum-purchasing-age law is a valid commercial regulation that does not fall under the Second Amendment's plain text). Because Plaintiffs bear this burden of proof at trial and provide no evidence to establish these elements, this renders all other facts immaterial and compels summary judgment against Plaintiffs. *See Celotex Corp.*, 477 U.S. at 322-23; *see also* Fed. R. Civ. P. 56(a).

## CONCLUSION

The Governor is entitled to summary judgment on Plaintiffs' claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. Ex. 5, Report & Decl. of Spitzer, ¶ 11.

2. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. In the eighteenth century, the vast majority of firearms available in America were European imports. *Id*.

3. Most American gunsmith work consisted of repair work, not the construction of firearms from scratch. *Id*.

4. For the few early American gunsmiths that did manufacture firearms from start to finish, it would have taken around a week of work to produce a basic, utilitarian longarm from scratch. *Id*. (citing Brian DeLay, "The Myth of Continuity in American Gun Culture," Cal. L. Rev. 113 (Feb. 2025), *available at* https://ssrn.com/abstract=4546050); *see also* Ex. 9, Francis Dep. Tr. 88:15-89:11 (speculating that "it could take weeks" and "two

weeks would not be surprising" for the construction of a single firearm in the early colonial period).

5. The process of producing a long gun from start to finish utilizing eighteenth century materials could take as long as 300 hours. Ex. 5, ¶ 11, n.3 (citing "Gunsmith of Williamsburg," produced by Colonial Williamsburg, narrated by NBC reporter David Brinkley, 1969; https://www.youtube.com/watch?v=X_O1-chxAdk).

6. People "might have [had] to wait a few weeks" to get a firearm due to low production rates. ECF No. 30, Prelim. Inj. Hr'g Tr. 10-26-23 at 156:5-6 (R. Roth).

7. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. Ex. 5, ¶ 12.

8. The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and other restrictions in the late 1800s and early 1900s. *Id.*

9. No organized system of gun waiting periods and background checking could feasibly exist until the modern era. The contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993 (although the waiting period was phased out in 1998 and replaced with an instant background check system). *Id.* at ¶ 13.

10. By its nature, a gun waiting period simply delays an otherwise lawful purchase for two sound reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons. *Id.*

11. The passage of firearm waiting period laws started over 100 years ago. *See, e.g.*, Ex. 5, Ex. F, pp. 2-3 (PDF pp. 192-93) & Ex. E, pp. 9-10 (PDF pp. 249-50) (1923 Cal. Laws 695, 696, ch. 339, §§ 2, 10); *id.* at Ex. F, pp. 4-5 (PDF pp. 194-95) & Ex. E, p. 16 (PDF p. 256) (1923 Conn. Laws 3707, ch. 252, § 7); *id.* at Ex. E, p. 76 (PDF p. 316) (1923 N.D. Laws 379, ch. 266, § 10).

12. Firearm waiting period laws, as they are understood and implemented today, did not exist early in the country's history. Ex. 5, ¶ 10.

13. In the eighteenth century, laws restricting the use or ownership of firearms by colonists of European ancestry were "rare[.]" Ex. 6, Report & Decl. of Roth, pp. 9-10, ¶¶ 5-6.

14. In the same time period, "the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated." *Id*. at 9, ¶ 5.

15. Homicide rates were low "from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government." *Id*. at 9-10, ¶¶ 5-6.

16. Although household ownership of firearms was common, "the impact of firearms on the homicide rate was modest[.]" *Id*. at 10, ¶ 6.

17. When homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. Ex. 5, ¶ 14; Ex. 6, p. 11, ¶ 7.

18. "[M]uzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era" because they were liable to misfire; could not fire multiple shots without reloading; and time consuming to load, requiring "at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand." Ex. 6, p. 11, ¶ 7.

19. Muzzle loading firearms were problematic as implements for murder, as they did lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Ex. 5, ¶ 14; Ex. 6, pp. 11-12, ¶ 7.

20. Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict. Ex. 5, ¶ 14; Ex. 6, p. 11, ¶ 7.

21. Family and household homicides were committed "almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." Ex. 6, p. 12, ¶ 8. "Guns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id*.

