# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor for the State of Colorado,

      Defendant.

---

## THE GOVERNOR'S RESPONSE IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

**INTRODUCTION**

Colorado's three-day Waiting Period Law imposes a short delay before a firearm is delivered to a purchaser. Because firearm waiting periods can reduce gun homicides and suicides between 7 and 17 percent, in the Waiting Period Law may save over 100 Coloradans' lives annually. The Court previously found Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge to the Waiting Period Law. ECF No. 32, p. 36. Having completed discovery, Plaintiffs ask for summary judgment on their Second Amendment claims; but, still, they cannot show this lifesaving law is unconstitutional.

The Supreme Court, in *New York Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 24 (2022), provided a two-prong test for Second Amendment challenges. Under the first prong, it is the plaintiff's burden to establish that the regulation falls under the Second Amendment's plain text. *Id.* at 17, 19-20. If they can do so, the burden shifts to the government under the second prong to establish that the law is nevertheless consistent with the Nation's historical tradition of firearm regulation, something it can do by comparison with historical analogues. *Id.* at 24, 27-30.

In their motion, Plaintiffs do not offer any evidence under the first prong, where they bear the burden to show Colorado's three-day Waiting Period Law implicates the plain text of the Second Amendment. Consequently, they have failed to carry their step-one burden, and summary judgment against Plaintiffs is required. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At the second step, which the Court need not reach, Plaintiffs argue the Governor's historical analogues do not reflect a historical acceptance of a delay in the acquisition of firearms. On that point, they are mistaken, as the Governor provided extensive evidence *not only* that citizens at the Founding did not expect immediate acquisition of guns but also of

1

numerous historical analogues restricting gun access to reduce impulsive violence. The Court should grant summary judgment in favor of the Governor.

**RESPONSE TO PLAINTIFFS' ASSERTIONS OF FACT**

Multiple of Plaintiffs' Statement of Undisputed Material Facts contain not facts, but legal arguments or assertions contesting facts. *See* ECF No. 62, p. 12 ¶ 38, p. 13 ¶ 42, pp. 15-18 ¶¶ 49(a)-(f). This Court should not consider those arguments. The Governor responds to Plaintiffs' asserted facts below, beginning at page 26.

**ARGUMENT**

**I.    Plaintiffs have not established standing.**

The Governor largely rests on the standing arguments made in his motion for summary judgment. ECF No. 63, pp. 9-13 (discussing Plaintiff Garcia, Plaintiff RMGO, and Plaintiff-RMGO individual members J.H. and S.H.). However, in their motion for summary judgment, Plaintiffs for the first time assert that Taylor Rhodes has standing and claims injury from the Waiting Period Law. ECF No. 62, p. 6 ¶¶ 18-20. The Complaint does not name Mr. Rhodes as an individual plaintiff or on behalf of RMGO. *See* ECF No. 1, ¶ 1 (Complaint) (identifying three RMGO members by initials, but not Taylor Rhodes); ECF No. 2-3 (Rhodes declaration) (same, and identifying RMGO's interest generally). On the contrary, Mr. Rhodes testified he was not personally a plaintiff. ECF No. 30, Prelim. Inj. Hr'g Tr. 10-26-23 at 34:25-35:1. And Mr. Rhodes's deposition was not in a personal capacity, but as a 30(b)(6) corporate representative.

Plaintiffs have not moved to add Mr. Rhodes as a plaintiff, as required by Fed. R. Civ. P. 15(a), and the deadline to amend the pleadings has long since passed. ECF No. 44, p. 4 ¶ b (setting April 8, 2024 as the deadline to amend). A new party cannot be added through argument

2

in a dispositive motion. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184-85 (4th Cir. 2013) ("well-established that parties cannot amend their complaints through briefing"); *accord Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995) (court assesses "legal sufficiency of the allegations contained within the four corners of the complaint"). Even if a motion were properly filed, Plaintiffs' efforts would be too little, too late. *See Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1366 (10th Cir. 1993) (holding district court did not abuse its discretion in denying motion for leave to amend where plaintiffs' motion was untimely and plaintiffs knew or should have known of intended defendant's identity "long before").

Regardless, for the same reasons that Plaintiff Garcia and RMGO members J.H. and S.H.[1] do not have standing, as discussed in the Governor's motion for summary judgment, ECF No. 63, pp. 9-13, neither does Mr. Rhodes have standing: the Waiting Period Law does not prevent him from acquiring a gun and he is not a gun seller. ECF No. 30 at 32:24-33:7, 35:4-8 (acknowledging collecting the purchased gun after the Waiting Period Law went into effect), Further, like Plaintiff Garcia and RMGO members Howard and Humphrey, Mr. Rhodes already has guns to use "in case of confrontation," *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008), thus satisfying the core Second Amendment right of confrontation, *see id*.; *see also* ECF No. 30 at 30:21-23 (Rhodes testifying he already owns guns). This is fatal to standing.

---

[1] Plaintiffs only identify "J.H." and "S.H." by initials in their Complaint. *See* ECF No. 1, ¶ 1. During his deposition, Mr. Rhodes identified their full names as John Howard and Steve Humphrey. ECF No. 63-4, Ex. 4, Rhodes Dep. Tr. 80:18-81:23, 83:15-84:6. Neither Mr. Howard nor Mr. Humphrey submitted affidavits, and the Waiting Period Law has not prevented either of them from owning or acquiring a firearm. *Id*. at 82:24-83:14, 85:17-86:4.

## II.   Plaintiffs have not carried their burden under *Bruen* step one.

"'[T]he right secured by the Second Amendment is not unlimited.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *Heller*, 554 U.S. at 626). Indeed, "the Second Amendment allows a 'variety' of gun regulations," *Bruen*, 597 U.S. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) (citation omitted), and "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.). Such regulations include conditions and qualifications on the commercial sale of arms. *Heller*, 554 U.S. at 626-27. These are "presumptively lawful regulatory measures." *Id*. at 627 n.26; *accord Rahimi*, 602 U.S. at 699. Colorado's Waiting Period Law is "consistent with the principles that underpin [our] regulatory tradition" of firearm regulation. *Rahimi*, 602 U.S. at 681 (citing *Bruen*, 597 U.S. at 26-31).

### A.  Plaintiffs have not established that the Waiting Period Law falls under the plain text of the Second Amendment at *Bruen* step one.

#### 1.   Plaintiffs have offered no evidence in support of *Bruen* step one.

Under *Bruen* step one, Plaintiffs must establish that the Second Amendment's text, "as informed by history," encompasses the conduct in which they seek to engage. 597 U.S. at 17, 19. At step one, Plaintiffs must undertake a "textual analysis" to assess the "'normal and ordinary' meaning of the Second Amendment's language" as understood at the time of its adoption. *Id.* at 20 (quoting *Heller*, 554 U.S. at 576-78); *accord Heller*, 554 U.S. at 634-35 (constitutional rights enshrined with scope they were understood to have when adopted). If the text is not implicated, "that ends the inquiry; the Second Amendment does not apply." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc); *see also Bruen*, 597 U.S. at 18 (If the text is not implicated, "the regulated activity is categorically unprotected."). The legal question of whether the Waiting

Period Law implicates the plain text of the Second Amendment depends on the "broader 'historical inquiry'"—an inquiry and burden that, under *Bruen* step one, is borne by the plaintiffs.[2] 597 U.S. at 20, 25 n.6. Because the Court "follow[s] the principle of party presentation," this Court is "entitled to decide a case based on the historical record compiled by the parties." *Id*. at 25 n.6. When plaintiffs present no evidence, they do not carry their burden.

In this case, Plaintiffs assert that the Second Amendment provides for a right to the immediate acquisition of firearms—i.e., acquisition without delay. However, Plaintiffs have presented *no* historical record establishing that the plain text of the Second Amendment safeguarded such a right or that a waiting period law interferes with the right to keep and bear arms for purposes of self-defense. Plaintiffs "cannot overcome the lack of information in the record by statements in the briefs." *Gregg v. Raemisch*, 2018 WL 447351, at *2 (D. Colo. Jan. 17, 2018) (quotation omitted).

Because Plaintiffs have not produced any evidence showing that the Waiting Period Law implicates the Second Amendment's plain text, summary judgment *against* them is appropriate. *Celotex Corp.*, 477 U.S. at 322 (failure to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" "mandates the entry of summary judgment" against that party). Plaintiffs' failure to carry

---

[2] Plaintiffs incorrectly assert that "to avoid reaching *Bruen* Step 2, the Defendant bears the heavy burden of establishing that the Waiting Period Law" is *not* a firearms regulation and is *not* a regulation on arms-bearing conduct in order to not implicate the plain text of the Second Amendment. ECF. No. 62, p. 20. This gets the *Bruen* test exactly backwards: Plaintiffs bear the burden of establishing a regulation *is covered* by the plain text *in order to proceed to* step two. *See Bruen*, 597 U.S. at 17, 18.

their step-one burden is fatal, and this Court should resolve the case against Plaintiffs at this threshold. *Bruen*, 597 U.S. at 25 n.6.

### 2. Plaintiffs' legal arguments do not establish that the plain text of the Second Amendment implicates a right to immediate acquisition of firearms.

The Second Amendment protects "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. It is not a pure right of possession, but rather a qualified right of possession related to self-defense. *See Bruen*, 597 U.S. at 26 ("The Second Amendment . . . elevates above all other interests the right of law-abiding, responsible citizens *to use arms for self-defense*.") (emphasis added, quotation marks omitted) (citing *Heller*, 554 U.S. at 635). In other words, the possession of guns is only a means to an end, namely safeguarding the Second Amendment right to self-defense. *See Heller*, 554 U.S. at 592; *McDonald*, 561 U.S. at 767 ("central component" of Second Amendment is right of self-defense) (quoting *Heller*, 554 U.S. at 599). A regulation "falls within the ambit of the Second Amendment only if the regulation 'infringes' the Second Amendment right to keep and bear arms." *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024), *cert. denied* 145 S. Ct. 1049 (Jan. 13, 2025). A three-day waiting period does not frustrate the right to keep and bear arms.