22. Overall, only 10-15% of homicides were committed with a firearm. *Id*. at 10, ¶ 6.

23. At the time of the nation's founding, suicides—and especially gun suicides—were rare. *Id*. at 35, ¶ 36.

24. A historical analysis of suicide in Vermont and New Hampshire from 1783-1824, reveals that the suicide rate was "remarkabl[y] low by today's standards" and that only 6 percent of suicides were committed with firearms, despite 50 to 60 percent

of households owning a firearm. *Id.* Most suicides involved hanging, drowning, or cutting. *Id.*

25. Muzzle loading firearms were not the preferred means for committing impulsive suicides or homicides. *Id.*

26. At the Founding, suicide was viewed as "an immoral act against God" and criminalized by the American colonies. Ex. 7, Report & Decl. of Ruben, ¶¶ 18-19. Founding era governments did not view reducing access to suicidal means to be a primary part of suicide prevention. *Id.* at ¶¶ 15, 23.

27. At the Founding era, the law's treatment of suicide was focused on after-the-fact criminal punishment. *Id.* at ¶ 15.

28. Today, suicide is understood as a manifestation of medical and psychological anguish. *Id.* at ¶ 39. Although medications and psychotherapy are available, data show that medicine alone is not sufficient for treatment of mental disorders or suicidality. *Id.* Beginning in the mid-1970s, studies have shown that limiting access to suicidal means brings down suicide rates. *Id.* at ¶ 41, n.9 & ¶ 43.

29. As Professor Ruben wrote, public health researchers Deborah Azrael and Matthew Miller explain that the understanding that:

> [R]estricting access to a highly lethal method can save lives rests on three well-established observations. . . . First, many suicidal crises are fleeting. . . . Second, the method people use in suicidal acts depends, to a vital extent, on the method's ready availability, over and above—and perhaps even independent of—the attempter's assessment of a method's intrinsic lethality. . . . Third, the prognosis if one survives a suicide attempt is excellent. . . . [F]ewer than 10% of people who attempt suicide and live later go on to die by suicide.

*Id.* at ¶ 43.

30. Today, firearms are the most used suicide method in United States suicides, despite being used in a relatively small proportion of suicide attempts. *Id.* at ¶ 44 & n.111 (estimating that firearms accounted for 4.8 percent of suicide attempts but 50.6 percent of suicide deaths).

31. The same is true of Colorado where firearms are the "leading method" in suicides. *Id.* at ¶ 44. In fact, Colorado's rate of firearm suicide is the 10th highest in the country. *Id.*

32. In 2022, 27,032 people in the United States took their lives by self-inflicted gun shots, the highest number since the Centers for Disease Control began recording suicide data in 1968. *Id*.

33. Nor was 2022 an outlier year; the gun suicide rate has been on an upward trajectory since 2006, cementing the United States' status as a "global leader" for gun suicides. *Id*.

### *Facts Supporting Intoxication Law Analogues*

34. Laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations in America. From the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states regulated the commercial sale or distribution of alcohol when firearms were also present; at least two states barred gun sales to those who were intoxicated; at least six states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred providing guns to Native Americans if intoxicated. Ex. 5, ¶ 22 & Exhibits B and C (PDF pp. 96-134).

35. In the 1600s, at least three states (which at the time were colonies) enacted seven intoxication laws; in the 1700s at least seven states enacted nine laws; in the 1800s at least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws. Ex. 5, ¶ 23 & Exhibits B and C (PDF pp. 96-134).

36. In 1623, 1631, and again in 1632, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments." Ex. 5, ¶ 24 & Exhibit C at 35 (PDF p. 132) (citing 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV).

37. In a 1655 Virginia law, alcohol-fueled revelry was subject to fines for any who would "shoot any guns at drinking," although the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted." Ex. 5, ¶ 24 & Exhibit C at 36 (PDF p. 133) (citing 1655 Va. Acts 401, Acts of March 10, 1655, Act XII).

38. In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Ex. 5, ¶ 24 & Exhibit C at 32 (PDF p.

129) (citing 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636).

39. In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." Ex. 5, ¶ 24 & Exhibit C at 9 (PDF p. 106) (citing The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814), *available at* The Making of Modern Law: Primary Sources. 1663).

40. In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so. Ex. 5, ¶ 24 & Exhibit C at 30 (PDF p. 127) (citing 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries).

41. In 1868, Kansas passed a law stating:

> Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

Ex. 5, ¶ 26 & Exhibit C at 7 (PDF p. 104) (citing *The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed* 378, Image 387 (1868), *available at* The Making of Modern Law: Primary Sources).

42. In 1878, Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge." Ex. 5, ¶ 26 & Exhibit C at 12 (PDF p. 109) (citing 1878 Miss. Laws 175-76, *An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes,* ch. 46, §§ 2-3*; Josiah A. Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes 776-777*).