● Plaintiffs argue that to "keep and bear" arms necessarily requires the ability to purchase and acquire, and by extension to acquire immediately. ECF No. 62, pp. 20-21. But this is a bridge too far. Even if the Second Amendment touched on the ability to acquire—and the Governor does not concede it does—Plaintiffs do not adequately explain how or why the Second Amendment would promote a right to *immediate* acquisition.

Moreover, the Second Amendment's plain text does not include a right to purchase. *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("on its face 'keep and bear' does not

include purchase"). And the plain text certainly does not constitutionally memorialize a right of immediate acquisition. *Id.* at 838-39 (distinguishing restriction on purchasing versus keeping, with the former not covered by the Second Amendment's plain text, and holding that a 10-day waiting period did not amount to a prohibition on possession). As discussed in the Governor's motion for summary judgment, ECF No. 63, pp. 14-19, keeping arms means to "have weapons," while bearing arms means "the carrying of weapons," specifically "for a particular purpose – confrontation." *Heller*, 554 U.S. at 582, 584. And at least as far back as 1878, the Tennessee Supreme Court held that the "right to 'keep and bear arms,'" did not "necessarily impl[y] the right to buy or otherwise acquire" a gun. *State v. Callicutt*, 69 Tenn. 714, 716 (1878) (in context of the right of those under 21 to purchase guns).

*Rahimi* explained why this is so, highlighting that "[t]he spark that ignited the American Revolution [occurred] when the British governor dispatched soldiers to seize the local farmers' arms and powder stores." 602 U.S. at 690. "This history demonstrates why the Second Amendment's 'keep and bear' language focuses on *retention* rather than *acquisition* of arms." *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1073 (D.N.M. 2024) (collecting authorities), *appeal pending*, 24-2121. Indeed, the driving force behind the Second Amendment was "the fear that the Federal Government would disarm the people[.]" *Heller*, 554 U.S. at 598; *see Ortega*, 741 F. Supp. 3d at 1073 (concluding "the Second Amendment was not drafted to protect the right to *purchase* arms" (emphasis added)). At best, any right to acquire is implied; but an implied right is not a right reflected in the plain text. *Cf. McRorey*, 99 F.4th at 838 (implied right "not the same thing as being covered by the plain text of the amendment"). In short, to "acquire" a gun is

distinct from "keeping" or "bearing" it—particularly where, as here, the delay in acquiring any gun is not abusive and does not amount to a de facto prohibition.

    ● Next, Plaintiffs rely on two cases from foreign jurisdictions, but neither changes the outcome here. See ECF No. 62, pp. 21-23 (discussing *Beckwith v. Frey*, 766 F. Supp. 3d 123 (D. Me. 2025), and *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583 (5th Cir. 2025)).

    In *Beckwith*,[3] the district court preliminarily enjoined Maine's 72-hour waiting period after finding that "[a]cquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm" and that the waiting period law temporarily "dispossessed" purchasers of their guns. 766 F. Supp. 3d at 129-30. But *Beckwith*'s reasoning is unsound. As discussed above, "keep and bear" does not include the right to immediately acquire. In the event a law were to impose an extreme restriction on purchasing or acquiring a firearm, courts would find that the prohibition on "abusive" regulations safeguards the Second Amendment right to keep and bear arms. *Cf. Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 122-23 (10th Cir. 2024) ("*RMGO*"). And *Beckwith*'s concern that a waiting period could "dispossess[]" individuals of their firearms is irrelevant here because Colorado expressly provides that a sale is complete when title transfers from the seller to the buyer, which occurs at the time of physical delivery of goods. *See* Colo. Rev. Stat. §§ 4-2-106(1); 4-2-401(2). A buyer cannot be "dispossessed" of an item he does not yet have title to. Finally, *Beckwith* relied on *Reese*, 766 F. Supp. 3d at 131-32, which, as discussed immediately *infra*, is not persuasive here.

---

[3] *Beckwith* is currently on appeal before the First Circuit, No. 25-1160 (1st Cir.).

In *Reese*, the Fifth Circuit considered a federal law prohibiting handgun sales to 18-to-20-year-olds. 127 F.4th at 586. There are two key problems with relying on *Reese* here. *First*, *Reese* relied primarily on *Rahimi*, which addressed a separate presumptively lawful regulation category concerning prohibitions on the possession of firearms by felons and those who suffer from mental illness, a category not at issue here. *Rahimi* did not address the separate category concerning laws imposing conditions and qualifications on the sale of arms, the key issue here. 602 U.S. at 699. So, *Reese*'s analytical framing is off target from the outset.

*Second*, while *Reese* found a federal law prohibiting the sale of firearms to 18-to-20-year-olds implicated the plain text of the Second Amendment and did not have adequate historical analogues under *Bruen* step two, the Tenth Circuit in this jurisdiction found *just the opposite*—that Colorado's minimum age law prohibiting the same does *not* implicate the plain text of the Second Amendment and is a lawful commercial regulation. *See RMGO*, 121 F.4th at 119-27. Plaintiffs' reliance on *Reese* is unavailing because *Reese* is not on point and directly conflicts with the Tenth Circuit's binding precedent in *RMGO*. This Court is bound to follow *RMGO*. Consistent with *RMGO*, the Waiting Period Law is a "condition or qualification on the sale of arms"; as such, it a "safe harbor" that "falls outside the scope of the Second Amendment's right to 'keep and bear' arms." *Id*. at 119-21.

● Plaintiffs also cite *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016), a pre-*Bruen* case, to assert that any law that *burdens* a person's right to get a gun implicates the Second Amendment and thus satisfies *Bruen* step one. But the Second Amendment is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Heller*, 554 U.S. at 634-35. Consequently, a court's analysis at step one must be "rooted in the Second Amendment's text, as

9

informed by history." *Bruen*, 597 U.S. at 19. That text says nothing about purchase or immediate acquisition (nor have Plaintiffs provided any evidence to that effect), and *burdening* a right is much different than implicating the plain text of the Second Amendment, as required by the subsequently imposed *Bruen* test. Even pre-*Bruen*, judges recognized this. *See Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring) ("Though delay has not always been associated with government regulation, *the ability to immediately exercise Second Amendment rights has no foundation in history*." (emphasis added)).

● Finally, Plaintiffs argue that a slight delay in constitutional rights would not be tolerated under other amendments. ECF No. 62, pp. 23-27. But that is not accurate. *See Silvester*, 843 F.3d at 832 (Thomas, C.J., concurring) (recognizing that the "imposition of a reasonable waiting period before the exercise of a constitutional right is not anomalous" and listing getting a marriage license or getting a permit for a gathering to protest or to have a parade as examples).

Indeed, courts routinely place restrictions on the exercise of constitutional rights:

- First Amendment rights may be subject to well-established time, place, and manner restrictions on when, where, and how to speak. *See Ward v. Rock Against Racism*, 491 U.S. 781, 787, 791 (1989); *see also Hill v. Colorado*, 530 U.S. 703, 725-26 (2000) (applying *Ward*'s time, place, and manner test).

- Even the right to vote, a "fundamental right," 52 U.S.C. § 20501(a)(1), requires an individual to register before exercising the right to vote, *see generally* 52 U.S.C. §§ 20503, et seq.

- In the Fourth Amendment context, courts regularly recognize "exceptions to the warrant requirement" that safeguard the Fourth Amendment right, *Illinois v. McArthur*, 531 U. S. 326, 330 (2001), almost too numerous to count.[4]

- The Fifth Amendment is not implicated unless and until a person is in custody and under interrogation.[5]

- And, under the Sixth Amendment, the constitutional right to a speedy trial provides that a defendant accused of a crime—and who faces deprivation of liberty and property—is not entitled to an *immediate* trial, but rather can be detained within reasonable constitutional limits.[6]

Further, because gun sales are already subject to government regulation, there is a reason to allow for differences in treatment, including minimal delays in acquisition. *Cf. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980) (recognizing different standards apply to commercial speech under the First Amendment because it is "traditionally subject to government regulation").

Plaintiffs also argue that courts have struck down waiting periods for abortions in states that recognize state constitutional protections for abortion. ECF No. 62, pp. 24-25. But Plaintiffs

---

[4] *See, e.g.*, *Arizona v. Hicks*, 480 U.S. 321 (1987) (plain view); *Chimel v. California*, 395 U.S. 752 (1969) (search incident to arrest); *United States v. Leon*, 468 U.S. 897 (1984) (good faith); *Colorado v. Bertine*, 479 U.S. 367 (1987) (inventory search); *Payton v. New York*, 445 U.S. 573 (1980) (exigent circumstances); *Missouri v. McNeely*, 569 U. S. 141 (2013) (warrantless blood draw); *Terry v. Ohio*, 392 U.S. 1 (1968) (stop and frisk on reasonable suspicion); *Carroll v. United States*, 267 U.S. 132 (1925) (warrantless search of vehicles).

[5] *See generally Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010) (suspect must unambiguously invoke right to remain silent).

[6] *See Barker v. Wingo*, 407 U.S. 514, 530-32 (1972) (identifying four-part balancing test that considers, inter alia, length and prejudice to the defendant).

fail to acknowledge that the U.S. Supreme Court *approved* of Pennsylvania's waiting period law in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 885 (1992) (stating that a finding that "important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable"), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).[7] The Supreme Court upheld that abortion waiting period as constitutional, despite the burdens it imposed, including additional cost, time, inconvenience, and travel. *See id.* at 885-86. These are the same general burdens that Plaintiffs attribute to the Waiting Period Law, yet the Supreme Court upheld Pennsylvania's waiting period law as to the then-federal-constitutionally-protected right to abortion.[8]

In sum, Plaintiffs have provided no record or evidence suggesting the Waiting Period Law implicates the plain text of the Second Amendment, and their legal arguments do not stand up to scrutiny.