43.  Mississippi enacted similar laws in 1880 and 1908. Ex. 5, ¶ 26 & Exhibit C at 12-14 (PDF pp. 109-11) (citing Image 776-777 (1880), *available at* The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908)).

44.  In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." Ex. 5, ¶ 26 & Exhibit C at 37 (PDF p. 134) (citing 1883 Wis. Sess. Laws 290).

45.  Nevada enacted measures in 1881 and 1885 that punished anyone who discharged firearms in various public spaces while "under the influence of liquor." Ex. 5, ¶ 26 & Exhibit C at 25-26 (PDF pp. 122-23) (citing 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, *The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto* 1076, Image 1084 (1885), *available at The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places*, § 1).

46.  The Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825. Ex. 5, ¶ 26 & Exhibit C at 34 (PDF p. 131) (citing 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292).

47. In 1879, Missouri passed a law stating:

> If any person  shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Ex. 5, ¶ 27 & Exhibit C at 14 (PDF p. 111) (citing MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds., 1879)).

48.  Missouri enacted a similar statute in 1883, and at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns. Ex. 5, ¶ 27 & Exhibit C at 14-25 (PDF pp. 111-22) (citing 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1).

49. In 1888, a law in Maryland provided:

> Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

Ex. 5, ¶ 28 & Exhibit C at 8-9 (PDF pp. 105-6) (citing John Prentiss Poe, *The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein* 522-23, Image 531-532 (Vol. 1, 1888), *available at* The Making of Modern Law: Primary Sources. 1884).

50. In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." Ex. 5, ¶ 28 & Exhibit C at 33 (PDF p. 130) (citing *General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State* Page 1010, Image 1026 (1896), *available at* The Making of Modern Law: Primary Sources. 1893).

51. Other laws in early America restricted the sale or distribution of alcohol in the proximity of persons with firearms. Ex. 5, ¶ 29 & Exhibit B (PDF pp. 96-97) (citing sources).

### *Facts Supporting Licensing Law Analogues*

52. Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today. Ex 5, ¶ 32.

53. While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted. *Id*. at ¶ 33.

54. "[L]icensing by its nature thwarts any ability to acquire or use firearms on demand." *Id*.

55. State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention). *Id*. at ¶ 34 & Exhibits H and I (PDF pp. 237-358).

56. In all, a total of at least 47 states (including D.C.) enacted some kind of licensing measure. Ex. 5, ¶ 35 & Exhibits H and I (PDF pp. 237-358).

57. At least 32 of those states enacted 72 licensing requirement laws for individuals as a pre-requisite for their weapons ownership or use during this time; 16 of those states did so in the 1800s. *Id*.

58. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). *Id*.

59. At least 13 states licensed hunting with firearms from the post-Civil War period through the early 1900s (one state, Pennsylvania, enacted such a law in 1760). *Id*.

60. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries from the early 1800s through the early 1900s. *Id*.

61. At least 22 states licensed the possession, handling, or transport of gunpowder and other explosives from the 1600s through the early 1900s. *Id*.

62. At least 17 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons, mostly in the early 1900s as the sales process became regulated. *Id*.

### *Facts Surrounding Waiting Period Laws*

63. Waiting period laws cause "large and statistically significant reductions in homicides," upwards of a 17% reduction. Ex. 1, Report & Decl. of Poliquin, ¶ 11 & Ex. 2, Luca, Malhotra & Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162, 12162 (Nov. 2017).

64. The 17 states with waiting periods collectively "avoid ~750 gun homicides" a year. Ex. 2 at 12164.

45

65. Waiting periods would prevent "an additional 910 gun homicides per year" if all states had them. *Id*.

66. "Waiting periods also lead to a 7-11% reduction in gun suicides . . . , equivalent to 22-35 fewer suicides per year for the average state." *Id*. at 12163; *see also* Ex. 1, ¶ 16.

67. In Colorado, a waiting period law means "the state avoids about 52 gun homicides per year" and "48 fewer gun suicides per year." Ex. 1, ¶¶ 11, 16.

68. Waiting period laws do not result in increases of non-gun homicide rates. *Id*. at ¶ 13.

69. Colorado enacted its Waiting Period Law in 2023 through House Bill 23-1219. ECF No. 18-1.

70. Colorado's Waiting Period Law provides that it is unlawful for any person who sells a firearm to deliver the firearm to the purchaser until after a three-day waiting period has passed. *Id*. at 3; Colo. Rev. Stat. § 18-12-115(1)(a)(I).