**B. Plaintiffs have not rebutted the presumption that the Waiting Period Law is a lawful commercial regulation.**

Laws that "impos[e] conditions and qualifications on the commercial sales of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *accord Rahimi*, 602 U.S. at 699 (reaffirming that the "many [] prohibitions" listed in *Heller* are "presumptively lawful"). And commercial regulations that "do not 'meaningfully constrain' any individual's ability to keep and bear arms . . . do not implicate the plain text of the Second Amendment."

---

[7] Misguidedly, Plaintiffs cite *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416 (1983), for the proposition that a state cannot "demand" a delay in abortion access, ECF No. 62, pp. 24-25—a holding *Casey* expressly "reconsider[ed]" and abrogated. 505 U.S. at 885.

[8] Waiting periods associated with abortion may inflict even higher burdens, including health risks and "harassment and hostility of anti-abortion protesters." *Casey*, 505 U.S. at 885-86 (citation omitted).

*B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 110 (9th Cir. 2024), *cert. denied* 2025 WL 1211774 (Apr. 28, 2025). In denying Plaintiffs' motion for a preliminary injunction, this Court held that the Waiting Period Law "regulates only the sale, and specifically sellers, of firearms . . . [and] imposes a condition on the commercial sale of a firearm." ECF No. 32, p. 21. There have been no legal developments that would change this ruling, and in fact, the Tenth Circuit recently underscored the continued validity of the presumptively lawful commercial regulation category in upholding a commercial regulation on minimum-age-purchasers for firearms. *See RMGO*, 121 F.4th at 119-27.

From *Heller* through *Rahimi*, the Supreme Court has affirmed that its Second Amendment framework should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see also Rahimi*, 602 U.S. at 699; *Rahimi*, 602 U.S. at 735 (Kavanaugh, J. concurring (recognizing same); *McDonald*, 561 U.S. at 786; *accord RMGO*, 121 F.4th at 118-19 (synthesizing same and explaining that "[b]ecause the 'presumptively lawful regulatory measures' language . . . has not been abrogated, it remains good law"). It is far from controversial that the government can "impos[e] conditions and qualifications on the commercial sale of arms." *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *McDonald*, 561 U.S. at 786). This "makes sense because commercial regulations that apply only to manufacturers and sellers *do not implicate an individual's right of possession.*" *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quotation omitted; emphasis added).

13

In *RMGO*, the Tenth Circuit determined that firearms regulations that are "presumptively lawful regulatory measures" are a recognized "safe harbor" category appropriately located in *Bruen* step one.[9] *RMGO*, 121 F.4th at 119-21; *see also Silvester*, 843 F.3d at 829 (Thomas, C.J., concurring) (explaining, in a pre-*Bruen* challenge, that "[a]s a longstanding qualification on the commercial sale of arms under [*Heller*] a ten-day waiting period is presumptively lawful" and it is unnecessary to proceed further). The Tenth Circuit further explained that a presumptively lawful commercial regulation should be upheld *unless the record established* that it was being employed to "abusive ends." *RMGO*, 121 F.4th at 122-23 (emphasis added). Plaintiffs do not even argue that the Waiting Period is "abusive."

Instead, Plaintiffs say the Waiting Period Law is not really a commercial regulation because it is not a condition on whether a firearms dealer may sell a firearm and is, instead, an overly broad and arbitrary limit on the purchaser's right to acquire arms. *See* ECF No. 62, pp. 27-31. But "[o]n its face, [even a ten-day] waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay — to permit compliance with background check requirements and provide a 'cooling off' period — as a prerequisite to acquiring a gun."

---

[9] The Tenth Circuit concluded presumptively lawful commercial regulations fell under step one for multiple reasons, including that (i) placing a presumption of legality for commercial regulations in step two made little sense, where on one hand the presumption would *favor* the regulation (which plaintiffs would have to disprove under step two, where defendants otherwise bore that burden) but on the other hand still place the burden on the government to prove historical analogues—thus creating a confusing two-step analysis within step two, something wholly apart from *Bruen*'s explicit test, *RMGO*, 121 F.4th at 121; (ii) nothing in *Bruen* required assessing "regulations potentially covered by the presumption" to be analyzed under step two, *id.*; (iii) it was "inconsistent" to make step one a textual analysis but then apply an "expansive view" under step two "to infer concomitant rights" not present in the Second Amendment's language, *id.*; and (iv) since such laws presumptively do not implicate the text of the Second Amendment they do not require further inquiry into historical analogues, *id.* at 120.

*Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) (discussing, pre-*Bruen*, California's ten-day waiting period law). And, more pointedly, "[l]aws or regulations imposing conditions or qualifications . . . on the commercial sale or purchase of arms, when not employed for abusive ends, remain outside the scope of the Amendment's protections under . . . *Bruen* step one." *RMGO*, 121 F.4th at 128. Thus, both the text of the Waiting Period Law itself and the Tenth Circuit's reasoning in *RMGO* establish that a waiting period is simply a condition or qualification on a sale, and thus, a commercial regulation.

The Waiting Period Law unquestionably only applies to sellers: section 18-12-115(1), by its plain terms, makes it a civil infraction for "any person who *sells* a firearm" to "deliver the firearm" before the end of the waiting period. (Emphasis added.) It makes no provision and imposes no penalty with respect to *possessing* a firearm. Even RMGO admitted, through its corporate representative, that the Waiting Period Law only applies to sellers. *See* Ex. 10, Suppl. Rhodes Dep. Tr. 103:9-21 ("The gun shop itself is responsible for that," for "put[ting] us into a queue"). If a person does not sell a firearm, the law does not apply.

As detailed in the Governor's motion for summary judgment, the Waiting Period Law has numerous exceptions that allows for firearm transfer when a background check is not required, including on temporary bases, gifts within families, and via intestate transfer or as bequeathed through a will. *See* ECF No. 63, pp. 10, 21-22 (citing, inter alia, Colo. Rev. Stat. §§ 18-12-115(2)(c) (transfer where background check not required), 18-12-112(6)(d), (e) & (h) (temporary transfers), 18-12-112(6)(b) (gift between family members), 18-12-112(6)(c) (will or testate transfer)). The plain language of the Waiting Period Law regulates only sellers, § 18-12-

15

115(1)(a).[10] Regardless, the Waiting Period Law does not regulate the *possession* of guns, and there are numerous paths to possess a firearm that the Waiting Period Law does not cover.

The Tenth Circuit's decision in *RMGO* closes the door on Plaintiffs' argument that the Waiting Period Law is not a presumptively lawful commercial regulation. In *RMGO*, the Tenth Circuit considered a minimum age law that likewise imposed a "condition or qualification on the sale of arms," and held that as such it was a commercial regulation that "falls outside of the scope of the Second Amendment's right to 'keep and bear' arms. 121 F.4th at 119-20; *accord id.* at 128. *RMGO* concluded that the government "may still lawfully regulate firearms, as it has done for centuries." *Id.* at 113 (citing *Rahimi*, 602 U.S. at 680). "'[L]aws imposing conditions and qualifications on the commercial sale of arms' [remain] presumptively constitutional." *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27); *see also id.* at 699 (reaffirming that the "many [] prohibitions" listed in *Heller* are "presumptive lawful") (quoting *Heller*, 554 U.S. at 626-27 & n.26).

The presumption that a commercial regulation is constitutional "can be overcome" only where the *plaintiff shows* that the challenged measure has "the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola v. Hochul*, 88 F.4th 186, 195-96 (2d Cir. 2023) (discussing commercial regulations, licensing scheme, and background check requirement for purchase of ammunition). Put differently, plaintiffs must prove that the "law is so restrictive that it threatens a citizen's right to acquire firearms," *Id.* at 196, and thus that the

---

[10] Even were Plaintiffs correct, commercial regulations *still* may properly regulate purchasers, as well, where the regulation is a condition on the commercial sale. *See Heller*, 554 U.S. at 626-27 (presumptively lawful commercial regulation focus on "conditions and qualifications on the commercial sale of arms").

law is abusive. Here, Plaintiffs have not shown that the Waiting Period law has the effect of "eliminating the ability of law-abiding, responsible citizens to acquire firearms." A three-day waiting period briefly delays a sale but does not prohibit it. In fact, Plaintiff Garcia has acquired additional firearms since the Waiting Period Law went into effect. *See* ECF No. 63, p. 46 ¶ 73; ECF No. 63-3, Ex. 3, Garcia Dep. Tr. 28:22-31:5, 46:3-15. The Waiting Period Law has not prevented J.H. or S.H. from owning or acquiring a firearm. ECF No. 63-4, Ex. 4, Rhodes Dep. Tr. at 82:24-83:14, 85:17-86:4. And the Waiting Period Law, like the minimum-age law in *RMGO*, 121 F.4th at 105, has numerous exceptions allowing for acquisition outside of purchase. *See id*. at 122 (holding minimum age law was not abusive and observing that law did not "prohibit[] anyone from possessing a gun nor prohibit certain non-purchase gun transfers" and contained exceptions for military and law enforcement sales and inheritance and family gifts). Consequently, Plaintiffs' claim fails at step one, and that ends the inquiry. *See Md. Shall Issue, Inc.*, 116 F.4th at 223 (if a plaintiff fails to rebut a presumption of constitutionality at step one, the challenge fails and there is "no requirement to conduct a historical analysis under step two").

In short, the Waiting Period Law is a presumptively lawful commercial regulation on firearm sales, Plaintiffs have neither produced evidence nor rebutted that presumption. Plaintiffs' challenge to the law fails under *Bruen* step one.