71. The Colorado General Assembly enacted the Waiting Period Law after recognizing that "mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm" and a "17 percent" reduction for firearm homicides. ECF No. 18-1, § 1(1)(f).

### *Facts About Plaintiffs Garcia and RMGO*

72. Plaintiff Garcia owns "twenty to thirty" guns. Ex. 3, Garcia Dep. Tr. 23:18-22.

73. Plaintiff Garcia has purchased and taken possession of purchased guns since the Waiting Period Law went into effect. *Id*. at 28:22-31:5, 46:3-15.

74. After the Waiting Period Law went into effect, Plaintiff Garcia purchased a shotgun in Colorado Springs, which is approximately two-and-a-half hours from her home, for an out-of-state shotgun shoot. Plaintiff Garcia conceded there are closer gun stores to her home and that it is "inconvenient for [her] to travel all of way down" to Colorado Springs. *Id*. at 29:23-32:2, 89:2-16, 95:5-14.

75. Plaintiff Garcia has been in Colorado Springs five to eight times since purchasing the shotgun and did not collect it. *Id*. at 86:19-87:6.

76. Plaintiff Garcia is not a gun seller and has not been cited or prosecuted under the Waiting Period Law, § 18-12-115. Ex. 3 at 26:22-25, 46:20-22, 74:7-8.

77. Plaintiff Garcia "knew of the event [the out-of-state shotgun shoot] like a week or so before the event." *Id*. at 97:14-98:3. The event was scheduled for Halloween, and

Plaintiff Garcia knew about it before she testified at the preliminary injunction hearing on October 26, 2023, in this case. *Id*. at 95:9-97:25.

78. RMGO's purpose is to educate people about the Second Amendment, defend the "right[s] of all law-abiding individuals to keep and bear arms," ECF No. 1, ¶ 1; ECF No. 2-3, ¶ 3, and has a "main purpose [of] operating in the legislature," Ex. 4, Rhodes Dep. Tr. 12:14-15, 48:15-17.

79. RMGO is funded by member dues and donations. Ex. 4 at 55:10-22.

80. The Waiting Period Law has neither prevented RMGO's activism nor prevented RMGO from pursuing its mission. *Id.* at 48:5-21, 57:6-58:11.

81. The two individual members RMGO identified as having been affected by the Waiting Period law, B.H. and S.H., did not file declarations. *See generally* ECF Nos. 1, 2, 2-1, 2-2, 2-3.

82. For neither B.H. nor S.H. did RMGO identify:

   a. a specific instance of either B.H. or S.H. buying or attempting to buy a gun;
   b. whether either had a specific plan to buy a gun;
   c. whether either was unable to purchase and acquire a gun;
   d. whether either even planned to buy a gun in the future;
   e. whether either had been prevented by the Waiting Period from buying or acquiring a gun;
   f. whether either B.H. or S.H. was a gun seller;
   g. whether either B.H. or S.H. as having been cited or prosecuted under the Waiting Period Law. Rhodes Dep.

Ex. 4 at 79:18-81:23, 82:24-83:14, 83:15-86:4.

83. Both members RMGO identified as having been affected by the Waiting Period were able to purchase and take possession of guns since the Waiting Period Law went into effect. *Id.* at 78:4-17.

84. RMGO did not identify any member who could not purchase and take possession of a gun because of the Waiting Period Law. *Id.* at 72:12-14.

Respectfully submitted: May 8, 2025

>PHILIP J. WEISER
>Attorney General
>
>*s/* Joseph G. Michaels
>*Joseph G. Michaels**
>Assistant Solicitor General
>
>*s/* Emily Burke Buckley
>*Emily Burke Buckley**
>Assistant Solicitor General
>Colorado Attorney General's Office
>1300 Broadway, 6th Floor
>Denver, Colorado 80203
>Telephone: (720) 508-6000
>Email: joseph.michaels@coag.gov
>       emily.buckley@coag.gov
>*Attorneys for Defendant Governor*
>  *Jared S. Polis*
>*Counsel of Record

48

**THE GOVERNOR'S EXHIBIT INDEX**
**FOR MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| 1 | Report & Declaration of Poliquin |
| 2 | Luca, Malhotra & Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162 (Nov. 2017) |
| 3 | Excerpts from Garcia Dep. Tr. |
| 4 | Excerpts from Rhodes Dep. Tr. |
| 5 | Report & Declaration of Spitzer |
| 6 | Report & Declaration of Roth |
| 7 | Report & Declaration of Ruben |
| 8 | Report & Declaration of Francis |
| 9 | Excerpts from Francis Dep. Tr. |