III.   **The Governor presented significant evidence of historical analogues to carry the State's burden under *Bruen* step two.**

If the Court reaches *Bruen*'s second step, it must determine whether the Waiting Period Law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Step two asks whether the challenged law "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did and whether it is "comparably justified." *Id*. at

17

29. Courts consider "why" and "how" the challenged law burdens the right to keep and bear arms. *Rahimi*, 602 U.S. at 698. As set forth in the Governor's motion for summary judgment, firearm waiting period laws did not exist early in the country's history because firearm homicide and suicide rates were low, the basic government infrastructure at the time could not have supported a system of background checks and waiting periods, firearms were not available on demand, and suicide means-prevention was not understood. ECF No. 63, pp. 25-28. The Governor does not repeat that analysis here, and instead addresses the arguments Plaintiffs make in their motion.

Specifically, Plaintiffs argue summary judgment is appropriate because the "why" and "how" of the Waiting Period Law do not align with the historical analogues offered by the Governor. As the Governor demonstrated in his motion for summary judgment, and as this Court previously held in denying Plaintiffs' motion for preliminary injunction, the Waiting Period Law is relevantly similar to early firearm restrictions in "why" and "how" it burdens Second Amendment rights. *See* ECF No. 63, pp. 28-35; ECF No. 32, pp. 34-36 (holding that laws pertaining to firearm use by intoxicated persons and licensing regimes were appropriate historical analogues). The Court should reach the same conclusion here.

## A. Intoxication laws are appropriate historical analogues.

First, Plaintiffs argue that the "why" of historical laws limiting firearm use while individuals are intoxicated or imbibing "just isn't the same" because "[d]runks are dangerous. Law-abiding citizens who have passed background checks are not." ECF No. 62, p. 32. But as the Governor has demonstrated, the "why" for these laws is the same: to reduce impulsive gun violence. *See* ECF No. 63, pp. 28-33; ECF No. 32, pp. 34-36. The purpose of the Waiting Period

Law is to "help prevent impulsive acts of firearm violence, including homicides and suicides." ECF No. 18-1, § 1(2)(a). The Governor produced unrebutted evidence that waiting period laws reduce firearm homicides and suicides. ECF No. 63-1, Ex. 1, Report & Decl. of Poliquin, ¶¶ 11, 16. Further, there is unrebutted expert testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence. *See* ECF No. 31, Prelim. Inj. Hr'g Tr. 10-30-23 at 217:16-218:6 (Testimony of C. Poliquin); ECF No. 32, p. 34 (same). The "why" for historical firearm intoxication laws is the same as the Waiting Period Law, namely to reduce impulsive acts of firearm violence—as Plaintiffs apparently concede by admitting that "[d]runks are dangerous." ECF No. 62, p. 32. The Waiting Period Law and the historical intoxication laws each "work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." ECF No. 32, p. 34. They thus "impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29; *see also* ECF No. 32, p. 34.

Second, Plaintiffs argue that the "how" of the Waiting Period Law and the historical intoxication laws differ. Plaintiffs assert historical intoxication laws were more targeted, applying "only to those who were intoxicated, and only for as long as they were under the influence of alcohol." ECF No. 62, p. 33. Plaintiffs argue that, by contrast, the Waiting Period Law "is indiscriminate in its application" and "prevents a much wider swath of people than necessary from acquiring firearms they wish to possess." *Id*. But as this Court previously held, the "hows" of these laws are similar. "The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated." ECF No. 32, p.

19

34 (emphasis in original). Similarly, the Waiting Period Law imposes a brief delay on all individuals prior to taking delivery of a firearm.

Further relevant to the "how" analysis, the Waiting Period imposes a relatively small burden on the right to self-defense because the law does not infringe on the right to keep and bear firearms already in one's possession. *Cf.* ECF No. 63, p. 46, ¶ 72 (Plaintiff Garcia owns "twenty to thirty" guns, [ECF No. 63-3] Exhibit 3, Garcia Dep. Tr. 23:18-22). As another federal court held, one may easily "'opt out' of [a] waiting period [by] purchas[ing] a firearm before the instant in which it is needed." *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 212 (D. Vt. 2024). "Like alcohol restrictions which disarmed the populace 'only while intoxicated or while at a tavern,' the waiting period restricts the right to purchase a firearm only while purchasers are potentially primed to make impulsive decisions. This is a minimal inhibition on the right to armed self-defense." *Id.* (holding historical intoxication laws are appropriate analogues for Vermont's 72-hour waiting period law and upholding the same).

## B. Licensing laws are appropriate historical analogues.

Plaintiffs dispute whether licensing laws are appropriate historical analogues. At the threshold, "shall-issue" licensing regimes are presumptively constitutional. *See Bruen,* 597 U.S. at 38 n.9; *Md. Shall Issue, Inc.*, 116 F.4th at 227 ("'shall-issue' licensing laws are presumptively constitutional") (citing *Bruen*, 597 U.S. at 38 n.9 & *McRorey*, 99 F.4th at 839 ("Our law is plan as can be that some amount of time for background checks is permissible.")). Waiting periods are like "shall-issue" licensing regimes in that they require that an action be taken—delivery of a purchased firearm—after a defined requirement is met, i.e., the passage of at least three days. ECF No. 32, p. 35. With respect to the "why" of historic licensing laws, Plaintiffs argue only that

20

"licensing regimes may be intended to vet purchasers, but not for the purpose of imposing a 'cooling off' period on firearms owners." ECF No. 62, p. 32. But as this Court recognized, licensing laws support that the Founding and Reconstruction generations accepted a modest delay on the delivery of a firearm to ensure that those receiving a firearm are "law-abiding, responsible citizens." *See* ECF No. 32, pp. 34-35. Similarly, the Waiting Period Law imposes a modest delay on the delivery of a firearm to help prevent individuals from acting unlawfully and impulsively. Thus, the licensing laws and waiting period laws share the "why" of a reduction in violence. *Cf. Ortega*, 741 F. Supp. 3d at 1086 (New Mexico's waiting period law is consistent with the historical tradition of restricting firearms "out of a fear that some among these groups would use the purchased firearms to do harm").

Plaintiffs also argue that historic licensing laws and the Waiting Period Law have differing "hows." Plaintiffs assert that historic licensing laws are inherently racist and thus not suitable analogues, relying on a dissent in an out-of-circuit en banc appellate decision,[11] a 2014 law review article, and three cases from the 1800s. ECF No. 62, pp. 33-34. None of the sources relied on by Plaintiffs consider the specific historic licensing laws presented in Dr. Spitzer's

---

[11] In *Maryland Shall Issue, Inc.*, the Fourth Circuit Court of Appeals *en banc* upheld the constitutionality of Maryland's shall-issue handgun licensing law, under which Maryland is required to issue a handgun license to individuals who met the law's qualifications. 116 F.4th at 216. The Fourth Circuit held that "despite some delay occasioned by 'shall-issue' permit processes, this type of licensing law is presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are "law-abiding" persons. *Id*. (quoting *Bruen*, 597 U.S. at 38 n.9). But Plaintiffs quote a dissenting judge who would have found the law unconstitutional under *Bruen*. See Doc. 62 at 34 (citing *Md. Shall Issue, Inc.*, 116 F.4th at 251 (Richardson, J., dissenting)). In his dissent, Judge Richardson argues that *Bruen* does *not* hold that shall-issue licensing laws are presumptively constitutional. This minority view contradicts the Tenth Circuit's holding in *RMGO* that "'shall-issue' licensing regimes are "presumptively lawful." 121 F.4th at 118-19.

report, nor could they. Further, anticipating this critique, Dr. Spitzer explained that the argument that all pre-1900 licensing laws "were systematically racist" was "demonstrably false, as a plain reading of licensing laws" listed in his report "make[s] clear." *See* ECF No. 63-5, p. 22 & Exs. H and I (PDF pp. 237-358). Of the 283 licensing laws examined by Dr. Spitzer, 13 states enacted 19 laws pertaining to African Americans (all pre-Civil War), amounting to 6.7% of all licensing laws. *Id*. at p. 22. And although "these few licensing laws were race-based, the point of these laws was to license or allow (not bar) the named groups to obtain access to weapons with the issuance of a license." *Id*. Aside from laws pertaining to African Americans, at least 15 states imposed licensing requirements on other marginalized groups (labeled "Named Groups" in ECF No. 63-5, Exs. H and I), variously including Native Americans, felons, non-citizens, non-state residents, or minors. Of these, five laws pertained to Native Americans (Connecticut, Florida, Massachusetts, Missouri, and New York). *Id*. at pp. 22-23. Only a relatively small number of licensing laws relied on race-based criteria. Licensing laws are far from "systematically racist," and may serve as appropriate analogues here.

Plaintiffs also argue that many licensing laws date to Reconstruction and the Court cannot consider them under *Bruen*. But the Supreme Court has not determined whether courts should "primarily" look to Founding-era or Reconstruction-era history, *Rahimi,* 602 U.S. at 692 & n.1, and has instructed that Reconstruction-era evidence may be considered unless it conflicts with earlier evidence. *See Bruen*, 597 U.S. at 18-19, 35-36, 66 & n.28.

Plaintiffs' argument on the "how" and "why" has the effect of recasting the "means-end" assessment that *Bruen* rejected. *See id*. at 19, 22-23 (repeatedly rejecting "means-end scrutiny"). While the laws around intoxication and licensing are not historical *twins* for waiting periods,

they need not be under *Bruen* or *Rahimi*, particularly as they were animated by similar rationale and are analogous. *Cf. Vt. Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 214 (holding "the principle underlying the [waiting period] law—that individuals who might be likely to make rash decisions with a firearm should be disarmed—has precedent in this country's history of firearm regulation"). The "how" and the "why" of the intoxication and licensing laws and the Waiting Period Act are sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 29; *accord Rahimi*, 602 U.S. at 700.

**IV.    Plaintiffs do not argue, let alone establish, that they satisfy the standards for a permanent injunction.**

Despite bearing the burden of establishing the need for a permanent injunction, Plaintiffs do not address the permanent injunction factors. Their failure to do so is independently fatal to their claim. *See Celotex Corp.*, 477 U.S. at 322-23. Even putting aside this fatal flaw, they could not establish any of the prongs that would entitle them to a permanent injunction.

A party is entitled to a permanent injunction if it shows: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Crandall v. City & Cnty. of Denver*, 594 F.3d 1231, 1235-36 (10th Cir. 2010) (citation omitted). As above, Plaintiffs have failed to show actual success on the merits, particularly because they presented no evidence and cannot establish that the Waiting Period Law falls under the plain text of the Second Amendment. *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018) (proving success on the merits is the "first and most important" factor). Indeed, this Court in its Order denying a preliminary

23

injunction noted that Plaintiffs failed to carry their burden to show they were likely to succeed on the merits. ECF No. 32, pp. 13-19.

Regarding the irreparable harm factor, Plaintiffs have not shown irreparable harm. The Waiting Period Law simply does not burden Plaintiffs' right to "keep and bear arms," so there is no constitutional injury. *Cf. Free the Nipple-Ft. Collins v. City of Ft. Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (in constitutional claims, the likelihood-of-success and irreparable-harm factors collapse); *cf. also Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (constitutional violation automatically amounts to an irreparable injury).[12] The Waiting Period Law is a short, three-day delay; even assuming, arguendo, the law falls under the plain text of the Second Amendment *and* there are no appropriate historical analogues, the harm of the brief delay—which does not prohibit either acquisition or possession, or keep or carry—is significantly less weighty than the many lives saved by the Waiting Period Law. *See* ECF No. 63-1, ¶¶ 11, 16. Regardless, it is Plaintiffs' burden to establish their constitutional rights are impaired, which they have not done.

Regarding the final factors, the public interest and the harm to the nonmoving party (the Governor, on behalf of the State), those factors strongly favor rejecting a permanent injunction. *See generally Nken v. Holder*, 556 U.S. 418, 435 (2009) (last two factors largely merge when the defendant is the government). As above, the greater public interest is in the lives saved each year, as weighed against Plaintiffs' interest in immediate acquisition of firearms vis-à-vis a minor delay in collecting a gun. This is particularly true given the Colorado General Assembly's

---

[12] Although *Free the Nipple* and *Nken v. Holder*, 556 U.S. 418 (2009), both discuss preliminary injunctions, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (quotations omitted).

recognition that the public interest favors a waiting period to prevent impulsive acts of firearm violence. *See* ECF No. 18-1, §§ 1(f), 2(a)-(b); *see also Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) (State's "democratically elected representatives are in a better position than this Court to determine the public interest," and it is not the court's function "to second-guess democratic determinations of the public interest.") (quotations omitted). In short, the public interest—and the injury to the nonmoving party—is to avoid the ~100 deaths per year of Colorado citizens by gun violence. *See* ECF No. 63-1, ¶¶ 11, 16 (waiting periods yield up-to 17% reduction in firearm homicides and 7-11% reduction in firearm suicides, resulting in approximately 52 fewer gun homicide and 48 fewer gun suicides per year in Colorado). The Waiting Period Law accomplishes this, with at most a minor inconvenience that does not even implicate the Second Amendment's plain text. Plaintiffs have not even argued for, let alone established an entitlement to, a permanent injunction. That is fatal to their motion for summary judgment.

*    *    *

As detailed in the Governor's Motion for Summary Judgment, there are no genuine issues of material fact, particularly as to *Bruen* step one where Plaintiffs have not offered *any* evidence. That alone should result in summary judgment for the Governor and a denial of summary judgment as to the Plaintiffs. *See Celotex Corp.*, 477 U.S. at 322-23 (where plaintiff fails to make showing of essential element, there can be no genuine issue of material fact and summary judgment is required). And, under *Bruen* step two, the Governor has shown that the Waiting Period Law is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, and thus withstands constitutional scrutiny. Summary judgment in the Governor's favor is warranted.

25

**CONCLUSION**

This Court should deny Plaintiffs' motion for summary judgment.

**THE GOVERNOR'S RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS**

1. On April 28, 2023, Governor Jared Polis signed into law House Bill 23-1219, entitled "An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm" (the Waiting Period Law). [ECF No. 2, Motion for Temporary Restraining Order, Attach. #1 Ex A. Act, 10/1/2023, at 3].

>    **Response**: Undisputed.

2. With limited exceptions, the Waiting Period Law makes it unlawful for any person who sells a firearm to deliver it to the purchaser until three days after the seller has initiated a background check, even if a clean background check comes back sooner. The Waiting Period Law is triggered by the firearm seller's initiation of either a state or federal background check, and is unrelated to whether the individual who has purchased and acquired title to the firearm poses any individualized or genuine safety concerns. [*Id.* at SECTION 2 – C.R.S. § 18-12-115(1)(a)(I).]

>    **Response**: Undisputed.

3. By the time that the waiting period initiates, the commercial transaction has already been completed: money has been exchanged, and ownership of a firearm has passed to the purchaser. [*Id.*] (referring to a "background check of the purchaser," not at the previous point of sale) (emphasis added).

>    **Response**: Disputed. Plaintiffs incorrectly assert as fact that a commercial transaction is completed when money has been exchanged, and that is what passes ownership of the firearm to the purchaser. ECF No. 62, pp. 3-4, ¶ 3. This is incorrect as a matter of law. Colorado expressly provides that a sale is complete when title transfers from the seller to the buyer, which occurs at the time of physical delivery of the goods. *See* Colo. Rev. Stat. §§ 4-2-106(1); 4-2-401(2). A would-be purchaser does not take title—and thus ownership—of a firearm until the firearm has been physically delivered to the purchaser.

4. The Waiting Period Law became effective on October 1, 2023. [*Id.* at SECTION 3.]

>    **Response**: Undisputed.

5. Plaintiff Alicia Garcia is an adult resident of Colorado, as well as a firearms instructor, range safety officer, and social media personality who reviews firearms and provides guidance and instruction to others on the safe and effective use of those firearms. [ECF No. 30 at 16, lines 4-10.]

**Response:** Undisputed. *See* ECF No. 30, p. 16:4-15.

6. Ms. Garcia regularly purchases firearms as part of her many business endeavors. [ECF No. 30 at 16, lines 16-17.]

**Response**: Undisputed.

7. On October 1, 2023, Ms. Garcia traveled to the Triple J Armory in Littleton, Colorado, for the purpose of acquiring a new Henry Big Boy brass lever action .357/.38 Special rifle. [ECF No. 30 at 16, lines 13-25.]

**Response**: Undisputed. *See* ECF No. 30, pp. 17:7-9; 18:16-17.

8. After completing the necessary paperwork for her background check and subsequently being informed that she had passed, Ms. Garcia paid the purchase price for her firearm. [ECF No. 2, Attach. #2 Garcia Declaration, ¶ 3]

**Response**: Undisputed.

9. However, when she requested that J.D. Murphree (the owner of Triple J Armory) deliver the firearm to her, Mr. Murphree refused to do so, explaining to Ms. Garcia that due to the Waiting Period Law she could not remove the firearm from the store for three days. [ECF No. 2, Attach. #2, ¶ 4.]

**Response**: Undisputed. *See* ECF No. 2-2, ¶ 3.

10. Ms. Garcia asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Law as to why she could not receive the fire arm and take it with her. Mr. Murphree said there was none. The Waiting Period Law's requirements were the only reason he would not deliver the firearm to Ms. Garcia. [ECF No. 2, Attach. #2, ¶ 4, and ECF No. 30 at 19, lines 2-4.]

**Response**: Undisputed.

11. On October 25, 2023, Ms. Garcia drove approximately five hours, roundtrip, to the Dragonman's gun store in Colorado Springs to purchase a shotgun. [ECF No. 30 at 20, lines 1-19.]

**Response:** Undisputed.

12. Ms. Garcia intended to acquire a shotgun from Dragonman's, so that she could attend a televised shotgun shooting event in Virginia later that week—an event which would likely have provided her with business opportunities. [ECF No. 30 at 21, lines 19-25, and at 22, lines 1-5.]

27

> **Response**: Undisputed but incomplete. Ms. Garcia knew of the shotgun shoot more than three days in advance of the shoot, giving her sufficient time to purchase and collect the gun from Dragonman's before the event. ECF No. 63-3, Ex. 3, Garcia Dep. Tr. 97:14-98:3; *see also id.* at 95:9-97:25. And there were closer gun stores to her than Dragonman's. *Id*. at 30:16-31:5; *see also* ECF No. 63, pp. 46-47, ¶ 77.

13. Unfortunately, even though Ms. Garcia passed her background check, she was unable to take possession of the shotgun on October 25 due to the requirements of the Waiting Period Law. [ECF No. 30 at 21, lines 12-19.]

> **Response**: Undisputed.

14. Without this shotgun, Ms. Garcia was forced to cancel her appearance at the shotgun shooting event in Virginia. [ECF No. 30 at 21, lines 19-25, and at 22, lines 1-5.]

> **Response**: Undisputed, insofar as Ms. Garcia elected to cancel her appearance. Disputed and argumentative as to the fact that Ms. Garcia was unable to timely purchase the shotgun and that "forced" her to cancel. ECF No. 63-3 at 97:14-98:3; *id.* at 95:9-97:25.

15. Ms. Garcia intends on purchasing additional firearms in Colorado in the future. [ECF No. 30 at 20, lines 23-25.]

> **Response**: Undisputed, insofar as Ms. Garcia has affirmed she intends to purchase more guns, although she does not limit purchasing to Colorado. *See* ECF No. 30, at 20:23-25 (Q: "Do you have any additional plans to purchase firearms in the future?" A: "Yes.").

16. Plaintiff Rocky Mountain Gun Owners (RMGO) is a Colorado based nonprofit organization whose mission is to defend the right of all law-abiding individuals to keep and bear arms. [ECF No. 2, Attach. #3 Rhodes Declaration, paragraph 3]

> **Response**: Undisputed.

17. RMGO has approximately 16,000 members—most of whom reside in Colorado. [ECF No. 30 at 29, lines 16-17.]

> **Response**: Undisputed.

18. At least two RMGO members, Ms. Garcia and Taylor Rhodes, have been affected by the Waiting Period Law. [ECF No. 2, Attach. #3 Rhodes Declaration, and ECF No. 30 at 32, lines 13-25.]

> **Response**: Undisputed as to Ms. Garcia. Disputed as to Mr. Rhodes: neither the Complaint nor Mr. Rhodes's Declaration, submitted on behalf of RMGO as an organization, identifies him either as being personally affected or as a representative

28

RMGO member. *See* ECF No. 1, ¶ 1 (identifying other members); ECF No. 2-3, ¶ 4 (identifying other members). Mr. Rhodes did testify that he purchased a gun on October 1, 2023, and had to collect it three days later. ECF No. 30, at 32:21-25.

19. On October 1, 2023, Mr. Rhodes—who at the time was the Executive Director of RMGO—attempted to purchase a firearm from the Triple J Armory. [ECF No. 30 at 30, lines 7-8.]

>    **Response**: Undisputed.

20. Although Mr. Rhodes paid the purchase price for the firearm and passed his background check, he was unable to take possession of the firearm at that time. In fact, due to travel, he was unable to take possession of the firearm until eight days later. [ECF No. 30 at 30, lines 1-10, and at 33, lines 1-7.]

>    **Response**: Undisputed.

21. On the issue of standing, in its previous Order Denying Plaintiffs Motion for Preliminary Injunction, this Court held:

Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. .. She has been impacted by the Act's waiting period and will be in the near future. ... She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does.

[ECF No. 32 at 6, ¶ 2 and fn 3.]

>    **Response**: Undisputed. This Court additionally determined that "RMGO's case for standing is less developed" and "there are no allegations that any identified member of RMGO, including Mr. Rhodes, will suffer harm[.]" ECF No. 32, p. 6 n.3.

22. In their effort to establish that the Waiting Period Law is in line with this nation's historical tradition of firearms regulation, the defense has offered the expert opinion of Professor Robert Spitzer. [ECF No. 18, Brief in Opposition to Motion for Temporary Restraining Order and for Preliminary Injunction, #3 Exhibit 3, Spitzer Declaration, 10/17/2023.]

>    **Response**: Undisputed.

23. As outlined in his curriculum vitae and expanded on during his deposition testimony, Professor Spitzer has been previously retained to offer an expert opinion in over 50 firearms related cases. [Spitzer Deposition Transcript at 19, lines 18-24,and ECF No. 18, #3, Ex. A to Spitzer Dec: CV.]

**Response**: Undisputed.

24. In all of these cases, Professor Spitzer worked on behalf of the proponent of the firearms regulation that was being challenged; and in every case, he concluded that there was an historical analogue to support the law. (Q. … Correct me if I'm wrong here, but in each and everyone of those cases, you've been an expert witness on behalf of the government—or probably better said, you've been an expert witness on behalf of the proponent of the firearms regulation that was being challenged; is that correct? A. The defender of various firearms laws, yes. … Q. In any of those 50 cases that you've been asked to research or review historical gun laws, have you ever come up with the problem of saying there is no analogous historical gun law to support whatever the current regulation that's being challenged is? A. No.). [Spitzer Deposition Transcript at 20, lines 6-13, and at 21, lines 14-20.]

> **Response**: Undisputed. Professor Spitzer further testified that he is:

> > not being retained to render a judgment about the constitutionality of these laws because that's up to the judge or magistrate. But I began researching historical gun laws over ten years ago now. And at that time, I was dumbstruck by how many old gun laws there were, and I continue to be startled by the sheer number and variety of early laws. So, when I'm approached to investigate . . . to see if there are historical weapons laws that might be relevant to a modern law, there's quite a pool of laws to parse. And I have, you know, found all kinds of laws that echo modern laws.

> ECF No. 62-1, Pl.'s Ex. A, Spitzer Dep. Tr. 20:19-21:8.

> Professor Spitzer further testified that with respect to the cases in which he had been retained to render an expert opinion, "I've offered . . . bodies of laws that seem to me to logically be relevant to or similar to modern laws. But, again, that's a judgment call [for the trier of fact]." *Id*. at 21:21-25.

25. Professor Spitzer does not believe that the Second Amendment confers an individual right to bear arms aside from government-based military or state militia service activity. (Q. Would it be fair to say that you … disagreed with the Supreme Court's decision in [the *Heller*] case? A. Yes. Q. In fact—and I went through and reviewed some of your writings and work actually going back all the way to the 1990s, but it's clear that you have been consistent in your opinion that the Second Amendment does not confer an individual right to bear arms aside or apart from any sort of government-based military or militia service activity. A. Yes.). [*Id.* at 45, lines 15-25, and at 46, line 1.]

> **Response**: Disputed and non-material. Plaintiffs assert as fact that Professor Spitzer does not believe the Second Amendment imparts a constitutional right for citizens to keep and bear arms. ECF No. 62, p. 7, ¶ 25. That is not accurate. While Professor Spitzer noted his

30

personal view, particularly pre-*Heller*, that he did not believe the Second Amendment provided such a broad right and that he personally disagreed with the holding, he unequivocally affirmed that that right is the law of the land. Ex. 11, Spitzer Dep. Tr. 67:7-16 ("[T]hat is what the law is today. That's what the law was as of 2008. So there's no dispute about that. I do not dispute that.").

26. During his deposition testimony, Professor Spitzer acknowledged that although firearms were readily available for individual acquisition and use during the Founding Era, government-imposed waiting periods did not exist in the United States at that time or for the next 150 years. (Q. But fair to say that guns were common in the United States at the founding? [] A. Yeah, common's kind of a vacuous term, but certainly there were guns to be had. If you wanted to have a gun, you could surely, you know, obtain one. [*Id.* at 102.] (Q. … But regardless of how an American in 1790 acquired a firearm, you know, either from a gunsmith, from—imported from Europe, homemade, fill in the blank, there was no government-imposed waiting period at this time, correct? A. No, not to my knowledge.) [*Id.* at. 102, lines 17-22, and at 110, lines 3-8.]

> **Response**: Disputed as to Plaintiffs' statement that "firearms were readily available for individual acquisition and use during the Founding Era." To the contrary, Professor Spitzer opined that "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s" and that "Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." ECF No. 63-5, Ex. 5, Report & Decl. of Spitzer ¶¶ 11-12. Further, Professor Spitzer testified at his deposition, in response to questioning by Plaintiffs' counsel, that delays in acquiring a gun were inherent in the Founding era:
>
> > Q: [I]f I'm understanding correctly, the first reason why waiting periods were not common, that you offered in your report, was the assertion that founding -- during the Founding era, it wasn't very easy to get your hands on a firearm in the first place. It's not like today where you have, you know, sporting goods stores or a gun dealership or—I don't even know if Walmart sells guns anymore, but Walmart to go down to and buy a gun if you want to, right? It was a different era. Am I understanding that correctly? A: Yeah. I mean, there were guns around, to be sure. But one might reasonably understand that it would take some period of time to obtain a firearm.
>
> *See* ECF No. 62-1 at 102:2-16.
>
> And further, Professor Spitzer testified that while at times, "arms were certainly readily available, although we also know that there were chronic arms shortages as governmental leaders reported, from the revolutionary period up through the first part of the 19th century." Ex. 11 at 92:5-10.

Undisputed that a government-imposed waiting period did not exist in the United States until 1923. ECF No. 30 at 39:8-13.

27. This fact was subsequently reiterated by the Plaintiffs' expert witness, Professor Lee Francis, who similarly asserted that "while firearms were generally accessible and available to the public both in small and individual sales and in bulk quantities, neither required a waiting period." [Francis Report and Declaration at 7, ¶ 18.]

**Response**: Disputed for the reasons stated immediately above.

28. The first law to impose any type of waiting period to acquire a firearm was not enacted until 1923 in California. In that instance, California imposed a one-day delay for retail handgun purchases, so that firearms dealers would have time to identify the purchaser to local law enforcement agencies for their record keeping. [ECF No. 30 at 39, lines 6-13.]

**Response**: Undisputed.

29. Professor Spitzer asserts that there are two categories of Founding Era laws that are analogous to Colorado's three-day waiting period law: (1) laws pertaining to intoxication, and (2) laws pertaining to weapons licensing "[b]ecause both involved mechanisms or activities or things that, wrapped up within them, included delays with respect to a weapons use or obtaining or the like." [Spitzer Deposition Transcript, at 70, lines 19-25, and at 71, lines 1-5.]

**Response**: Undisputed.

30. In his Declaration, as well as in his deposed testimony, Professor Spitzer asserted that Founding Era intoxication laws are an analogous historical parallel to modern waiting period laws, since they prevented firearm acquisition or use only for a limited period of time—the period of actual intoxication. Sobriety usually lifted the barrier to gun access within a day or so, if not within a matter of hours. "Because intoxication is by its nature temporary, it interrupts gun access only temporarily, as is the case with waiting periods. Moreover, old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment. These purposes also mimic the purpose of modern waiting period." [ECF No. 18, Attach. #3 Exhibit 3, Spitzer Declaration at 6, Section III – "Guns and Intoxication."]

**Response**: Undisputed.

31. While there was a condition precedent that needed to be in place before the restrictions of firearms related intoxication laws would be triggered—namely, the inebriation of the person seeking to acquire, possess or use a firearm—there is no condition precedent required for Colorado's three-day waiting period. It applies universally, regardless of the physical state, mental state or personal history of the person seeking to acquire a firearm. ([Regarding the intoxication laws] Q. They were intoxicated. There was a condition that they could either avoid

32

or cure through sobriety, and then they could take possession of the firearm. … What's the condition, though, for someone in Colorado who passes the background check? So we're not talking about waiting for --to determine if they're prohibited. A. Well, that's a condition, isn't it? Q. It is a condition, but they've passed it....What is the condition then that's in place to prevent them from taking possession of the firearm for three days? A. Well, it's because state law stipulates three—72 hours. Q. Correct. But it's not based on any specific condition of the person trying to purchase the firearm. A. Well, it's based on a public policy goal. Q. I understand that. It's not based on a condition like the intoxication laws are, correct? A. Well, I—well, I would just say that the definition of similar to is not identical. And I think similar to is a reasonable metric). [Spitzer Deposition Transcript, at 135, lines 17-25, and at 136, lines 1-16.[13]]

> **Response**: Disputed and not a material fact. In the quoted portion of Professor Spitzer's testimony, Professor Spitzer testified that the condition precedent to the 72-hour waiting period is seeking to purchase a firearm. Ex. 11 at 129:19-22. Professor Spitzer did not agree with Plaintiffs' counsel's assertion, stated in Plaintiffs' Motion for Summary Judgement, that "there is no condition precedent required for Colorado's three-day waiting period." ECF No. 62, p. 14 ¶ 31. This "Statement of Undisputed Material Fact" is argument of counsel, not fact.

32. Professor Spitzer was unable to identify any intoxication-related weapons laws from the Founding Era (or even during the Reconstruction Era) that prohibited the <u>acquisition</u> of a firearm by an intoxicated person; instead, the laws he cite dealt with the <u>possession and use</u> of an already acquired firearm while intoxicated. [ECF No. 18 at #5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws.]

> **Response**: Disputed. Plaintiffs fail to cite to the final version of Professor Spitzer's report (which is found at ECF No. 63-5') and instead rely on a version produced in connection with the preliminary injunction hearing (i.e., ECF No. 18). Professor Spitzer's report identifies laws in Delaware (1911 and 1919) and Mississippi (1878, 1880, and 1908) that prohibited sales of guns to intoxicated individuals. Ex. 11 at 142:15-17 (explaining that at Exhibit B to his report, "[t]he third column is you can't sell guns to people who are drunk"); ECF No. 63-5, PDF pp. 95-97.

33. Plaintiff expert Professor Francis offers expert testimony that, of the numerous intoxicated-related weapons laws enacted between the 1600s and the early 1900s that Professor Spitzer identified, only two states implemented laws which prohibited firearm sales to those who were intoxicated. [Francis Report and Declaration at 10, ¶ 27, and at 13, ¶ 37.]

> **Response**: Undisputed as to the assertion that Professor Spitzer's report, at Exhibit B, identifies laws in Delaware (1911 and 1919) and Mississippi (1878, 1880, and 1908) that prohibited sales of guns to intoxicated individuals. Disputed as to Professor Francis's statements, but this statement is not a material fact. Professor Francis's opinion regarding

---

[13] *See* ECF No. 62-1 at 135:13-136:16.

the "relevant historical period under *Bruen*" is not a fact; it is legal opinion and/or or argument.

34. Professor Spitzer confirmed during his deposition testimony that up until the early 20th century, the only two states that implemented laws which prohibited firearm sales to those who were intoxicated were Mississippi in 1878, and Delaware in 1911. (Q. … So let me ask this question. As I'm looking at that table [in your report], of all these laws that are listed and the states that were passing intoxication-related laws, how many states prohibited firearm sales to those who were intoxicated? A. Well, … it's totaled at the bottom. … [I]t looks like just two states. I see Delaware and Mississippi. … Q. The only two states that passed laws that related to the status of the person who was purchasing the firearm, basically the status or condition of the person at the time they were trying to obtain the firearm originally, were Delaware and Mississippi; is that correct? A. With respect to sale, yes.). [Spitzer Deposition Transcript, at 143, lines 17-25, 144, lines 1-6, and at 145, lines 10-16[14]; and ECF No. 18 at #5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws.]

> **Response**: Undisputed that Professor Spitzer's report, at Exhibit B, identifies laws in Delaware (1911 and 1919) and Mississippi (1878, 1880, and 1908) that prohibited sales of guns to intoxicated individuals. ECF No. 63-5, PDF pp. 95-97.

35. Based on his review of historical state laws regulating firearm use and intoxication, Professor Francis reached a similar conclusion. "None of the historical statutes from the Founding Era cited in Professor Spitzer's report indicate a similar intrusion on the right to bear arms. To put it another way, merely being intoxicated during the Founding Era would not have prohibited an individual from obtaining a firearm . . . [only their] *use* of a firearm while intoxicated." [Francis Report and Declaration at 8, ¶ 21.]

> **Response**: Disputed, but this is not a material fact. Professor Francis's evaluation of historical analogues identified by Professor Spitzer amounts to a legal opinion and/or argument. Further, Professor Francis admitted at his deposition that he never reviewed the final report submitted by Professor Spitzer. Ex. 12, Suppl. Francis Dep. Tr. 47:8-53:5) (Francis testified that he signed his expert report on August 28, 2024 and did not revise it thereafter; the Governor produced its expert reports to Plaintiffs on August 30, 2024); *id.* at 173:7-175:21 (Francis testified that he reviewed Professor Spitzer's report produced in connection with the motion for preliminary injunction).

36. In addition to intoxication laws, Professor Spitzer also proffered that Founding Era weapons licensing or permitting laws offer an analogous historical parallel to modern waiting period laws. In his Declaration, Professor Spitzer wrote:

While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process

---

[14] *See* ECF No. 62-1 at 143:17-144:1; 145:10-16

whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application or permission to do something is submitted (such as a hunting license [application]) and the license or permission is granted. [ECF No. 18, Attach. #3 Exhibit 3 at 20, ¶ 33.[15]]

> **Response**: Undisputed that Professor Spitzer's expert report and declaration, produced in connection with the preliminary hearing, contains these statements (ECF No. 18-3). The full report produced by Professor Spitzer is found Exhibit 5 to the Governor's Motion for Summary Judgment, ECF No. 63-5.

37. Professor Spitzer's expert opinion is that firearms licensing regimes, which typically include a separate administrative process, are sufficiently analogous to waiting period laws because they both impose some delay on the acquisition of a firearm. (Q. The waiting period law in this case requires no application process, correct? A. If you say so. But that's not the key fact. The key fact is the passage of time.) [Spitzer Deposition Transcript at 160, lines 15-18.]

> **Response**: Undisputed. However, this asserted fact does not capture, in full, Professor Spitzer's reasoning. As stated in his expert report:
>
>> By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods, in that they are a more nuanced and sophisticated policy tool to winnow out those who might pose a threat with possession of a firearm. In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand.
>
> ECF No. 63-5, ¶ 33.

38. Unlike the Waiting Period Law, licensing regimes generally involve a specific approval process that relates to an individual's circumstances. (Q. --But the weapons licensing laws, the ones you reference, required some sort of application process of some sort, correct? A. Right.) [*Id.* at 160, lines 10-14.]

> **Response**: Undisputed.

---

[15] *See* ECF No. 18-3, pp. 15-16.

35

39. It was not until 1885 that a licensing law was enacted in the United States that required individuals to obtain a permit before acquiring a firearm. (Q. Well, to your last point, it appears, based on my scanning of the table, is that there's only one such law under that category of Seller Registers Buyer that occurred in the 19th century, in the late 19th century. That was Illinois. It appears that all the other similar laws were passed in the 20th century, based on my review. Does that seem right? A. I believe that's right, yep.). [*Id.* at 167, lines 13-21.]

> **Response:** Undisputed.

40. The vast majority of other licensing laws cited in Professor Spitzer's report related to individuals who already acquired a firearm, but who were seeking permission to carry or use the firearm in some unique or additional manner (e.g. concealed carry). (Q. … It seems like the vast majority of the laws under the Carry or Have category that you outlined in your report … [w]ith rare exception, they all appeared to be related to concealed carry permits of some sort. A. I think the majority of them are or were. I think that's right. I mean, I would want to, you know, parse that more specifically …. Q. So … In those situations, the person who's applying for that permit, they already have the firearm in their possession. A. Some of them were possession. I think the majority—I think the majority of the laws I examined here, they already had the weapons.) [*Id.* at 169, lines 20-25, and at 170, lines 1-11.]

> **Response**: Undisputed. *See* ECF No. 65-5, at PDF pp. 236-40.

41. None of the Founding Era weapons licensing laws cited by Professor Spitzer in his Report required someone to delay taking possession of a firearm. [ECF No. 18 at #5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws; and Francis Report and Declaration at 21-22, ¶ 65.]

> **Response**: Disputed. Professor Spitzer explained that "By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted . . . . In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand." ECF No. 63-5, ¶ 33.

42. As Professor Francis noted, "[e]ven when a permit or license [was] required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm regardless of whether he'd be permitted to hunt." [Francis Report and Declaration at 21-22, ¶ 65.]

> **Response:** Disputed and not a material fact. Professor Francis's evaluation of historical analogues identified by Professor Spitzer is not a fact, it is legal opinion and argument. Further, Professor Francis admitted at his deposition that he never reviewed the final report submitted by Professor Spitzer. Ex. 12 at 47:8-53:5) (Professor Francis testified that he signed his expert report on August 28, 2024 and did not revise it thereafter; the

Governor produced its expert reports to Plaintiffs on August 30, 2024); *id*. at 173:7-175:21 (Francis testified that he reviewed Professor Spitzer's report produced in connection with the motion for preliminary injunction). Further, Professor Spitzer explained that "By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted . . . . In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand." ECF No. 63-5, ¶ 33.

43. Of the approximately 265 weapons licensing laws Professor Spitzer examined and included in his report, 41 of those laws were specifically targeted at either African Americans or other targeted groups. [ECF No. 18 at #5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws, and Spitzer Report and Declaration at 22, ¶¶ 36 and 37.]

> **Response**: Disputed. Plaintiffs cite to the version of Professor Spitzer's report produced in connection with the motion for preliminary injunction, i.e., ECF No. 18. Professor Spitzer's final report states:
>
>> Of the 283 licensing laws examined here, at least 13 states enacted 19 laws pertaining to African Americans (all pre-Civil War), equaling just 6.7% of all licensing laws. Even though these few licensing laws were race-based, the point of these laws was to license or allow (not bar) the named groups to obtain access to weapons with the issuance of a license . . . . Aside from laws pertaining to African Americans, at least 15 states imposed licensing requirements on other marginalized groups (labeled "Named Groups" in Exhibits H and I), variously including Native Americans, felons, non-citizens, non-state residents, or minors. Of these, five of those laws pertained to Indigenous people (Connecticut, Florida, Massachusetts, Missouri, and New York).
>
> ECF No. 63-5, ¶¶ 36-37.

44. Of the pre-Civil War examples included in Professor Spitzer's "Table of Weapons Licensing Laws," the weapons licensing laws directed at African Americans were solely concerned with the government controlling "when enslaved persons or free persons of color were allowed to have possession of weapons." [Spitzer Report and Declaration at 22, ¶¶ 36 and 37; ECF No. 18 at #5 Exhibit 5, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws.]

> **Response**: Undisputed. *See* ECF No. 63-5, ¶ 64.

45. Such was also the case for licensing laws that pertained to other racial and ethnic minorities—both before and after the Civil War and Reconstruction Era:

The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances. [Spitzer Report and Declaration at 40-41, ¶ 65.]

     **Response**: Undisputed. *See* ECF No. 63-5, ¶ 65.

46. Although these laws were "indisputably racist," proponents of these licensing regimes were able to legally justify them at that time on the basis that they were intended to keep firearms out of the hands of potentially "dangerous people." [Francis Report and Declaration at 22-23, ¶ 69.]

     **Response**: Undisputed.

47. Professor Christopher Poliquin, who has also been retained as an expert witness for the defense, has provided a declaration and testimony in this case related to a research study he conducted which analyzed the impact of waiting period policies that impose a delay between the purchase and receipt of a handgun on firearm violence, homicide, and suicide rates. The study reviewed 45 years (1970 to 2014) of relevant firearm violence data that had been collected from all 50 states and the District of Columbia. [ECF No. 31, Transcript of Preliminary Injunction Hearing, Vol. 2 at 200, lines 23-25, and at 201, lines 1-9.]

     **Response**: Undisputed.

48. Professor Poliquin's study concluded that waiting period laws that delay the receipt of a purchased handgun may reduce gun-related homicides by as much as 17 percent and gun-related suicides by as much as 11 percent. [*Id.* at 201, lines 10-20.]

     **Response**: Undisputed.

49. Although this was a quantitative, multivariable assessment of American handgun waiting period laws over a 45-year period, the effect of the following items were not considered or implemented as "control variables" as part of the study:

a. The fluctuating crime rates and incarceration rates of the individual states over the 45-year study period were not used as control variables. (Q. … [D]id you include the overall crime rate of the individual states as one of the control variables in the study? A. No. Q. How about the incarceration rates in each of the states? A. No.) [Poliquin Deposition Transcript at 35, lines 19-25.]

     **Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization,

black population, and seven age groups." ECF No. 63-1, Report & Decl. of Poliquin, PDF p. 15. The same control variables were used in related leading studies. Ex. 13, Poliquin Dep. Tr. 33:15-23.

b. The overall number of law enforcement officers in each state over the 45-year study period was not used as a control variable. (Q. And did you control for the number of law enforcement officers in a given area or in a given state, whether urban or suburban or rural? A. No, no.) [*Id.* at 36, lines 1-4.]

> **Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23.

c. The Violent Crime Control in Law Enforcement Act passed by Congress and signed into law by President Bill Clinton in 1994 was also not considered or used as a control variable in the study, even though its crime-fighting provisions were implemented nationwide in the middle of the study period. (Q. I just want to make it clear, though, that that piece of legislation or any specific piece of [federal crime] legislation was not used as a control variable in the study? A. Correct, not explicitly entered as a—as a variable.) [*Id.* at 48, lines 1-6.]

> **Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23. Professor Poliquin further testified that in his opinion, the Violent Crime Control in Law Enforcement Act "has very little impact on my study's conclusions" because the study controls for a federal law that could potentially reduce gun violence because the study, by design, compared "changes over time in a control group versus changes over time in a treatment group." *Id*. at 105:20-106:14.

d. California's 1994 "Three Strikes law", as well as similar "tough on crime" legislation passed by dozens of states between 1994 and 2004, was not used as a control variable in the study. (Q. And were you aware that after California implemented the Three Strikes Law in 1994, 26 other states had passed and implemented similar tough-on-crime laws by 2004, 10 years later? A. I was not aware of that, no. Q. And that would be a period of time, 1994 to 2004, that fell right in between your study period, correct? A. That period overlaps in my study period, correct. Q. And these tough-on-crime initiatives that were passed by a majority of states in this country during that period … were … not a control variable that you considered, correct? A. Correct.) [*Id.* at 78, lines 4-18.]

39

**Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23. Further, in response to Plaintiffs' counsel's questioning, Professor Poliquin testified that his study used statistical models to "reestimate the models that are used in table 1 of . . . the main paper text [by] add[ing] additional control variables to the analysis for other gun policies that may have been in place across different states during [the] study period." *Id*. at 79:12-18. Further, Professor Poliquin testified that if California's Three Strikes Law "had no effect on crime" it would have "very little impact" on the study results, *but* "[t]o the extent that we think California's Three Strikes Law reduced gun homicide, it would potentially mean that the estimates in my study are . . . more conservative" and that the waiting period in California resulted in even greater reductions gun homicide. *Id*. at 103:2-104:11.

e. At the end of the Brady Act interim period in 1998, with the implementation of the NICS instant background check system, approximately 10 states abandoned the waiting periods that they had previously imposed to ensure sufficient time to conduct federally mandated background checks. The study did not analyze what impact, if any, the loss of those waiting periods had on the gun related homicide or suicide rates in those states. (Q. And I know that the -- the Brady [Act] period that you were focused on was approximately four years, correct? A. Correct. Q. So '94 to '98, approximately. So let me ask this then: In the four years that followed—so now we're looking at 1999 to 2003, … did the study discover or notice a rebound … in gun homicides or gun-related suicides in the states that abandoned the waiting periods that had existed during Brady? A. We didn't specifically look at that.) [*Id.* at 93, lines 1-12.]

**Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23.

f. The study did not analyze or consider "time-to-crime" statistics as a control variable. (Q. Okay. And . . . multiyear crime data show that the average is over six years between when a firearm is acquired and when it is used for criminal activity. Would—does that surprise you, hearing it's that length of time? A. A statistic of six years does not surprise me, no. Q. Were … these time-to-crime statistics or data related to the length of time between when a firearm is acquired and when it is used, … for a criminal purpose, were they considered as part of your study, these statistics? A. We did not analyze time-to-crime in our study, no.) [*Id.* at 99, lines 13-25, and 100, lines 1-3.[16]]

---

[16] This discussion occurred on pages 98-99 of Professor Poliquin's deposition. Defendant has included these relevant pages for the Court's benefit in Exhibit 13.

**Response**: Undisputed and non-material. Professor Poliquin's study used a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23. Further, Professor Poliquin testified that "the ATF has said . . . that time-to-crime stats cannot be used to really draw strong inferences about the population of guns that are used in crime, and . . . that's largely because those stats are not a random sample of crime guns. They're . . . a sample of guns that law enforcement felt the need to trace." *Id*. at 108:13-19. Professor Poliquin testified that "time-to-crime" has "no implications or significance" to the conclusion that waiting periods reduce gun homicides and suicides. *Id*. at 108:20-109:3.

> Q: So with that in mind, what significance, if any, does time-to-crime have on your study? A. My opinion is that it has essentially no implications or significance for the conclusions of my study, and the opinion expressed in my expert report that waiting periods reduce gun homicides and suicides. Q. So just to be clear, average time-to-crime does not impact your study? A. No.

50. Although 44 states and the District of Columbia had a waiting period of some type in place during the period of the study (1970 to 2014), the nature, purpose and/or length of each of those waiting periods was not considered by Professor Poliquin or his associates in their study. (Q. Okay. But just so I'm clear, the . . . nature and type of the waiting period was not a control variable in the study. A. No. Q. So, for example, we just spoke about whether the waiting period applies to all transactions or some was not considered, correct? A. Correct. Q. And whether the waiting period was related to permitting or licensing or some other delay requirement was not considered either, correct? A. Correct, no. That's right.) [*Id.* at 66, lines 15-25, and 67, lines 1-3.]

> **Response**: Undisputed and non-material. Professor Poliquin's study employed a regression analysis and "time-varying state-level control variables that may influence rates of gun violence, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups." ECF No. 63-1, PDF p. 15. The same control variables were used in related leading studies. Ex. 13 at 33:15-23.

Respectfully submitted: June 20, 2025

PHILIP J. WEISER
Attorney General

*s/* Joseph G. Michaels
*Joseph G. Michaels\**
Assistant Solicitor General

*s/* Emily Burke Buckley
*Emily Burke Buckley\**
Assistant Solicitor General
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: joseph.michaels@coag.gov
        emily.buckley@coag.gov
*Attorneys for Defendant Governor*
  *Jared S. Polis*
\*Counsel of Record

**THE GOVERNOR'S EXHIBIT INDEX**
**FOR RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

| 10 | Suppl. Excerpts from Rhodes Dep. Tr. |
|----|--------------------------------------|
| 11 | Excerpts from Spitzer Dep. Tr. |
| 12 | Suppl. Excerpts from Francis Dep. Tr. |
| 13 | Excerpts from Poliquin Dep. Tr. |